# EXHIBIT 2



IN THE MATTER OF THE ARBITRATION ACT 1996

AND

IN THE MATTER OF AN ARBITRATION


B E T W E E N :-

## PACIFIC GULF SHIPPING CO. LTD

Claimants
(Time Charterers)

-   and –


## ADAMASTOS SHIPPING & TRADING S.A.

Respondents
(Owners)

"ADAMASTOS"

Charterparty dated 8th April 2014


---

### FIRST FINAL ARBITRATION AWARD

---


W H E R E A S:-


1.      By a contract contained in and evidenced by a fixture recapitulation dated 8th April

2014 for a time charterparty on an amended NYPE form, the Claimants

(hereinafter referred to as "the Charterers") chartered the "ADAMASTOS" from the Respondents (hereinafter referred to as "the Owners") for a time charter of a minimum of 90 days up to a maximum of 180 days.

2.  The fixture recapitulation contained expressly agreed terms with the contractual terms otherwise to be found in a charterparty dated 15th January 2013 between Adamastos and Milestone logically amended. That charterparty provided that should any disputes arise between the parties, they were to be referred to arbitration in London, each party appointing an arbitrator and a third being appointed by the two so chosen.

3.  Disputes arose between the parties as detailed hereafter. On 31st July 2015 Clyde & Co. LLP, the Charterers' solicitors, appointed me, Mark William Hamsher of 18c Ensign Street, London E1 8JD, as the arbitrator nominated on behalf of the Charterers. By a letter dated 4th August 2015 Clyde & Co. advised the Owners of my appointment and called upon them to appoint their arbitrator within 14 days. That letter was served on the Owners on 13th August 2015 in accordance with an order of the Liberian Commercial Court.

4.  By a letter dated 27th August 2015 Clyde & Co. advised the Owners that if they did not appoint their arbitrator within seven clear days, they would appoint me as sole arbitrator in accordance with the Arbitration Act 1996. That letter was served on the Owners on 28th August 2015 in accordance with an order of the Liberian Commercial Court.

5. On 4th September 2015 Clyde & Co., on behalf of the Charterers, appointed me as the sole arbitrator in respect of all disputes arising under the charterparty dated 8th April 2014. The time limits provided to the Owners to appoint their arbitrator complied with the requirements laid down in the Arbitration Act 1996. No objection to my acting as sole arbitrator was taken at the time or indeed at any time prior to the publication of this final award. The seat of the arbitration is in London.

6. The Charterers claimed declarations entitling them to damages of approximately US$32 million primarily as a result of claims made against them arising out of the vessel's arrest and subsequent detention at the load port of Sao Francisco Do Sul, Rio Grande, the abandonment of the vessel's contractual voyage and the subsequent sale of the cargo on a distressed basis. Details of the Charterers' claims were set out in claim submissions dated 6th June 2016 and supporting documentation prepared by Clyde & Co. The claim submissions will be considered below. They were served on the respondent Owners on 7th July 2016 pursuant to an order of the Liberian Commercial Court.

7. On 31st August 2016 I set out directions for the service of defence submissions and what would happen if defence submissions were not served. The letter was addressed to the respondent Owners and was in the following terms:-

> *"I refer to the claim submissions dated 6th June 2016 that were served on you on 4th July 2016 pursuant to an order of the Commercial Court in Montserrado County.*

*Clyde & Co., the solicitors acting for the claimants, have advised me that defence submissions have not been served. In accordance with my obligations under section 33 of the Arbitration Act 1996, I must therefore now lay down a timetable for the finalisation of the reference.*

*As you may know, the normal period for service of defence submissions in LMAA arbitrations is 28 days from receipt of the claim submissions.*

*Bearing in mind the time that has already elapsed since service of the claim submissions on you on 4th July, I hereby order that defence submissions be served within 14 days of service on you of this order.*

*Obviously in the event of your encountering difficulties in complying with that time limit, there is liberty to apply for an extension of it. However, in the event of neither defence submissions nor a request for a time extension being received by the time limit now laid down in this order, then a final and peremptory order will come into effect requiring service of your defence submissions within a further period of 21 days.*

*To avoid any misunderstandings, I must make it clear that the time limit laid down in the final and peremptory order would not be one that could be extended save in truly exceptional circumstances. Assuming that no such application is*

*made, then on expiry of that time limit you would be precluded from serving*
*defence submissions and, on the application of the claimants, I would proceed to*
*my award on the basis of the documents then before me, excluding any*
*submissions served after expiry of the time limit.*

*Naturally I hope that it will not come to that and that you will serve defence*
*submissions within the time limit laid down in this order or, if that is not*
*realistically possible, apply for an extension of the time limit.*

*I look forward to hearing further from you or Clyde & Co. in due course."*

8.    My letter was served on the Owners on 15th September 2016 pursuant to an order
of the Liberian Commercial Court.

9.    Unfortunately, no submissions were ever received from or on behalf of the
respondent Owners. However, I was satisfied that the respondent Owners had
been given every reasonable opportunity of serving submissions and I could
properly proceed to my award even in the absence of any submissions. However,
in the absence of any defence submissions it was appropriate for me to scrutinise
the Charterers' claims particularly closely and I did so.

10.   The "ADAMASTOS" is a 1995 built bulk carrier with a deadweight of 73,506
metric tons on a draft of about 13.767 metres. In the head charterparty she was
described as flying the Liberian flag.

11.    The claimant Charterers sub-chartered the vessel to Intergis Co. Ltd. ("Intergis") who in turn sub-chartered the vessel to Marubeni Corporation ("Marubeni") to carry 60,000 metric tons 10% more or less in Owners' option of HSS in bulk (intention soya beans) from one safe port out of a range of ports including Sao Francisco Do Sul, Rio Grande to one safe port in north or south China. In the claim submissions it was explained that Marubeni subsequently became the owners of the cargo and/or the cargo was shipped at their risk.

