# EXHIBIT 3



# THE REPUBLIC OF LIBERIA
## LIBERIA MARITIME AUTHORITY

80 Park Avenue, Suite 1700
New York NY 10016 USA
Tel: +1 212 697 3434
Fax: +1 212 697 3434
Email: registration@liscr.com
Website: www.liscr.com

### OFFICE OF THE DEPUTY COMMISSIONER
### OF MARITIME AFFAIRS OF THE
### REPUBLIC OF LIBERIA

**I HEREBY CERTIFY THAT** the within is a true copy of the instrument which is filed or recorded in this office in

BOOK ____ PM 54 ___ at PAGE _____ 1692 _____ on __ 13 __ Day of __ December __ Month, __ 2012 __ Year

as __ 806 __ AM __ 25 681

Name of Vessel : ADAMANTOS

Official Number : 16998

GIVEN under my hand and seal this

13th day of December 2012.

_____
Yvonne Clinton
Deputy Commissioner
Maritime Affairs

Dated 14 December, 2012

-------------------------------------------

**ADAMASTOS SHIPPING & TRADING S.A.**
(the "Owner")

**TO**

**PIRAEUS BANK A.E.**
(the "Mortgagee")

**FIRST PREFERRED LIBERIAN SHIP MORTGAGE**

**on m.v. "ADAMASTOS"**

# TABLE OF CONTENTS

**CLAUSES/HEADINGS**                                                                                     **PAGE**

1.   DEFINITIONS AND INTERPRETATION ............................................................. 3
2.   REPRESENTATIONS AND WARRANTIES ....................................................... 7
3.   MORTGAGE ............................................................................................................ 8
4.   PAYMENT COVENANTS ...................................................................................... 9
5.   PRESERVATION OF SECURITY AND CUMULATIVE REMEDIES ............ 12
6.   INSURANCE ........................................................................................................... 14
7.   VESSEL COVENANTS .......................................................................................... 19
8.   PROTECTION OF SECURITY ............................................................................. 25
9.   MORTGAGEE'S POWERS ON EVENT OF DEFAULT .................................... 26
10.   APPLICATION OF MONEYS .............................................................................. 28
11.   DELEGATION ......................................................................................................... 29
12.   INDEMNITIES ........................................................................................................ 29
13.   POWER OF ATTORNEY ....................................................................................... 30
14.   FURTHER ASSURANCES .................................................................................... 31
15.   EXPENSES ............................................................................................................... 31
16.   MISCELLANEOUS ................................................................................................ 31
17.   PREFERRED STATUS .......................................................................................... 32
18.   CONSIDERATION ................................................................................................. 32
19.   COUNTERPARTS .................................................................................................. 32
20.   RECORDATION CLAUSE .................................................................................... 32
21.   NOTICES AND COMMUNICATIONS ................................................................ 32
22.   ASSIGNMENTS ...................................................................................................... 33
23.   APPLICABLE LAW AND JURISDICTION ......................................................... 33

**THIS FIRST PREFERRED SHIP MORTGAGE** is made this *K/th* day of December two thousand and twelve (2012).

BY:

**"ADAMASTOS SHIPPING & TRADING S.A."** a company incorporated under the laws of the Republic of Liberia, having its registered office at 80, Broad Street, Monrovia, Liberia (hereinafter indiscriminately called either the **"Owner"** or **"Borrower"**, which expressions shall include its successors and permitted assigns)

IN FAVOR OF

**"PIRAEUS BANK A.E."**, a banking société anonyme incorporated and existing under the laws of the Hellenic Republic, having its registered office at 4, Amerikis Street, Athens, Greece acting through its Shipping Centre at 47-49, Akti Miaouli, Piraeus, Greece (hereinafter called the **"Mortgagee"**, which expression shall include its successors and assigns).

WHEREAS:

(A)   The Owner is the sole, absolute and unencumbered owner of the whole of m.v. **"ADAMASTOS"** (the **"Vessel"**) whose particulars are described in Clause 1.1 hereof.

(B)   By a Loan Agreement dated 13 December, 2012 (hereinafter called the **"Loan Agreement"**) and made between (A) the Mortgagee, as lender (therein called the "Lender")  and (B) the Owner (therein called, the "Borrower"), the Mortgagee agreed inter alia to make available to the Borrower, upon the terms and conditions therein set forth, a loan facility in the sum of up to US$25,000,000 (United States Dollars Twenty Five Million) (hereinafter called the **"Loan"**) in up to six (6) advances as follows:

(i) an amount of up to US$24,000,000 (United States Dollars Twenty Four Million, hereinafter called **"Advance A"**) should be advanced to the Borrower for the partial financing of the acquisition cost of the Vessel consisting of a first tranche (**"Tranche A"**) of United States Dollars Six Million (US$6,000,000) and a second tranche (**"Tranche B"**) of up to United States Dollars Eighteen Million (US$18,000,000);

(ii) an amount of up to US$1,000,000 (United States Dollars One Million) (**"Advance B"**) should be advanced to the Borrower for the partial financing of the cost of repairs of the Vessel in a single tranche (**"Tranche C"**) and up to five (5) consecutive sub-advances of not less than US$200,000 (United States Dollars Two Hundred Thousand) each (by order of advance each of them hereinafter called, **"Sub-Advance B1"**, **"Sub-Advance B2"**, **"Sub-Advance B3"**, **"Sub-Advance B4"** and/or **"Sub-Advance B5"** respectively and any of them a **"Sub-Advance"**);

(C)   The Owner, in order to secure:

2

(a)    the repayment of the principal amount of the Loan pursuant to the Loan Agreement and interest thereon and all other sums of money from time to time owing by the Owner to the Mortgagee under the Loan Agreement and the other Security Documents; and

(b)    the performance and observance of and compliance with all of the covenants terms and conditions in this Mortgage and the said Loan Agreement and the other Security Documents contained,

has duly authorised the execution and delivery of this First Preferred Ship Mortgage.

(E)    This Mortgage is supplemental to the Loan Agreement and to the security created thereby.

**NOW THIS MORTGAGE WITNESSETH AND IT IS HEREBY AGREED AS FOLLOWS:**

**1.    DEFINITIONS AND INTERPRETATION**

1.1    In this Mortgage unless the context otherwise requires:

*"Advance"* means any of Advance A or Advance B and *"Advances"* means all of them;

*"Advance A"* means an amount of up to U.S. Dollars Twenty Four Million (US$24,000,000) which is to be advanced to the Borrower for the partial financing of the cost of acquisition of the Vessel by the Borrower consisting of Tranche A and Tranche B;

*"Advance B"* means an amount of up to U.S. Dollars One Million (US$1,000,000) which is to be advanced to the Borrower in up to five (5) Sub-Advances for the partial financing of the repairs of the Vessel consisting of Tranche C ;

*"Applicable Margin"* means:

(i)    in respect of Tranche A, two and seventy five centesimals per centum (2.75%) per annum;

(ii)    in respect of Tranche B, twenty five centesimals per centum (0.25%) per annum;

(iii)    in respect of Tranche C, two and seventy five centesimals per centum (2.75%) per annum;

*"Assignment"* means the first priority general assignment of Earnings, Insurances and Requisition Compensation in respect of the Vessel executed or to be executed by the Owner in favour of the Mortgagee bearing even date with this Deed as the same may from time to time be supplemented and/or amended;

3

*"Assured"* means, in respect of the Insurances, the Owner;

*"Commitment"* means the total sum of up to U.S. Dollars Twenty Five Million (US$25,000,000);

*"Dollars" and "$"* means the lawful currency of the United States of America;

*"Earnings"* means all moneys whatsoever due or to become due to or for the account of the Owner at any time during the Security Period arising out of the use or operation of the Vessel including (but without prejudice to the generality of the foregoing) all freight, hire, time-freight and passage moneys, compensation payable to the Owner in case of requisition of the Vessel for hire, remuneration for salvage and towage services, demurrage and detention moneys and damages for breach (or payments for variation or termination) of any charterparty or other contract for the employment of the Vessel, <u>Provided that</u> if and so long as the Vessel may be used for the purpose of any pooling arrangement or joint venture between the Owner and any other person or persons (the terms of which pooling arrangement or joint venture shall be subject to the prior written approval of the Mortgagee), the term "Earnings" shall be construed for the period during which the Vessel is used for such purpose as meaning that proportion of the net revenue of the relevant pooling or joint venture agreement or agreements which is attributable to the Vessel;

*"Environmental Approvals"* means all approvals, licenses, permits, exemptions or authorisation required under applicable Environmental Laws;

*"Environmental Claim"* means (i) any claim by, or directive from, any applicable governmental, judicial or other regulatory authority alleging breach of, or non-compliance with, any Environmental Laws or Environmental Approvals or otherwise howsoever relating to or arising out of an Environmental Incident or (ii) any claim by any other third party howsoever relating to or arising out of an Environmental Incident (and, in each such case, "claim" shall mean a claim for damages, clean-up costs, compliance, remedial action or otherwise);

*"Environmental Incident"* means (i) any release of Environmentally Sensitive Material from the Vessel, (ii) any incident in which Environmentally Sensitive Material is released from a vessel other than the Vessel and which involves collision between the Vessel and such other vessel or some other incident of navigation or operation, in either case, where the Vessel, the Owner or the Approved Manager are actually or allegedly at fault or otherwise liable (in whole or in part) or (iii) any incident in which Environmentally Sensitive Material is released from a vessel other than the Vessel and where the Vessel is actually or potentially liable to be arrested as a result and/or where the Owner, the Approved Manager are actually or allegedly at fault or otherwise liable;

*"Environmental Laws"* means all laws, regulations, conventions and agreements whatsoever relating to pollution or protection of the environment (including, without limitation, the United States Oil Pollution Act of 1990 and any comparable laws of the individual States of the United

4

States of America) which are from time to time and at any relevant time applicable to the Vessel;

*"Environmentally Sensitive Material"* means oil, oil products, any other substance which is polluting, toxic or hazardous or any substance the release of which into the environment is regulated, prohibited or penalised by or pursuant to any Environmental Law;

*"Events of Default"* means any of the events or circumstances described in Clause 9.1;

*"Insurances"* includes all policies and contracts of insurance (which expression includes all entries of the Vessel in a protection and indemnity or war risks association) which are from time to time taken out or entered into in respect of the Vessel or her Earnings or otherwise howsoever in connection with the Vessel or her Earnings;

*"Loan"* means the principal amount of the Commitment advanced or to be advanced by the Mortgagee to the Borrower pursuant to the Loan Agreement or (as the context may require) such part thereof as is from time to time outstanding;

*"Loan Agreement"* means the agreement mentioned in Recital (B) hereto and annexed hereto as "Annex A" and as the same may from time to time be amended and/or supplemented which constitutes an integral part hereof;

*"Major Casualty"* means any casualty to the Vessel in respect whereof the claim or the aggregate of the claims against all insurers, before adjustment for any relevant franchise or deductible, exceeds one hundred thousand Dollars ($100,000) or the equivalent in any other currency;