12.    On 5th August 2014, while the vessel was still loading at Sao Francisco Do Sul, Rio Grande, she was inspected by Port State Control. The inspectors identified 42 defects, the last of which concluded:-

> *"Maintenance of the ship and equipment – There are clear evidences that the ship does not comply with the ISM Code requirements".*

At the end of the list of deficiencies the inspectors added a note:-

> *"This inspection was not complete and the deficiencies listed here may not be exhaustive. It is recommended that a thorough inspection is carried out by the renowned [sic] organization and that all A/S deficiencies are remedied before a new inspection is requested."*

A copy of the original Spanish report and an English translation of the report are attached to this award as Appendix I.

13. Prior to the completion of loading, at about 1855 hours local time on 6th August 2014, while the vessel was still loading her cargo, she broke free of her moorings and drifted towards the middle of the channel with the ebb tidal current and grounded at about 1930 hours local time. At about 1130 hours local time on 7th August the vessel re-floated with the assistance of pilots and tugs, the tugs belonging to Rebras - Rebocadores do Brasil SA. The vessel was shifted to an inner anchorage to the north of the berth.

14. At the time of the grounding, no bills of lading had been issued for the 59,674.680 metric tons of soya beans that had been loaded. No damage was suffered by the vessel or the cargo on board as a result of the grounding. However, some of the vessel's mooring lines were damaged when the vessel broke free or her moorings. There was a balance of cargo to be loaded of approximately 3,600 metric tons of soya beans.

15. The terminal at which the vessel had previously been berthed would not allow the vessel to re-berth without (a) a letter of guarantee for BRL1 million and (b) an approved berthing plan. Given the Port State Control deficiencies and the resulting detention of the vessel, she was ordered to anchor at the outer anchorage by the Sao Francisco Do Sul port captain. She sailed to the outer anchorage on 9th August 2014 where she remained anchored in the open sea approximately six miles from the port. She remained there until 23rd April 2015. Because of the deteriorated condition of the cargo, Marubeni concluded a distressed sale of the

cargo to CRC Cargo Recovery Consultants, who arranged for the vessel to be towed to Cadiz where the cargo was discharged and sold.

16.     At the time Marubeni were represented by the New York attorneys, K&L Gates LLP. By an email dated 12th January 2015 and in a subsequent email dated 26th January 2015, K&L Gates advised the English solicitors acting for Intergis, Davies Johnson & Co., that Marubeni considered that the voyage to China had been abandoned.   They advised that Marubeni were attempting to negotiate a distressed sale of the cargo and would hold Intergis liable for damage to the cargo as well as for other losses and expenses.

17.     In an email of 24th April 2015 the claimant Time Charterers' solicitors, Clyde & Co., advised the Owners' then solicitors, Swinnerton Moore, that the Time Charterers accepted the Owners' breaches of the charterparty relating to the condition of the vessel and at the very least acquiescing in the vessel sailing from Sao Francisco Do Sul on the instructions of CRC Cargo Recovery Consultants as continuing repudiatory breaches of the charterparty which they accepted as terminating it.

18.     There were a number of factors which, both in isolation but above all in combination, led to the abandonment of the contractual voyage and the distressed sale of the cargo.

19.     Firstly, there was the physical condition of the vessel. Reference has already been made in paragraph 11 above to the 42 defects identified by the Port State Control inspectors during their inspection of 5th August 2014.   Item 23 recorded that

generator number 2 was inoperative. Item 24 recorded that generator number 1 was leaking oil and could not produce power greater than 100kw. The emergency generator could only generate 300 volts when it should have been generating 440 volts and its frequency meter was damaged. In any event, in accordance with all Classification Society Rules, an emergency generator is intended to be reserved for emergencies and should not be considered as part of the vessel's power generating capacity. Even though the vessel was forced to use her emergency generator, a lack of fuel oil and lubricating oil meant that the generator could not operate for more than five hours a day. (The claim submissions referred to three main generators not working. Although it was not clear from the documentation whether the vessel was equipped with two or three main generators, it was clear that none of the main generators was functioning properly and, wholly inappropriately, the crew were dependent on using the emergency generator on a routine, non-emergency basis). In addition, the boiler was not functioning.

20.   The Port State Control inspectors found that the compressors of all the winches were dirty with hydraulic oil. The Charterers alleged that, in addition, the mooring winches were either broken or heavily corroded. They also alleged that the vessel's mooring ropes were old, in bad condition and long overdue for replacement. The absence of properly working generators limited the efficient operation of the mooring winches and tending of the moorings. That was said to be one of the reasons why the vessel broke her moorings and grounded on 6th August 2014.

21. On 26th November 2014 RINA issued a ship's status report listing twelve of the defects identified by the Port State Control inspectors as being outstanding class and/or statutory recommendations.

22. On 29th December 2014 the vessel was re-inspected by Port State Control who confirmed that many of the deficiencies previously identified remained unrectified and identified seven further deficiencies. The inspectors concluded:-

> *"The [sic] is clear evidence the ship does not substantially comply with the requirements of ISM Code."*

23. Secondly, there were problems with the crew who had not been paid for five to seven months. The crew made a formal complaint to the ITF on 23rd September 2014 and a complaint by the crew to the harbour master was passed to various federal bodies in Brazil including the Ministry of Labour. On 21st November 2014 they complained to the harbour master that the vessel had no or insufficient fuel, lubricating oils, provisions and water and they requested repatriation and medical assistance. The Labour Prosecutor's Office commenced proceedings on or about 26th November 2014 against the vessel and/or the respondent Owners and the agents for an order that the master and crew be permitted to leave the vessel. Relations on board deteriorated so that on 27th November a Greek superintendent employed by the respondent Owners as well as a Greek electrician had been locked inside a cabin until released by the police.