*"Outstanding Indebtedness"* means the aggregate of (a) the Loan and interest thereon (and interest on any unpaid interest thereon and on any other sums of money on which interest is stated in the Loan Agreement to be payable) and (b) all such expenses, claims, liabilities, losses, costs, duties, fees, charges or other moneys as are stated in this Mortgage to be payable by the Owner to or recoverable from the Owner by the Mortgagee (or in respect of which the Owner agrees in this Mortgage to indemnify the Mortgagee) whether actually or contingently, presently or in the future together with interest thereon as provided in the Loan Agreement and this Mortgage and (c) all other sums of money from time to time owing to the Mortgagee under the Security Documents or any of them whether actually or contingently, presently or in the future;

*"person"* includes any body or persons corporate or unincorporate;

*"Requisition Compensation"* includes all moneys or other compensation payable during the Security Period by reason of requisition for title or other compulsory acquisition of the Vessel otherwise than by requisition for hire;

*"Security Documents"* means any such document as is defined in the Loan Agreement as a Security Document (including this Mortgage and, where the context so admits, the Loan Agreement itself) or as may from time to time

be executed by any person as security for or as a guarantee of the Outstanding Indebtedness or any part thereof as the same may hereafter be supplemented and/or amended and references to the "Security Documents" shall mean all or any of them, as the context so requires;

*"Security Interest"* means a mortgage, charge (whether fixed or floating), pledge, lien, hypothecation, assignment, trust arrangement, title retention or other security interest or arrangement of any kind whatsoever;

*"Security Parties"* means the Owner, the Approved Manager (as defined in the Loan Agreement) and/or any other party (other than the Mortgagee) to any of the Security Documents and in the singular means any of them;

*"Security Period"* means the period terminating upon discharge of the security created by the Security Documents;

*"Vessel"* means the motor vessel "ADAMASTOS" built in 1995 of the following approximate dimensions and tonnages:

| | |
|---|---|
| Length | 218.69 metres |
| Breadth: | 32.25 metres |
| Depth: | 19.00 metres |
| Gross Tons: | 39,017.00 tons |
| Net Tons: | 24,421.00 tons |
| Engine(s): | 11,200 BHP |

having IMO No. 9087269, Official Number 15903 and International Call Sign D5DK4 and more particularly described in the Certificate of Registry issued by the Bureau of Maritime Affairs of the Republic of Liberia the title of which Vessel in the name of the Owner has been registered under the Laws and Flag of Liberia and includes any share or interest therein and her engines, machinery, boats, tackle, outfit, spare gear, fuel, consumable or other stores, belongings and appurtenances existing at the date hereof whether on board or ashore and whether now owned or hereafter acquired.

1.2    In Clause 6.1 (a) hereof:

*"Excess Risks"* means the proportion of claims for general average and salvage charges and under the ordinary running-down clause not recoverable in consequence of the value at which the Vessel is assessed for the purpose of such claim exceeding her insured value; and

*"Protection and Indemnity Risks"* means the usual risks covered by a protection and indemnity association including F D & D cover and the proportion (if any) of any sums payable to any other person or persons in case of collision which are not recoverable under the hull and machinery policies by reason of the incorporation therein of Clause 1 of the Institute Time Clauses (Hulls) (1/10/83) or (with respect to Insurances commencing on or after 1/11/1995) Clause 8 of the Institute Time Clauses (Hulls) (1/11/1995) or the Institute Amended Running Down Clause (1/10/71) or any equivalent provision;

6

*"War Risks"* includes the risk of mines and all risks excluded by Clause 23 of the Institute Time Clauses (Hulls) (1/10/83) or (with respect to Insurances commencing on or after 1/11/1995) Clause 24 of the Institute Time Clauses (Hulls) (1/11/1995).

1.3     This Mortgage shall be read together with the Loan Agreement but in the case of any conflict between the two instruments the provisions of the Loan Agreement shall prevail.

1.4     In this Mortgage:-

(a)     all capitalised terms which are used herein and are not otherwise defined herein shall have the same meaning given to them in the Loan Agreement;

(b)     clause headings are inserted for convenience only and shall not affect the construction of this Mortgage and, unless otherwise specified, all references to Clauses are to clauses of this Mortgage;

(c)     unless the context otherwise requires, words denoting the singular number shall include the plural and vice versa;

(d)     references to persons include bodies corporate and unincorporate;

(e)     references to assets include property, rights and assets of every description;

(f)     references to any document are to be construed as references to such document as amended or supplemented from time to time; and

(g)     references to any enactment include re-enactments, amendments and extensions thereof.

## 2.     REPRESENTATIONS AND WARRANTIES

2.1     The Owner hereby represents and warrants to the Mortgagee that:

(a)     it is a corporation duly incorporating and existing in good standing under the Laws of the Republic of Liberia;

(b)     the Owner is the sole legal and beneficial owner of and has full title guarantee to the whole of the Vessel and neither the whole nor any part of the Vessel is subject to any Security Interest (save as constituted by this Mortgage);

(c)     the Owner has not sold or transferred, or agreed to sell or transfer, the Vessel or any part thereof;

(d)     the Vessel is not, save as has been disclosed by the Owner to the Mortgagee in writing, subject to, or contemplated to perform under, any charter or other contract for her employment;

7

(e)    the Owner has power to own the Vessel and keep the Vessel registered under the laws and flag of the Republic of Liberia;

(f)    this Mortgage is in accordance with the provisions of the laws of Liberia; and

(g)    the representations and warranties contained in Clause 2 of the Loan Agreement are true and correct with respect to the facts and circumstances existing at the date of this Mortgage and are hereby repeated and restated as if set out in full herein.

2.2    The Owner hereby further represents and warrants to the Mortgagee that:

(a)    all applicable Environmental Laws and Environmental Approvals relating to the Vessel, its operation and management and the business of the Owner (as now conducted and as reasonably anticipated to be conducted in the future) have been complied with;

(b)    no Environmental Claim has been made or threatened against the Owner, the Approved Manager or otherwise in connection with the Vessel; and

(c)    no Environmental Incident has occurred.

## 3.    MORTGAGE

In consideration of the agreement of the Mortgagee to make available the Loan to the Borrower under the Commitment and pursuant to the Loan Agreement, and in consideration of receipt by the Borrower of the amount of U.S. Dollars Twenty Four Million (US$24,000,000) representing the total and final amount drawndown under Advance A of the Loan and, in particular, the aggregate amounts of US$6,000,000 under Tranche A of the Loan and US$18,000,000 under Tranche B of the Loan, such receipt being hereby expressly confirmed and acknowledged by the Owner that it has been effected on 17 December, 2012 (the "**Drawdown Date of Advance A**"), and in further consideration of the agreement of the Mortgagee to make available to the Borrower the amount of Advance B and in further consideration of the agreement of the Mortgagee to maintain the Loan throughout the Security Period pursuant and subject to the terms and conditions of the Loan Agreement and in order to secure the payment to the Mortgagee of the Outstanding Indebtedness by the Owner as well as interest, costs, expenses of collection, amounts due and payable to the Mortgagee under the Security Documents resulting from the fluctuation of the rates of exchange of currencies or means of payment and all other sums agreed and from time to time comprising the Outstanding Indebtedness and to secure the performance and observance of any compliance with the covenants, terms and conditions contained in this Mortgage, the Loan Agreement and the other Security Documents, the Owner hereby mortgages and charges to and in favour of the Mortgagee the Vessel (and all the Owner's interest therein) to the intent that this Mortgage shall constitute in favour of the Mortgagee a first and absolute Mortgage on the whole of the Vessel in accordance with the provisions of Chapter 3 Title 21 of the Liberian Code of Laws of 1956 as amended and all other pertinent provisions of law of the Republic of Liberia. IT IS NOT INTENDED that this Mortgage shall cover, and

8

this Mortgage shall not cover, property other than the Vessel as the term "Vessel" is used in Sub-division 1 of Section 106 of Chapter 3 of Title 21 of the Liberian Code of Laws of 1956 as amended.

## 4.    PAYMENT COVENANTS

4.1    The Owner hereby covenants and undertakes with the Mortgagee as follows:

(a)    the Owner will repay the Loan pursuant to Clause 6 of the Loan Agreement as follows:

(aa)    Tranche A of the Loan shall be repaid by: (i) twenty (20) equal consecutive quarterly instalments (the "**Tranche A Repayment Instalments**") of U.S. Dollars One Hundred and Seventy Five Thousand (US$175,000) each the first of which falling due for payment twenty seven (27) months from the Drawdown Date of Advance A and the final twentieth (20th) such Tranche A Repayment Instalment falling due for payment eighty four (84) months from the Drawdown Date of Advance A (the "**Advance A Final Maturity Date**"); and (ii) a balloon payment (the "**Tranche A Balloon Instalment**") of U.S. Dollars Two Million Five Hundred Thousand (US$2,500,000) payable together with the final Tranche A Repayment Instalment on Advance A Final Maturity Date and any other amount then due and payable under Tranche A of the Loan;

(bb)    if any Cash Sweep (as such term is defined in the Loan Agreement) results from the Earnings of the Vessel as same will be calculated by latest forty five (45) days following the end of each Financial Period (as such term is defined in the Loan Agreement), commencing from the Financial Period corresponding to the year 2013, then the Borrower shall prepay to the Mortgagee the full amount of Cash Sweep so calculated on the tenth (10th) day of receipt of notice of such calculation given by the Mortgagee to the Borrower which will be applied towards reduction of Tranche A Balloon Instalment (each such day, a "**Tranche A Balloon Instalment Repayment Date**"); Cash Sweep shall first be calculated and paid on the basis of the relevant unaudited annual financial statements to be provided to the Mortgagee within latest one (1) month from the end of each Financial Period; the calculation of each amount of Cash Sweep shall always be subject to review and final adjustment on the basis of the audited annual financial statements of the Borrower relating to each relevant Financial Period provided within 150 days from the end of each Financial Period (both audited and unaudited financial statements prepared and furnished pursuant to Clause 11.2 of the Loan Agreement) and in the event of any resulting Cash Sweep surplus (but not deficit) such surplus shall be due and payable on the immediately following Tranche A Balloon Instalment Repayment Date;

9

(cc)    Tranche B of the Loan shall be repaid in a bullet payment on Advance A Final Maturity Date together with any capitalised or non-capitalised interest out of the sale proceeds of the Vessel and will be equal to fifty (50%) of the net sale price of the Vessel after deducting the principal amount then due under Tranche A of the Loan and any prepayment made as Cash Sweep pursuant to Clause 6.1(b) above provided always that if on Advance A Final Maturity Date there in an Event of Default continuing, the Borrower shall repay Tranche B in full;

(dd)    Tranche C of the Loan shall be repaid in a bullet payment on a day falling twelve (12) months from the Drawdown Date of the first Sub-Advance to be drawn down under Advance B (the "**Advance B Final Maturity Date**") together with any other amounts then due and payable under Tranche C of the Loan;

(b)    In the event of Total Loss or sale of the Vessel (such sale to be always subject to the Mortgagee's approval such approval not be unreasonably withheld) whether on or before Advance A Final Maturity Date, the Borrower, in addition to the amounts payable in relation to Tranche B of the Loan pursuant and subject to the provisions of Clause 6.1(c) above, shall prepay to the Mortgagee the aggregate amount of Tranche A and Tranche C of the Loan outstanding (i) immediately prior to the completion of any such sale or (ii) within one hundred and eighty (180) days after the occurrence of such Total Loss (or such longer period as the Lender may at its absolute discretion agree) or, if earlier, on the date upon which the insurance proceeds in respect of such Total Loss are, or Requisition Compensation for the Vessel is, received by the Borrower (or the Mortgagee pursuant to the Security Documents).