24. Between Christmas and the New Year, seven Indonesian crew members were repatriated by the American P&I Club. On 24th January 2015 the master and the remaining crew left the vessel and were repatriated by the American P&I Club. The Owners left the vessel unmanned and the Brazilian Navy and/or Maritime Agency placed their own personnel on board and took possession of the vessel.

25. According to the claim submissions, the Labour Prosecutor's Office obtained a court order against the Owners and the vessel which imposed an initial fine of US$19,000.00 per day, subsequently increased to US$150,000.00 per day for non-compliance with the earlier court order obtained by the Labour Prosecutor's Office. It was not clear from the claim submissions and supporting documentation to what extent the fines were actually imposed (and collected) as opposed to threatened, but even the threat of substantial fines accruing on a daily basis would doubtless have assisted in securing compliance. In any event, it is to be inferred from the evidence that the master and crew would have focused on surviving as best they could despite the increasing defects on board the vessel and understandably their primary concern would have been the recovery of unpaid wages and repatriation rather than repairing the defects in the vessel's equipment or maintaining the condition of the cargo.

26. Thirdly, the condition of the cargo deteriorated because it was not adequately ventilated. On 15th September 2014 a local surveyor appointed by Intergis found that the average temperature of the cargo was between 18° and 21° centigrade. A subsequent survey on 12th November 2014 found that the average temperature had

increased to between 23° and 26° centigrade. A further inspection on 15th December 2014 found that the temperature had increased again to between 25° and 31° centigrade. Specifically in hold number 1 the cargo temperature was 28° centigrade. That hold was slack and the condition of the cargo was recorded as *"Foul smell – large quantity of live and dead insects in the surface and larvas in way of inner hatch coaming"*. In cargo hold number 7 the cargo temperature was 31° centigrade. Again this was a slack hold and the cargo condition was described as *"Strong foul smell. Live and dead insects and a specific area of burnt cargo on a depth of at least 1 metre by way of port side aft part"*.

27.    The respondent Owners failed to ensure that the crew ventilated the cargo adequately by opening the hatches every day. This would have required either the repair of the vessel's main generators or the installation of portable generators to allow the opening and closing of the hatch covers so that ventilation could take place each day.

28.    It was also the case of the claimant Time Charterers that once it became clear that the cargo of soya beans would not be carried to China, the respondent Owners should have arranged for it to be fumigated and subsequently discharged at the load port of Sao Francisco Do Sul, Rio Grande or at the closest convenient suitable port.

29.    Fourthly, there were a number of lawsuits against the Owners and the vessel which, unless the claims were settled or security was provided, prevented the vessel from sailing.

30.     On 13th October 2014 the salvors, Rebras – Rebocadores do Brasil SA, commenced an action claiming US$1,078,512.00 in respect of the salvage and on 13th or 14th October the vessel was arrested to provide security for their claim.

31.     On 16th October 2014 the local agents, Sagres Agenciamentos Maritimos, arrested the vessel as security for their claim of US$160,000.00.

32.     On 4th November 2014 Kronos Maritime Agent Ltd. arrested the vessel for their claim for US$8,250.00 in respect of unpaid agency fees.

33.     On 3rd January 2015 the master and the crew commenced an action in the Brazilian courts against the vessel, her Owners and agents seeking payment of unpaid wages. The court ordered the arrest of both the vessel and her cargo.

34.     In addition to the various arrest orders, the declared position of the Owners was that they did not have the financial means enabling the vessel to complete the contractual voyage.   On 21st November 2014 the Owners' then solicitors, Swinnerton Moore, set out the expenses which they considered would have to be paid before the vessel could re-berth and complete her Port State Control re-inspection. The expenses were:-

| | | |
|---|---|---|
| SMIT berthing and salvage expenses/pilots/agency | US$ | 1,700,000.00 |
| Owners' protecting agents | US$ | 75,000.00 |
| Crew wages since the casualty | US$ | 300,000.00 |
| Total | US$ | 2,075,000.00 |

In the same email they advised that the Owners were not in a position to cover those expenses. Obviously with the passage of time the expenses only increased.

35. What were the contractual rights and obligations of the Owners and the claimant Charterers? The charterparty contract dated 8th April 2014 contained many of the standard NYPE clauses.

Lines 21 to 22 of the preamble provided:-

> " *Vessel on her delivery to be tight, staunch, strong and in every way fitted for the service ...*"

Clause 1 provided:-

> *"That the Owners shall ... pay for the insurance of the vessel ... and maintain her class and keep the vessel in a thoroughly efficient state in hull, machinery and equipment with inspection certificates necessary to comply with current requirements at ports of call and canals for and during the service ..."*

Clause 8 provided:-

> *"That the Captain shall prosecute his voyages with the utmost despatch and shall render all customary assistance with ship's crew and boats ..."*

Clause 15 provided:-

> *"That in the event of the loss of time from deficiency and/or default of men or deficiency of stores, fire, breakdown or damages to hull, machinery or equipment, grounding ... or by any other [cause] whatsoever preventing the full working of the vessel to the Charterers, the payment of hire and overtime shall cease for the time thereby lost ..."*

Clause 40 provided:-

> *"The vessel's equipment shall comply with the regulations and/or requirements in effect at port or ports of call and canals and countries in which the vessel will be employed. The Owners also guarantee that the vessel shall be at all times in possession of valid and up-to-date certificates on board to comply with such regulations and/or requirements ..."*

Clause 51 provided:-

> *"Should the vessel be captured or seizured or detained or arrested by any authority or by any legal process during the currency of this Charter Party, the payment of hire shall be suspended until the time of her release, unless such capture or seizure or detention or arrest is occasioned by any personal act or*

*omission or default of the Charterers or their Agent or vessel's normal operation are not affected. Any extra expenses incurred by and/or during the above capture or seizure or detention or arrest shall be for Owners' account."*

Clause 59 provided that the Clause Paramount, the US Clause Paramount, Canadian Clause Paramount *"wherever applicable, shall be deemed to fall part of this charterparty"*.