<u>Provided however</u> that:

(i)    if any payment shall become due on a day which is not a Banking Day, the due date therefor shall be extended to the next following Banking Day unless such Banking Day falls in the next calendar month in which event such due date shall be the immediately preceding Business Day;

(ii)    the Owner shall be entitled to prepay the Loan in whole or in part, subject to and in accordance with Clause 6.2 and Clause 6.4 of the Loan Agreement;

(iii)    the Owner shall be further obliged to prepay the Loan in whole or in part, in the circumstances referred to in Clauses 14.2 and/or 14.4 of the Loan Agreement; and

(iv)    the Loan or any part thereof may become repayable or prepayable in accordance with the provisions of the Loan Agreement;

(c)    the Owner will pay, in accordance with Clauses 7.1 and 8.2 of the Loan Agreement to the Mortgagee interest on the Loan (or any part thereof), calculated on the basis of the actual number of days elapsed

and on the basis of a 360 day year for each Interest Period determined as per Clauses 1.1 and 7.2 of the Loan Agreement relative thereto at the annual rate of interest (the "Interest Rate") which is conclusively (save for manifest error) certified by the Mortgagee to be (subject to Clause 7.3, Clause 7.4 and Clause 14.4 of the Loan Agreement) the aggregate of (i) the Applicable Margin in respect of each Tranche of the Loan and (ii) the annual rate of interest conclusively certified by the Mortgagee as being the annual rate of interest at which deposits in Dollars and for amounts equivalent to the amount of the Loan (or any part thereof) are offered for lending to the Mortgagee by prime banks for periods equal to the relevant Interest Period at the London Interbank Market at or about 11:00 a.m. (London time), calculated by reference to the rate appearing on Reuters page BBA Libor, for the duration of such Interest Period two (2) Banking Days prior to the commencement of such Interest Period ("**LIBOR**");

(d) subject only to the provisions of Clause 7.4 of the Loan Agreement in relation to Tranche B of the Loan, in the event of any delay by the Owner in the payment on the due date of any sum due under the Loan Agreement, this Mortgage or any of the Security Documents, the Owner shall, without affecting any other remedy of the Mortgagee, pay in accordance with Clause 7.3 of the Loan Agreement on demand interest on all sums overdue (including, without limitation, any sum payable pursuant to Clause 7.3 of the Loan Agreement) from the due date therefor to the date of actual payment (as well as after as before judgement) accruing on a daily basis at the rate per annum determined by the Mortgagee to be the Interest Rate increased by 2% per annum;

(e) according to Clause 7.4 of the Loan Agreement and notwithstanding the provisions of Clauses 7.2 and 7.3 of the Loan Agreement, the Borrower will not be obliged to pay any interest accrued in relation to Tranche B of the Loan on any relevant Interest Payment Date other than Advance A Final Maturity Date and any such unpaid interest will be deemed as part of the principal amount of Tranche B of the Loan and capitalised on each relevant Interest Payment Date;

(f) the Owner will pay in full all other amounts and moneys howsoever making part of the Outstanding Indebtedness as and when the same shall become due and payable in accordance with the terms of the Security Documents;

(g) the Owner will pay to and/or indemnify the Mortgagee for such additional expenses as may be necessary in order that all payments under this Mortgage after deduction of for or on account of every present or future tax assessment or governmental charge imposed by any competent authority in any country to the revenue laws of which the Owner may from time to time be the subject shall be no less than such payment would have been had there been no such tax assessment or charge;

(h) the Owner will pay all such expenses, claims, liabilities, losses, costs, duties, fees, charges or other moneys as are stated in this Mortgage to be payable by the Owner to or recoverable from the Owner by the

11

Mortgagee (or in respect of which the Owner agrees in this Mortgage to indemnify the Mortgagee) at the times and in the manner specified in this Mortgage;

(i)    the Owner will pay interest on any such expenses, claims, liabilities, losses, costs, duties, fees, charges or other moneys referred to herein from the date on which the relevant expense, claim, liability, loss, cost, duty, fee, charge or other money is paid or incurred by the Mortgagee (both before and after any relevant judgement) at the rate described in Clause 7.3 of the Loan Agreement, such interest to be payable on demand, <u>Provided however</u> that this provision shall not affect the right of the Mortgagee to receive interest calculated at the rate prescribed in Clause 7.3 from such date prior to demand being made as is provided for in the Loan Agreement; and

(j)    the Owner will pay each and every other sum of money which may be or become owing to the Mortgagee under the Loan Agreement, this Mortgage and the other Security Documents to which the Owner is or is to be a party at the times and in the manner specified herein or therein.

## 5.    PRESERVATION OF SECURITY AND CUMULATIVE REMEDIES

5.1    It is declared and agreed that:

(a)    the security created by this Mortgage and the other Security Documents shall be held by the Mortgagee as a continuing security for the payment of the Outstanding Indebtedness and the performance of all the obligations (express or implied) of the Owner in the Security Documents contained;

(b)    the security so created shall not be satisfied by any intermediate payment or satisfaction of any part of the amount hereby and thereby secured (or by any settlement of accounts between the Owner or any other person who may be liable to the Mortgagee in respect of the Outstanding Indebtedness or any part thereof and the Mortgagee);

(c)    the security so created shall be in addition to and shall not in any way prejudice or affect and may be enforced by the Mortgagee without prior recourse to the security created by any other of the Security Documents or by any deposit of documents, or any guarantee, lien, bill, note, mortgage or other security now or hereafter held by the Mortgagee, or any right or remedy of the Mortgagee thereunder and shall not in any way be prejudiced or affected thereby or by the invalidity or unenforceability thereof, or by the Mortgagee releasing, modifying or refraining from perfecting or enforcing any of the same, or granting time or indulgence or compounding with any person liable;

(d)    all the rights, powers and remedies given to the Mortgagee hereunder shall be in addition to and not a limitation of any and every other right, power or remedy vested in the Mortgagee under the Loan

Agreement, this Mortgage, the other Security Documents or at law and that all the powers so vested in the Mortgagee may be exercised from time to time and as often as the Mortgagee may deem expedient;

(e) no failure, delay or omission on the part of the Mortgagee to exercise any right, power or remedy vested in it under the Security Documents or any of them shall impair such right, power or remedy or be construed as a waiver of or acquiscence in any default by the Owner or breach by the Owner of any of its obligations under this Mortgage shall prejudice the rights of the Mortgagee under this Mortgage arising from any subsequent default or breach (whether or not such subsequent default or breach is of a nature different from the previous default or breach) nor the discontinuance, abandonment or adverse determination of any proceedings taken by the Mortgagee to enforce any right, power or remedy preclude any other or further exercise thereof or proceedings to enforce the same or the exercise of any other right, power or remedy nor shall the giving by the Mortgagee of any consent to the doing of any act which by the terms hereof requires the consent of the Mortgagee prejudice the right of the Mortgagee to give or withhold as it thinks fit its consent to the doing of any other similar act;

(f) the Mortgagee shall not be obliged to make any enquiry as to the nature or sufficiency of any payment received by it hereunder or to make any claim or to take any action to collect any moneys hereby assigned or to enforce any rights and benefits hereby assigned to the Mortgagee or to which the Mortgagee may at any time be entitled hereunder;

(g) the Mortgagee shall not be bound to enforce any of the other Security Documents before enforcing the security created by the Mortgage; and

(h) any waiver by the Mortgagee of any terms of this Mortgage or any consent given by the Mortgagee under this Mortgage shall only be effective if given in writing and then only for the purpose and upon the terms for which it is given.

5.2 The Owner waives any right it may have of first requiring the Mortgagee to proceed against or claim payment from any other person or enforce any guarantee or security (whether by the Owner or any other person) before enforcing this Mortgage.

5.3 Any settlement or discharge under this Mortgage between the Mortgagee and the Owner shall be conditional upon no security or payment to the Mortgagee by the Owner or any other person being avoided or set aside or ordered to be refunded or reduced by virtue of any provision or enactment relating to bankruptcy, insolvency, administration or liquidation for the time being in force, and if such condition is not satisfied, the Mortgagee shall be entitled to recover from the Owner on demand the value of such security or the amount of any such payment as if such settlement or discharge had not occurred.

13

5.4 Any certificate submitted by the Mortgagee to the Owner as to the amount owing in respect of the Outstanding Indebtedness or any part thereof or the Interest Rate or the default interest rate shall (in the absence of manifest error) be conclusive and binding on the Owner.

5.5 The Owner shall remain liable to perform all the obligations assumed by it in relation to the Vessel and the Mortgagee shall be under no obligation of any kind whatsoever in respect thereof or be under no liability whatsoever in event of any failure by the Owner to perform its obligations in respect thereof.

5.6 Upon the Mortgagee being satisfied that the Outstanding Indebtedness has been unconditionally and irrevocably paid and discharged in full, and following a written request therefor from the Owner, the Mortgagee will, subject to being indemnified to their satisfaction for the costs and expenses incurred by the Mortgagee in connection therewith, release the security created by this Mortgage.