36. It was the Charterers' case that the grounding, the need for salvage assistance and the deterioration in the condition of the cargo were caused by the Owners' breaches of lines 21 to 22 and clauses 1, 8 and 40 of the charterparty in that:-

(1) The vessel as not suitable in all respects for the loading, carriage and discharge of the cargo from South America to China; and/or

(2) The vessel was not tight, staunch, strong and in every way fitted for service under the charterparty or for the voyage and/or was not seaworthy and/or was not properly manned, equipped and supplied; and/or

(3) The vessel did not comply with the regulations and/or requirements in effect at the port or ports of call and/or the countries in which it was to be employed; and/or

(4) The vessel was not at all times in possession of valid and up-to-date certificates on board to comply with such regulations and/or requirements.

(5) The Owners were in breach of their obligation to ensure that the vessel would proceed on her voyage with utmost despatch.

37.     It was the Charterers' case that the Hague/Hague Visby Rules were incorporated into the charterparty by clause 59. The Charterers argued that the Owners were in breach of their obligations, pursuant to Article III Rule 1, to make the ship seaworthy, properly manned, equipped and supplied and make the holds fit and safe for the reception, carriage and preservation of the cargo. They also argued that the Owners were in breach of their obligation, pursuant to Article III Rule 2, to properly and carefully keep and care for the goods carried and to deliver these goods at the discharge port in the same good order and condition as they were upon loading on to the vessel.

38.     As has already been recited, the Owners failed to serve any defence submissions. However, the evidence relied upon by the Charterers was so overwhelming that it is difficult to conceive of any points that could validly be raised in response to the factual and legal allegations advanced on behalf of the Charterers. I had little hesitation in concluding that the Owners were indeed in breach of their charterparty obligations as alleged by the Charterers. Furthermore, the Owners were subsequently in repudiatory breach of the charterparty because they: (1)

failed to take any or any adequate steps to remedy the deficiencies in the vessel; and/or (2) failed to complete the loading of the vessel; and/or (3) failed to commence the voyage to China; and/or (4) failed to carry the cargo laden on board the vessel to China with utmost or reasonable despatch or at all; and/or (5) abandoned the vessel and/or the contractual voyage and/or the carriage of the cargo and the cargo itself; and/or (6) failed to deliver the cargo at the contractual discharge port.

39.     What were the financial consequences of these breaches?

40.     Marubeni sought to recover from Intergis losses that they said that they had suffered in arbitration proceedings that they had commenced against Intergis. In turn, Intergis sought to pass these claims on to the Charterers in arbitration proceedings that they had commenced against the Charterers.

41.     It was Marubeni's case that an affiliated company had bought on their behalf 60,000 metric tons of Brazilian soya beans in bulk on FOB terms. That was the cargo that was intended to be loaded on board the "ADAMASTOS". It was Marubeni's case that they would have sold the cargo in China for US$36 million. The cargo was sold to CRC for US$3.35 million. Marubeni therefore claimed a net loss of US$32.65 million.

42.     Marubeni, as owners of the cargo at the relevant time, were also under a potential liability to Rebras – Rebocadores de Brasil SA either for salvage or remuneration.

43.    In these arbitration proceedings the Charterers sought a declaration that they were entitled to be indemnified against any liability to Intergis for its liability to Marubeni.   They also sought a declaration that they were entitled to be indemnified against any liability they have towards Rebras – Rebocadores de Brasil SA or other third parties in Rio Grande.

44.    It was right that the Charterers should only seek a declaration of their entitlement in principle because neither Marubeni's claims nor the potential liability of Intergis had yet been established.   However, given the Owners' breaches of the charterparty, it was clear that the Charterers would be entitled to recover from the Owners any liability that they, the Charterers, incurred towards Intergis for claims advanced against Intergis which were reasonably settled by Intergis.

45.    In addition, Intergis claimed freight of US$760,912.24 from the Charterers that they would have earned under their sub-charter with Marubeni.

46.    In addition, Intergis advanced claims against the Charterers for overpaid hire and bunkers which in turn the Charterers claimed from the Owners.   The Charterers had invoiced Intergis for the first instalment of hire under the sub-charterparty on 31st July 2014 and it was paid by Intergis on 4thAugust 2014.  However, the vessel was off-hire between 6th August 2014 at about 1855 hours local time when the vessel broke free from her moorings at the loading berth and 23rd April 2015 at 1355 hours local time when the vessel sailed from Rio Grande under the orders of CRC.  The vessel had therefore been on hire to Intergis only from 31st July 2014 at 0001 hours to 6th August 2014 at about 1855 hours local time.  Intergis therefore

claimed overpaid hire from the Charterers in the net amount of US$98,823.78 together with C/E/V of US$448.04. In addition, Intergis had paid for bunkers in the amount of US$675,600.00. On the basis of the consumption warranted in the recapitulation email of *"2.5 mt IFO 380 CST ÷ 1 mt if boiler required"*. Intergis calculated that the vessel had consumed bunkers to a value of US$12,418.98 until the vessel went off-hire on 6th August 2014.

47.    When the vessel was towed to Cadiz following the sale of the cargo to CRC it was impossible to remove the remaining fuel oil and sell it separately. Intergis therefore sold the balance of the remaining bunkers to CRC. Integis therefore claimed US$663,180.00 as the value of 1,105.30 metric tons of fuel oil, but gave a credit of US$25,000.00 for the sale price to CRC, giving rise to a net claim in respect of fuel oil purchased but not consumed for the account of Intergis and less the price paid by CRC in the amount of US$638,180.00.

48.    In principle given the breaches of charterparty for which the Owners were liable, the Charterers were entitled to an indemnity in respect of claims awarded to Intergis or reasonably settled with Intergis in respect of overpaid hire and bunkers consumed when the vessel was off-hire, but as with Marubeni's claims relating to the losses relating to the cargo, it was appropriate to deal with the Charterers' claims for an indemnity in respect of any liability to Intergis by way of declaration; the Charterers' rights to an indemnity could only be quantified once the sums that they owed to Intergis were established.