## 6. INSURANCE

6.1 The Owner further covenants with the Mortgagee and undertakes throughout the Security Period:

(a) to insure and keep the Vessel insured at the expense of the Owner against: (i) fire and usual marine risks (including excess risks), (ii) war risks and (iii) protection and indemnity risks (including F D & D cover) without any exclusion for any Environmental Incident; and to indemnify the Mortgagee for any and all costs incurred by it (as conclusively certified by the Mortgagee) in effecting and keeping effected a Mortgagee's Interest Insurance which the Mortgagee may from time to time effect in respect of the Vessel upon such terms as it shall deem desirable and (iv) any other insurance cover which the Mortgagee may from time to time effect in respect of the Vessel and/or in respect of its interest or potential third party liability as mortgagee of the Vessel as it shall deem desirable having regard to any limitations in respect of amount or extent of cover which may form time to time be applicable to any of the insurances referred to in this Clause 6.1 (a);

(b) to effect the said insurances (i) in Dollars (ii) in the case of the insurances against fire and usual marine risks and war risks, in such amounts (but not less than the value of the Vessel nor less than 125% of the aggregate amount of Tranche A and Tranche C of the Loan) and under such terms as shall from time to time be approved in writing by the Mortgagee, (iii) in the case of oil pollution liability risks included within the protection and indemnity risks, in the maximum amount available in the market from time to time and without any exclusion of any Environmental Incident, (iv) in the case of oil pollution liability risks in excess of the limit of cover for oil pollution liability risks included within the protection and indemnity risks, in such amount as the Mortgagee may from time to time require, (v) on such terms as shall from time to time be approved in writing by the Mortgagee, (vi)

14

through such brokers (hereinafter, save as regards the brokers employed to effect the mortgage's interest insurance, called "the Approved Brokers") and with such insurance companies and/or underwriters as shall from time to time be approved in writing by the Mortgagee, provided that the insurances in respect of war risks and protection and indemnity risks may be effected by entry of the Vessel, on terms approved by the Mortgagee in writing, in war risks and protection and indemnity risks associations as shall from time to time be approved in writing by the Mortgagee and (vii) if so required by the Mortgagee (but without liability on the part of the Mortgagee for premiums or calls) with the Mortgagee named as co-assured;

(c)    at least twenty one (21) days before the expiry of any of the policies or contracts for the said insurances to notify the Mortgagee in writing of the identity of the brokers (or other insurers) and any protection and indemnity or war risks association through or with whom the Owner proposes to renew the said insurances and at least fourteen (14) days before the relevant policies or contracts expire to renew all such insurances and upon the renewal of the said insurances to procure that the approved brokers and/or the war risks and protection and indemnity associations with which any such renewal is effected shall promptly notify the Mortgagee in writing of the terms and conditions of such renewal;

(d)    punctually to pay all premiums, calls, contributions or other sums payable in respect of all such insurances and to produce all relevant receipts when so required by the Mortgagee;

(e)    make all such quarterly or other voyage declarations as may from time to time be required by the protection and indemnity risks association in order to maintain cover for trading to the United States of America and Exclusive Economic Zone (as defined in the United States Oil Pollution Act of 1990) and promptly deliver to the Mortgagee copies of all such declarations;

(f)    to arrange for the execution of such guarantees as may from time to time be required by a protection and indemnity or war risks association;

(g)    to procure that there are duly endorsed upon all slips, cover notes, policies, certificates of entry or other instruments of insurance issued or to be issued in connection with the said insurances aforesaid: (i) the interest of the Mortgagee by means of a Notice of Assignment (signed by the Assured) and/or a Loss Payable Clause providing that unless and until any of the events specified in Clause 9 hereof shall happen and the Mortgagee shall give notice thereof to the insurers (whereupon all insurance recoveries shall be receivable by the Mortgagee in accordance with Clause 10.1 (b) hereof) there shall be paid to the Mortgagee any and every sum receivable in respect of a Total Loss and any and every sum of the Insurances shall be paid to the Owner (save as and to the extent provided under Clause 3.1(b) of the Assignment) and (ii) a cancellation clause providing that the insurers undertake not to exercise any right of cancellation which they may

15

have by reason of non-payment of premiums or calls when due without giving 14 days' prior written notice of such cancellation to the Mortgagee and an opportunity of paying any such unpaid premium or call and (iii) a provision that the insurances will not be permitted to lapse or be materially modified within 14 days' prior written notice being given to the Mortgagee;

(h)    to procure that all such instruments of insurance referred to in Clause 6.1(g) above shall be deposited with the approved brokers and/or insurance companies and that the approved brokers and/or insurance companies shall furnish the Mortgagee with copies thereof within forty five (45) days of the date hereof and a letter or letters or undertaking in such form as may from time to time be required by the Mortgagee such letter or letters to include undertakings by the approved brokers that:

    (i)    they will hold the said instruments of insurance, and the benefit of the insurances thereunder, to the order of the Mortgagee in accordance with the terms of the loss payable clause referred to in Clause 6.1(g), and

    (ii)    they will have endorsed on each and every policy as and when the same is issued the loss payable clause and the notice of assignment referred to in Clause 6.1(g), and

    (iii)    they will advise the Mortgagee immediately of any material changes which may be made to the terms of the said insurances and notify the Mortgagee, not less than fourteen (14) days prior to the expiry of the said insurance, in the event of their not having received notice of renewal instructions from the Owner and/or its agents and, in the event of their receiving instructions to renew, they will advise the Mortgagee promptly of the details thereof, and

    (iv)    they will not set off against any sum recoverable in respect of a claim against the Vessel under the said insurances any premiums or other amounts due to the approved brokers or any other person in respect of any other vessel nor cancel the said insurances by reason of non-payment of such premiums or other amounts;

(i)    to procure that any protection and indemnity and/or war risks associations wherein the Vessel is entered shall furnish the Mortgagee within forty five (45) days of the date hereof with a certified copy of the certificate of entry for the Vessel and a letter or letters of undertaking in such form as may from time to time be required by the Mortgagee;

(j)    not to employ the Vessel or allow the Vessel to be employed otherwise than in conformity with the terms of the instruments of insurance referred to in Clause 6.1(g) (including any warranties expressed or implied therein) without first obtaining the consent to such employment of the insurers and complying with such

16

requirements as to extra premium or otherwise as the insurers may prescribe;

(k) to apply all such sums receivable in respect of the Insurances as are paid to the Owner in accordance with Clause 3.1 of the Assignment for the purpose of making good the loss and fully repairing all damage in respect whereof the insurance moneys shall have been received;

(l) to comply with all warranties contained in the instruments of insurance referred to in Clause 6.1(g) (including, without limitation, warranties in relation to the classification of the Vessel);

(m) to reimburse to the Mortgagee on demand any costs or expenses incurred by the Mortgagee in obtaining reports from time to time from an independent marine insurance broker as to the adequacy of the insurances effected or proposed to be effected by the Owner pursuant to this Clause 6.1 and procure that there is promptly delivered to such broker any and all such information in relation to the said insurances as such broker may require;

(n) not to make any alteration in any of the terms of any of the instruments of insurance referred to in Clause 6.1(g) which have been approved by the Mortgagee and not to make, do, consent or agree to any act or omission which would or might render any such instrument of insurance invalid void, voidable or unenforceable or render any sum payable thereunder repayable in whole or in part;

(o) (if any of the Insurances form part a fleet cover), procure that the Approved Brokers shall undertake to the Mortgagee that they shall neither set off against any claims in respect of the Vessel any premiums due in respect of other vessels under such fleet cover or any premiums due for other insurances, nor cancel the insurance for reasons of non-payment of premiums for other vessels under such fleet cover or of premiums for such other insurances, and shall undertake to issue a separate policy in respect of the Vessel if and when so requested by the Mortgagee;

(p) not without the prior written consent of the Mortgagee to settle, compromise or abandon any claim under the said insurances for Total Loss or for a Major Casualty; and

(q) to reimburse to the Mortgagee on the Mortgagee's first demand from time to time all costs and expenses incurred by the Mortgagee in effecting and maintaining, on such terms, in such amounts and with such insurers as the Mortgagee shall consider appropriate, (i) a Mortgagee's interest insurance policy on the Vessel in an amount no less than one hundred and twenty five per cent (125%) of the amount of the aggregate of Tranche A and Tranche C of the Loan and (ii) an insurance policy for the benefit of the Mortgagee against the possible consequences of pollution involving the Vessel including, without limitation, the risk of expropriation or sequestration of the Vessel or the imposition of a lien or encumbrance of any kind having priority to this Mortgage.

6.2    The Mortgagee shall be entitled to review the requirements of Clause 6.1 from time to time in order to take account of changes in circumstances after the date of this Deed (such changes in circumstances to include, without limitation, changes in the price and availability of insurance coverage). The Mortgagee may notify the Owner in writing from time to time of any modification to the requirements of Clause 6.1 which the Mortgagee shall specify and any such notification shall be binding on the Owner and shall take effect as an amendment to Clause 6.1.

6.3    The Owner further covenants with the Mortgagee in connection with the Earnings that throughout the Security Period the Owner will:-

(a)    take all necessary steps to procure the due performance by charterers of their obligations under any charterparty (hereinafter a "charterparty") entered into by or on behalf of the Owner in relation to the Vessel and shippers of their obligations under any agreement (hereinafter a "contract of affreightment") entered into on behalf of the Owner in relation to the Vessel for the carriage or transportation of cargo, mail or passengers, save where those obligations are subject of a genuine compromise;

(b)    promptly and diligently perform the obligations on its part contained in charterparties and contracts of affreightment and notify the Mortgagee of any material default by any charterer or shipper under any charterparty or contract of affreightment;

(c)    at the request of the Mortgagee made at any time after the execution of this Mortgage when there is due and payable but unpaid a sum (of principal, interest or otherwise) the due payment of which is secured by the Mortgage, write letters to each of the agents and representatives into whose hands or control any part of the Earnings of the Vessel may come informing each such addressee (i) to remit promptly to the Mortgagee, any part of the Earnings of the Vessel which may come into such addressee's hands or control and to continue so to do until such time as such addressee may receive such written notice to the contrary direct from the Mortgagee and (ii) to acknowledge direct to the Mortgagee the receipt of such instructions from the Owner;

(d)    at the request of the Mortgagee made at any time after the execution of this Mortgage, give notice of the assignment of Earnings contained within this Mortgage to any charterer under a charterparty in such form as may be acceptable to the Mortgagee.

6.4    Notwithstanding any assignment of Earnings:-

(a)    the Owner shall remain liable under each charterparty and each contract of affreightment to perform all obligations therein undertaken;

(b)    the Mortgagee shall not be under any obligation or liability under any charterparty or contract of affreightment;

18

(c)  the Mortgagee need not and shall not be required to assume or be under any obligation under any such charterparty or contract of affreightment or make any enquiry as to the nature or sufficiency of any payment received by the Mortgagee under or in respect of any charterparty or contract of affreightment.

## 7.  VESSEL COVENANTS

### 7.1  Vessel's name and registration

Not to change the Vessel's name and/or the Owner's name and to keep the Vessel permanently registered and matriculated as a Liberian flag vessel at the Port of Monrovia by paying all fees and expenses and filing and producing to the Bureau of Maritime Affairs (and any other appropriate authorities) of the Republic of Liberia any and all such documents or things as may be required for such purpose to keep the Vessel registered and matriculated as a Liberian ship and to do or allow to be done nothing whereby such registration and/or matriculation may be forfeited or imperilled and to procure that no attempts will be made to abandon, delete or remove the Vessel from the said registry and/or enter the Vessel in a special registry pursuant to charterparty arrangements or otherwise and/or change the Vessel's nationality without the consent of the Mortgagee and promptly furnish to the Mortgagee from time to time such proofs as the Mortgagee may request for its satisfaction with respect to the Owner's compliance with the provisions of this Clause 7.1;

### 7.2  Modification

Not without the previous consent in writing of the Mortgagee to make any modification to the Vessel which would or might materially alter the structure, type or performance characteristics of the Vessel or materially reduce the value of the Vessel;

### 7.3  Maintenance of Class-Compliance with Regulations-Repairs-Removal of Parts

To keep the Vessel or procure that the Vessel is kept in a good and efficient state of repair so as to maintain the highest available class, with a classification society approved by the Mortgagee and will continue at all times to maintain such classification (or equivalent) with any other first-class classification society which is under IACS and which is in all respects satisfactory to the Mortgagee, so as to comply with the provisions of all laws regulations and requirements (statutory or otherwise) from time to time applicable to vessels registered under the laws and flag of the Republic of Liberia and to procure that all repairs to or replacement of any damaged worn or lost parts or equipment be effected in such manner (both as regards workmanship and quality of materials) as not to diminish the value of the Vessel and not to remove any material part of, or item of equipment installed on, the Vessel unless the part or item so removed is forthwith replaced by a suitable part or item which is in the same condition as or better condition than the part or item removed, is free from any Security Interest in favour of any person other than the Mortgagee and becomes on

installation on the Vessel, the property of the Owner and subject to the security constituted by this Mortgage.