49.    However, it was appropriate to include in the declarations a declaration as to the Charterers' rights to interest from the date of this award because this award fixes the liability of the Owners.

50.    Although the Charterers did not obtain an award for quantified claims, they nevertheless obtained the declarations confirming the liability of the Owners and it was therefore appropriate that the Owners should bear their own and the Charterers' costs relating to this award as well as the costs of my award.

51.    NOW I the said Mark William Hamsher, having taken upon myself the burden of this reference, having carefully and conscientiously considered the written evidence and arguments submitted to me, DO HEREBY MAKE, ISSUE AND PUBLISH this my FIRST FINAL AWARD as follows:-

A)    I FIND that the Charterers are entitled to declarations that they can recover an indemnity from the Owners in respect of any liability towards Marubeni and/or third parties and/or Intergis both in respect of losses suffered by Intergis themselves and/or sums that Intergis have had to pay to Marubeni either pursuant to an award or under a reasonable settlement.

B)    I THEREFORE AWARD, ADJUDGE AND DECLARE that the Charterers are entitled to be indemnified by the Owners against the following liabilities:-

(i)    Any and all liability that the Charterers have or might be found to have or might in the future reasonably incur to Marubeni and Rebras - Rebocadores do Brasil SA for salvage and/or remuneration;

(ii)   Any liability that the Charterers have or might be found to have or might in the future reasonably incur in respect of Intergis's liability to Marubeni for losses claimed by Marubeni in relation to the deterioration in the condition of the cargo leading to its distressed sale;

(iii)  Any liability towards Intergis that the Charterers have or might be found to have or might in the future reasonably incur in respect of payments made for hire not earned and bunkers not consumed when the vessel was on hire;

(iv)   Any liability that the Charterers have or might be found to have or might in the future reasonably incur towards any third parties in Rio Grande or elsewhere arising out of the grounding of the vessel and subsequent deterioration in the condition of the cargo and its distressed sale.

C)   I FURTHER AWARD AND ADJUDGE that the Charterers shall be entitled to compound interest on any sums payable to them under paragraph B above at the rate of 5% per annum compounded at three monthly rests from the date of this award until the date of payment.

D)     I FURTHER AWARD AND ADJUDGE that the Owners shall bear their own and the Charterers' costs of the reference, the latter, if not agreed, to be assessed by me in an award of costs, I hereby reserving my jurisdiction as necessary.

E)     I FURTHER AWARD AND ADJUDGE that the Owners shall bear the costs of this my first final award in the amount of £5,530.00 PROVIDED that if, in the first instance, the Charterers shall have borne any part of the said costs of this my final award, they shall be entitled to immediate reimbursement by the Owners of the sum so paid.

F)     I FURTHER AWARD AND ADJUDGE that the Charterers shall be entitled to compound interest on any sums payable to them under paragraphs D and E above at the rate of 5% per annum compounded at three monthly rests from the date of this award until the date of payment in respect of sums due under paragraph D and from the date of payment until the date of reimbursement in respect of sums due under paragraph E.

G)     I DECLARE that this award is FINAL as to the matters herein determined, but I reserve to myself the right to make a further award or awards as may be appropriate in respect of other outstanding differences between the parties to this reference, including but not restricted to quantification of the sums payable pursuant to the declarations for liability set out above.

GIVEN under my hand in London this 19th day of April 2017

Mark Hammler
Sole Arbitrator

# APPENDIX I

RELATÓRIO DE INSPEÇÃO DE NAVIO

PORT STATE CONTROL



DIRETORIA DE PORTOS E COSTAS
Rua Teófilo Otoni, 4 - Centro
Rio de Janeiro - RJ - Brasil - Cep: 20090-070
Phone: 21 2104-5880 / Fax 21 2104-5228