7.4    Surveys

To submit the Vessel or procure that the Vessel be submitted, regularly to such periodical or other surveys as may be required for classification purposes and if so required to supply to the Mortgagee copies of all survey reports issued in respect thereof;

7.5    Inspection

To permit the Mortgagee by surveyors or other persons appointed by it for that purpose to board the Vessel at all reasonable times for the purpose of inspecting her condition or for the purpose of satisfying itself in regard to proposed or executed repairs and to afford all proper facilities for such inspection.

7.6    Prevention of and Release from Arrest

To promptly pay and discharge or procure payment and discharge of all debts, damages and liabilities whatsoever which have given or may give rise to maritime or possessory liens on or claims enforceable against the Vessel and all tolls, dues, taxes, assessments, governmental charges, fines and penalties lawfully charged on or in respect of the Vessel and all other outgoings whatsoever in respect of the Vessel and in the event of arrest of the Vessel pursuant to legal process, or in the event of her detention in exercise or purported exercise of any such lien or claim as aforesaid, procure the release of the Vessel from such arrest or detention forthwith upon receiving notice thereof by providing bail or otherwise as the circumstances may require;

7.7    Employment

Not to employ the Vessel or allow her employment in any trade or business which is forbidden by International Law or is otherwise illicit or in carrying illicit or prohibited goods or in any manner whatsoever which may render her liable to condemnation in a Prize Court or to destruction seizure or confiscation and in the event of hostilities in any part of the world (whether war be declared or not) not employ the Vessel or suffer her employment in carrying any contraband goods or to enter or trade to any zone which is declared a war zone by any government or by the Vessel's war risks insurers unless the Mortgagee shall have first given its consent thereto in writing and there shall have been effected by the Owner (at its expense) such special, additional or modified insurance cover as the Mortgagee may require.

7.8    Information

Promptly to furnish to the Mortgagee all such information as it may from time to time require regarding the Vessel, her employment, position and engagements, particulars of all towages and salvages and, upon the Mortgagee's request in writing, copies of all charters and other contracts for her employment or otherwise howsoever concerning her.

20

7.9    Notification of Certain Events

To notify the Mortgagee forthwith by letter or in case of urgency by telex or facsimile thereafter confirmed by letter of:-

(a)    any casualty to the Vessel which is or is likely to be a Major Casualty; and

(b)    any occurrence in consequence whereof the Vessel has become or is, by the passing of time or otherwise, likely to become a Total Loss, and

(c)    any requirement or recommendation made by any insurer or classification society or by any competent authority which is not immediately complied with, and

(d)    any arrest of the Vessel or the exercise or purported exercise of any lien on the Vessel or her Earnings, and

(e)    any intended dry docking of the Vessel.

7.10    Payment of Outgoings and Evidence of Payments

Promptly to pay or procure or procure the payment of all tolls due and other outgoings whatsoever in respect of the Vessel and to keep proper books of account in respect of the Vessel and her Earnings and as and when the Mortgagee may so require to make such books available for inspection on behalf of the Mortgagee and furnish satisfactory evidence that the wages and allotments and the insurance and pension contributions of the Master and crew are being regularly paid and that all deductions from crew's wages in respect of any tax liability are being properly accounted for and that the Master has no claim for disbursements other than those incurred by him in the ordinary course of trading.

7.11    Encumbrances

Not to mortgage charge or otherwise assign the Vessel nor her Insurances, Earnings or Requisition Compensation or to suffer the creation of any such mortgage charge or assignment as aforesaid to or in favour of any person other than the Mortgagee.

7.12    Sale or other Disposal

Not without the previous consent in writing (not to be unreasonably withheld) of the Mortgagee (and then only subject to such terms as the Mortgagee may impose) to sell, agree to sell or otherwise dispose of the Vessel or any share therein.

7.13    Chartering - Laid-up

Not without the previous consent of the Mortgagee in writing (not to be unreasonably withheld):

21

(a)   to let the Vessel on demise or bareboat charter for any period; or

(b)   without prejudice to the provisions of this Mortgage and the Loan Agreement relating to the Charterparty, to let the Vessel by any time or consecutive voyage charter for a term which exceeds, or which by virtue of any optional extensions therein contained is likely to exceed, eleven (11) months' duration; or

(c)   to let the Vessel on terms whereby more than two months' hire (or the equivalent) is payable in advance; or

(d)   to let the Vessel otherwise than on bona fide arm's length terms at the time when the Vessel is fixed; or

(e)   to de-activate or lay up the Vessel

and forthwith upon being required so to do by the Mortgagee to enter into an assignment to the Mortgagee, as further security for the Outstanding Indebtedness, of the benefit, but not the burden, of any letting of the Vessel whether or not the Mortgagee's consent thereof is required under this Clause 7.13.

7.14   Repairer's Liens

Not without the previous consent in writing of the Mortgagee to put the Vessel into the possession of any person for the purpose of work being done upon her in an amount exceeding or likely to exceed one hundred thousand dollars ($100,000) (or the equivalent in any other currency).

7.15   Maintenance and Protection of the Security

To pay to the Mortgagee on demand all moneys whatsoever which the Mortgagee shall or may expend be put to or become liable for in or about the protection maintenance or enforcement of the security created by this Mortgage or in or about the exercise by the Mortgagee of any of the powers vested in it under the Security Documents and to pay interest thereon at the rate provided for Clause 4.1 (c) hereof from the date whereon such expense or liability was incurred by the Mortgagee until the date of actual receipt (as well after as before any judgment).

7.16   Sharing of Earnings

Not without the previous consent in writing of the Mortgagee to enter into any agreement or arrangement whereby the Earnings may be shared with any other person.

7.17   Investigation, legal expenses, etc.

To pay on demand to the Mortgagee (or as it may direct) the amount of all investigation and legal expenses of any kind whatsoever stamp duties (if any) registration fees and any other charges incurred by the Mortgagee in connection with the preparation, completion and registration of the Security

22

Documents or otherwise in connection with the Outstanding Indebtedness and the security therefor and pay interest thereon at the rate prescribed in Clause 4.1 (c) hereof from the date whereon such expense or liability was incurred by the Mortgagee, until the date of payment whether before or after any relevant judgment.

7.18   Manager

Not without the previous consent in writing of the Mortgagee (and then only on and subject to such terms and conditions as the Mortgagee from time to time may agree) to appoint a manager of the Vessel other than the Approved Manager.

7.19   Books of account

To keep proper books of account in respect of the Vessel and her Earnings and as and when the Mortgagee may so require make such books available for inspection on behalf of the Mortgagee and furnish satisfactory evidence that the wages and allotments and the insurance and pension contributions of the Master and crew are being regularly paid and that all deductions from crew's wages in respect of tax and/or social security liability are being properly accounted for and that the Master has no claim for disbursements other than those incurred by him in the ordinary course of trading on the voyage then in progress;

7.20   Compliance with Environmental laws - Notification

The Owner further covenants with the Mortgagee that throughout the Security Period the Owner will:

(a)   comply, or procure compliance with, all Environmental Laws and Environmental Approvals relating to the Vessel, her operation or management and the business of the Owner from time to time;

(b)   notify the Mortgagee forthwith upon:

(i)   any Environmental Claim being or made against the Owner, the Approved Manager or otherwise in connection with the Vessel; or

(ii)   any Environmental Incident occurring,

and keep the Mortgagee promptly advised, in writing on such regular basis and in such detail as the Mortgagee shall require, of the Owner's response to such Environmental Claim or Environmental Incident.

7.21   Safety Management System ("SMS")

Without prejudice to its other obligations under this Deed, the Owner undertakes throughout the Security Period (and shall procure that the Approved Manager takes all necessary action):

23

(a)  to implement and maintain a safety management system ("SMS") which complies with all laws, rules and regulations, and with all the codes, guidelines and standards recommended by the International Maritime Organisation (including without limitation Resolution A.741(18) of the International Maritime Organisation), the flag state of the Vessel and the Vessel's Classification Society, which may from time to time be applicable to the Vessel and/or the Owner and/or the Approved Manager, and which is otherwise appropriate having regard to the Owner's obligations under this Mortgage;

(b)  to maintain on board the Vessel at all times valid certificates evidencing compliance with the requirements of Clause 7.3;

(c)  to take immediate action to remedy any deficiency in (as the case may be) its or the Approved Manager's SMS notified to it by the Mortgagee.

7.23  Anti-Drug Abuse Act of 1986

The Owner agrees to take (and to procure that the Approved Manager takes) all reasonable precautions to prevent any infringements of the Anti-Drug Abuse Act 1986 of the United States of America (as the same may be amended and/or re-enacted from time to time hereafter) or any similar legislation applicable to the Vessel in any other jurisdiction in which the Vessel shall trade and, for this purpose the Owner shall inter alia enter into a "Carrier Initiative Agreement" the United States' Customs Service and procure that the same or similar agreement is maintained in full force and effect and its obligations thereunder performed by the Owner in respect of the Vessel throughout the Security Period.

7.24  Recordation of Mortgage

(a)  Forthwith upon the execution of this Mortgage by or on behalf of the Owner and the acceptance thereof by or on behalf of the Mortgagee to procure the due and proper legalisation thereof and the recordation thereof against the Vessel by recording this Mortgage in the Liberian Registry pursuant to the pertinent legislation of the Republic of Liberia.

(b)  To keep this Mortgage registered as a First Preferred Mortgage on the Vessel under and in accordance with the laws of the Republic of Liberia in due time and for this purpose to deliver, execute and record within two (2) months of the date hereof any and all such documents or things as may be necessary or desirable permanently to register and/or to preserve this Mortgage as a valid First Preferred Mortgage on the Vessel and to deliver to the Mortgagee forthwith upon request all appropriate certificates that this Mortgage is duly registered as a First Preferred Mortgage on the Vessel.