Original: Comandante
Cópia: Agente da Autoridade Marítima

| 2 | Nome do navio: ADAMASTOS | | 6 | Número IMO :9087266 | |
|---|---|---|---|---|---|
| 10 | Data da Inspeção :05/08/2014 | | 11 | Local da Inspeção:Rio Grande (Brasil) | |
| No. | Cod. IMO | Natureza da deficiência (1) | | Convenção | Ação Tomada (2) |
| 1 | 14122 | Proteção dos tanques combustível - A MAIOR PARTE DAS BANDEJAS DE CONTANÇÃO DE ÓLEO DO CONVÉS PRINCIPAL NÃO TEM PLUG DE VEDAÇÃO. | | MANU/R12A | 17 - 12 - 10 |
| 2 | 10117 | Ecobatímetro - O EQUIPAMENTO NÃO REGISTRA O FUNDO E O PAPEL DO TAMBOR NÃO ESTÁ GIRANDO. | | S - V / 19.2.3.1 | 17 - 10 |
| 3 | 14501 | Lixo - EXISTE MUITO LIXO NO PASSADIÇO E TAMBÉM NOS CONVESES EXTERNOS (ACONDICIONADOS EM TAMBORES) - DEVEM SER REMOVIDOS ANTES DA PARTIDA. | | Res A1052(27)/A7/S18 | 17 - 10 |
| 4 | 02117 | Corrosão em Convés - MUITOS RODETES DO CONVÉS ESTÃO TRAVADOS POR CORROSÃO E NÃO GIRAM MANUALMENTE. DEVEM SER LUBRIFICADOS. | | S - I / 11 | 17 - 10 |
| 5 | 13107 | Outras (Máquinas) - GE LO ST TANQUE ESTA COM ÓLEO NA BANDEJA E O PISO ENFRENTE ESTA ESCORREGADIO MUITO SUJO DE ÓLEO | | MARPOL AN I | 17 - 10 |
| 6 | 09201 | Ventilação e Aquecimento - TANQUE DO AQUECEDOR ESTA FURADO | | ILO 92 - ART. 4, 7, 8 | 17 - 10 |
| 7 | 09130 | Água / Redes / Tanques - TANQUE AGUA DE BEBER COM VALVULA FURADA | | ILO 92 - ART. 13 | 17 - 10 |
| 8 | 09232 | Limpeza da Praça de Máquinas - EM GERAL A PRAÇA DE MAQUINAS ESTA SUJA COM MUITO MATERIAIS JOGADOS E LIXO | | S - II-1 / 26.7 | 17 - 10 |
| 9 | 09232 | Limpeza da Praça de Máquinas - TODOS OS PISOS DA PRAÇA DE MAQUINAS EST~~AO SUJOS DE ÓLEO E ESCORREGADIOS | | S - II-1 / 26.7 | 30 - 10 |
| 10 | 07110 | Dispositivos (equipamento geral) - EXISTEM 3 EXTINTORES PORTATEIS SOLTOS PRÓXIMO A CALDEIRA | | S - II-2 C 10 | 17 - 10 |
| 11 | 13107 | Outras (Máquinas) - CALDEIRA COM VAZAMENTO DE COMBUSTIVEL E COM ÓLEO NA BANDEJAS COM FISCO DE INCENDIO | | S-II-1 C/26 | 30 - 10 |
| 12 | 04110 | gerador de Emergencia - O EQUIPAMENTO ESTÁ GERANDO APENAS 300 VOLTS QUANDO DEVERIA GERAR 440 VOLTS. O FREQUENCÍMETRO ESTÁ AVARIADO. | | S - II-1/FMP | 30 - 10 |
| 13 | 13107 | Outras (Máquinas) - CALDEIRA COM VAZAMENTO D'AGUA PELA REDE AO LADO QUEIMADOR | | S-II-1 C/26 | 17 - 10 |
| 14 | 07110 | Dispositivos (equipamento geral) - EXTINTOR FALTANDO NO CABIDE F14 PRÓXIMO A CALDEIRA | | S - II-2 C 10 | 17 - 10 |
| 15 | 08104 | Alarme do Sistema do Governo - TANQUE S/G OIL TURBO 188 ESTA COM A BANDEJA CHEIA DE ÓLEO | | S - II-1 / 29 MODU 89 CAP 7 / 7.5 | 17 - 10 |
| 16 | 09127 | Limpeza - MÃO DO LEME MUITO SUJA DE ÓLEO IHID | | ILO 92 - ART. 13 | 17 - 10 |
| 17 | 07120 | Meios de Escapo - FALATA CABO E CINTO N SAIDA EMERG DA PRAÇA DE MAQUINAS | | S - II-2 / 13 | 17 - 10 |
| 18 | 04102 | Bomba de Incêndio Emergencia e suas redes - COMPARTIMENTO COM AGUA EMBARCADA E COM VALVULA DE DESCARGA SEM MANUTENÇÃO | | S - II-2/10.2.2.3 | 17 - 10 |
| 19 | 09229 | Guinchos e Cabrestantes - COMPRESSORES DA POPA SUJO DE ÓLEO HIDRAULICO | | ILO 134 | 17 - 10 |

1 de 3

| 20 | 13101 | Máquina de Propulsão Principal - PURIFICADORES DE ÓLEO LUB # 1 E 2 ESTÃO INOPERANTES | S - II-1 / 26.3 | 30 - 10 |
| 21 | 13101 | Máquina de Propulsão Principal - PURIFICADOR ÓLEO COMB MCP # 1 E 2 ESTÃO INOPERANTES | S - II-1 / 26.3 | 30 - 10 |
| 22 | 13107 | Outras (Máquinas) - SALA PURIFICADORES COM PISO MUITO SUJO DE ÓLEO - RISCO DE INCÊNDIO | S-II-1 C/26 | 17 - 10 |
| 23 | 13102 | Máquinas Auxiliares - MCA # 2 ESTÁ INOPERANTE | S - II-1 / 27 | 17 - 10 |
| 24 | 13102 | Máquinas Auxiliares - MCA # 1 APRESENTA VAZAMENTOS DE ÓLEO E CONTÉM ÓLEO NA BANDEJA DE CONTENÇÃO - O GERADOR NÃO PRODUZ POTÊNCIA MAIOR QUE 100 KW | S - II-1 / 27 | 30 - 10 |
| 25 | 13107 | Outras (Máquinas) - EXISTE MUITO ÓLEO JUNTO AO CASCO NO DECK DOS MCA PRÓXIMO AOS REFRIADORES MCA'S - RISCO DE INCÊNDIO | S-II-1 C/26 | 17 - 10 |
| 26 | 13107 | Outras (Máquinas) - CALDEIRA BOMBA ALIMENTADORA DE ÁGUA # 2 ESTÁ INOPERANTE | S-II-1 C/26 | 17 - 10 |
| 27 | 13107 | Outras (Máquinas) - BOMBA DE ALIMENTAÇÃO CALDEIRA # 1 ESAT VAZANDO MUITA ÁGUA | S-II-1 C/26 | 17 - 10 |
| 28 | 13107 | Outras (Máquinas) - TUBULAÇÃO DE VAPOR DO CONDENSADOR ESTA SEM MANUTENÇÃO E SEM O VOLANTE DA VÁLVULA | S-II-1 C/26 | 17 - 10 |
| 29 | 13107 | Outras (Máquinas) - COMPRESSORES DE AR - ÁREA E BANDEJAS COM MUITO ÓLEO - RISCO DE INCÊNDIO | S-II-1 C/26 | 30 - 10 |
| 30 | 13107 | Outras (Máquinas) - RESFRIADOR # 1 DOS COMPRESSORES DE AR ESTA INOPERANTE | S-II-1 C/26 | 17 - 10 |
| 31 | 13103 | Operação de Máquinas - POWER UNIT FOR V/V REMCCOM SYS ESTA COM A BANDEJA CHEIA DE ÓLEO | S - II-2 / 14 | 17 - 10 |
| 32 | 13101 | Máquina de Propulsão Principal - DETECTOR DE FUMAÇA DO CÁRTER ESTA INOPERANTE | S - II-1 / 26.3 | 30 - 10 |
| 33 | 07113 | Bombas de Incêndio - BOMBA # 1INCÊNDIO, ESGOTO E SERV GERAIS ESTA VAZANDO MUITA ÁGUA PELO SELO | S - II-2 C 10 | 17 - 10 |
| 34 | 13104 | Dispositivos de Esgoto de Porão - EJECTOR BOMBA ESAT INOPERANTE | S - II-1 / 21 -1.3 | 30 - 10 |
| 35 | 09104 | Ventilação / Aquecimento - SISTEMA AR CONDICIONADO CENTRAL ESTA INOPERANTE | ILO 92- ART.7e 8 | 17 - 10 |
| 36 | 13107 | Outras (Máquinas) - TANQUE COMBUSTÍVEL WILZ BE VAZANDO MUITA ÁGUA PELA REDE DE VAPOR | S-II-1 C/26 | 17 - 10 |
| 37 | 14608 | Incinerador e manual operações e instruções - INCINERADOR INOPERANTE | M/ANV/R16(2) | 17 - 10 |
| 38 | 14119 | Misturas Oleosas e Hidrocarbonetos provenientes da Praça de Máquinas - PORÃO CONTENDO MISTURA OLEOSA | R. A 767(10) CAP .3.5.53 | 17 - 10 |
| 39 | 13101 | Máquina de Propulsão Principal - RESFRIADOR ÓLEO MCP ESTA VAZANDO ÁGUA SALGADA PELAS PLACAS | S - II-1 / 26.3 | 17 - 10 |
| 40 | 13101 | Máquina de Propulsão Principal - TUBULAÇÃO DESCARGA PARA O MAR DO RESFRIADOR ÓLEO MCP ESTA FURADA | S - II-1 / 26.3 | 17 - 10 |
| 41 | 09215 | Outros(espaços de trabalho) - O PISO DO COMPARTIMENTO DA PROA ESTA SEM MANUTENÇÃO E LIMPEZA E FALTA DE ILUMINAÇÃO EM DUAS LUMINARIAS | ILO 132 | 17 - 10 |
| 42 | 15109 | Manutenção do Navio e Equipamentos - O NAVIO TEM CLARAS EVIDENCIA QUE NÃO CUMPRE COM OS REQUISITOS DO ISM CODE | ISM - 10.2 | 19 - 30 - 10 |