7.25  Notice of Mortgage

At all times to carry on board the Vessel a duly certified copy of this Mortgage on board the Vessel (which shall form part of the Vessel's

24

documents) and to cause the same to be shown to any persons having business with the Vessel which might create or imply any commitment or encumbrance whatsoever on the Vessel and to place and maintain in a conspicuous place in the navigation room and in the Master's cabin of the Vessel a framed printed notice in plain type in the following form:

"NOTICE OF NAVAL MORTGAGE

This Vessel is mortgaged by the Owner thereof ADAMASTOS SHIPPING & TRADING S.A. of Monrovia, Liberia with a First Preferred Ship Mortgage to PIRAEUS BANK A.E. under authority of Title 21 of the Liberian Code of Laws 1956 as amended and other pertinent legislation and pursuant also to the terms of the said Mortgage, a certified copy of which is preserved with the Vessel's papers. Therefore, neither the Owner nor any charterer nor the Master of this Vessel nor any other person has any right, power or authority to create, incur or permit to be imposed upon this Vessel any lien whatsoever other than liens commitments or encumbrances for crew's wages and salvage."

7.26   International Ship and Port Facilities Security (ISPS) Code

The Owner further undertakes throughout the Security Period (and shall procure that the Approved Manager takes all necessary action) for full compliance with the provisions of the International Ship and Port Facilities Security (ISPS) Code and the other respective amendments of SOLAS Convention and to maintain on board the Ship at all times valid certificates evidencing compliance with this Clause.

## 8.   PROTECTION OF SECURITY

8.1   The Mortgagee shall without prejudice to its other rights and powers hereunder be entitled (but not bound) at any time and as often as may be necessary to take any such action as it may in its discretion think fit for the purpose of protecting or maintaining the security created by this Mortgage and the other Security Documents (including, without limitation, such action as is referred to in Clause 8.2) and each and every expense, liability, or loss (including, without limitation, legal fees) so incurred by the Mortgagee in or about the protection or maintenance of the said security shall be repayable to it by the Owner on demand together with interest thereon at the rate provided for in Clause 4.1 (c) hereof from the date whereon such expense or liability or loss was incurred by the Mortgagee until the date of actual receipt (as well after as before any judgment).

8.2   Without prejudice to the generality of the foregoing:

(a)   in every case that the provisions of Clause 6.1 or any of them shall not be complied with the Mortgagee shall be at liberty to effect and thereafter to maintain all such Insurances in such manner as in its discretion it may think fit and to require that all policies, contracts and other records relating to the Insurances (including details of and correspondence concerning outstanding claims) be forthwith delivered

25

to such brokers as the Mortgagee may nominate and to collect, receive, compromise and give a good discharge for all claims then outstanding or thereafter arising under the Insurances or any of them and to take over or institute (if necessary using the name of the Owner) all such proceedings in connection therewith as the Mortgagee in its absolute discretion may think fit and to permit the brokers through whom the collection or recovery is effected to charge the usual brokerage therefor; and

(b)     in the event that the provisions of Clause 7.4 and/or 7.5 hereof or any of them shall not be complied with the Mortgagee shall be at liberty to arrange for the carrying out of such repairs to and/or surveys of the Vessel as it deems expedient or necessary; and

(b)     in the event that the provisions of Clause 7.6 hereof or any of them shall not be complied with the Mortgagee shall be at liberty to pay and discharge all such debts, damages and liabilities as are therein mentioned and/or to take any such measures as it deems expedient or necessary for the purpose of securing the release of the Vessel.

## 9.     MORTGAGEE'S POWERS ON EVENT OF DEFAULT

9.1     Upon the happening of any of the Events of Default specified in Clause 9 of the Loan Agreement, including but not limited to any failure of the Owner or any other party to any of the other Security Documents (other than the Mortgagee) to pay when due any sum payable pursuant to the Loan Agreement or any of the other Security Documents or any default of the Owner or any other Security Party in the performance of their obligations under the Loan Agreement or any of the other Security Documents, the security created by this Mortgage shall become immediately enforceable and the Outstanding Indebtedness shall become immediately due and payable to the Mortgagee (whether or not the Mortgagee shall have given notice to the Owner, and without being necessary to obtain a judgment or court order or declaration in any jurisdiction that an Event of Default has occurred) and the Mortgagee shall become forthwith entitled as and when it may see fit to put into force and exercise all or any of the rights, powers and remedies possessed by it as mortgagee of the Vessel or otherwise (under law, by virtue of this Mortgage or otherwise) and in particular (but without limitation):

(a)     to take possession of the Vessel (whether actually or constructively) and/or otherwise to take control of the Vessel wherever the Vessel may be and cause the Owner or any other person in possession of the Vessel forthwith to surrender the same to the Mortgagee without legal process and without liability of the Mortgagee for any losses or damages incurred thereby and without having to render accounts to the Owner in connection therewith and the Owner shall forthwith, upon being required to do so, surrender possession and control of the Vessel to the Mortgagee at its own cost and expense whereupon (inter alia) the Master, officers and crew shall comply with the instructions given from time to time by or on behalf of the Mortgagee;

(b)    to require that all policies, contracts and other records relating to the Insurances (including details of and correspondence concerning outstanding claims) be forthwith delivered to or to the order of the Mortgagee;

(c)    to collect, recover, compromise and give a good discharge for any and all moneys or claims for moneys then outstanding or thereafter arising under the Insurances or in respect of the Earnings or any Requisition Compensation and to permit any brokers through whom collection or recovery is effected to charge the usual brokerage therefor;

(d)    to take over or institute (if necessary using the name of the Owner) all such proceedings in connection with the Vessel, the Insurances, the Earnings or any Requisition Compensation as the Mortgagee in its absolute discretion thinks fit and to discharge, compound, release or compromise claims against the Owner in respect of the Vessel which have given or may give rise to any charge or lien on the Vessel or which are or may be enforceable by proceedings against the Vessel;

(e)    to sell the Vessel or any interest therein (after twenty calendar days' prior notice to the Owner and other mortgagees of record (if any) or such lesser period of notice (or no notice at all) as may be permitted under the Liberian law from time to time and with or without the benefit of any charterparty or other contract for her employment, by public auction or private contract at such place and upon such terms (including, without limitation, on terms such that payment of some or all of the purchase price be deferred) as the Mortgagee in its absolute discretion may determine with power to postpone any such sale, without being answerable for any loss occasioned by such sale or resulting from postponement thereof, and/or itself to purchase the Vessel at any such public auction and to set-off the purchase price against all or any part of the Outstanding Indebtedness;

(f)    to manage, insure, maintain and repair the Vessel and to charter, employ, sail or lay up the Vessel in such manner, upon such terms and for such period as the Mortgagee in its absolute discretion deems expedient and for the purposes aforesaid the Mortgagee shall be entitled to do all acts and things incidental or conducive thereto and in particular to enter into such arrangements respecting the Vessel, and the insurance, management, maintenance, repair, classification, chartering employment of the Vessel, in all respects as if the Mortgagee were the owner of the Vessel and without being responsible for any loss thereby incurred;

(g)    to recover from the Owner on demand any such expenses, liabilities or losses as may be incurred by the Mortgagee in or about the exercise of the power vested in the Mortgagee under Clause 9.1(f) above with interest thereon at the rate provided for in Clause 4.1 (c) hereof from the date when such expenses, liabilities or losses were incurred by the Mortgagee until the date of payment by judgment; and

(h)    generally, to recover from the Owner on demand each and every expense, liability or loss incurred by the Mortgagee in or about or

27

incidental to the exercise by it of any of the powers aforesaid together with interest thereon at the rate provided for in Clause 4.1 (c) hereof from the date when such expenses payments or disbursements were incurred by the Mortgagee until the date of actual receipt (as well after as before any judgment).

9.2   The Mortgagee shall not be obliged to make any enquiry as to the nature or sufficiency of any payment received by it under this Mortgage or to make any claim, take any action or enforce any rights and benefits assigned to the Mortgagee by this Mortgage or to which the Mortgagee may at any time be entitled hereunder.

9.3   The Mortgagee shall be entitled to do all acts and things incidental or conducive to the exercise of any of the rights, powers or remedies possessed by it as mortgagee of the Vessel (whether at law, under this Mortgage or otherwise) and in particular (but without prejudice to the generality of the foregoing), upon becoming entitled to discharge any cargo on board the Vessel (whether the same shall belong to the Owner or any other person) and to enter into such other arrangements in respect of the Vessel, her insurances, management, maintenance, repair, classification and employment in all respects as if the Mortgagee was the owner of the Vessel, but without being responsible for any loss incurred as a result of the Mortgagee doing or omitting to do any such acts or things as aforesaid.

9.4   Neither the Mortgagee nor its agents, managers, officers, employees, delegates and advisers shall be liable for any expense, claim, liability, loss, cost, damage or expense incurred or arising in connection with the exercise or purported exercise of any rights, powers and discretions under this Mortgage in the absence of gross negligence or willful misconduct.

9.5   The Mortgagee shall not by reason of the taking possession of the Vessel be liable to account as mortgagee-in-possession or for anything except actual receipts or be liable for any loss upon realisation or for any default or omission for which a mortgagee-in-possession might be liable.

9.6   Upon any sale of the Vessel or any interest therein by the Mortgagee the purchaser shall not be bound to see or enquire whether the Mortgagee's power of sale has arisen in the manner provided in this Mortgage and the sale shall be deemed to be within the power of the Mortgagee and shall divest the Owner of all rights, title and interest of any nature whatsoever in the Vessel and to bar any such interest of the Owner and all persons claiming through, by or under the Owner, notwithstanding the observance or not by the Mortgagee of the terms and conditions therefor which are set forth herein and the receipt of the Mortgagee for the purchase money shall effectively discharge the purchaser who shall not be concerned with the manner of application on the proceeds of sale or be in any way answerable therefor.

**10.   APPLICATION OF MONEYS**

10.1  All moneys received by the Mortgagee:

28

(a)   in respect of a sale of the Vessel or any interest therein;

(b)   in respect of recovery under the Insurances (other than any such sum or sums as may have been received by the Mortgagee in accordance with Clause 3.1 (b) of the Assignment and which has or have been paid over to the Owner as therein provided);

(c)   in respect of Requisition Compensation;

(d)   in respect of net profits arising out of the employment of the Vessel pursuant to Clause 9.1(f);

shall be held by it upon trust in the first place to pay or make good all such expenses, liabilities, losses, costs, duties, fees, charges or other moneys whatsoever [together with interest payable thereon under Clause 4.1(c)] as may have been paid or incurred by the Mortgagee in or about or incidental to the exercise by the Mortgagee of the powers specified or otherwise referred to in Clause 8 and 9.1 hereof or any of them and the balance shall be applied in discharge of the Outstanding Indebtedness and/or any other sum or sums due to the Mortgagee pursuant to the provisions of Clause 10.2 of the Loan Agreement.

PROVIDED THAT, notwithstanding the foregoing, the Mortgagee may, at its absolute discretion, apply such monies on its own books of account in any order or priority without affecting the obligations of the Owner to the Mortgagee.