Órgão emissor: CAPITANIA DOS PORTOS DO RIO GRANDE DO SUL.
Telefone: 53 3233-6119 53 3233-6184    Fax: 53 3233-6300 53 3233-6188

EDUARDO GÜNTHER
Inspetor Naval
Assinatura: _____

Ubirabi Pereira de
Magalhães
Inspetor Auxiliar



1 - Esta Inspeção não foi completa e as deficiências listadas podem não ser exaustivas. É recomendado que uma inspeção completa seja realizada pela organização reconhecida e que todas deficiências A/S sejam retificadas antes que seja feita uma solicitação para reinspeção.

2 - Ações tomadas listadas no verso.

SHIP INSPECTION REPORT

PORT STATE CONTROL

Directorate of Ports and Coasts

Rua Teófilo Otoni, 4 – Centro

Rio de Janeiro – RJ – Brazil – CEP 20090-070

Phone: 21 2104-6680/ Fax: 21 2104-5228

Original Copy: Master

Copy: Maritime Authority Agent

| 2 | Name of Ship: ADAMASTOS | | 6 | IMO number: 9087259 | |
|---|---|---|---|---|---|
| 10 | Date of inspection: August 5, 2014 | | 11 | Place of inspection: Rio Grande (Brazil) | |
| No | IMO Code | Nature of deficiency (1) | | Convention | Action taken (2) |
| 1 | 14122 | Protection of fuel tanks - Most of the oil containment trays of the main deck has no sealing plug. | | M/AN// R12A | 17-12-10 |
| 2 | 10117 | Echo Sounder - The equipment does not record the bottom and the drum paper is not rotating. | | S-V/19.2.3.1 | 17-10 |
| 3 | 14501 | Garbage- There is much garbage on the bridge and external decks (packed in barrels). They must be removed before departure. | | Res A1052(27)/A7/S1 8 | 17-10 |
| 4 | 02117 | Corrosion in Deck- Many rollers on deck are jammed due to corrosion and they do not turn manually. They must be lubricated. | | S-I/11 | 17-10 |
| 5 | 13107 | Other (Machines)- GE CO SF tank has oil on tray and the floor in front of it is slippery and dirty with oil. | | MARPOL AN I | 17-10 |
| 6 | 09201 | Ventilation and heating - The heating tank is bored. | | IL092-ART 4, 7, 8 | 17-10 |
| 7 | 09130 | Water/Networks/Tanks- The valve of the potable water tank is bored. | | IL092- ART. 13 | 17-10 |
| 8 | 09232 | Cleaning of Engine Room - in general, the Engine Room is dirty with lots of materials scattered and trash. | | S-11-1/26.7 | 17-10 |
| 9 | 09232 | Cleaning of Engine Room - All floors of the engine room are dirty with oil and slippery. | | S-11-1/26.7 | 30-10 |
| 10 | 07110 | Devices (general equipment) -There are 3 portable fire extinguishers loose next to the boiler. | | S- II -2C10 | 17-10 |
| 11 | 13107 | Other (Machines)- Boiler with fuel leak and oil on trays with risk of fire. | | S- II -1 C/26 | 30-10 |
| 12 | 04114 | Emergency Generator - The equipment is generating only 300 Volts, when, actually, it should be generating 440 Volts. The frequency meter is damaged. | | S- II-1/R42 | 30-10 |
| 13 | 13107 | Other (Machines)- Boiler with leak of water through the network next to the burner. | | S-II-1 C/29 | 17-10 |
| 14 | 07110 | Devices (General equipment) - Lack of fire extinguisher in hanger F14 near the boiler. | | S - II-2 C 10 | 17-10 |
| 15 | 08104 | Government Alarm System - Tray of tank S/G OILTURBO T68 is full of oil | | S-11-1/29MODU 89 Chapter 7/7.5 | 17-10 |