## 11.   DELEGATION

The Mortgagee shall be entitled at any time and as often as may be expedient to delegate by power of attorney or in any other manner to any person or persons all or any of the powers, authorities and discretions which are for the time being exercisable by the Mortgagee under this Mortgage (including the powers vested in it by virtue of Clause 13 hereof). Any such delegation may be made upon such terms and subject to such regulations as the Mortgagee may think fit. The Mortgagee shall not be in any way liable or responsible to the Owner for any loss or damage arising from any act, default, omission or misconduct on the part of any such delegate.

## 12.   INDEMNITIES

12.1  The Owner will indemnify and save harmless the Mortgagee and each agent or attorney appointed under or pursuant to this Mortgage from and against any and all expenses, claims, liabilities, losses, taxes, costs, duties, fees and charges suffered, incurred or made by the Mortgagee or such agent or attorney:

(a)   in the exercise or purported exercise of any rights, powers or discretions vested in them pursuant to this Mortgage; or

(b)   in the preservation or enforcement of the Mortgagee's rights under this Mortgage; or

29

(c)  on the release of the Vessel or any share therein from the security created by this Mortgage,

and the Mortgagee, each such agent or attorney may retain and pay all sums in respect of the same out of money received under the powers conferred by this Mortgage. All such amounts recoverable by the Mortgagee, each such agent or attorney shall be recoverable on a full indemnity basis.

12.2  If any sum due from the Owner under or in connection with the Loan Agreement, this Mortgage or under any order or judgment given or made in relation to the Loan Agreement and this Mortgage (or either of them) has to be converted from the currency (the "first currency") in which the same is payable under the Loan Agreement and this Mortgage (or either of them) or under such order or judgment into another currency (the "second currency") for the purpose of (a) making or filing a claim or proof against the Owner, (b) obtaining an order or judgment in any court or other tribunal, or (c) enforcing any order or judgment given or made in relation to the Loan Agreement and this Mortgage (or either of them), the Owner shall indemnify and hold harmless the Mortgagee from and against any loss or damage suffered as a result of any discrepancy between (i) the rate of exchange used for such purpose to convert the sum in question from the first currency into the second currency and (ii) the rate or rates of exchange at which the Mortgagee may in the ordinary course of business purchase the first currency with the second currency upon receipt of a sum paid to them in or towards satisfaction of any such order, judgement, claim or proof.

12.3  The indemnity contained in this Clause 12 shall apply irrespective of any indulgence granted to the Owner from time to time and shall continue in full force and effect notwithstanding any payment in favour of the Mortgagee and any amount due from the Owner under this Clause 12 will be due as a separate debt and shall not be affected by judgement being obtained for any other sums due under or in respect of the Loan Agreement and this Mortgage (or either of them).

**13.    POWER OF ATTORNEY**

13.1  The Owner, by way of security and in order more fully to secure the performance of the Owner's obligations under this Mortgage, HEREBY IRREVOCABLY APPOINTS (such appointment being coupled with an interest of the Mortgagee) the Mortgagee as its attorney for the duration of the Security Period for the purposes of:

(a)  doing in its name all acts and executing, signing and (if required) registering in its name all documents which the Owner, itself could do execute, sign or register in relation to the Vessel (including without limitation, transferring title to the Vessel to a third party) (after prior notice of at least 20 calendar days to the Owner) (or such lesser period of notice (or no notice at all) as may be permitted under Liberian law from time to time) Provided however that such power shall not be exercisable by or on behalf of the Mortgagee until the Outstanding Indebtedness shall have become repayable on demand (whether or not

30

such demand shall have been made) under the Loan Agreement and the security constituted by this Mortgage shall become immediately enforceable pursuant to Clause 9.1 hereof; and

(b)   executing, signing, perfecting, doing and (if required) registering every such further assurance document, act or thing as is referred to in Clause 15.

13.2   The exercise of such power as is referred to in Clause 13.1 by or on behalf of the Mortgagee shall not put any person dealing with the Mortgagee upon any enquiry as to whether the Loan has become repayable on demand and/or this Mortgage has become enforceable nor shall such person be in any way affected by notice that such security has not become repayable and/or this Mortgage has not become enforceable and in relation to both Clauses 13.1(a) and 13.1(b), the exercise by the Mortgagee of such power shall be conclusive evidence of its right to exercise the same.

## 14.   FURTHER ASSURANCES

The Owner hereby further undertakes at its own expense to execute sign perfect do (and if required) register every such further assurance document act or thing as in the opinion of the Mortgagee may be necessary or desirable for the purpose of more effectual mortgaging and charging the Vessel or perfecting the security constituted or intended to be constituted by this Mortgage and the covenants and obligations of the Owner under this Mortgage shall inure to the benefit of any such assignee of the Mortgagee as is referred to in Clause 23.1.

## 15.   EXPENSES

The Owner covenants that it will pay to the Mortgagee (or as it may direct) on demand the amount of all investigation and legal fees, costs and expenses of any kind whatsoever (inclusive of value added tax thereon) stamp duties (if any) registration fees and any other charges and Taxes thereon incurred by the Mortgagee or for which the Mortgagee may become liable in connection with: (a) the negotiation, preparation, completion and (if required) registration of the Loan Agreement, this Mortgage and the other Security Documents and the preserving or enforcing of, or attempting to preserve or enforce, the security created by this Mortgage or otherwise in connection with the Outstanding Indebtedness and the security therefor; and (b) any variation of, or amendment or supplement to, any of the terms of, or any consent or waiver required from the Mortgagee in relation to, the Loan Agreement and the Security Documents (or any of them), and in any case, regardless of whether the same is actually implemented, completed or granted as the case may be.

## 16.   MISCELLANEOUS

16.1   If any provision in this Mortgage be or becomes invalid or unenforceable under any applicable law, the provisions thereof shall in all other respects remain in full force and effect and the provision in question shall be ineffective to the extent (but only to the extent) of its disconformity with the requirement of the applicable law and if it is competent to the parties to waive any requirements which would otherwise operate as aforesaid those

31

requirements are hereby waived to the extent permitted by such law to the end that this Mortgage shall be valid binding and enforceable in accordance with its terms.

16.2 For the purposes of enforcement, the Interest Rate in respect of each Interest Period, the default interest rate, the occurrence of an Event of Default and in particular the failure of Owner to pay any amount due when it was due and the amount at any time due from the Owner under the Loan Agreement and this Mortgage shall be proven by a certificate of the Mortgagee, which is hereby agreed that it shall be conclusive and binding upon the Owner (save for manifest error).

## 17.   PREFERRED STATUS

No provision in this Mortgage can be interpreted or construed as constituting a waiver of the preferred status of this Mortgage and particularly in respect to the lien created hereby in relation to the other liens under the laws of any applicable jurisdiction or forum anywhere world-wide.

## 18.   CONSIDERATION

The Owner has agreed to execute this Mortgage in favour of the Mortgagee in consideration of the Mortgagee agreeing, subject to and upon the terms and conditions set out in the Loan Agreement, to advance the Loan to the Borrower (it being a condition, inter alia, of the Mortgagee's obligation to maintain the Loan that this Mortgage be executed by the Owner).

## 19.   COUNTERPARTS

This Mortgage may be executed in any number of counterparts each of which shall be an original but such counterparts shall together constitute but one and the same instrument.

## 20.   RECORDATION CLAUSE

For the purpose of recording this First Preferred Mortgage as required by Chapter 3 of Title 21 of the Liberian Code of Laws of 1956 as amended, the total amount is U.S. Dollars Twenty Five Million (US$25,000,000) which represents the Loan secured by this Mortgage, plus interest, other amounts to become due under the Mortgage and performance of Mortgage covenants. The maturity of the Loan is 14 December, 2019 and the discharge amount is the same as the aforesaid amount plus interest and costs.

## 21.   NOTICES AND COMMUNICATIONS

The provisions of Clause 18 of the Loan Agreement (NOTICES) shall apply mutatis mutandis in relation to any notice, demand or other communication under this Mortgage.

32

## 22.   ASSIGNMENTS

22.1   This Mortgage shall be binding upon and shall enure to the benefit of the Owner and the Mortgagee and their respective successors and permitted assigns and references in this Mortgage shall be construed accordingly, provided that the Owner may not assign or transfer all or any part of its rights and/or obligations under this Mortgage.

22.2   The Mortgagee shall be entitled to assign or transfer the whole or any part of its rights or obligations under this Mortgage without the consent of the Owner to any other bank or financial institution or any other entity howsoever involved in the financing and investments business. Following any such assignment or transfer, the Mortgagee shall notify the Owner in writing following which any such assignee shall substitute for the Mortgagee in all of its rights and obligations hereunder or to such part of them as may be assigned or transferred and the Owner hereby undertakes to execute and deliver and/or procure execution and delivery of, all documents, instruments, acts and things which the Mortgagee or the assignee/transferee may request for giving effect to and/or perfecting any such assignment or transfer but without any expense for the Owner.

## 23.   APPLICABLE LAW AND JURISDICTION

23.1   This Mortgage shall be governed by and construed in accordance with the laws of the Republic of Liberia.

23.2   (a)   In relation to any legal action or proceeding arising out of or in connection with this Mortgage and for the exclusive benefit of the Mortgagee, the Owner hereby irrevocably and unconditionally:

(i)   submits to the jurisdiction of the Courts of Piraeus and waives any objection to proceedings with respect to this Mortgage in such Courts on the grounds of venue or convenience forum; and

(ii)   appoints Mr. George Miltiadis Aspiotis, attorney-at-law, of 116, Kolokotroni Street & Defteras Merarchias Street, 185 35 Piraeus, Greece as its agent (antiklitos) for service of process in respect of such proceedings and undertakes to maintain throughout the term of this Mortgage such agent (*antiklitos*) for such purposes, failing which the Mortgagee may validly serve any action, process or document addressed to the Owner to the Procurator of the Court of First Instance of Piraeus.

(b)   Nothing in this Clause shall affect the Mortgagee's right to serve process in any other manner permitted by law or limit the right of the Mortgagee to take proceedings with respect to this Mortgage in any jurisdiction (including, without limitation, any jurisdiction where the Vessel may be located) nor shall the taking of proceedings with respect to this Mortgage in any jurisdiction preclude the Mortgagee from taking proceedings in any other jurisdiction or jurisdictions, whether concurrently or not.

23.3 Without prejudice to the generality of Clause 23.2, the Mortgagee shall have the right to arrest and take action against the Vessel at whatever place the Vessel shall be found lying and for the purpose of any action which the Mortgagee may bring before the Courts of such jurisdiction or other judicial authority and for the purpose of any action which the Mortgagee may bring against the Vessel, any writ, notice, judgment or other legal process or documents may (without prejudice to any other method of service under applicable law) be served upon the Master of the Vessel (or upon any one acting as her Master) and such service shall be deemed good service on the Owner for all purposes.