1

January 20, 2015 2:03 PM

| 16 | 09127 | Cleaning - Rudder machinery is dirty with oil HID | ILO B2 - Section 13 | 17-10 |
|----|-------|---|---|---|
| 17 | 07120 | Means of Evacuation - Lack of cables and harness at the emergency exit of the engine room. | S-11-2/13 | 17-10 |
| 18 | 34102 | Emergency fire pump and its networks - compartment with water onboard with relief valve with no servicing. | S - II-2/10.2.2.3 | 17-10 |
| 19 | 09229 | Winches and capstans - Aft compressors dirty with hydraulic oil | ILO134 | 17-10 |
| 20 | 13101 | Main propulsion machine - Lub oil purifiers No. 1 and 2 are not operating. | S-II-1 / 26.3 | 30- 10 |
| 21 | 13101 | Main Propulsion Machine - Oil Purifier COMB MCP Nos. 1 and 2 are not operating. | S - II-1 /26 3 | 30- 10 |
| 22 | 13107 | Other (Machines)- Floor of Purifier Room is dirty with oil - Risk of fire | S -II-1 C/26 | 17-10 |
| 23 | 13102 | Auxiliary machines- MCA # 2 is inoperative. | S-II-1/27 | 17-10 |
| 24 | 13102 | Auxiliary machines-MCA# 1 has oil spills and there is oil in the containment tray. The generator does not produce power greater than 100 KW. | S-II-1 /27 | 30-10 |
| 25 | 13107 | Other (Machines)- There is too much oil next to the hull, on the deck of the MCA close to MCA's Coolers - Risk of Fire | S-I-1 C/26 | 17-10 |
| 26 | 13107 | Other (machines)- Water feeding pump of Boiler No. 2 is inoperative. | S-I-1 C/26 | 17-10 |
| 27 | 13107 | Other (machines) - There is a lot of water leaking from the feeding pump of boiler No. 1. | S-II-1 C/26 | 17-10 |
| 28 | 13107 | Other (Machines)- The steam pipe of condenser has no servicing and and there is no valve wheel. | S-II-1 C/26 | 17-10 |
| 29 | 13107 | Other (Machines) - Air compressors - area and trays have much oil - Risk of fire | S-II-1 C/26 | 30-10 |
| 30 | 13107 | Other (machines)- Cooler No. 1 of air compressors is inoperative | S-II-1 C/26 | 17-10 |
| 31 | 13108 | Machine operation- The tray of the power unit for VA/REMOCOM Sys is full of oil. | S-II-2/14 | 17-10 |
| 32 | 13101 | Main propulsion engine - Smoke detector of the crankcase is inoperative. | S-II-1 /26.3 | 30-10 |
| 33 | 07113 | Fire pumps- Fire, Sewer and General Serv Pump No. 1 is leaking much water through the seal. | S-I-2C10 | 17-10 |
| 34 | 13104 | Hold sewage devices - Pump ejector is inoperative. | S-11-1 / 21 -1.3 | 30-10 |
| 35 | 09104 | Ventilation/Heating- Central Air Conditioning System is inoperative. | ILO92-ART.7e5 | 17-10 |
| 36 | 13107 | Other (Machines)- There is a large leak of water in fuel tank Wilzbe through the steam network. | S-II-1 C/26 | 17- 10 |
| 37 | 14606 | Incinerator and operations manual and instructions- Incinerator is inoperative. | M/ANVI/R16(2) | 17-10 |
| 38 | 14119 | Oily mixtures and hydrocarbons from the Engine Room - Hold with oily mixture. | R, A 787(19) CAP 3.5.53 | 17-10 |
| 39 | 13101 | Main propulsion machine- Oil cooler MCP is leaking saltwater through the plates. | S-II-1/26.3 | 17-10 |
| 40 | 13101 | Main propulsion machine- The pipeline that discharges into the sea of the oil cooler MCP is pierced. | S-II-1 / 26.3 | 17-10 |
| 41 | 09215 | Other (workspaces)- The floor of the bow compartment has no servicing and cleaning and there is no lighting in two light fixtures. | ILO132 | 17-10 |

2

| 42 | 15109 | Maintenance of the ship and equipment - There are clear evidences that the ship does not comply with the ISM Code Requirements. | ISM-10.2 | 19-30-10 |
| --- | --- | --- | --- | --- |

Issuer: Port Authority of Rio Grande do Sul
Phone Number: 53 3233-6119 53 3233-6184
Fax: 53 3233-6300 53 3233-6188

Eduardo Günther
Naval Inspector
Signature: [Blank]

Ubirahi Pereira de Magalhães
Assistant Inspector

1- This inspection was not complete and the deficiencies listed here may not be exhaustive. It is recommended that a thorough inspection is carried out by the renowned organization and that all A/S deficiencies are remediated before a new inspection is requested.
2- Actions taken are listed overleaf.

IN THE MATTER OF THE
ARBITRATION ACT 1996

AND

IN THE MATTER OF AN
ARBITRATION


B E T W E E N :-


PACIFIC GULF SHIPPING CO. LTD

Claimants
(Time Charterers)

-   and –


ADAMASTOS SHIPPING &
TRADING S.A.

Respondents
(Owners)


"ADAMASTOS"

Charterparty dated 8th April 2014


FIRST FINAL ARBITRATION
AWARD