**IN WITNESS** whereof the Owner has executed this Mortgage the day and year first above written.


**ADAMASTOS SHIPPING &**
**TRADING S.A.**


By: _____

G. D. GOURDOMICHALIS
Attorney-in-fact

34

ACKNOWLEDGEMENT

............................    )

...............................    )

On this 14 day of December, 2012 before me personally appeared . G.D. Goordomichalis
......................................., to me known, who being by me duly sworn
deposes and says that he/she resides at . 95, Akti Miaouli Street, Piraeus, Greece
that he/she is an attorney-in-fact of ADAMASTOS SHIPPING & TRADING S.A.
the corporation described in and which executed the foregoing instrument and that
he/she signed his/her name thereto pursuant to authority from the Board of
Directors of said Corporation.



----------------------------------
MARIA XAGORARI

SPECIAL AGENT LIBERIA MARITIME AUTHORITY

ANNEX A

Dated : 13 December, 2012

between

**ADAMASTOS SHIPPING & TRADING S.A.**
(the "Borrower")

and

**PIRAEUS BANK A.E.**
(the "Lender")

**LOAN AGREEMENT**
For up to United States Dollars 25,000,000

2

## TABLE OF CONTENTS

| | | PAGE |
|---|---|---|
| 1. | PURPOSE AND DEFINITIONS | 3 |
| 2. | REPRESENTATIONS AND WARRANTIES | 11 |
| 3. | THE LENDER'S COMMITMENT | 15 |
| 4. | AVAILABILITY AND DRAWDOWN | 16 |
| 5. | THE ADVANCE OF THE COMMITMENT | 21 |
| 6. | REPAYMENT AND PREPAYMENT | 22 |
| 7. | INTEREST AND INTEREST PERIODS | 24 |
| 8. | PAYMENTS - LOAN ACCOUNT | 25 |
| 9. | EVENTS OF DEFAULT | 26 |
| 10. | SECURITY, APPLICATION CLAUSE AND MAINTENANCE OF SECURITY | 29 |
| 11. | UNDERTAKINGS AND COVENANTS | 31 |
| 12. | OPERATING ACCOUNT | 37 |
| 13. | FEES AND EXPENSES | 38 |
| 14. | FORCE MAJEURE, ILLEGALITY, INCREASED COST AND CHANGE OF CIRCUMSTANCES. | 39 |
| 15. | COSTS-INDEMNITY | 42 |
| 16. | SET-OFF | 43 |
| 17. | ASSIGNMENT | 44 |
| 18. | NOTICES | 44 |
| 19. | MISCELLANEOUS | 45 |
| 20. | APPLICABLE LAW AND FORUM | 46 |
| | SCHEDULE 1 - DRAWDOWN NOTICE | 48 |



3

**THIS LOAN AGREEMENT** is made on the 13th day of December, 2012

**BETWEEN**

(1)   **ADAMASTOS SHIPPING & TRADING S.A.** as borrower (hereinafter called the "**Borrower**");

(2)   **PIRAEUS BANK A.E.** as lender (hereinafter called the "**Lender**")

**WHEREAS**

The Lender has agreed to make available to the Borrower a loan facility of up to United States Dollars Twenty Five Million (US$25,000,000) (the "**Loan**") in up to six (6) advances upon and subject to the terms and conditions contained in this Agreement.

**WHEREBY IT IS AGREED**

**1.    PURPOSE AND DEFINITIONS**

1.1    The purpose of the Loan is to assist the Borrower with the cost of acquisition and repairs of m.v. "V-Rod" (to be renamed "Adamastos").

1.2    In this Agreement in addition to the terms elsewhere defined in this Agreement the words and expressions specified below shall have the meaning attributed to them below:

"**Accounts Pledge**" means the pledge over the Operating Account and the Retention Account executed or to be executed in favour of the Lender as security of the obligations of the Borrower arising out of this Agreement in such form or forms as the Lender may require or approve and as the same may from time to time be supplemented and/or amended;

"**Advance**" means any of Advance A or Advance B and "**Advances**" means both of them;

"**Advance A**" means an amount of up to U.S. Dollars Twenty Four Million (US$24,000,000) which is to be advanced to the Borrower for the partial financing of the cost of acquisition of the Vessel consisting of Tranche A and Tranche B;

"**Advance B**" means an amount of up to U.S. Dollars One Million (US$1,000,000) which is to be advanced to the Borrower in up to five (5) Sub-Advances for the partial financing of the repairs of the Vessel consisting of Tranche C;

"**Applicable Margin**" means:

4

    (i)      in respect of Tranche A, two and seventy five centesimals per centum (2.75%) per annum;

    (ii)     in respect of Tranche B, twenty five centesimals per centum (0.25%) per annum;

    (iii)    in respect of Tranche C, two and seventy five centesimals per centum (2.75%) per annum;

**"Approved Manager"** means, for the time being, PHOENIX SHIPPING & TRADING S.A., a company incorporated under the laws of the Republic of Marshall Islands, having its registered office at Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro, Marshall Islands MH 96960, and having established an office in Greece under Greek laws 89/67, 378/68, 27/75, 814/78 and 2234/94 and other pertinent legislation at 25, Akti Miaouli, Piraeus, Greece, which is to be the manager of the Vessel or any other company which the Lender may approve from time to time as the manager of the Vessel;

**"Approved Manager's Undertaking"** means a letter of undertaking addressed to the Lender for its acceptance executed or to be executed by the Approved Manager in favour of the Lender as security of the obligations of the Borrower arising out of this Agreement in such form and substance as the Lender shall require and as the same may from time to time be supplemented and/or amended;

**"Assignment"** means a first priority general assignment of Earnings, Insurances and Requisition Compensation in respect of the Vessel executed or to be executed by the Borrower in favour of the Lender as security of the obligations of the Borrower under this Agreement in such form as the Lender may approve or require and as the same may from time to time be supplemented and/or amended;

**"Availability Period"** means a period commencing on the date of this Agreement and ending on the Final Availability Date in respect of each Advance;

**"Banking Day"** means a day on which in Piraeus, Athens, London and New York City and in each country or place in or at which any act is required to be done under this Agreement, banks and the relevant foreign exchange markets are open for the transaction of business of the nature concerned;

**"Borrower"** means Adamastos Shipping and Trading S.A., a company incorporated under the laws of the Republic of Liberia, having its registered office at 80, Broad Street, Monrovia, Liberia, which is to be the owner of the Vessel;

**"Cash Surplus"** means, in relation to the calculation of Cash Sweep during each relevant Financial Period, the aggregate of the actual Earnings of the Vessel after deducting: (a) the aggregate of the Operating Expenses of the Vessel actually incurred (b) the aggregate of any special and/or intermediate survey and/or drydocking expenses (if any) actually in-

5

curred in respect of the Vessel excluding, in respect of the calculation during the first Financial Period, the repair costs that are to be financed by Tranche C hereunder (c) the aggregate amount actually paid by the Borrower towards repayment of Tranche A, Tranche B and/or Tranche C including principal and interest;

**"Cash Sweep"** means, in relation to repayment of Tranche A pursuant to Clause 6.1 (b) fifty per centum (50%) of Cash Surplus;

**"Commitment"** means the total sum of up to U.S. Dollars Twenty Five Million (US$25,000,000) to be made available by the Lender to the Borrower in accordance with Clause 5, subject to the terms and conditions of this Agreement;

**"Compulsory Acquisition"** means requisition for title or other compulsory acquisition, requisition, appropriation, expropriation, deprivation, forfeiture or confiscation of the Vessel for any reason by any government entity or other competent authority, whether *de jure* or *de facto*, but shall exclude requisition for use or hire not involving requisition of title;

**"Dollars", "U.S. Dollars", "US$" and "$"** means the lawful currency of the United States of America at any relevant time hereunder;

**"Drawdown Date"** means, in relation to each Advance or Sub-Advance, the Banking Day on which such Advance or Sub-Advance is drawn down in accordance with Clauses 3, 4 and 5;

**"Earnings"** means, in relation to the Vessel, all moneys whatsoever due or to become due to or for the account of the owner thereof at any time during the Security Period arising out of the use or operation of the Vessel including (but not limited to) all freight, hire and passage moneys, compensation payable to such owner in the event of requisition of the Vessel for hire, remuneration for salvage and towage services, demurrage and detention moneys and damages for breach (or payments for variation or termination) of any charterparty or other contract for the employment of the Vessel and all sums recoverable under insurances in respect of loss of Earnings (and including, if and whenever the Vessel is employed on terms whereby any or all such moneys as aforesaid are pooled or shared with any other person, that proportion of the net receipts of the relevant pooling or sharing arrangement which is attributable to the Vessel);

**"Encumbrance"** means a mortgage, charge, pledge, lien, hypothecation, assignment, trust arrangement, title retention or other encumbrance or interest given by way of security or arrangement of any kind whatsoever;

**"Event of Default"** means any of the events of default set out in Clause 9.1;

**"Final Availability Date"** means, in relation to Advance A, 30th December 2012 and in relation to Advance B, 31st March, 2013 (or any such later time that the Lender may approve in its absolute discretion);

**"Financial Period"** means, in relation to calculation of Cash Sweep, each calendar year of the Security Period;

**"Indebtedness"** means in relation to any person (a) monies borrowed or raised by such person, (b) any liability of such person under debenture, bond, note or other security, (c) any liability of such person under acceptance credit facilities, financial leases, deferred purchase consideration arrangements or any other agreement or instrument having the commercial effect of a borrowing of money by such person and (d) any guarantee, indemnity or other assurance against financial loss given by such person in respect of any of the foregoing;

**"Interest Payment Date"** means the last day of an Interest Period (other than an Interest Period relating to Tranche B with the exception of the last such Interest Period relating to Tranche B) provided that if an Interest Period in relation to any Tranche of the Loan (other than Tranche B) extends for any reason whatsoever beyond any Repayment Date, such Repayment Date shall be an Interest Payment Date;

**"Interest Period"** means each three-month period in respect of any part of the Loan in respect of which the Interest Rate is computed commencing on the date of expiration of the immediately preceding Interest Period

Provided Always That:

(i)     if the last day of an Interest Period would, but for the provision of this paragraph, fall on a day which is not a Banking Day, then such Interest Period shall be extended to the immediately following Banking Day unless such immediately following Banking Day falls in the next calendar month in which case the last day of such Interest Period shall fall on the immediately preceding Banking Day;

(ii)    any Interest Period which commences on the last day of a calendar month and any Interest Period which commences on the day on which there is no numerically corresponding day in the calendar month during which such Interest Period is due to end, shall end on the last Banking Day of the calendar month during which such Interest Period is due to end;

(iii)   the first Interest Period in relation to Sub-Advance B2 other than Sub-Advance B1 shall commence on the relevant Drawdown Date and end on the last day of the then current Interest Period in relation to Sub-Advance B1 so that, following the advance of the entire amount that is to be advanced hereunder by the Lender to the Borrower under Tranche C of the Loan and the end of the first Interest Period in relation to the last such Sub-Advance interest shall be calculated thereafter on the