# EXHIBIT 10

Dated 30 December 2014

**VIGOROUS SHIPPING & TRADING S.A.**
as Owner

and

**CIT FINANCE LLC**
in its capacity as Security Agent and trustee
as Mortgagee

**FIRST PREFERRED LIBERIAN MORTGAGE**

relating to
m.v. "VIGOROUS"

WATSON FARLEY
&
WILLIAMS

## Index

| Clause | | Page |
|---|---|---|
| 1 | Definitions and Interpretation | 1 |
| 2 | Covenant to Pay and Perform | 2 |
| 3 | Mortgage | 2 |
| 4 | Undertakings | 3 |
| 5 | Protection of Security | 4 |
| 6 | Enforceability and Mortgagee's Powers | 5 |
| 7 | Protection of Third Parties | 7 |
| 8 | Application of Moneys | 7 |
| 9 | Further Assurance | 7 |
| 10 | Power of Attorney | 8 |
| 11 | Incorporation of Facility Agreement Provisions | 8 |
| 12 | Total Amount | 9 |
| 13 | Supplemental | 9 |
| 14 | Changes to the Parties | 9 |
| 15 | Governing Law | 10 |
| 16 | Enforcement | 10 |

**THIS FIRST PREFERRED LIBERIAN MORTGAGE** is made on 30 December 2014

**PARTIES**

(1) **VIGOROUS SHIPPING & TRADING S.A.,** a corporation incorporated in the Republic of Liberia whose registered office is at 80 Broad Street, Monrovia, Republic of Liberia (the **"Owner"**)

(2) **CIT FINANCE LLC**, acting in its capacity as Security Agent and trustee through its office at 11 West 42nd Street, New York, New York, 10036, U.S.A. (the **"Mortgagee"**)

**BACKGROUND**

(A) The Owner is the sole owner of the whole of the vessel "VIGOROUS" registered under the laws and flag of the Republic of Liberia with Official Number 16411.

(B) By the Facility Agreement the Lenders agreed to make available to Brazen Shipping and Trading S.A. and Dashing Shipping S.A. of The Republic of Liberia in their capacity as joint and several borrowers (the "**Borrowers**") a facility of (originally) up to US$24,150,000. The form of the Facility Agreement without attachments is annexed to this Mortgage marked "A" and forms an integral part of this Mortgage.

(C) Under the terms of the Facility Agreement, Blue Wall Shipping Limited (the "**Parent Guarantor**") has guaranteed all the liabilities of the Borrowers under the Finance Documents.

(D) Under the terms of the Facility Agreement, the Owner as collateral guarantor has guaranteed all the liabilities of the Borrowers under the Finance Documents.

(E) By the Facility Agreement, it was agreed that the Mortgagee would hold the Security Property on trust for the Secured Parties.

(F) It is a condition precedent to the continuing availability of the Facility under the Facility Agreement that the Owner executes, delivers and records this Mortgage in favour of the Mortgagee as security for the Secured Liabilities.

(G) This Mortgage is the Mortgage referred to in the Facility Agreement.

(H) The Owner has authorised the execution and delivery of this Mortgage under and pursuant to Chapter 3 of Title 21 of the Liberian Code of Laws of 1956 as amended.

**OPERATIVE PROVISIONS**

**1      DEFINITIONS AND INTERPRETATION**

**1.1    Definitions**

In this Mortgage:

**"Facility Agreement"** means the facility agreement dated 3 September 2014 (as amended and restated pursuant to an amending and restating agreement dated 29 December 2014 and as further amended and supplemented from time to time) and made between, amongst others, (i) the Borrowers, (ii) the Parent Guarantor, (iii) the Owner, (iv) the Original Lenders, (v) the Facility Agent, (vi) the Mortgagee and (vii) the Hedge Counterparties.

**"Finance Documents"** means the finance documents as defined in the Loan Agreement other than any Hedging Agreement.

**"Party"** means a party to this Mortgage.

"**Secured Liabilities**" means all present and future obligations and liabilities (whether actual or contingent and whether owed jointly or severally or in any other capacity whatsoever) of the Owner to the Secured Parties or any of them under or in connection with the Finance Documents to which the Owner is a party (other than any Hedging Agreement) or any of them.

"**Ship**" means the vessel "VIGOROUS" registered in the ownership of the Owner under the laws and flag of the Republic of Liberia with IMO number 9298521 and includes its engines, machinery, boats, tackle, outfit, spare gear, fuel, consumable or other stores, belongings and appurtenances whether on board or ashore and whether owned as at the date of this Mortgage or later acquired.

### 1.2 Defined expressions

Defined expressions in the Facility Agreement shall have the same meanings when used in this Mortgage unless the context otherwise requires or unless otherwise defined in this Mortgage.

### 1.3 Application of construction and interpretation provisions of Facility Agreement

Clause 1.2 (*construction*) of the Facility Agreement applies to this Mortgage as if it were expressly incorporated in it with any necessary modifications.

### 1.4 Inconsistency between Facility Agreement provisions and this Mortgage

This Mortgage shall be read together with the Facility Agreement, but in case of any conflict between the Facility Agreement and this Mortgage, unless expressly provided to the contrary in this Mortgage, the provisions of the Facility Agreement shall prevail to the extent permitted by Liberian law.

### 1.5 Third party rights

Unless expressly provided to the contrary in a Finance Document, a person who is not a Party has no right to enforce any term of this Mortgage.

## 2 COVENANT TO PAY AND PERFORM

### 2.1 Covenant to pay

The Owner shall duly and punctually pay and discharge the Secured Liabilities in the manner provided for in the Finance Documents to which it is a party.

### 2.2 Covenant to perform

The Owner covenants with the Mortgagee to observe and perform all its obligations to the Mortgagee and the other Secured Parties or any of them under the Finance Documents to which it is a party, other than those referred to in Clause 2.1 (*Covenant to pay*).

## 3 MORTGAGE

### 3.1 Mortgage

In consideration of the premises and other good and valuable consideration, the Owner grants, conveys, mortgages, pledges, confirms, assigns, transfers and sets over the whole of the Ship to the Mortgagee as a continuing security for the due and punctual payment and discharge by the Owner of the Secured Liabilities under Clause 2.1 (*Covenant to pay*) and the observation and performance by the Owner of all its obligations under Clause 2.2 (*Covenant to perform*).

54168085v2

3.2    **Extent of property mortgaged**

This Mortgage shall not cover property other than the Ship as the term "**Vessel**" is used in Sub division 1 of Section 106 of Chapter 3 of Title 21 of the Liberian Code of Laws of 1956 as amended.

3.3    **Void provisions**

Any provision of this Mortgage construed as waiving the preferred status of this Mortgage shall, to such extent, be void and of no effect.

3.4    **Continuing and additional security**

(a)    This Mortgage shall remain in force until the end of the Security Period as a continuing security and, in particular:

(i)    the Security created by Clause 3.1 (*Mortgage*) will extend to the ultimate balance of all sums payable by the Owner under the Finance Documents to which it is a party, regardless of any intermediate payment or discharge in whole or in part;

(ii)    the Security created by Clause 3.1 (*Mortgage*), and the rights of the Mortgagee under this Mortgage, are only capable of being extinguished, limited or otherwise adversely affected by an express and specific term in a document signed by or on behalf of the Mortgagee;

(iii)    no failure or delay by or on behalf of the Mortgagee to enforce or exercise a Security created by Clause 3.1 (*Mortgage*) or a right of the Mortgagee under this Mortgage, and no act, course of conduct, acquiescence or failure to act (or to prevent the Owner from taking certain action) which is inconsistent with such a Security or such a right shall preclude or estop the Mortgagee (either permanently or temporarily) from enforcing or exercising it.

(b)    This Mortgage is in addition to and is not in any way prejudiced by, and shall not prejudice any guarantee or other Security or any other right of recourse now or subsequently held by any Secured Party or any right of set-off or netting or rights to combine accounts in connection with the Finance Documents.

4    **UNDERTAKINGS**

4.1    **General**

The undertakings in this Clause 4 (*Undertakings*) remain in force throughout the Security Period except as the Mortgagee may otherwise permit.

4.2    **Insurance and Ship undertakings**

The Owner shall comply with the provisions of clause 25 (*insurance undertakings*) and clause 26 (*General Ship undertakings*) of the Facility Agreement, all of which are expressly incorporated in this Mortgage with any necessary modifications.

4.3    **Perfection of Mortgage**

The Owner shall:

(a)    comply with and satisfy all the requirements and formalities established by the Liberian Code of Laws of 1956 as amended and any other pertinent legislation of the Republic of Liberia to perfect this Mortgage as a legal, valid and enforceable first preferred Liberian mortgage and maritime lien upon the Ship; and

(b)    promptly provide the Mortgagee from time to time with evidence in such form as the Mortgagee requires that the Owner is complying with paragraph (a) of this Clause 4.3 (*Perfection of Mortgage*).

**4.4    Notice of Mortgage**

The Owner shall:

(a)    carry on board the Ship with its papers a certified copy of this Mortgage and cause that certified copy of this Mortgage to be exhibited to any person having business with the Ship which might give rise to a lien on the Ship other than a lien for crew's wages and salvage and to any representative of the Mortgagee on demand; and

(b)    place and maintain in a conspicuous place in the navigation room and the Master's cabin of the Ship a framed printed notice in plain type in English of such size that the paragraph of reading matter shall cover a space not less than 6 inches wide and 9 inches high reading as follows:

"NOTICE OF MORTGAGE"

This Ship is owned by VIGOROUS SHIPPING & TRADING S.A. and is subject to a first preferred Liberian mortgage in favour of CIT Finance LLC in its capacity as Security Agent and Trustee, under the terms of the said Mortgage, neither the Owner, any Charterer, the Master of the Ship or any other person has any right, power or authority to create, incur or permit to be imposed upon this Ship any lien whatsoever other than for crew's wages and salvage."

**4.5    Negative pledge**

(a)    The Owner shall not create or permit to subsist any Security over the Ship.

(b)    Paragraph (a) above does not apply to any Permitted Security.

(c)    This Clause 4.5 (*Negative pledge*) is in addition to, and shall not be limited by, any provision of the Facility Agreement.

**4.6    Disposals**

The Owner shall not enter into a single transaction or a series of transactions (whether related or not) and whether voluntary or involuntary to sell, lease, transfer or otherwise dispose of the Ship or any part of the Ship other than a Permitted Charter.

**4.7    Protection of Secured Party interests**

The Owner shall not enter into any transaction, or do anything, which is contrary to, or which may adversely affect, the rights of the Mortgagee under this Mortgage or any Secured Party's interest in those rights.

**5    PROTECTION OF SECURITY**

**5.1    Mortgagee's right to protect or maintain security**

The Mortgagee may, but shall not be obliged to, take any action which it may think fit for the purpose of protecting or maintaining the Security created or intended to be created by this Mortgage or for any similar or related purpose.

**5.2    No obligations imposed on Mortgagee**

The Owner shall remain liable to perform all obligations connected with the Ship and the Mortgagee shall not, in any circumstances, have or incur any obligation of any kind in connection with the Ship.

**5.3    Mortgagee's right to insure, repair etc.**

Without limiting the generality of Clause 5.1 (*Mortgagee's right to protect or maintain security*), if the Owner does not comply with Clause 4 (*Undertakings*), the Mortgagee may:

(a)    effect, replace and renew any Insurances;

(b)    arrange for the carrying out of such surveys and/or repairs of the Ship as it deems expedient or necessary; and

(c)    discharge any liabilities charged on the Ship, or otherwise relating to or affecting it, and/or take any measures which the Mortgagee may think expedient or necessary for the purpose of preventing its arrest and securing its release.

**5.4    Release of Security**

At the end of the Security Period, the Mortgagee shall, at the request and cost of the Owner, discharge this Mortgage.

**6    ENFORCEABILITY AND MORTGAGEE'S POWERS**

**6.1    Right to enforce security**

If an Event of Default occurs and irrespective of whether a notice has been served under clause 29.19 (*Acceleration*) of the Facility Agreement or a demand made under the Facility Agreement and without the necessity for the Mortgagee to serve any notice or take any other action or for any court order in any jurisdiction to the effect that an Event of Default has occurred or that the Security constituted by this Mortgage has become enforceable:

(a)    the Security constituted by this Mortgage shall immediately become enforceable for all purposes;

(b)    the Mortgagee shall be entitled then or at any later time or times to exercise the powers set out in Clause 6.2 (*Right to take possession, sell etc.*) and in any other Finance Document;

(c)    the Mortgagee shall be entitled then or at any later time or times to exercise the powers possessed by it as mortgagee of the Ship conferred by the law of any country or territory the courts of which have or claim any jurisdiction in respect of the Owner or the Ship; and

(d)    the Mortgagee shall be entitled to exercise all the rights and remedies in foreclosure and otherwise given to mortgagees by applicable law including the provisions of Chapter 3 of Title 21 of the Liberian Code of Laws of 1956 as amended.

**6.2    Right to take possession, sell etc.**

If the Security constituted by this Mortgage has become enforceable, the Mortgagee shall be entitled then or at any later time or times:

(a)    to take possession of the Ship whether actually or constructively and/or otherwise to take control of the Ship wherever the Ship may be and cause the Owner or any other person in possession of the Ship forthwith upon demand to surrender the Ship to the Mortgagee

without legal process and without the Mortgagee or any other Secured Party being liable for any losses caused by such actions or to account to the Owner in connection with the same;

(b)     to sell the Ship with or without prior notice to the Owner, and with or without the benefit of any Charter, by public auction or private contract at any time, at any place and upon any terms (including, without limitation, on terms that all or any part or parts of the purchase price be satisfied by shares, loan stock or other securities and/or be left outstanding as a debt, whether secured or unsecured and whether carrying interest or not) which the Mortgagee may think fit, with power for the Mortgagee to purchase the Ship at any such public auction and to set off the purchase price against all or any part of the Secured Liabilities;

(c)     to manage, insure, maintain and repair the Ship and to charter, employ, lay up or in any other manner whatsoever deal with the Ship, upon any terms and for any period which the Mortgagee may think fit, in all respects as if the Mortgagee were the owner of the Ship and without the Mortgagee or any other Secured Party being responsible for any loss incurred as a result of or in connection with any such action;

(d)     to collect, recover and give good discharge for any moneys or claims arising in relation to the Ship and to permit any brokers through whom collection or recovery is effected to charge the usual brokerage for the same;

(e)     to take over or commence or defend (if necessary using the name of the Owner) any claims or proceedings relating to, or affecting, the Ship which the Mortgagee may think fit and to abandon, release or settle in any way any such claims or proceedings; and

(f)     generally, to enter into any transaction or arrangement of any kind and to do anything in relation to the Ship which the Mortgagee may think fit.

**6.3     No liability of Mortgagee**

(a)     Neither the Mortgagee nor any Delegate shall be obliged to:

(i)     check the nature or sufficiency of any payment received by it or him under this Mortgage; or

(ii)     preserve, exercise or enforce any right forming part of, or relating to, the Ship.

(b)     In addition to, and without limiting, any exclusion or limitation of liability of any Secured Party under any Finance Document, neither the Mortgagee nor any Delegate shall have any liability:

(i)     for any loss caused by an exercise of, or failure to exercise, rights under or enforcement of, or failure to enforce any Security created by this Mortgage;

(ii)     as mortgagee in possession or otherwise, to account for any income or principal amount which might have been produced or realised from the Ship; or

(iii)     as mortgagee in possession or otherwise, for any reduction in the value of the Ship.

**6.4     No requirement to commence proceedings**

Neither the Mortgagee nor any other Secured Party will need to commence any proceedings under, or enforce any Security created by the Facility Agreement or any other Finance Document before commencing proceedings under, or enforcing any Security created by, this Mortgage

54168085v2

6.5    **Prior Security**

(a)    At any time after the Security created by this Deed has become enforceable, the Mortgagee may:

    (i)    redeem any prior Security over all or any part of the Ship;

    (ii)    procure the transfer of that Security to itself; and/or

    (iii)    settle the accounts of any prior mortgagee, chargee or encumbrancer and any accounts so settled will be, in the absence of manifest error, conclusive and binding on the Owner.

(b)    The Owner shall pay to the Mortgagee immediately upon demand the costs and expenses incurred by the Mortgagee in connection with any such redemption, settlement and/or transfer including the payment of any principal or interest.

7    **PROTECTION OF THIRD PARTIES**

No person dealing with the Mortgagee or any other Secured Party shall be concerned to enquire:

(a)    whether the rights conferred by or pursuant to any Finance Document are exercisable or have been properly exercised;

(b)    whether any Secured Liabilities remain owing;

(c)    whether any laws, directions, restrictions, consents and/or, regulations affecting the rights of the Mortgagee or any Secured Party have been obtained or complied with; or

(d)    as to the application of any monies received by the Mortgagee.

8    **APPLICATION OF MONEYS**

All sums received by the Mortgagee:

(a)    in respect of a sale of the Ship;

(b)    in respect of net profits arising out of the employment of the Ship pursuant to paragraph (c) of Clause 6.2 (*Right to take possession, sell etc.*); or

(c)    in respect of any other transaction or arrangement under Clause 6.1 (*Right to enforce security*) or Clause 6.2 (*Right to take possession, sell etc.*),

shall be held by the Mortgagee upon trust:

    (i)    **first**, to pay or discharge any expenses or liabilities (including any interest) which have been paid or incurred by the Mortgagee or any Delegate in or in connection with the exercise of its powers under this Mortgage; and

    (ii)    **second**, to pay the balance over to the Facility Agent for application in accordance with clause 35.5 (*application of receipts; partial payments*) of the Facility Agreement.

9    **FURTHER ASSURANCE**

Clause 24.21 (*further assurance*) of the Facility Agreement applies to this Mortgage as if it were expressly incorporated in it with any necessary modifications.

54168085v2

**10      POWER OF ATTORNEY**

**10.1     Appointment**

The Owner, by way of security for the performance of its obligations under this Mortgage, irrevocably appoints (with full power of substitution) the Mortgagee as its attorney-in-fact:

(a)     to do all acts and execute or sign all documents which the Owner itself can do and execute in relation to the Ship including, without limitation, all acts and documents necessary to sell the Ship by such means and on such terms as the Mortgagee may determine;

(b)     to do all acts and things and execute or sign all documents which the Owner is obliged to do, execute or sign under this Mortgage and which it has failed so to do, execute or sign immediately upon the Mortgagee's first written demand,

**provided that** the power of attorney constituted by paragraph (a) of this Clause 10.1 (*Appointment*) shall be exercisable only on the occurrence of an Event of Default which is continuing.

**10.2     General power of attorney**

The power of attorney constituted by Clause 10.1 (*Appointment*) shall be a general power of attorney.

**10.3     Ratification of actions of attorney**

The Owner ratifies and confirms, and agrees to ratify and confirm, any act, deed or document which the Mortgagee (or any Delegate or substitute) does or executes pursuant to its terms.

**10.4     Conclusiveness of exercise**

The exercise of the power of attorney constituted by Clause 10.1 (*Appointment*) shall not put any person dealing with the Mortgagee (or any Delegate or substitute) on enquiry whether, by its terms, the power of attorney is exercisable and the exercise by the Mortgagee (or any Delegate or substitute) of its powers shall, as between the Mortgagee (or any Delegate or substitute) and any third party, be conclusive evidence of the Mortgagee's right (or the right of any Delegate or substitute) to exercise the same.

**10.5     Delegation**

The Mortgagee may delegate to any person or persons all or any of the powers and discretions conferred on the Mortgagee by Clause 10 (*Power of Attorney*) and may do so on terms authorising successive sub-delegations.

**10.6     Duration**

The power of attorney constituted by Clause 10.1 (*Appointment*) shall be granted for the duration of the Security Period.

**11      INCORPORATION OF FACILITY AGREEMENT PROVISIONS**

**11.1     Incorporation of specific provisions**

The following provisions of the Facility Agreement apply to this Mortgage as if they were expressly incorporated in this Mortgage with any necessary modifications:

clause 12.2 (*tax gross-up*);

clause 35.6 (*no set-off by transaction Obligors*);

clause 37 (*notices*);

clause 39 (*partial invalidity*);

clause 40 (*remedies and waivers*);

clause 42 (*irrevocable payment*); and

clause 45 (*counterparts*).

**11.2    Incorporation of general provisions**

Clause 11.1 (*Incorporation of specific provisions*) is without prejudice to the application to this Mortgage of any provision of the Facility Agreement which, by its terms, applies or relates to the Finance Documents generally or this Mortgage specifically.

**12    TOTAL AMOUNT**

For the purpose of recording this Mortgage as required by Chapter 3 of Title 21 of the Liberian Code of Laws of 1956 as amended, the total amount of the direct and contingent obligations secured by this Mortgage is US$24,150,000 together with interest, fees, commissions and performance of mortgage covenants.   The date of maturity of this Mortgage is 31 December 2019 and there is no separate discharge amount.

**13    SUPPLEMENTAL**

**13.1    No restriction on other rights**

Nothing in this Mortgage shall be taken to exclude or restrict any power, right or remedy which the Mortgagee or any other Secured Party may at any time have under:

(a)    any other Finance Document; or

(b)    the law of any country or territory the courts of which have or claim any jurisdiction in respect of the Owner or the Ship.

**13.2    Exercise of other rights**

The Mortgagee may exercise any right under this Mortgage before it or any other Secured Party has exercised any right referred to in paragraphs (a) or (b) of Clause 13.1 (*No restriction on other rights*).

**13.3    Settlement or discharge conditional**

Any settlement or discharge under this Mortgage between the Mortgagee and the Owner shall be conditional upon no security or payment to the Mortgagee or any other Secured Party by the Owner or any other person being set aside, adjusted or ordered to be repaid, whether under any insolvency law or otherwise.

**14    CHANGES TO THE PARTIES**

**14.1    Owner**

The Owner may not assign any of its rights or transfer any of its rights or obligations under this Deed.

**14.2**  **Mortgagee**

The Mortgagee may:

(a)  assign any of its rights; or

(b)  transfer any of its rights or obligations,

under this Mortgage in accordance with the provisions of the Facility Agreement.

**15**  **GOVERNING LAW**

This Mortgage is governed by Liberian law.

**16**  **ENFORCEMENT**

**16.1**  **Jurisdiction**

The Mortgagee reserves the rights:

(a)  to commence proceedings in relation to any matter which arises out of or in connection with this Mortgage in the courts of any country which have or claim jurisdiction to that matter; and

(b)  to commence such proceedings in the courts of any such country or countries concurrently with or in addition to proceedings in Liberia or without commencing proceedings in Liberia.

**16.2**  **Action against Ship**

The rights referred to in Clause 16.1 (*Jurisdiction*) include the right of the Mortgagee to arrest and take action against the Ship at whatever place the Ship shall be found lying and for the purpose of any action which the Mortgagee may bring before the courts of that jurisdiction or other judicial authority and for the purpose of any action which the Mortgagee may bring against the Ship, any writ, notice, judgment or other legal process or documents may (without prejudice to any other method of service under applicable law) be served upon the Master of the Ship (or upon anyone acting as the Master) and such service shall be deemed good service on the Owner for all purposes.

**16.3**  **Mortgagee's rights unaffected**

Nothing in this Clause 16.3 (*Mortgagee's rights unaffected*) shall exclude or limit any right which the Mortgagee may have (whether under the law of any country, an international convention or otherwise) with regard to the bringing of proceedings, the service of process, the recognition or enforcement of a judgment or any similar or related matter in any jurisdiction.

**This Mortgage has been executed by the duly authorised Attorney-in-Fact of the Owner on the date stated at the beginning of this Mortgage.**

**VIGOROUS SHIPPING & TRADING S.A.**

By ................................................................

STELIOS ANDREIOTIS

Attorney-in-Fact

54168085v2

## ACKNOWLEDGEMENT OF MORTGAGE

CITY OF PIRAEUS          )
PREFECTURE OF ATTICA)          S.S.
REPUBLIC OF GREECE    )

On this **30** day of December 2014 before me personally appeared *Stelios Andreiotis* , to me is known, who, being by me duly sworn, did depose and say that he resides at *14a Karaiskov Str, Piraeus, Greece* that he is an attorney-in-fact for VIGOROUS SHIPPING & TRADING S.A. corporation described in and which executed the above instrument; and that he signed his name thereto by authority of the board of directors of said corporation.

_____
Special Agent
*MARIA KASORARI*

54168085v2

"A"

**Dated 3 September 2014**

**as amended and restated
on      December 2014**

**US$24,150,000**

**TERM LOAN FACILITY**

**BRAZEN SHIPPING & TRADING S.A.** and
**DASHING SHIPPING & TRADING S.A.**
as joint and several Borrowers
and Hedge Guarantors

and

**VIGOROUS SHIPPING &TRADING S.A.**
as Collateral Guarantor

and

**BLUE WALL SHIPPING LIMITED**
as Parent Guarantor

and

**CIT FINANCE LLC**
as Facility Agent

and

**CIT FINANCE LLC**
as Security Agent

**FACILITY AGREEMENT**

relating to
the part financing of hull no. S-853 (tbr "BRAZEN")
and on-lending to the Collateral Guarantor
for working capital purposes related to m.v. "VIGOROUS"

W A T S O N   F A R L E Y
&
W I L L I A M S

Index

| Clause | | Page |
|---|---|---|

| | Section 1 Interpretation | 2 |
|---|---|---|
| 1 | Definitions and Interpretation .................................................................. | 2 |
| | Section 2 The Facility | 26 |
| 2 | The Facility.................................................................................................. | 26 |
| 3 | Purpose ....................................................................................................... | 26 |
| 4 | Conditions of Utilisation............................................................................ | 26 |
| | Section 3 Utilisation | 28 |
| 5 | Utilisation ................................................................................................... | 28 |
| | Section 4 Repayment, Prepayment and Cancellation | 29 |
| 6 | Repayment .................................................................................................. | 29 |
| 7 | Prepayment and Cancellation .................................................................... | 29 |
| | Section 5 Costs of Utilisation | 35 |
| 8 | Interest ........................................................................................................ | 35 |
| 9 | Interest Periods .......................................................................................... | 37 |
| 10 | Changes to the Calculation of Interest...................................................... | 38 |
| 11 | Fees ............................................................................................................. | 39 |
| | Section 6 Additional Payment Obligations | 41 |
| 12 | Tax Gross-Up, Indemnities and FATCA ...................................................... | 41 |
| 13 | Increased Costs .......................................................................................... | 46 |
| 14 | Other Indemnities ...................................................................................... | 47 |
| 15 | Mitigation by the Finance Parties ............................................................. | 50 |
| 16 | Costs and Expenses .................................................................................... | 50 |
| | Section 7 Guarantees and Joint and Several Liability of Borrowers | 52 |
| 17 | Guarantee and Indemnity – Parent Guarantor ........................................ | 52 |
| 18 | Guarantee and indemnity – collateral guarantor .................................... | 54 |
| 19 | Joint and Several Liability of the Borrowers............................................ | 57 |
| 20 | Guarantee and Indemnity – Hedge Guarantors........................................ | 58 |
| | Section 8 Representations, Undertakings and Events of Default | 62 |
| 21 | Representations .......................................................................................... | 62 |
| 22 | Information Undertakings........................................................................... | 68 |
| 23 | Financial Covenants ................................................................................... | 72 |
| 24 | General Undertakings ................................................................................ | 75 |
| 25 | Insurance Undertakings ............................................................................. | 81 |
| 26 | General Ship Undertakings........................................................................ | 86 |
| 27 | Security Cover ............................................................................................. | 92 |
| 28 | Application of Earnings; Retention Accounts; Maintenance Reserve Accounts; BWTS Accounts..................................................................................................... | 93 |
| 29 | Events of Default ........................................................................................ | 94 |
| | Section 9 Changes to Parties | 99 |
| 30 | Changes to the Lenders.............................................................................. | 99 |
| 31 | Changes to the Obligors............................................................................. | 103 |
| | Section 10 The Finance Parties | 104 |
| 32 | The Facility Agent ...................................................................................... | 104 |
| 33 | The Security Agent ..................................................................................... | 110 |
| 34 | Conduct of Business by the Finance Parties.............................................. | 120 |
| | Section 11 Administration | 123 |
| 35 | Payment Mechanics ................................................................................... | 123 |
| 36 | Set-Off ........................................................................................................ | 126 |
| 37 | Notices ........................................................................................................ | 126 |
| 38 | Calculations and Certificates .................................................................... | 128 |
| 39 | Partial Invalidity ........................................................................................ | 129 |
| 40 | Remedies and Waivers ............................................................................... | 129 |
| 41 | Settlement or Discharge Conditional ........................................................ | 129 |
| 42 | Irrevocable Payment .................................................................................. | 129 |

43      Amendments and Waivers ................................................................................. 129
44      Confidentiality ................................................................................................... 131
45      Counterparts ..................................................................................................... 134
        Section 12 Governing Law and Enforcement                                                135
46      Governing Law .................................................................................................. 135
47      Enforcement ...................................................................................................... 135
48      patriot act notice ............................................................................................. 135
Schedule 1 The Parties ............................................................................................... 136
Schedule 2 Conditions Precedent ............................................................................. 139
Schedule 3 Requests .................................................................................................. 144
Schedule 4 Form of Transfer Certificate ................................................................... 147
Schedule 5 Form of Assignment Agreement ............................................................. 149
Schedule 6 Form of Borrowers' Compliance Certificate ........................................... 152
Schedule 7 Form of Parent Guarantor's Compliance Certificate .............................. 155
Schedule 8 Timetables .............................................................................................. 158
Execution Pages ......................................................................................................... 159

**THIS AGREEMENT** is made on 3 September 2014 as amended and restated by an amending and restating agreement dated      December 2014

**PARTIES**

(1)  **BRAZEN SHIPPING & TRADING S.A** a corporation incorporated in the Republic of Liberia whose registered office is at 80 Broad Street, Monrovia, Liberia as a borrower ("**Borrower A**")

(2)  **DASHING SHIPPING & TRADING S.A.** a corporation incorporated in the Republic of Liberia whose registered office is at 80 Broad Street, Monrovia, Liberia as a borrower ("**Borrower B**");

(3)  **VIGOROUS SHIPPING & TRADING S.A.** a corporation incorporated in the Republic of Liberia whose registered office is at 80 Broad Street, Monrovia, Liberia as collateral guarantor (the "Collateral Guarantor")

(4)  **BLUE WALL SHIPPING LIMITED,** a corporation incorporated in the Republic of the Marshall Islands whose registered office is at Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro, Republic of the Marshall Islands MH 96960 as guarantor (the "**Parent Guarantor**")

(5)  **THE COMPANIES** listed in Part A of Schedule 1 (*The Parties*) as hedge guarantors (the "**Hedge Guarantors**")

(6)  **THE FINANCIAL INSTITUTIONS** listed in Part B of Schedule 1 (*The Parties*) as lenders (the "**Original Lenders**")

(7)  **THE FINANCIAL INSTITUTIONS** listed in Part B of Schedule 1 (*The Parties*) as hedge counterparties (the "**Hedge Counterparties**")

(8)  **CIT FINANCE LLC** as agent of the other Finance Parties (the "**Facility Agent**")

(9)  **CIT FINANCE LLC** as security agent for the Secured Parties (the "**Security Agent**")

**BACKGROUND**

(A)  The Original Lenders have agreed to make available, in two tranches, to the Borrowers a secured term loan facility of up to:

(i)  in respect of Tranche A, 50 per cent. of the lesser of (a) the Initial Market Value of Ship A and (b) the Purchase Price of Ship A, for the purpose of part financing part of the acquisition cost of Ship A and covering certain other fees, expenses and reserves due in connection with the above; and

(ii)  in respect of Tranche B, the lesser of (i) 50 per cent. of the Initial Market Value of Ship B and (ii) US$7,500,000, for the purpose of on-lending to the Collateral Guarantor for working capital purposes related to Ship B and covering certain other fees, expenses and reserves due in connection with the above, and

in aggregate, the amount of the Loan shall be up to the lesser of (a) US$24,150,000 and (b) 50 per cent. of the aggregate Market Value of the Mortgaged Ships.

(B)  The Hedge Counterparties have agreed to enter into interest rate swap transactions with the Borrowers from time to time to hedge the Borrowers' exposure under this Agreement to interest rate fluctuations.

**OPERATIVE PROVISIONS**

**SECTION 1**

**INTERPRETATION**

**1**    **DEFINITIONS AND INTERPRETATION**

**1.1**    **Definitions**

In this Agreement:

"**Account Bank**" means, in relation to each of:

(a)    the Earnings Accounts, the Maintenance Reserve Accounts and the BWTS Accounts, Joh. Berenberg, Gossler & Co. KG acting through its office at Neuer Jungfernstieg 20, 20354 Hamburg, Germany; and

(b)    the Retention Accounts, CIT Bank acting through its offices at 11 West 42nd Street, New York, New York 10036, USA,

and, in the plural, means both of them.

"**Accounts**" means the Earnings Accounts, the Maintenance Reserve Accounts, the BWTS Accounts and the Retention Accounts and, in the singular, means any of them.

"**Account Security**" means a document creating Security over any Account, each in agreed form.

"**Advance**" means a borrowing of all or part of a Tranche under this Agreement.

"**Affiliate**" means, in relation to any person, a Subsidiary of that person or a Holding Company of that person or any other Subsidiary of that Holding Company.

"**Approved Classification**" means:

(a)    in relation to Ship A, as at the date of this Agreement, "C ✠ Bulk Carrier ESP CSR, BC–A (Hold 2 and 4 may be empty) COAT-WBT, GRAB[X]" with RINA or the equivalent classification with another Approved Classification Society; and

(b)    in relation to Ship B, as at the date of this Agreement, "C ✠ bulk carrier ESP-heavycargo-nonhomload; unrestricted navigation" with RINA or the equivalent classification with another Approved Classification Society.

"**Applicable Sanctions**" means any Sanctions by which any Obligor is bound or to which it is subject or, as regards a regulation, compliance with which is reasonable in the ordinary course of business of any Obligor.

"**Approved Classification Society**" means:

(a)    in relation to Ship A, as at the date of this Agreement, RINA or any other classification society approved in writing by the Facility Agent acting with the authorisation of the Majority Lenders which is a member of the International Association of Classification Societies; and

54148659v3

(b)    in relation to Ship B, as at the date of this Agreement, RINA or any other classification society approved in writing by the Facility Agent acting with the authorisation of the Majority Lenders which is a member of the International Association of Classification Societies; and

**"Approved Commercial Manager"** means, in relation to a Ship, as at the date of this Agreement, Phoenix Shipping & Trading S.A. (incorporated in the Republic of the Marshall Islands) whose place of business is at 25 Akti Miaouli, 18535, Piraeus, Greece or any other person approved in writing by the Facility Agent acting with the authorisation of the Majority Lenders, as the commercial manager of that Ship.

**"Approved Flag"** means, in relation to a Ship, as at the date of this Agreement, Malta, Marshall Islands, Liberia or such other flag and, if applicable, port of registry approved in writing by the Facility Agent acting with the authorisation of the Majority Lenders.

**"Approved Manager"** means, in relation to a Ship, the Approved Commercial Manager or the Approved Technical Manager of that Ship.

**"Approved Technical Manager"** in relation to a Ship, as at the date of this Agreement, Phoenix Shipping & Trading S.A. (incorporated in the Republic of the Marshall Islands) whose place of business is at 25 Akti Miaouli, 18535, Piraeus, Greece or any other person approved in writing by the Facility Agent acting with the authorisation of the Majority Lenders, as the technical manager of that Ship.

**"Approved Valuers"** means:

(a)    MJLF & Associates, Maersk Brokers K/S, H. Clarkson & Company Limited and Barry Rogliano Salles, Paris; and

(b)    any other firm or firms of independent sale and purchase shipbrokers engaged in the business of valuing ships similar to the Ships and approved in writing by the Facility Agent, acting with the authorisation of the Majority Lenders (acting reasonably) and the Parent Guarantor (acting reasonably),

and, in the singular, means any of them.

**"Assignment Agreement"** means an agreement substantially in the form set out in Schedule 5 (*Form of Assignment Agreement*) or any other form agreed between the relevant assignor and assignee.

**"Authorisation"** means an authorisation, consent, approval, resolution, licence, exemption, filing, notarisation, legalisation or registration.

**"Availability Period"** means the period from and including the date of this Agreement to and including 31 December 2014.

**"Available Commitment"** means a Lender's Commitment minus:

(a)    the amount of its participation in the outstanding Loan; and

(b)    in relation to any proposed Utilisation, the amount of its participation in any Advance that is due to be made on or before the proposed Utilisation Date.

**"Available Facility"** means the aggregate for the time being of each Lender's Available Commitment.

**"Basel II Approach"** means, in relation to any Finance Party, either the Standardised Approach or the relevant Internal Ratings Based Approach (each as defined in the Basel II

Accord) adopted (or otherwise followed, wholly or in part) by any Finance Party (or its Holding Company) for the purposes of implementing or complying with the Basel II Capital Accord.

"**Basel II Capital Accord**" means the "International Convergence of Capital Measurement and Capital Standards, a Revised Framework" published by the Basel Committee on Banking Supervision in June 2004 in the form existing on the date of this Agreement or any other law or regulation which implements the Basel II Capital Accord (whether such implementation, application or compliance is by a government, regulator, any Finance Party or any of its Affiliates).

"**Basel II Regulation**" means (a) any law or regulation implementing the Basel II Capital Accord or (b) any Basel II Approach adopted by any Finance Party.

"**Basel III Approach**" means, in relation to any Finance Party, either the Standardised Approach or the relevant Internal Ratings Based Approach (each as defined in the Basel III Capital Accord) adopted by any Finance Party (or its Holding Company) for the purposes of implementing or complying with the Basel III Capital Accord.

"**Basel III Capital Accord**" means the "International framework for liquidity risk management, standard and monitoring" published by the Basel Committee on Banking Supervision in December 2010, the "Global systemically important banks: assessment methodology and the additional loss absorbency requirement - Rules text" published by the Basel Committee on Banking Supervision in November 2011 each as amended, supplemented or restated in the form existing at the date of this Agreement or any further guidance or standards published by the Basel Committee on Banking Supervision relating to Basel III or any other law or regulation which implements the Basel III Capital Accord (whether such implementation, application or compliance is by a government, regulator, any Finance Party or any of its Affiliates).

"**Basel III Regulation**" means (a) any law or regulation implementing the Basel III Capital Accord or (b) any Basel III Approach adopted by any Finance Party.

"**Borrower**" means Borrower A or Borrower B and, in the plural, means both of them.

"**Borrowers' Compliance Certificate**" means a certificate in the form set out in Schedule 6 (*Form of Borrowers' Compliance* Certificate) or in any other form agreed between the Borrowers, the Collateral Guarantor and the Facility Agent.

"**Break Costs**" means the amount (if any) by which:

(a)     the interest which any Finance Party should have received for the period from the date of receipt of all or any part of its participation in the Loan or Unpaid Sum to the last day of the current Interest Period in respect of the Loan or Unpaid Sum, had the principal amount or Unpaid Sum received been paid on the last day of that Interest Period

          exceeds

(b)     the amount which any Finance Party would be able to obtain by placing an amount equal to the principal amount or Unpaid Sum received by it on deposit with a leading bank in the London interbank market for a period starting on the Business Day following receipt or recovery and ending on the last day of the current Interest Period.

"**Builder**" means Imabari Shipbuilding Co. Ltd.

"**Business Day**" means a day (other than a Saturday or Sunday) on which banks are open for general business in London and New York.

"**BWTS**" means, in respect of each Ship, the ballast water treatment system.

"**BWTS Account**" means, in relation to an Owner:

(a)     an account in the name of that Owner with the relevant Account Bank designated "BWTS Account"; or

(b)     any other account (with that or another office of that Account Bank or with a bank or financial institution other than that Account Bank) which is designated by the relevant Obligors and the Facility Agent as the BWTS Account of an Owner for the purposes of this Agreement.

"**BWTS Amount**" means, in respect of each Ship, an amount of US$375,000 being the aggregate amount representing all costs required for the installation of the BWTS for that Ship.

"**Capital Expenditures**" means, in respect of each Owner, any expenditures (by the expenditure of cash or the incurrence of Financial Indebtedness) by that Owner during any measuring period for any fixed assets or improvements or for replacements, substitutions or additions thereto that have a useful life of more than one year and that are required to be capitalized under IFRS and shall also include any and all survey expenditures normally capitalized, including, but not limited to, drydock expenses and any such expenditure shall be calculated net of any amount contributed from the Accounts solely for the purpose of offsetting all or a portion thereof.

"**Charged Property**" means all of the assets which from time to time are, or are expressed to be, the subject of the Transaction Security.

"**Charter**" means, in respect of a Ship, a time charter for its employment for a firm period of 12 months or more (excluding any optional exclusions and renewal options) in form and substance reasonably approved by, and with a charterer reasonably acceptable to, the Facility Agent.

"**Charter Assignment**" means the charter assignment creating security over any Charter in the agreed form.

"**CISADA**" means the United States Comprehensive Iran Sanctions, Accountability and Divestment Act of 2010 as it applies to non-US persons.

"**Code**" means the United States Internal Revenue Code of 1986.

"**Collateral Guarantor**" means Vigorous Shipping & Trading S.A., a corporation incorporated under the laws of the Republic of Liberia having its registered office at 80 Broad Street, Monrovia, Liberia.

"**Commitment**" means:

(a)     in relation to an Original Lender, the amount set opposite its name under the heading "Commitment" in Part B of Schedule 1 (*The Parties*) and the amount of any other Commitment transferred to it under this Agreement; and

(b)     in relation to any other Lender, the amount of any Commitment transferred to it under this Agreement,

to the extent not cancelled, reduced or transferred by it under this Agreement.

54148659v3

"**Confidential Information**" means all information relating to any Transaction Obligor, the Group, the Finance Documents or the Facility of which a Finance Party becomes aware in its capacity as, or for the purpose of becoming, a Finance Party or which is received by a Finance Party in relation to, or for the purpose of becoming a Finance Party under, the Finance Documents or the Facility from either:

(a)     any Transaction Obligor or any of its advisers; or

(b)     another Finance Party, if the information was obtained by that Finance Party directly or indirectly from any Transaction Obligor or any of its advisers,

in whatever form, and includes information given orally and any document, electronic file or any other way of representing or recording information which contains or is derived or copied from such information but excludes information that:

(i)     is or becomes public information other than as a direct or indirect result of any breach by that Finance Party of Clause 44 (*Confidentiality*); or

(ii)     is identified in writing at the time of delivery as non-confidential by any Transaction Obligor or any of its advisers; or

(iii)     is known by that Finance Party before the date the information is disclosed to it in accordance with paragraphs (a) or (b) above or is lawfully obtained by that Finance Party after that date, from a source which is, as far as that Finance Party is aware, unconnected with any Transaction Obligor and which, in either case, as far as that Finance Party is aware, has not been obtained in breach of, and is not otherwise subject to, any obligation of confidentiality.

"**Confidentiality Undertaking**" means a confidentiality undertaking in substantially the appropriate form recommended by the LMA from time to time or in any other form agreed between the Borrowers and the Facility Agent.

"**Corresponding Debt**" means any amount, other than any Parallel Debt, which an Obligor owes to a Secured Party under or in connection with the Finance Documents.

"**Cure Amount**" has the meaning given to it in Clause 23.2 (*Interest Coverage Ratio*).

"**Debt to Total Capitalization Ratio**" means, in respect of the Parent Guarantor as of any date of determination, the ratio determined on a consolidated basis without duplication of (A) Financial Indebtedness of the Parent Guarantor to (B) Total Capitalisation, to be tested on the last day of each Fiscal Quarter;

"**Deed of Covenant**" means, if required by the Approved Flag, a deed of covenant collateral to the Mortgage and creating security in respect of the Ship in agreed form.

"**Default**" means an Event of Default or a Potential Event of Default.

"**Delegate**" means any delegate, agent, attorney, co-trustee or other person appointed by the Security Agent.

"**Disruption Event**" means either or both of:

(a)     a material disruption to those payment or communications systems or to those financial markets which are, in each case, required to operate in order for payments to be made in connection with the Facility (or otherwise in order for the transactions

contemplated by the Finance Documents to be carried out) which disruption is not caused by, and is beyond the control of, any of the Parties; or

(b)     the occurrence of any other event which results in a disruption (of a technical or systems-related nature) to the treasury or payments operations of a Party preventing that, or any other, Party:

  (i)     from performing its payment obligations under the Finance Documents; or

  (ii)    from communicating with other Parties in accordance with the terms of the Finance Documents,

and which (in either such case) is not caused by, and is beyond the control of, the Party whose operations are disrupted.

"**Document of Compliance**" has the meaning given to it in the ISM Code.

"**dollars**" and "**US$**" mean the lawful currency, for the time being, of the United States of America.

"**Earnings**" means, in relation to a Ship, all moneys whatsoever which are now, or later become, payable (actually or contingently) to an Owner or the Security Agent and which arise out of the use or operation of that Ship, including (but not limited to):

(a)     the following, save to the extent that any of them is, with the prior written consent of the Facility Agent, pooled or shared with any other person:

  (i)     all freight, hire and passage moneys;

  (ii)    compensation payable to an Owner or the Security Agent in the event of requisition of that Ship for hire;

  (iii)   remuneration for salvage and towage services;

  (iv)    demurrage and detention moneys;

  (v)     damages for breach (or payments for variation or termination) of any charterparty or other contract for the employment of that Ship;

  (vi)    all moneys which are at any time payable under any Insurances in relation to loss of hire;

  (vii)   all monies which are at any time payable to an Owner in relation to general average contribution; and

(b)     if and whenever that Ship is employed on terms whereby any moneys falling within sub-paragraphs (i) to (vi) of paragraph (a) above are pooled or shared with any other person, that proportion of the net receipts of the relevant pooling or sharing arrangement which is attributable to that Ship.

"**Earnings Account**" means, in relation to an Owner:

(a)     an account in the name of that Owner with the relevant Account Bank designated "Earnings Account"; or

(b)     any other account (with that or another office of that Account Bank or with a bank or financial institution other than that Account Bank) which is designated by the

relevant Obligors and the Facility Agent as the Earnings Account of that Owner for the purposes of this Agreement.

"**EBITDA**" means, in relation to an Owner for any fiscal period, and without duplication, an amount equal to the aggregate of (a) the net income of that Owner for such period determined in accordance with IFRS, minus (b) the aggregate of (i) income tax credits, (ii) interest income, (iii) gain from extraordinary items for such period, (iv) the aggregate net gain or loss during such period arising from the sale, exchange or other disposition of capital assets by that Owner (including any fixed assets, whether tangible or intangible, all inventory sold in conjunction with the disposition of fixed assets and all securities), and (v) any other non-cash gains that have been added in determining net income, in each case to the extent included in the calculation of net income of that Owner for such period in accordance with IFRS, but without duplication, plus (c) the aggregate of (i) any provision for income taxes, (ii) Interest Expense, (iii) loss from extraordinary items for such period, (iv) depreciation and amortization for such period, (v) amortized debt discount for such period, and (vi) the amount of any deduction to net income as the result of any grant to any members of the management of that Owner of any stock, in each case to the extent included in the calculation of net income of that Owner for such period in accordance with IFRS, but without duplication.   For purposes of this definition, the following items shall be excluded in determining net income of the relevant Owner:

(a)     any restoration to income of any contingency reserve, except to the extent that provision for such reserve was made out of income accrued during such period;

(b)     any write-up or impairment of any asset; and

(c)     any net gain arising from the acquisition of any securities, or the extinguishment, under IFRS, of any Financial Indebtedness of that Owner.

"**Environmental Approval**" means any present or future permit, ruling, variance or other Authorisation required under Environmental Laws.

"**Environmental Claim**" means any claim by any governmental, judicial or regulatory authority or any other person which arises out of an Environmental Incident or an alleged Environmental Incident or which relates to any Environmental Law and, for this purpose, "**claim**" includes a claim for damages, compensation, contribution, injury, fines, losses and penalties or any other payment of any kind, including in relation to clean-up and removal, whether or not similar to the foregoing; an order or direction to take, or not to take, certain action or to desist from or suspend certain action; and any form of enforcement or regulatory action, including the arrest or attachment of any asset.

"**Environmental Incident**" means:

(a)     any release, emission, spill or discharge into any Ship or into or upon the air, sea, land or soils (including the seabed) or surface water of Environmentally Sensitive Material within or from any Ship; or

(b)     any incident in which Environmentally Sensitive Material is released, emitted, spilled or discharged into or upon the air, sea, land or soils (including the seabed) or surface water from a vessel other than any Ship and which involves a collision between any Ship and such other vessel or some other incident of navigation or operation, in either case, in connection with which a Ship is actually or potentially liable to be arrested, attached, detained or injuncted and/or a Ship and/or any Obligor and/or any operator or manager of a Ship is at fault or allegedly at fault or otherwise liable to any legal or administrative action; or

(c)     any other incident in which Environmentally Sensitive Material is released, emitted, spilled or discharged into or upon the air, sea, land or soils (including the seabed) or

surface water otherwise than from a Ship and in connection with which a Ship is actually or potentially liable to be arrested and/or where any Obligor and/or any operator or manager of a Ship is at fault or allegedly at fault or otherwise liable to any legal or administrative action, other than in accordance with an Environmental Approval.

"**Environmental Law**" means any present or future law relating to pollution or protection of human health or the environment, to conditions in the workplace, to the carriage, generation, handling, storage, use, release or spillage of Environmentally Sensitive Material or to actual or threatened releases of Environmentally Sensitive Material.

"**Environmentally Sensitive Material**" means and includes all contaminants, oil, oil products, toxic substances and any other substance (including any chemical, gas or other hazardous or noxious substance) which is (or is capable of being or becoming) polluting, toxic or hazardous.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended, and any successor thereto.

"**ERISA Affiliate**" means each person (and defined in Section 3(9) of ERISA) which together with any Borrower would be deemed to be a "single employer" within the meaning of Section 414(b), (c), (m) or (o) of the Uniform Commercial Code (as from time to time in effect in any applicable jurisdiction).

"**Event of Default**" means any event or circumstance specified as such in Clause 29 (*Events of Default*).

"**Executive Order**" means an executive order issued by the President of the United States of America.

"**Extraordinary Receipts**" shall mean, in relation to an Owner, any amount received by or paid to or for the account of that Owner provided that extraordinary receipts shall exclude any single or related services of amounts received in an aggregate amount of less than US$200,000 in any Fiscal Quarter.

"**Facility**" means the term loan facility made available under this Agreement as described in Clause 2 (*The Facility*).

"**Facility Office**" means the office or offices notified by a Lender to the Facility Agent in writing on or before the date it becomes a Lender (or, following that date, by not less than 5 Business Days' written notice) as the office or offices through which it will perform its obligations under this Agreement.

"**FATCA**" means Sections 1471 through 1474 of the Code and any regulations thereunder issued by the United States Treasury.

"**FATCA Deduction**" means a deduction or withholding from a payment under any Finance Document required by or under FATCA.

"**FATCA Exempt Party**" means a FATCA Relevant Party who is entitled under FATCA to receive payments free from any FATCA Deduction and any FATCA Relevant Party which has at any time been a FATCA Exempt Party and ceases to be entitled under FATCA to receive payments free from any FATCA Deduction as a result of any change in law (including any change in the interpretation, administration or application of any applicable law, treaty or intergovernmental agreement) that results in FATCA being materially more onerous for such FATCA Relevant Party to comply with.

"**FATCA Non-Exempt Lender**" means any Lender who is a FATCA Non-Exempt Party.

"**FATCA Non-Exempt Party**" means a FATCA Relevant Party who is not a FATCA Exempt Party.

"**FATCA Relevant Party**" means each Finance Party and each Transaction Obligor.

"**Fee Letter**" means any letter or letters dated on or about the date of this Agreement between the Facility Agent, each Borrower and the Parent Guarantor setting out any of the fees referred to in Clause 11 (*Fees*).

"**Finance Document**" means:

(a)     this Agreement;

(b)     any Fee Letter;

(c)     any Shares Security;

(d)     any Mortgage;

(e)     any Deed of Covenant;

(f)     any Accounts Security;

(g)     any General Assignment;

(h)     any Manager's Undertaking;

(i)     any Charter Assignment;

(j)     any Hedging Agreement;

(k)     any Hedging Agreement Assignment;

(l)     any Subordination Agreement;

(m)     any Subordinated Debt Security;

(n)     the Warranties Assignment;

(o)     any other document (whether or not it creates Security) which is executed as security for, or for the purpose of establishing any priority or subordination arrangement in relation to, the Secured Liabilities; and

(p)     any other document designated as such by the Facility Agent and the Borrowers.

"**Finance Party**" means the Facility Agent, the Security Agent, a Lender or a Hedge Counterparty.

"**Financial Indebtedness**" means any indebtedness for or in relation to:

(a)     moneys borrowed;

(b)     any amount raised by acceptance under any acceptance credit facility or dematerialised equivalent;

(c)     any amount raised pursuant to any note purchase facility or the issue of bonds, notes, debentures, loan stock or any similar instrument;

54148659v3

(d)     any deferred payment assets or services acquired (which for the avoidance of doubt shall not include any refunds of hire or freight due to a charterer of the Ship);

(e)     the amount of any liability in relation to any lease or hire purchase contract which would, in accordance with IFRS, be treated as a finance or capital lease;

(f)     receivables sold or discounted (other than any receivables to the extent they are sold on a non-recourse basis);

(g)     any amount raised under any other transaction (including any forward sale or purchase agreement) having the commercial effect of a borrowing;

(h)     any derivative transaction entered into in connection with protection against or benefit from fluctuation in any rate or price (and, when calculating the value of any derivative transaction, only the marked to market value shall be taken into account);

(i)     any counter-indemnity obligation in relation to a guarantee, indemnity, bond, standby or documentary letter of credit or any other instrument issued by a bank or financial institution; and

(j)     the amount of any liability in relation to any guarantee or indemnity for any of the items referred to in paragraphs (a) to (i) above.

"**Fiscal Quarter**" means any of the quarterly accounting periods ending on March 31, June 30, September 30 and December 31 of each year.

"**Fiscal Year**" means each annual accounting period ending on December 31 of each year.

"**Fixed Charges**" means, as of any date of determination, an amount equal to the aggregate of:

(a)     the cash portion of Interest Expense for such period; and

(b)     any Repayment Instalments of the Loan for such period; and

(c)     any taxes paid in cash during such period,

all as determined in accordance with IFRS.

"**Fixed Charge Coverage Ratio**" means the ratio of:

(a)     the aggregate EBITDA of the Owners for the period of the most recent four Fiscal Quarters (or annualized, in the case where fewer than four Fiscal Quarters have elapsed) less Capital Expenditures of the Owners made in such period (or annualized, in the case where fewer than four Fiscal Quarters have elapsed); to

(b)     the aggregate Fixed Charges of the Borrowers for such period (or annualized, in the case where fewer than four Fiscal Quarters have elapsed.

"**General Assignment**" means, in relation to a Ship, the general assignment creating Security over that Ship's Earnings, its Insurances and any Requisition Compensation in relation to that Ship, in agreed form.

"**Group**" means the Parent Guarantor and its Subsidiaries from time to time.

"**Hedging Agreement**" means any master agreement, confirmation, transaction, schedule or other agreement in agreed form entered into or to be entered into by a Borrower for the purpose of hedging interest payable under this Agreement.

"**Hedging Agreement Assignment** " means, in relation to a Borrower, a first assignment of that Borrower's rights and interests in any Hedging Agreement, in agreed form.

"**Hedging Exposure**"  means, as at any relevant date, the aggregate of the amount certified by each Hedge Counterparty to the Facility Agent to be the aggregate net amount in dollars which would be payable by the Borrowers (or either of them) to that Hedge Counterparty under (and calculated in accordance with) section 6(e)] (*Payments on Early Termination*) of each Hedging Agreement entered into between the Borrowers (or either of them) and that Hedge Counterparty if an Early Termination Date (as defined in that Hedging Agreement) had occurred on the relevant date in relation to all continuing transactions entered into between the Borrowers (or either of them) and that Hedge Counterparty under that Hedging Agreement.

"**Hedging Prepayment Proceeds**" means any amount payable to a Borrower as a result of termination or closing out under a Hedging Agreement.

"**Holding Company**" means, in relation to a person, any other person in relation to which it is a Subsidiary.

 "**IFRS**" means international accounting standards within the meaning of the IAS Regulation 1606/2002 to the extent applicable to the relevant financial statements.

"**Indemnified Person**" has the meaning given to it in Clause 14.2 (*Other indemnities*).

"**Initial Market Value**" means, in respect of a Ship, the Market Value as determined by the valuation referred to in Schedule 2, Part B, paragraph 2.5.

"**Insurances**" means, in relation to a Ship:

(a)     all policies and contracts of insurance, including entries of that Ship in any protection and indemnity or war risks association, effected in relation to that Ship, the Earnings or otherwise in relation to that Ship whether before, on or after the date of this Agreement; and

(b)     all rights and other assets relating to, or derived from, any of such policies, contracts or entries, including any rights to a return of premium and any rights in relation to any claim whether or not the relevant policy, contract of insurance or entry has expired on or before the date of this Agreement.

"**Interest Coverage Ratio**" means, as of any date of determination, the ratio of EBITDA to Interest Expense.

"**Interest Expense**" means with respect to any person for any fiscal period, interest expense (whether cash or non-cash) of such person determined in accordance with IFRS for the relevant period ended on such date, including interest expense with respect to any Financial Indebtedness of such person and interest expense for the relevant period that has been capitalised on the balance sheet of such person.

"**Interest Period**" means, in relation to an Advance, the Loan or any part of the Loan, each period determined in accordance with Clause 9 (*Interest Periods*) and, in relation to an Unpaid Sum, each period determined in accordance with Clause 8.3 (*Default interest*).

"**ISM Code**" means the International Safety Management Code for the Safe Operation of Ships and for Pollution Prevention (including the guidelines on its implementation), adopted by the International Maritime Organisation, as the same may be amended or supplemented from time to time.

54148659v3

"**ISPS Code**" means the International Ship and Port Facility Security (ISPS) Code as adopted by the International Maritime Organization's (IMO) Diplomatic Conference of December 2002, as the same may be amended or supplemented from time to time.

"**ISSC**" means an International Ship Security Certificate issued under the ISPS Code.

"**Lender**" means:

(a)     any Original Lender; and

(b)     any bank, financial institution, trust, fund or other entity which has become a Party in accordance with Clause 30 (*Changes to the Lenders*),

which in each case has not ceased to be a Party in accordance with this Agreement.

"**LIBOR**" means, in relation to the Loan, any part of the Loan or any Unpaid Sum:

(a)     the applicable Screen Rate; or

(b)     (if no Screen Rate is available for the Interest Period of the Loan, that part of the Loan or that Unpaid Sum) the Reference Bank Rate,

as of the Specified Time on the Quotation Day for a period comparable to the Interest Period for the Loan, that part of the Loan or that Unpaid Sum and, if any such rate is below zero, LIBOR shall be deemed to be zero.

"**Limitation Acts**" means the Limitation Act 1980 and the Foreign Limitation Periods Act 1984.

"**LMA**" means the Loan Market Association.

"**Loan**" means the loan to be made available under the Facility or the aggregate principal amount outstanding for the time being of the borrowings under the Facility.

"**Maintenance Reserve Account**"  means, in relation to an Owner:

(a)     an account in the name of that Owner with the relevant Account Bank designated "Maintenance Reserve Account"; or

(b)     any other account (with that or another office of that Account Bank or with a bank or financial institution other than that Account Bank) which is designated by the relevant Obligors and the Facility Agent as the Maintenance Reserve Account of that Owner for the purposes of this Agreement.

"**Maintenance Reserve Amount**" has the meaning given in Clause 23.4 (*Liquidity Amounts*).

"**Major Casualty**" means, in relation to a Ship, any casualty to that Ship in relation to which the claim or the aggregate of the claims against all insurers, before adjustment for any relevant franchise or deductible, exceeds US$350,000 or the equivalent in any other currency.

"**Majority Lenders**" means:

(a)     if no Advance has yet been made, a Lender or Lenders whose Commitments aggregate more than 66⅔ per cent. of the Total Commitments; or

(b)     at any other time, a Lender or Lenders whose participations in the Loan aggregate more than 66⅔ per cent. of the amount of the Loan then outstanding or, if the Loan

13

54148659v3

has been repaid or prepaid in full, a Lender or Lenders whose participations in the Loan immediately before repayment or prepayment in full aggregate more than 66⅔ per cent. of the Loan immediately before such repayment.

"**Manager's Undertaking**" means the letter of undertaking from the Approved Technical Manager and the letter of undertaking from the Approved Commercial Manager subordinating the rights of the Approved Technical Manager and the Approved Commercial Manager respectively against each Ship and each Owner to the rights of the Finance Parties in agreed form.

"**Margin**" means:

(a)     in respect of Tranche A, 4.75 per cent. per annum; and

(b)     in respect of Tranche B, 4.50 per cent. per annum.

"**Market Disruption Event**" has the meaning given to it in Clause 10.2 (*Market disruption*).

"**Market Value**" means, in relation to a Ship at any date, the market value shown by a valuation prepared:

(a)     in Dollars;

(b)     as at a date not more than 14 days previously;

(c)     by an Approved Valuer;

(d)     with or without physical inspection of that Ship (as the Facility Agent may require); and

(e)     on the basis of a sale for prompt delivery for cash on normal arm's length commercial terms as between a willing seller and a willing buyer, free of any charter,

after deducting the estimated amount of the usual and reasonable expenses which would be incurred in connection with the sale.

"**Material Adverse Effect**" means a material adverse effect on:

(a)     the business, operations, property, condition (financial or otherwise) or prospects of any Transaction Obligor; or

(b)     the ability of any Transaction Obligor to perform its obligations under any Finance Document; or

(c)     the validity or enforceability of, or the effectiveness or ranking of any Security granted or intended to be granted pursuant to any of, the Finance Documents or the rights or remedies of any Finance Party under any of the Finance Documents.

"**MOA**" means the memorandum of agreement dated 7 July 2014 and entered into by the Seller as seller and Borrower A as buyer pursuant to which Ship A will be purchased by Borrower A.

"**Month**" means a period starting on one day in a calendar month and ending on the numerically corresponding day in the next calendar month, except that:

(a)     (subject to paragraph (c) below) if the numerically corresponding day is not a Business Day, that period shall end on the next Business Day in that calendar month

54148659v3

in which that period is to end if there is one, or if there is not, on the immediately preceding Business Day;

(b)     if there is no numerically corresponding day in the calendar month in which that period is to end, that period shall end on the last Business Day in that calendar month; and

(c)     if an Interest Period begins on the last Business Day of a calendar month, that Interest Period shall end on the last Business Day in the calendar month in which that Interest Period is to end.

The above rules will only apply to the last Month of any period.

"**Mortgage**" means, in relation to a Ship which is registered under an Approved Flag, a first priority/preferred mortgage on that Ship governed by the law of the Approved Flag and in agreed form.

"**Mortgaged Ship**" means any Ship which is subject to a Mortgage at any relevant time.

"**Obligor**" means a Borrower, the Parent Guarantor, the Collateral Guarantor or a Hedge Guarantor.

"**OFAC**" means the Office of Foreign Assets Control of the United States Department of Treasury.

"**Overseas Regulations**" means the Overseas Companies Regulations 2009 (SI 2009/1801).

"**Original Financial Statements**" means the annual audited consolidated financial statements of the Parent Guarantor for the Fiscal Year which ended on 31 December 2013.

"**Owner**" means each of Borrower A and the Collateral Guarantor.

"**Parallel Debt**" means any amount which an Obligor owes to the Security Agent under Clause 33.2 (*Parallel Debt (Covenant to pay the Security Agent)*).

"**Parent Guarantor**" means Blue Wall Shipping Limited, a corporation incorporated in the Republic of the Marshall Islands whose registered office is at Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro, Republic of the Marshall Islands MH 96960.

"**Parent Guarantor's Compliance Certificate**" means a certificate in the form set out in Schedule 7 (*Form of Parent Guarantor's Compliance Certificate*) or in any other form agreed between the Parent Guarantor and the Facility Agent.

"**Participating Member State**" means any member state of the European Union that has the euro as its lawful currency in accordance with legislation of the European Union relating to Economic and Monetary Union.

"**Party**" means a party to this Agreement.

"**PATRIOT Act**" means the United States Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Improvement and Reauthorization Act of 2005 (H.R. 3199).

"**Permitted Financial Indebtedness**" means:

(a)     any Financial Indebtedness incurred under the Finance Documents;

54148659v3

(b)     any Financial Indebtedness incurred with the prior written consent of the Facility Agent (including but not limited to any Permitted Inter-Company Loan) and which is fully subordinated to all Financial Indebtedness incurred under the Finance Documents in a manner satisfactory to the Facility Agent and subject to a Subordinated Debt Security; and

(c)     any Financial Indebtedness incurred in the normal course of owning, chartering and operating the Ship up to the maximum amount of US$300,000 subject to any such Financial Indebtedness being granted on normal trade credit terms.

"**Permitted Inter-Company Loan**" means a loan made or to be to a Borrower by any Affiliate, Holding Company or Subsidiary of the Parent Guarantor:

(a)     which is unsecured;

(b)     in relation to which no interest, fees, costs or expenses are payable during the Security Period;

(c)     in relation to which no repayment or prepayment of principal is capable of being made to the relevant lender in accordance with its terms and conditions during the Security Period; and

(d)     which is fully subordinated in all respects to the Secured Liabilities,

and, in the plural means, all of them;

"**Permitted Security**" means:

(a)     Security created by the Finance Documents;

(b)     any netting or set-off arrangement entered into by any Transaction Obligor in the ordinary course of its banking arrangements for the purpose of netting debit and credit balances;

(c)     liens for unpaid master's and crew's wages in accordance with usual maritime practice;

(d)     liens for salvage;

(e)     liens for master's disbursements incurred in the ordinary course of trading;

(f)     any other lien arising by operation of law or otherwise in the ordinary course of the operation, repair or maintenance of the Ship, provided such liens do not secure amounts more than 30 days overdue and subject, in the case of liens for repair or maintenance, to Clause 26.15 (*Restrictions on chartering, appointment of managers etc.*); and

(g)     Security arising by operation of law in respect of taxes which are not overdue for payment other than taxes being contested in good faith by appropriate steps and in respect of which appropriate reserves have been made.

"**Plan**" means any "employee benefit plan" as defined in Section 3(3) of ERISA that is subject to Title IV of ERISA which is or was sponsored, maintained or contributed to by, or required to be contributed to by any Transaction Obligor or any of their respective ERISA Affiliates.

"**Potential Event of Default**" means any event or circumstance specified in Clause 29 (*Events of Default*) which would (with the expiry of a grace period, the giving of notice, the making

54148659v3

of any determination under the Finance Documents or any combination of any of the foregoing) be an Event of Default.

"**Prohibited Person**" means any person (whether designated by name or by reason of being included in a class of persons) against whom Sanctions are directed.

"**Protected Party**" has the meaning given to it in Clause 12.1 (*Definitions*).

"**Purchase Agreement**" means, in relation to Ship A, the MOA.

"**Purchase Price**" means, in respect of a Ship A, the purchase price payable by Borrower A for the acquisition of Ship A pursuant to the Purchase Agreement.

"**Quotation Day**" means, in relation to any period for which an interest rate is to be determined, two Business Days before the first day of that period unless market practice differs in the London interbank market in which case the Quotation Day will be determined by the Facility Agent in accordance with market practice in the London interbank market (and if quotations would normally be given by leading banks in the London interbank market on more than one day, the Quotation Day will be the last of those days).

"**Receiver**" means a receiver or receiver and manager or administrative receiver of the whole or any part of the Charged Property.

"**Reference Bank Rate**" means the arithmetic mean of the rates (rounded upwards to four decimal places) as supplied to the Facility Agent at its request by the Reference Banks as the rate at which the relevant Reference Bank could borrow funds in the London interbank market in dollars for the relevant period, were it to do so by asking for and then accepting interbank offers for deposits in reasonable market size in that currency and for that period.

"**Reference Banks**" means the principal London offices of JP Morgan or such other leading banks in the London interbank market as may be appointed by the Facility Agent in consultation with the Borrower.

"**Related Fund**" in relation to a fund (the "first fund"), means a fund which is managed or advised by the same investment manager or investment adviser as the first fund or, if it is managed by a different investment manager or investment adviser, a fund whose investment manager or investment adviser is an Affiliate of the investment manager or investment adviser of the first fund.

"**Relevant Fiscal Quarters**" has the meaning given to it in Clause 23.2 (*Interest Coverage Ratio*).

"**Relevant Jurisdiction**" means, in relation to an Obligor:

(a)     its jurisdiction of incorporation;

(b)     any jurisdiction where any asset subject to, or intended to be subject to, any of the Transaction Security created, or intended to be created, under the Finance Documents to which it is a party is situated;

(c)     any jurisdiction where it conducts its business; and

(d)     the jurisdiction whose laws govern the perfection of any of the Transaction Security created, or intended to be created, under the Finance Documents to which it is a party.

"**Repayment Date**" means each date on which a Repayment Instalment is required to be paid under Clause 6.1 (*Repayment of Loan*).

54148659v3

"**Repayment Instalment**" has the meaning given to it in Clause 6.1 (*Repayment of Loan*).

"**Repeating Representation**" means each of the representations set out in Clause 21 (*Representations*) except Clause 21.10 (*Insolvency*), Clause 21.11 (*No filing or stamp taxes*) and Clause 21.12 (*Deduction of Tax*), Clause 21.17 (*No proceedings pending or threatened*), Clause 21.20 (*No breach of laws*), Clause 21.21 (*Compliance with Environmental Laws*), Clause 21.22 (*No Environmental Claim*), Clause 21.23 (*No Environmental Incident*), Clause 21.25 (*Taxes paid*) and Clause 21.26 (*Financial Indebtedness*) and any representation of any Obligor made in any other Finance Document that is expressed to be a "Repeating Representation" or is otherwise expressed to be repeated.

"**Representative**" means any delegate, agent, manager, administrator, nominee, attorney, trustee or custodian.

"**Requisition**" means, in relation to a Ship:

(a)     any expropriation, confiscation, requisition or acquisition of that Ship, whether for full consideration, a consideration less than its proper value, a nominal consideration or without any consideration, which is effected by any government or official authority or by any person or persons claiming to be or to represent a government or official authority (excluding a requisition for hire for a fixed period not exceeding one year without any right to an extension) unless it is within 30 days redelivered to the full control of the relevant Owner;

(b)     any arrest, capture, seizure or detention of that Ship (including any hijacking or theft) unless it is within 30 days redelivered to the full control of the relevant Owner; and

(c)     any condemnation of that Ship by any tribunal or by any person or persons claiming to be a tribunal.

"**Requisition Compensation**" includes all compensation or other moneys payable by reason of any Requisition.

"**Restricted Cash Reserve Amount**" means, in relation to a Ship, a restricted cash amount being US$600,000 for Ship A and US$300,000 for Ship B, such amount to be held in the Retention Account of the Owner owning that Ship.

"**Retention Account**" means, in relation to Borrower A (in respect of Ship A) and in relation to the Collateral Guarantor (in respect of Ship B):

(a)     an account in the name of that Obligor with the relevant Account Bank designated "*name of relevant Obligor(s) - Retention Account*"; or

(b)     any other account (with that or another office of that Account Bank or with a bank or financial institution other than that Account Bank) which is designated by the Facility Agent as the Retention Account of that Obligor for the purposes of this Agreement.

"**Safety Management Certificate**" has the meaning given to it in the ISM Code.

"**Safety Management System**" has the meaning given to it in the ISM Code.

"**Sanctions**" means any sanctions, embargoes, freezing provisions, prohibitions or other restrictions relating to trading, doing business, investment, exporting, financing or making assets available (or other activities similar to or connected with any of the foregoing):

(a)     imposed by law or regulation of the United Kingdom, the Council of the European Union, the United States of America, the United Nations or its Security Council;

(b)     under CISADA;

(c)     in respect of (i) a "national" of any "designated foreign country", within the meaning of the Foreign Assets Control Regulations or the Cuban Asset Control Regulations of the United States Department of the Treasury, 31 C.F.R., Subtitle B, Chapter V, as amended, or (ii) a "specially designated national" listed by OFAC or any regulations or rulings issued thereunder; or

(d)     otherwise imposed by any law or regulation or Executive Order by which any Finance Party or any Transaction Obligor is bound or, as regards a regulation, compliance with which is reasonable in the ordinary course of business of any Finance Party or any Transaction Obligor, including without limitation laws or regulations or Executive Orders restricting loans to, investments in, or the export of assets to, foreign countries or entities doing business there.

"**Screen Rate**" means the London interbank offered rate administered by ICE Benchmark Administration Limited (or any other person which takes over the administration of that rate) for dollars for the relevant period displayed on Bloomberg BBAM Screen (or any replacement Bloomberg page which displays that rate) or on the appropriate page of such other information service which publishes that rate from time to time in place of Bloomberg. If such page or service ceases to be available, the Facility Agent may specify another page or service displaying the relevant rate after consultation with the Borrowers and the Parent Guarantor.

"**Secured Liabilities**" means all present and future obligations and liabilities, (whether actual or contingent and whether owed jointly or severally or in any other capacity whatsoever) of each Transaction Obligor to any Secured Party under or in connection with each Finance Document.

"**Secured Party**" means each Finance Party from time to time party to this Agreement and any Receiver or Delegate.

"**Security**" means a mortgage, pledge, lien, charge, assignment, hypothecation or security interest or any other agreement or arrangement having the effect of conferring security.

"**Security Period**" means the period starting on the date of this Agreement and ending on the date on which the Facility Agent is satisfied that there is no outstanding Commitment in force and that the Secured Liabilities have been irrevocably and unconditionally paid and discharged in full.

"**Security Property**" means:

(a)     the Transaction Security expressed to be granted in favour of the Security Agent as trustee for the Secured Parties and all proceeds of that Transaction Security;

(b)     all obligations expressed to be undertaken by an Obligor to pay amounts in relation to the Secured Liabilities to the Security Agent as trustee for the Secured Parties and secured by the Transaction Security together with all representations and warranties expressed to be given by an Obligor in favour of the Security Agent as trustee for the Secured Parties;

(c)     the Security Agent's interest in any turnover trust created under the Finance Documents;

(d)     any other amounts or property, whether rights, entitlements, choses in action or otherwise, actual or contingent, which the Security Agent is required by the terms of the Finance Documents to hold as trustee on trust for the Secured Parties,

except:

(i)     rights intended for the sole benefit of the Security Agent; and

(ii)    any moneys or other assets which the Security Agent has transferred to the Facility Agent or (being entitled to do so) has retained in accordance with the provisions of this Agreement.

"**Selection Notice**" means a notice substantially in the form set out in Part B of Schedule 3 (*Requests*) given in accordance with Clause 9 (*Interest Periods*).

"**Seller**" means Giant Line Inc. S.A., a company incorporated in Panama whose registered address is at 53rd E Street, Urbanizacion Marbella, MMG Tower, 16th Floor, Panama, Republic of Panama;

"**Servicing Party**" means the Facility Agent or the Security Agent.

"**Shares Security**" means, in relation to a Borrower and the Collateral Guarantor, a document creating Security over the share capital in that Borrower and in the Collateral Guarantor in agreed form.

"**Ship**" means Ship A or Ship B and, in the plural, means both of them.

"**Ship A**" means the 2014-built 28,500 DWT Handysize drybulk carrier with Builder's hull no. S-853 which is to be purchased by Borrower A pursuant to the MOA and registered in its name under an Approved Flag with the name "BRAZEN".

"**Ship B**" means the Supramax motor vessel "VIGOROUS" having 52,498 DWT, built at Tsuneishi Cebu, Philippines in 2005 and currently owned by the Collateral Guarantor and registered in its name under an Approved Flag in all respects approved and acceptable to the Facility Agent.

"**Shortfall**" has the meaning given to it in Clause 23.2 (*Interest Coverage Ratio*).

"**Specified Time**" means a time determined in accordance with Schedule 8 (*Timetables*).

"**Subordinated Creditor**" means:

(a)     a Transaction Obligor; or

(b)     any other person who becomes a Subordinated Creditor in accordance with this Agreement.

"**Subordinated Debt Security**" means a document creating Security in relation to any Subordinated Debt entered or to be entered into by a Subordinated Creditor in favour of the Security Agent in agreed form.

"**Subordinated Debt**", in relation to a Subordinated Creditor, has the meaning given to it in the Subordination Agreement entered into by that Subordinated Creditor.

"**Subordination Agreement**" means a subordination agreement entered into or to be entered into by a Subordinated Creditor, an Obligor and the Security Agent in agreed form.

"**Subsidiary**" means a subsidiary within the meaning of section 1159 of the Companies Act 2006.

"**Tax**" means any tax, levy, impost, duty or other charge or withholding of a similar nature (including any penalty or interest payable in connection with any failure to pay or any delay in paying any of the same).

"**Tax Credit**" has the meaning given to it in Clause 12.1 (*Definitions*).

"**Tax Deduction**" has the meaning given to it in Clause 12.1 (*Definitions*).

"**Tax Payment**" has the meaning given to it in Clause 12.1 (*Definitions*).

"**Termination Date**" means, in relation to a Tranche, the date falling on the fifth anniversary of the Utilisation Date for that Tranche.

"**Third Parties Act**" has the meaning given to it in Clause 1.5 *(Third party rights)*.

"**Total Capitalisation**" means, as at the date of calculation, Financial Indebtedness plus the total shareholders' equity (including retained earnings) of the Parent Guarantor plus consolidated total shareholder loans, minus goodwill and other non-tangible items.

"**Total Commitments**" means the aggregate of the Commitments, being up to US$24,150,000 at the date of this Agreement.

"**Total Loss**" means, in relation to a Ship:

(a)    actual, constructive, compromised, agreed or arranged total loss of that Ship; or

(b)    any Requisition.

"**Total Loss Date**" means, in relation to the Total Loss of a Ship:

(a)    in the case of an actual loss of that Ship, the date on which it occurred or, if that is unknown, the date when that Ship was last heard of;

(b)    in the case of a constructive, compromised, agreed or arranged total loss of that Ship, the earlier of:

(i)    the date on which a notice of abandonment is given to the insurers; and

(ii)    the date of any compromise, arrangement or agreement made by or on behalf of the relevant Owner with that Ship's insurers in which the insurers agree to treat that Ship as a total loss; and

(c)    in the case of any other type of total loss, the date (or the most likely date) on which it appears to the Facility Agent that the event constituting the total loss occurred.

"**Tranche**" means Tranche A or Tranche B, and, in the plural, means all of them.

"**Tranche A**" means that part of the Loan made or to be made available to the Borrowers in amount of up to 50 per cent. of the lesser of (a) the Initial Market Value of Ship A and (b) the Purchase Price of Ship A.

"**Tranche B**" means that part of the Loan made or to be made available to Borrowers in amount of up to the lesser of (a) 50 per cent. of the Initial Market Value of Ship B and (b) US$7,500,000.

"**Transaction Document**" means:

(a)     a Finance Document;

(b)     any Charter; or

(c)     any other document designated as such by the Facility Agent and the Borrowers.

"**Transaction Obligor**" means an Obligor, the Parent Guarantor, each Approved Manager or any other person, except a Finance Party, who executes a Finance Document.

"**Transaction Security**" means the Security created or intended to be created in favour of the Security Agent pursuant to the Finance Documents.

"**Transfer Certificate**" means a certificate substantially in the form set out in Schedule 4 (*Form of Transfer Certificate*) or any other form agreed between the Facility Agent and the Borrowers.

"**Transfer Date**" means, in relation to an assignment or a transfer, the later of:

(a)     the proposed Transfer Date specified in the relevant Assignment Agreement or Transfer Certificate; and

(b)     the date on which the Facility Agent executes the relevant Assignment Agreement or Transfer Certificate.

"**UK Establishment**" means a UK establishment as defined in the Overseas Regulations.

"**Unpaid Sum**" means any sum due and payable but unpaid by an Obligor under the Finance Documents.

"**Unrestricted Cash Reserve Amount**" means, in relation to a Ship, an unrestricted cash amount being US$300,000 for that Ship, such amount to be held in the Earnings Account of the Owner owning that Ship.

"**US Tax Obligor**" means:

(a)     a person which is resident for tax purposes in the United States of America; or

(b)     a person some or all of whose payments under the Finance Documents are from sources within the United States for US federal income tax purposes.

"**Utilisation**" means a utilisation of the Facility.

"**Utilisation Date**" means the date of a Utilisation, being the date on which the relevant Advance is to be made.

"**Utilisation Request**" means a notice substantially in the form set out in Part A of Schedule 3 (*Requests*).

"**VAT**" means:

(a)     any tax imposed in compliance with the Council Directive of 28 November 2006 on the common system of value added tax (EC Directive 2006/112); and

(b)     any other tax of a similar nature, whether imposed in a member state of the European Union in substitution for, or levied in addition to, such tax referred to in paragraph (a) above, or imposed elsewhere.

"**Warranties Assignment**" means a first priority assignment in favour of the Security Agent of the warranties under the MOA, in agreed form.

**1.2    Construction**

(a)    Unless a contrary indication appears, a reference in this Agreement to:

(i)    either "**Account Bank**", the "**Facility Agent**", any "**Finance Party**", any "**Hedge Counterparty**", any "**Lender**", any "**Obligor**", any "**Party**", any "**Secured Party**", the "**Security Agent**", any "**Transaction Obligor**" or any other person shall be construed so as to include its successors in title, permitted assigns and permitted transferees to, or of, its rights and/or obligations under the Finance Documents;

(ii)    "**assets**" includes present and future properties, revenues and rights of every description;

(iii)    "**contingent liability**" means a liability which is not certain to arise and/or the amount of which remains unascertained;

(iv)    "**document**" includes a deed and also a letter, fax or telex;

(v)    "**expense**" means any kind of cost, charge or expense (including all legal costs, charges and expenses) and any applicable Tax including VAT;

(vi)    a "**Finance Document**" or "**Transaction Document**" or any other agreement or instrument is a reference to that Finance Document or Transaction Document or other agreement or instrument as amended or novated;

(vii)    "**indebtedness**" includes any obligation (whether incurred as principal or as surety) for the payment or repayment of money, whether present or future, actual or contingent;

(viii)    "**law**" includes any order or decree, any form of delegated legislation, any treaty or international convention and any regulation or resolution of the Council of the European Union, the European Commission, the United States of America, the United Nations or its Security Council;

(ix)    "**proceedings**" means, in relation to any enforcement provision of a Finance Document, proceedings of any kind, including an application for a provisional or protective measure;

(x)    a "**person**" includes any individual, firm, company, corporation, government, state or agency of a state or any association, trust, joint venture, consortium or partnership (whether or not having separate legal personality);

(xi)    a "**regulation**" includes any regulation, rule, official directive, request or guideline (whether or not having the force of law) of any governmental, intergovernmental or supranational body, agency, department or regulatory, self-regulatory or other authority or organisation;

(xii)    a provision of law is a reference to that provision as amended or re-enacted;

(xiii)    a time of day is a reference to New York time;

(xiv)    any English legal term for any action, remedy, method of judicial proceeding, legal document, legal status, court, official or any legal concept or thing shall, in respect of a jurisdiction other than England, be deemed to include that which most nearly approximates in that jurisdiction to the English legal term;

(xv)    words denoting the singular number shall include the plural and vice versa; and

(xvi)    "**including**" and "**in particular**" (and other similar expressions) shall be construed as not limiting any general words or expressions in connection with which they are used.

(b)    Section, Clause and Schedule headings are for ease of reference only and are not to be used for the purposes of construction or interpretation of the Finance Documents.

(c)    Unless a contrary indication appears, a term used in any other Finance Document or in any notice given under, or in connection with, any Finance Document has the same meaning in that Finance Document or notice as in this Agreement.

(d)    A Potential Event of Default is "continuing" if it has not been remedied or waived and an Event of Default is "continuing" if it has not been waived.

**1.3    Construction of insurance terms**

In this Agreement:

"**approved**" means, for the purposes of Clause 25 (*Insurance Undertakings*), approved in writing by the Facility Agent;

"**excess risks**" means, in respect of a Ship, the proportion of claims for general average, salvage and salvage charges not recoverable under the hull and machinery policies in respect of that Ship in consequence of its insured value being less than the value at which that Ship is assessed for the purpose of such claims;

"**obligatory insurances**" means all insurances effected, or which any Owner is obliged to effect, under Clause 25 (*Insurance Undertakings*) or any other provision of this Agreement or of another Finance Document;

"**policy**" includes a slip, cover note, certificate of entry or other document evidencing the contract of insurance or its terms;

"**protection and indemnity risks**" means the usual risks covered by a protection and indemnity association managed in London, including pollution risks and the proportion (if any) of any sums payable to any other person or persons in case of collision which are not recoverable under the hull and machinery policies by reason of the incorporation in them of clause 1 of the Institute Time Clauses (Hulls) (1/10/82) or clause 8 of the Institute Time Clauses (Hulls) (1/11/1995) or the Institute Amended Running Down Clause (1/10/71) or any equivalent provision; and

"**war risks**" includes the risk of mines and all risks excluded by clause 23 of the Institute Time Clauses (Hulls) (1/10/83) or clause 24 of the Institute time Clauses (Hulls) (1/11/1995).

**1.4    Agreed forms of Finance Documents**

References in Clause 1.1 (*Definitions*) to any Finance Document being in "agreed form" are to that Finance Document:

(a)    in a form attached to a certificate dated the same date as this Agreement (and signed by each Borrower and the Facility Agent); or

(b)    in any other form agreed in writing between each Borrower and the Facility Agent acting with the authorisation of the Majority Lenders or, where Clause 43.3 (*Other exceptions*) applies, all the Lenders.

54148659v3

### 1.5 Third party rights

(a) Unless expressly provided to the contrary in a Finance Document, a person who is not a Party has no right under the Contracts (Rights of Third Parties) Act 1999 (the "Third Parties Act") to enforce or to enjoy the benefit of any term of this Agreement.

(b) Notwithstanding any term of any Finance Document, the consent of any person who is not a Party is not required to rescind or vary this Agreement at any time.

(c) Any Receiver, Delegate or any other person described in Clause 29.15 (*Litigation*) may, subject to this Clause 1.5 (*Third party rights*) and the Third Parties Act, rely on any Clause of this Agreement which expressly confers rights on it.

54148659v3

**SECTION 2**

**THE FACILITY**

**2      THE FACILITY**

**2.1      The Facility**

Subject to the terms of this Agreement, the Lenders make available to the Borrowers a dollar term loan facility in two Tranches in an aggregate amount not exceeding the Total Commitments.

**2.2      Finance Parties' rights and obligations**

(a)    The obligations of each Finance Party under the Finance Documents are several. Failure by a Finance Party to perform its obligations under the Finance Documents does not affect the obligations of any other Party under the Finance Documents. No Finance Party is responsible for the obligations of any other Finance Party under the Finance Documents.

(b)    The rights of each Finance Party under or in connection with the Finance Documents are separate and independent rights and any debt arising under the Finance Documents to a Finance Party from an Obligor shall be a separate and independent debt.

(c)    A Finance Party may, except as otherwise stated in the Finance Documents, separately enforce its rights under the Finance Documents.

(d)    Notwithstanding any other provision of the Finance Documents, a Finance Party may separately sue for any Unpaid Sum due to it without the consent of any other Finance Party or joining any other Finance Party to the relevant proceedings.

**3      PURPOSE**

**3.1      Purpose**

Each Borrower shall apply all amounts borrowed by it under the Facility only for the purpose stated in the preamble (Background) to this Agreement.

**3.2      Monitoring**

No Finance Party is bound to monitor or verify the application of any amount borrowed pursuant to this Agreement.

**3.3      Proceeds of Loan**

No part of the proceeds of the Loan will be used, directly or indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as may be amended from time to time.

**4      CONDITIONS OF UTILISATION**

**4.1      Initial conditions precedent**

The Borrowers may not deliver a Utilisation Request unless the Facility Agent has received all of the documents and other evidence listed in Part A of Schedule 2 (Conditions Precedent) in form and substance satisfactory to the Facility Agent.

**4.2   Further conditions precedent**

The Lenders will only be obliged to comply with Clause 5.4 (*Lenders' participation*) if on the date of the Utilisation Request and on the proposed Utilisation Date and before the Advance is made available:

(a)   no Default is continuing or would result from the making available of the proposed Utilisation;

(b)   the Repeating Representations to be made by each Obligor, or as the case may be, Transaction Obligor are true in all material respects;

(c)   no event described in paragraph (a) of Clause 7.3 (*Mandatory prepayment - sale or Total Loss; Change of Control*) has occurred in relation to the Ship in respect of which such Advance is to be made;

(d)   the provisions of paragraph (c) of Clause 10.3 (*Alternative basis of interest or funding, suspension*) do not apply;

(e)   there has been no Material Adverse Effect; and

(f)   there has been no material adverse effect on the business, operations, property, condition (financial or otherwise) or prospects of any member of the Group; or

(g)   the Facility Agent has received, or is satisfied it will receive when the Advance is made available, all of the documents and other evidence listed in Part A and Part B of Schedule 2 (*Conditions Precedent*) relevant to that Advance in form and substance satisfactory to the Facility Agent.

**4.3   Notification of satisfaction of conditions precedent**

(a)   The Facility Agent shall notify the Borrowers and the Lenders promptly upon being satisfied as to the satisfaction of the conditions precedent referred to in Clause 4.1 (*Initial conditions precedent*) and Clause 4.2 (*Further conditions precedent*).

(b)   Other than to the extent that the Majority Lenders notify the Facility Agent in writing to the contrary before the Facility Agent gives the notification described in paragraph (a) above, the Lenders authorise (but do not require) the Facility Agent to give that notification. The Facility Agent shall not be liable for any damages, costs or losses whatsoever as a result of giving any such notification.

**4.4   Waiver of conditions precedent**

If the Majority Lenders, at their discretion, permit an Advance to be borrowed before any of the conditions precedent referred to in Clause 4.1 (*Initial conditions precedent*) or Clause 4.2 (*Further conditions precedent*) has been satisfied, the Borrowers shall ensure that that condition is satisfied within five Business Days after the relevant Utilisation Date or such later date as the Facility Agent, acting with the authorisation of the Majority Lenders, may agree in writing with the Borrowers.

## SECTION 3

## UTILISATION

**5      UTILISATION**

**5.1    Delivery of a Utilisation Request**

(a)     The Borrowers may utilise the Facility by delivery to the Facility Agent of a duly completed Utilisation Request not later than the Specified Time.

(b)     The Borrowers may not deliver more than one Utilisation Request under each of Tranche A and Tranche B.

**5.2    Completion of a Utilisation Request**

Each Utilisation Request is irrevocable and will not be regarded as having been duly completed unless:

(i)     the proposed Utilisation Date is a Business Day within the Availability Period;

(ii)    the currency and amount of the Utilisation comply with Clause 5.3 (*Currency and amount*); and

(iii)   the proposed Interest Period complies with Clause 9 (*Interest Periods*).

**5.3    Currency and amount**

(a)     The currency specified in a Utilisation Request must be dollars.

(b)     The amount of the proposed Advance in respect of Tranche A must be an amount which is not more than 50 per cent. of the lesser of (i) the Initial Market Value and (ii) the Purchase Price of Ship A.

(c)     The amount of the proposed Advance in respect of Tranche B must be an amount which is not more than the lesser of (i) 50 per cent. of the Initial Market Value of Ship B and (ii) US$7,500,000.

(d)     The amount of the proposed Loan must be an amount which is not more than the Available Facility.

**5.4    Lenders' participation**

(a)     If the conditions set out in this Agreement have been met, each Lender shall make its participation in each Advance available by the Utilisation Date through its Facility Office.

(b)     The amount of each Lender's participation in each Advance will be equal to the proportion borne by its Available Commitment to the Available Facility immediately before making that Advance.

(c)     The Facility Agent shall notify each Lender of the amount of each Advance and the amount of its participation in that Advance by the Specified Time.

**5.5    Cancellation of Commitments**

The Commitments in respect of any Tranche which are unutilised at the end of the Availability Period for such Tranche shall then be cancelled.

## SECTION 4

## REPAYMENT, PREPAYMENT AND CANCELLATION

**6       REPAYMENT**

**6.1     Repayment of Loan**

(a)      Each Borrower shall repay each Tranche as follows:

   (i)      by 20 equal consecutive 3-monthly instalments (each an "**Instalment**" and, in the plural means, all of them) in the amount of X each; and

   (ii)     a balloon instalment in the amount of Y (the "**Balloon Instalment**" and, together with the Instalments, the "**Repayment Instalments**" and, in the singular, means any of them).

In this Clause 6.1:

"**Age**" means, in relation to a Ship, the age of that Ship on the Utilisation Date of the Tranche which is used to finance or refinance that Ship;

"**U**" means the product of V and 4;

"**V**" means, in relation to a Tranche, 18 minus the Age of the Ship financed or refinanced by that Tranche;

"**W**" means X multiplied by 20;

"**X**" means an amount achieved by dividing Z by U;

"**Y**" means, in relation to each Tranche, Z minus W; and

"**Z**" means, in relation to each Tranche, the amount of that Tranche on its Utilisation Date (after the same has been made available to the Borrowers).

(b)      the first Repayment Instalment of each Tranche shall be repaid on the date falling 3 months after the Utilisation Date of that Tranche, each subsequent Repayment Instalment shall be repaid at three-monthly intervals thereafter and the last Repayment Instalment shall be repaid together with the Balloon Instalment on the Termination Date for that Tranche.

**6.2     Termination Date**

On the second Termination Date, the Borrowers shall additionally pay to the Facility Agent for the account of the Finance Parties all other sums then accrued and owing under the Finance Documents.

**6.3     Re-borrowing**

No Borrower may re-borrow any part of the Facility which is repaid.

**7       PREPAYMENT AND CANCELLATION**

**7.1     Illegality**

(a)      If it becomes unlawful in any applicable jurisdiction for a Lender to perform any of its obligations as contemplated by this Agreement or to fund or maintain its participation in an

Advance or the Loan or it becomes unlawful for any Affiliate of a Lender for that Lender to do so:

(i)     that Lender shall promptly notify the Facility Agent upon becoming aware of that event;

(ii)    upon the Facility Agent notifying the Borrowers, the Commitment of that Lender will be immediately cancelled; and

(iii)   the Borrowers shall repay that Lender's participation in the Loan on the last day of the Interest Period for the Loan occurring after the Facility Agent has notified the Borrowers or, if earlier, the date specified by the Lender in the notice delivered to the Facility Agent (being no earlier than the last day of any applicable grace period permitted by law).

(b)    Any partial prepayment under this Clause 7.1 (*Illegality*) of a Tranche shall reduce *pro rata* the amount of each Repayment Instalment for that Tranche falling after that prepayment by the amount prepaid.

**7.2    Voluntary prepayment of a Tranche**

(a)    The Borrowers may, if they give the Facility Agent not less than 3 Business Days' (or such shorter period as the Majority Lenders may agree) prior notice, prepay the whole or any part of either Tranche (but, if in part, being an amount that reduces the amount of that Tranche by a minimum amount of US$250,000 or an integral multiple of that amount).

(b)    Either Tranche may only be prepaid after the last day of the Availability Period (or, if earlier, the day on which the Available Facility is zero).

(c)    Any partial prepayment under this Clause 7.2 (*Voluntary prepayment of* ) shall reduce in inverse chronological order the amount of each Repayment Instalment for that Tranche falling after that prepayment by the amount prepaid,

**Provided that** the provisions of this Clause 7.2 (*Voluntary prepayment of a Tranche*) shall not apply to any prepayments made by the Borrowers pursuant to Clause 23.2 (*Interest Coverage Ratio*).

**7.3    Mandatory prepayment - sale or Total Loss; Change of Control**

(a)    If a Ship is sold or otherwise disposed of or becomes a Total Loss, the Borrowers shall be obliged to prepay in full the Tranche relating to that Ship:

(i)     in the case of a sale or other disposal, on or before the earlier of (i) the date on which the sale or disposal is completed by delivery of that Ship to the buyer or other person, (ii) the date of receipt by the Owner owning that Ship of the sale proceeds (or, as the case may be pursuant to the provisions of paragraph (d) of Clause 7.4 (*Further events triggering mandatory prepayment*), any balance of the sale proceeds) and (iii) the Termination Date for that Tranche; or

(ii)    in the case of a Total Loss on the earlier of (i) the date falling 120 days after the Total Loss Date, (ii) the date of receipt by the Security Agent of the proceeds of insurance relating to the Total Loss and (iii) the Termination Date for that Tranche,

and any surplus proceeds of the sale, disposal or (as the case may be) Total Loss (after making such prepayment and paying any other amount required under this Agreement) shall in the case Ship A is sold or becomes a Total Loss, be applied in or towards prepayment of Tranche B (reducing in inverse order of maturity the amount of each Repayment Instalment for Tranche B) and, in the case Ship B is sold or becomes a Total Loss (if there is no Event of

Default which is continuing at the time of such prepayment of Tranche B) be released to the Borrowers. However, if there is such an Event of Default which is continuing at such time, the Borrowers shall, on the date of such prepayment of Tranche B, apply all such surplus proceeds as a prepayment of the remaining Tranche A (with any partial prepayment reducing *pro rata* the amount of each Repayment Instalment for that Tranche falling after that prepayment by the amount prepaid).

(b)    If a Change of Control occurs (without the prior written consent of the Facility Agent) after the date of this Agreement in respect of:

(i)    either Owner, the Borrowers shall prepay the total amount of the Tranche relevant to that Ship owned by that Borrower immediately upon receipt of the Facility Agent's notice; and

(ii)    the Parent Guarantor, the Facility Agent shall, by not less than 7 days' notice to the Borrowers, cancel the Facility and declare the Loan, together with accrued interest, and all other amounts accrued under the Finance Documents immediately due and payable whereby the Facility will be cancelled and all such outstanding amounts will become immediately due and payable.

(c)    The Borrowers shall give written notice to the Facility Agent immediately upon the occurrence of a Change of Control.

In this Clause 7.3 (*Mandatory prepayment - sale or Total Loss; Change of Control*):

"**Change of Control**" means

(a)    in respect of an Owner, the occurrence of the act, event or circumstance that resulted in the Parent Guarantor holding less than 100 per cent. of the issued voting share capital of that Owner; and

(b)    in respect of the Parent Guarantor, the occurrence of the act, event or circumstance that resulted in a shareholder (other than any shareholder existing and disclosed to the Facility Agent on the date of this Agreement) holding more than 25 per cent. of the issued voting share capital of the Parent Guarantor after the date of this Agreement.

**7.4    Further events triggering mandatory prepayment**

If any of the following events (each an "**Event**") occur (without prejudice to any provisions of the Finance Documents which may restrict the Owners' ability to carry out certain of the matters referred to in this Clause 7.4 (*Further events triggering mandatory prepayment*)), each of the Owners shall apply (and irrevocably authorise the Borrowers to apply) all monies received by it in or towards prepayment firstly of the relevant Tranche related to that Ship and then towards prepayment of the remaining Tranche **Provided that** in the case of paragraph (d) below of this Clause 7.4 (*Further events triggering mandatory prepayment*) as long as there is no Event of Default which is continuing all moneys received by that Owner shall be applied in or towards prepayment of the Tranche related to that Ship and any surplus shall be released to the relevant Owner (if there is no Event of Default which is continuing at the time of such prepayment):

(a)    the incurrence by either Owner of any Financial Indebtedness other than the Permitted Financial Indebtedness;

(b)    other than in the case of a Total Loss, any recovery is made by either Owner under the Insurances which are paid to that Owner and which are not applied towards the repair of the Ship owned by that Owner in accordance with the terms of this Agreement (unless the insurance proceeds are paid to that Owner for repairs already settled by that Owner

**Provided that** (i) that Owner has provided evidence satisfactory to the Facility Agent showing the total cost incurred, and already settled, by that Owner and (ii) no Event of Default has then occurred which is continuing);

(c)     the issuing of any equity securities (including, without limitation, shares) by either Owner;

(d)     without prejudice to Clause 7.3(a)(i) (*Mandatory prepayment - sale or Total Loss; Change of Control*), in the case of a sale or other disposal of a Ship, receipt by the Owner owning that Ship of any amount unconditionally and irrevocably paid to that Owner as part of the sale proceeds of that Ship prior to the date on which the sale or disposal is completed by delivery of that Ship to the buyer or other person; and

(e)     receipt by either Owner of any Extraordinary Receipts,

and any such prepayment shall, in each case, be made on the date that such proceeds are received by the relevant Owner; and any partial prepayment of a Tranche under this Clause shall reduce *pro rata* the amount of each Repayment Instalment for that Tranche falling after that prepayment by the amount prepaid.

**7.5     Mandatory prepayment of Hedging Payment Proceeds**

Any Hedging Prepayment Proceeds arising as a result of any cancellation or prepayment under this Agreement shall, following payment into the relevant Retention Account related to that Tranche being cancelled or prepaid in accordance with Clause 28.1 (*Payment of Earnings*), be applied on the last day of the Interest Period which ends on or after such payment in, in prepayment of the Loan and shall reduce *pro rata* the amount of each Repayment Instalment falling after that prepayment by the amount prepaid.

**7.6     Right of repayment and cancellation in relation to a single Lender**

(a)     If:

(i)     any sum payable to any Lender by an Obligor is required to be increased under paragraph (c) of Clause 12.2 (*Tax gross-up*); or

(ii)     any Lender claims indemnification from a Borrower under Clause 12.3 (*Tax indemnity*) or Clause 13.1 (*Increased costs*); or

the Borrowers may whilst the circumstance giving rise to the requirement for that increase or indemnification continues or give the Facility Agent notice of cancellation of the Commitment of that Lender and its intention to procure the repayment of that Lender's participation in the Loan together with any other amounts payable or give the Facility Agent notice of its intention to replace that Lender in accordance with paragraph (d) below.

(b)     On receipt of a notice of cancellation referred to in paragraph (a) above, the Commitment of that Lender shall immediately be reduced to zero.

(c)     On the last day of each Interest Period which ends after the Borrowers have given notice of cancellation under paragraph (a) above  in relation to a Lender (or, if earlier, the date specified the Borrowers in that notice), the Borrowers shall repay that Lender's participation in the Loan together with all interest and other amounts accruing under the Finance Documents.

(d)     The Borrowers may, in the circumstances set out in paragraph (a) above, on 5 Business Days' prior notice to the Facility Agent and that Lender, replace that Lender by requesting that Lender to transfer pursuant to 30 (*Changes to the Lenders*) all (and not part only) of its rights and obligations under this Agreement to a Lender or other bank, financial institution, trust,

fund or other entity selected by the Borrowers which confirms its willingness to assume and does assume all the obligations of the transferring Lender in accordance with 30 (*Changes to the Lenders*) for a purchase price in cash or other cash payment payable at the time of the transfer equal to the outstanding principal amount of the Loan and all accrued interest, Break Costs and other amounts payable in relation thereto under the Finance Documents.

(e)     The replacement of a Lender pursuant to paragraph (d) above shall be subject to the following conditions:

(i)     the Borrowers shall have no right to replace the Facility Agent;

(ii)    any replacement Lender must be approved in writing by the Facility Agent (acting on behalf of the Majority Lenders) such approval not to be unreasonably withheld;

(iii)   neither the Facility Agent nor any Lender shall have any obligation to find a replacement Lender;

(iv)    in no event shall the Lender replaced under paragraph (d) above be required to pay or surrender any of the fees received by such Lender pursuant to the Finance Documents; and

(v)     the Lender shall only be obliged to transfer its rights and obligations pursuant to paragraph (d) above once it is satisfied that it has complied with all necessary "know your customer" or other similar checks under all applicable laws and regulations in relation to that transfer.

(f)     A Lender shall perform the checks described in paragraph (e)(v) above as soon as reasonably practicable following delivery of a notice referred to in paragraph (d) above and shall notify the Facility Agent and the Borrowers when it is satisfied that it has complied with those checks.

(g)     For the avoidance of doubt, the replacement of a Lender pursuant to paragraph (d) does not in any way prejudice the continued application of paragraph (c) of Clause 12.2 (*Tax gross-up*), Clause 12.3 (*Tax indemnity*)or Clause 13 (*Increased Costs*) and nothing in this Clause 7.6 (*Right of repayment and cancellation in relation to a single Lender*) shall remove the Borrowers' obligations to pay to any Lender any amounts payable to any Lender by the Borrowers pursuant to paragraph (c) of Clause 12.2 (*Tax gross-up*), Clause 12.3 (*Tax indemnity*) or Clause 13.1 (*Increased costs*).

(h)     Any partial prepayment under this Clause 7.6 (*Right of repayment and cancellation in relation to a single Lender*) shall reduce *pro rata* the amount of each Repayment Instalment falling after that prepayment by the amount prepaid.

**7.7     Restrictions**

(a)     Any notice of cancellation or prepayment given by any Party under this Clause 7 (*Prepayment and Cancellation*) shall be irrevocable and, unless a contrary indication appears in this Agreement, shall specify the date or dates upon which the relevant cancellation or prepayment is to be made and the amount of that cancellation or prepayment.

(b)     Any prepayment under this Agreement shall be made together with accrued interest on the amount prepaid and amounts (if any) payable under the Hedging Agreements in connection with that prepayment and, subject to the fee provided for in Clause 11.3 (*Prepayment Fee*) if applicable and any Break Costs, without premium or penalty.

(c)     No Borrower may reborrow any part of the Facility which is prepaid.

(d)     No Borrower shall repay or prepay all or any part of the Loan or cancel all or any part of the Commitments except at the times and in the manner expressly provided for in this Agreement.

(e)     No amount of the Total Commitments cancelled under this Agreement may be subsequently reinstated.

(f)     If the Facility Agent receives a notice under this Clause 7 (*Prepayment and Cancellation*) it shall promptly forward a copy of that notice to either the Borrowers or the affected Lenders and/or Hedge Counterparties, as appropriate.

54148659v3

**SECTION 5**

**COSTS OF UTILISATION**

**8      INTEREST**

**8.1     Calculation of interest**

The rate of interest on the Loan or any part of the Loan for each Interest Period applicable to it is the percentage rate per annum which is the aggregate of:

(a)     the Margin; and

(b)     LIBOR.

**8.2     Payment of interest**

(a)     The Borrowers shall pay accrued interest on the Loan or any part of the Loan on the last day of each Interest Period applicable to it.

(b)     If an Interest Period is longer than three Months, the Borrowers shall also pay interest then accrued on the Loan or the relevant part of the Loan on the dates falling at three Monthly intervals after the first day of the Interest Period.

**8.3     Default interest**

(a)     If an Obligor fails to pay any amount payable by it under a Finance Document on its due date, interest shall accrue on the Unpaid Sum from the due date up to the date of actual payment (both before and after judgment) at a rate which, subject to paragraph (b) below, is 2 per cent. higher than the rate which would have been payable if the Unpaid Sum had, during the period of non-payment, constituted part of the Loan in the currency of the Unpaid Sum for successive Interest Periods, each of a duration selected by the Facility Agent. Any interest accruing under this Clause 8.3 (*Default interest*) shall be immediately payable by the Obligor on demand by the Facility Agent.

(b)     If an Unpaid Sum consists of all or part of the Loan which became due on a day which was not the last day of an Interest Period relating to the Loan or the relevant portion of the Loan:

(i)      the first Interest Period for that Unpaid Sum shall have a duration equal to the unexpired portion of the current Interest Period relating to the Loan; and

(ii)     the rate of interest applying to that Unpaid Sum during that first Interest Period shall be 2 per cent. higher than the rate which would have applied if that Unpaid Sum had not become due.

(c)     Default interest (if unpaid) arising on an Unpaid Sum will be compounded with the Unpaid Sum at the end of each Interest Period applicable to that Unpaid Sum but will remain immediately due and payable.

**8.4     Notification of rates of interest**

The Facility Agent shall promptly notify the Lenders and the Borrowers of the determination of a rate of interest under this Agreement.

54148659v3

**8.5    Hedging**

(a)    If a Borrower in its discretion determines that it wants to hedge its exposure under this Agreement it shall enter into Hedging Agreements and shall after that date maintain such Hedging Agreements in accordance with this Clause 8.5 (*Hedging*).

(b)    The aggregate notional amount of the transactions in respect of the Hedging Agreements shall not exceed the aggregate amount of the Loan.

(c)    Each Hedging Agreement shall:

    (i)    be with a Hedge Counterparty and each Hedge Counterparty shall also be a Lender;

    (ii)    be for a term ending on the second Termination Date;

    (iii)    have settlement dates coinciding with the Interest Payment Dates;

    (iv)    be in agreed form;

    (v)    provide for two-way payments in the event of a termination of a transaction in respect of a Hedging Agreement, whether on a Termination Event (as defined in the relevant Hedging Agreement) or on an Event of Default (as defined in the relevant Hedging Agreement); and

    (vi)    provide that the Termination Currency (as defined in the relevant Hedging Agreement) shall be in Dollars.

(d)    The rights of each Borrower under the Hedging Agreements shall be assigned by way of security under a Hedging Agreement Assignment.

(e)    The parties to each Hedging Agreement must comply with the terms of that Hedging Agreement.

(f)    Neither a Hedge Counterparty nor a Borrower may amend, supplement, extend or waive the terms of any Hedging Agreement without the consent of the Facility Agent.

(g)    Paragraph (f) above shall not apply to an amendment, supplement or waiver that is administrative and mechanical in nature and does not give rise to a conflict with any provision of this Agreement.

(h)    If, at any time, the aggregate notional principal amount of the transactions in respect of the Hedging Agreements exceeds or, as a result of any repayment or prepayment under this Agreement, will exceed the Loan at that time, the Borrowers must promptly notify the Facility Agent and must, at the request of the Facility Agent, reduce the aggregate notional amount of those transactions by an amount and in a manner satisfactory to the Facility Agent so that it no longer exceeds or will not exceed the Loan then or that will be outstanding.

(i)    Any reductions in the aggregate notional amount of the transactions in respect of the Hedging Agreements in accordance with paragraph (h) above will be apportioned as between those transactions *pro rata*.

(j)    Paragraph (h) above shall not apply to any transactions in respect of any Hedging Agreement under which no Borrower has any actual or contingent indebtedness.

(k)    Subject to paragraph (l) below, neither a Hedge Counterparty nor a Borrower may terminate or close out any transactions in respect of any Hedging Agreement (in whole or in part) except:

(i)    in accordance with paragraph (h) above;

(ii)    on the occurrence of an Illegality, (as such expression is defined in the relevant Hedging Agreement);

(iii)    in the case of termination or closing out by a Hedge Counterparty, if the Facility Agent serves notice under paragraph (b) of Clause 29.19 (*Acceleration*) makes a demand;

(iv)    in the case of any other termination or closing out by a Hedge Counterparty or a Borrower, with the consent of the Facility Agent; or

(v)    If the Secured Liabilities (other than in respect of the Hedging Agreements) have been irrevocably and unconditionally paid and discharged in full;

(l)    If a Hedge Counterparty is entitled to terminate or close out any transaction in respect of any Hedging Agreement under sub-paragraph (iii) of paragraph (k) above, such Hedge Counterparty shall promptly terminate or close out such transaction following a request to do so by the Security Agent.

(m)    A Hedge Counterparty may only suspend making payments under a transaction in respect of a Hedging Agreement if a Borrower is in breach of its payment obligations under any transaction in respect of that Hedging Agreement.

(n)    Each Hedge Counterparty consents to, and acknowledges notices of, the assigning by way of security by each Borrower pursuant to the relevant Hedging Agreement Assignment of its rights under the Hedging Agreements to which it is party in favour of the Security Agent.

(o)    Any such assigning by way of security is without prejudice to, and after giving effect to, the operation of any payment or close-out netting in respect of any amounts owing under any Hedging Agreement.

(p)    The Security Agent shall not be liable for the performance of any of a Borrower's obligations under a Hedging Agreement.

## 9    INTEREST PERIODS

### 9.1    Selection of Interest Periods

(a)    The Borrowers may select the Interest Period for the Loan in the Utilisation Request for the first Tranche. Subject to paragraphs (f) and (h) below, the Borrowers may select each subsequent Interest Period in respect of the Loan in a Selection Notice.

(b)    Each Selection Notice is irrevocable and must be delivered to the Facility Agent by the Borrowers not later than the Specified Time.

(c)    If the Borrowers fail to select an Interest Period in the first Utilisation Request or fail to deliver a Selection Notice to the Facility Agent in accordance with paragraphs (a) and (b) above, the relevant Interest Period will, subject to Clause 9.2 (*Changes to Interest Periods*) and paragraph (h) below, be three Months.

(d)    Subject to this Clause 9 (*Interest Periods*), the Borrowers may select an Interest Period of 3 Months or any other period agreed between the Borrowers and the Facility Agent (acting on the instructions of all the Lenders).

(e)    An Interest Period in respect of the Loan shall not extend beyond the second Termination Date.

(f)     In respect of a Repayment Instalment, an Interest Period for a part of the Loan equal to such Repayment Instalment shall end on the Repayment Date relating to it if such date is before the end of the Interest Period then current.

(g)     Subject to paragraph (h) below, the first Interest Period for the Loan shall start on the first Utilisation Date and each subsequent Interest Period shall start on the last day of the preceding Interest Period.

(h)     The first Interest Period for the second and any subsequent Advance shall start on the Utilisation Date of such Advance and end on the last day of the Interest Period applicable to the Loan on the date on which such Advance is made.

(i)     Except for the purposes of paragraph (f) and paragraph (h) above, the Loan shall have one Interest Period only at any time.

**9.2     Changes to Interest Periods**

(a)     If after the Borrowers have selected and the Lenders have agreed an Interest Period longer than three Months, any Lender notifies the Facility Agent within two Business Days after the Specified Time relating to the relevant Utilisation Request or Selection Notice that it is not satisfied that deposits in dollars for a period equal to the Interest Period will be available to it in the Relevant Interbank Market when the Interest Period commences, the Facility Agent shall shorten the Interest Period to three Months.

(b)     If the Facility Agent makes any change to an Interest Period referred to in this Clause 9.2 (*Changes to Interest Periods*), it shall promptly notify the Borrowers and the Lenders.

**9.3     Non-Business Days**

If an Interest Period would otherwise end on a day which is not a Business Day, that Interest Period will instead end on the next Business Day in that calendar month (if there is one) or the preceding Business Day (if there is not).

**10      CHANGES TO THE CALCULATION OF INTEREST**

**10.1    Absence of quotations**

Subject to Clause 10.2 (*Market disruption*), if LIBOR is to be determined by reference to the Reference Banks but a Reference Bank does not supply a quotation by the Specified Time on the Quotation Day, the applicable LIBOR shall be determined on the basis of the quotations of the remaining Reference Banks.

**10.2    Market disruption**

(a)     If a Market Disruption Event occurs in relation to the Loan or any Advance for any Interest Period, then the rate of interest on each Lender's share of the Loan or such Advance for the Interest Period shall be the rate per annum which is the sum of:

    (i)      the Margin; and

    (ii)     the rate notified to the Facility Agent by that Lender as soon as practicable and in any event before interest is due to be paid in respect of that Interest Period, to be that which expresses as a percentage rate per annum the cost to that Lender of funding its participation in the Loan or such Advance from whatever source it may reasonably select, in consultation with the Borrowers.

(b)     In this Agreement "**Market Disruption Event**" means:

(i) at or about noon on the Quotation Day for the relevant Interest Period, LIBOR is to be determined by reference to the Reference Banks and none or only one of the Reference Banks supplies a rate to the Facility Agent to determine LIBOR for dollars for the relevant Interest Period; or

(ii) before close of business in London on the Quotation Day for the relevant Interest Period, the Facility Agent receives notifications from a Lender or Lenders (whose participations in the Loan exceed 33.3 per cent. of the Loan) that the cost to it or them of obtaining matching deposits in the London interbank market would be in excess of LIBOR.

**10.3 Alternative basis of interest or funding, suspension**

(a) If a Market Disruption Event occurs and the Facility Agent or the Borrowers so require, the Facility Agent and the Borrowers shall enter into negotiations (for a period of not more than 30 days) with a view to agreeing a substitute basis for determining the rate of interest or (as the case may be) an alternative basis for funding.

(b) Any substitute or alternative basis agreed pursuant to paragraph (a) above shall, with the prior consent of all the Lenders and the Borrowers, be binding on all Parties to the Finance Documents.

(c) If a Market Disruption Event occurs before an Advance is made in circumstances falling within sub-paragraph (i) or (ii) of paragraph (b) of Clause 10.2 (*Market disruption*), the Lenders' obligation to make that Advance, shall be suspended while the circumstances giving rise to the Market Disruption Event continue.

**10.4 Break Costs**

(a) The Borrowers shall, within three Business Days of demand by a Finance Party, pay to that Finance Party its Break Costs attributable to all or any part of the Loan or Unpaid Sum being paid by a Borrower on a day other than the last day of an Interest Period for the Loan or Unpaid Sum.

(b) Each Lender shall, as soon as reasonably practicable after a demand by the Facility Agent, provide a certificate confirming the amount of its Break Costs for any Interest Period in which they accrue.

**11 FEES**

**11.1 Upfront fee**

The Borrowers shall pay to the Facility Agent (for the account of each Lender) an upfront fee in the amount and at the time agreed in a Fee Letter.

**11.2 Commitment fee**

The Borrowers shall pay to the Facility Agent (for the account of each Lender) a commitment fee in the amounts and at the times agreed in a Fee Letter.

**11.3 Prepayment fee**

If, at any time after the first Utilisation Date, the Loan is prepaid (or any part thereof) through a refinancing by a person other than the Facility Agent or an Affiliate of the Facility Agent, the Borrowers shall pay to the Facility Agent for each Lender on the date on which such prepayment is effected pursuant to paragraph (a) of Clause 7.2 (*Voluntary prepayment of a Tranche*) (unless such prepayment follows a demand by a Finance Party pursuant to Clause 12.2 (*Tax gross-up*), Clause 13 (*Increased Costs*), Clause 14.3 (*Mandatory Cost*), or

54148659v3

Clause 27.1 (*Minimum required security cover*)), a prepayment fee (the "**Prepayment Fee**") equal to the Relevant Percentage of the amount prepaid.

In this Clause 11.3 (*Prepayment fee*):

"**Relevant Percentage**" means:

(a)    for the period commencing on the Utilisation Date of the Tranche being prepaid and ending on the date falling 12 months after that Utilisation Date, 3 per cent.;

(b)    for the period commencing after the date falling 12 months after that Utilisation Date and ending on the date falling 24 months after that Utilisation Date, 2 per cent.; and

(c)    for the period commencing after the date falling 24 months after that Utilisation Date and ending on the date falling 36 months after that Utilisation Date, 1 per cent.

54148659v3

## SECTION 6

## ADDITIONAL PAYMENT OBLIGATIONS

**12**  **TAX GROSS-UP, INDEMNITIES AND FATCA**

**12.1**  **Definitions**

(a)  In this Agreement:

"**Protected Party**" means a Finance Party which is or will be subject to any liability, or required to make any payment, for or on account of Tax in relation to a sum received or receivable (or any sum deemed for the purposes of Tax to be received or receivable) under a Finance Document.

"**Tax Credit**" means a credit against, relief or remission for, or repayment of any Tax.

"**Tax Deduction**" means a deduction or withholding for or on account of Tax from a payment under a Finance Document other than a FATCA Deduction.

"**Tax Payment**" means either the increase in a payment made by an Obligor to a Finance Party under Clause 12.2 (*Tax gross-up*) or a payment under Clause 12.3 (*Tax indemnity*).

(b)  Unless a contrary indication appears, in this Clause 12 (*Tax Gross-Up, Indemnities and FATCA*) reference to "determines" or "determined" means a determination made in the absolute discretion of the person making the determination.

(c)  This Clause 12 (*Tax Gross-Up, Indemnities and FATCA*) shall not apply to any Hedging Agreement.

**12.2**  **Tax gross-up**

(a)  Each Obligor shall make all payments to be made by it without any Tax Deduction, unless a Tax Deduction is required by law.

(b)  The Borrowers shall promptly upon becoming aware that an Obligor must make a Tax Deduction (or that there is any change in the rate or the basis of a Tax Deduction) notify the Facility Agent accordingly. Similarly, a Lender shall notify the Facility Agent on becoming so aware in respect of a payment payable to that Lender. If the Facility Agent receives such notification from a Lender it shall notify the Borrowers and that Obligor.

(c)  If a Tax Deduction is required by law to be made by an Obligor, the amount of the payment due from that Obligor shall be increased to an amount which (after making any Tax Deduction) leaves an amount equal to the payment which would have been due if no Tax Deduction had been required.

(d)  If an Obligor is required to make a Tax Deduction, that Obligor shall make that Tax Deduction and any payment required in connection with that Tax Deduction within the time allowed and in the minimum amount required by law.

(e)  Within 30 days of making either a Tax Deduction or any payment required in connection with that Tax Deduction, the Obligor making that Tax Deduction shall deliver to the Facility Agent for the Finance Party entitled to the payment evidence reasonably satisfactory to that Finance Party that the Tax Deduction has been made or (as applicable) any appropriate payment paid to the relevant taxing authority.

54148659v3

**12.3   Tax indemnity**

(a)   The Borrowers shall (within three Business Days of demand by the Facility Agent) pay to a Protected Party an amount equal to the loss, liability or cost which that Protected Party determines will be or has been (directly or indirectly) suffered for or on account of Tax by that Protected Party in respect of a Finance Document.

(b)   Paragraph (a) above shall not apply:

    (i)   with respect to any Tax assessed on a Finance Party:

        (A)   under the law of the jurisdiction in which that Finance Party is incorporated or, if different, the jurisdiction (or jurisdictions) in which that Finance Party is treated as resident for tax purposes; or

        (B)   under the law of the jurisdiction in which that Finance Party's Facility Office is located in respect of amounts received or receivable in that jurisdiction,

        if that Tax is imposed on or calculated by reference to the net income received or receivable (but not any sum deemed to be received or receivable) by that Finance Party; or

    (ii)   to the extent a loss, liability or cost is compensated for by an increased payment under Clause 12.2 (*Tax gross-up*); or

    (iii)   to the extent that a loss, liability or costs relates to a FATCA Deduction.

(c)   A Protected Party making, or intending to make, a claim under paragraph (a) above shall promptly notify the Facility Agent of the event which will give, or has given, rise to the claim, following which the Facility Agent shall notify the Borrowers.

(d)   A Protected Party shall, on receiving a payment from an Obligor under this Clause 12.3 (*Tax indemnity*), notify the Facility Agent.

**12.4   Tax Credit**

    If an Obligor makes a Tax Payment and the relevant Finance Party determines that:

(a)   a Tax Credit is attributable to an increased payment of which that Tax Payment forms part, to that Tax Payment or to a Tax Deduction in consequence of which that Tax Payment was received; and

(b)   that Finance Party has obtained, utilised and retained that Tax Credit,

    the Finance Party shall pay an amount to the Obligor which that Finance Party determines will leave it (after that payment) in the same after-Tax position as it would have been in had the Tax Payment not been required to be made by the Obligor.

(c)   Notwithstanding the provisions of paragraphs (a) and (b) above, if any Finance Party, having paid an amount required under this Clause 12.4 (*Tax Credit*), is subsequently obliged to comply with any law or any instructions or decisions of any tax authority requiring reimbursement of such payment, the Borrowers undertake reimburse such Finance Party an amount equal to the amount so paid to the Borrowers.

**12.5    Stamp taxes**

The Borrowers shall pay and, within three Business Days of demand, indemnify each Secured Party against any cost, loss or liability which that Secured Party incurs in relation to all stamp duty, registration and other similar Taxes payable in respect of any Finance Document.

**12.6    VAT**

(a)    All amounts expressed to be payable under a Finance Document by any Party to a Finance Party which (in whole or in part) constitute the consideration for any supply for VAT purposes are deemed to be exclusive of any VAT which is chargeable on that supply, and accordingly, subject to paragraph (b) below, if VAT is or becomes chargeable on any supply made by any Finance Party to any Party under a Finance Document and such Finance Party is required to account to the relevant tax authority for the VAT, that Party must pay to such Finance Party (in addition to and at the same time as paying any other consideration for such supply) an amount equal to the amount of the VAT (and such Finance Party must promptly provide an appropriate VAT invoice to that Party).

(b)    If VAT is or becomes chargeable on any supply made by any Finance Party (the "**Supplier**") to any other Finance Party (the "**Recipient**") under a Finance Document, and any Party other than the Recipient (the "**Relevant Party**") is required by the terms of any Finance Document to pay an amount equal to the consideration for that supply to the Supplier (rather than being required to reimburse or indemnify the Recipient in respect of that consideration):

(i)    (where the Supplier is the person required to account to the relevant tax authority for the VAT) the Relevant Party must also pay to the Supplier (at the same time as paying that amount) an additional amount equal to the amount of the VAT.  The Recipient must (where this sub-paragraph (i) applies) promptly pay to the Relevant Party an amount equal to any credit or repayment the Recipient receives from the relevant tax authority which the Recipient reasonably determines relates to the VAT chargeable on that supply; and

(ii)    (where the Recipient is the person required to account to the relevant tax authority for the VAT) the Relevant Party must promptly, following demand from the Recipient, pay to the Recipient an amount equal to the VAT chargeable on that supply but only to the extent that the Recipient reasonably determines that it is not entitled to credit or repayment from the relevant tax authority in respect of that VAT.

(c)    Where a Finance Document requires any Party to reimburse or indemnify a Finance Party for any cost or expense, that Party shall reimburse or indemnify (as the case may be) such Finance Party for the full amount of such cost or expense, including such part of it as represents VAT, save to the extent that such Finance Party reasonably determines that it is entitled to credit or repayment in respect of such VAT from the relevant tax authority.

(d)    Any reference in this Clause 12.6 (*VAT*) to any Party shall, at any time when such Party is treated as a member of a group for VAT purposes, include (where appropriate and unless the context otherwise requires) a reference to the representative member of such group at such time (the term "representative member" to have the same meaning as in the Value Added Tax Act 1994).

(e)    In relation to any supply made by a Finance Party to any Party under a Finance Document, if reasonably requested by such Finance Party, that Party must promptly provide such Finance Party with details of that Party's VAT registration and such other information as is reasonably requested in connection with such Finance Party's VAT reporting requirements in relation to such supply.

54148659v3

**12.7    FATCA Information**

(a)    Subject to paragraph (c) below, each Party shall, within ten Business Days of a reasonable request by another Party:

    (i)    confirm to that other Party whether it is:

        (A)    a FATCA Exempt Party; or

        (B)    not a FATCA Exempt Party; and

    (ii)    supply to that other Party such forms, documentation and other information relating to its status under FATCA (including its applicable "passthru payment percentage" or other information required under the US Treasury Regulations or other official guidance including intergovernmental agreements) as that other Party reasonably requests for the purposes of that other Party's compliance with FATCA.

(b)    If a Party confirms to another Party pursuant to sub-paragraph (i) of paragraph (a) above that it is a FATCA Exempt Party and it subsequently becomes aware that it is not, or has ceased to be a FATCA Exempt Party, that Party shall notify that other Party reasonably promptly.

(c)    Paragraph (a) above shall not oblige any Finance Party to do anything which would or might in its reasonable opinion constitute a breach of:

    (i)    any law or regulation;

    (ii)    any fiduciary duty; or

    (iii)    any duty of confidentiality.

(d)    If a Party fails to confirm its status or to supply forms, documentation or other information requested in accordance with paragraph (a) above (including, for the avoidance of doubt, where paragraph (c) above applies), then:

    (i)    if that Party failed to confirm whether it is (and/or remains) a FATCA Exempt Party then such Party shall be treated for the purposes of the Finance Documents as if it is not a FATCA Exempt Party; and

    (ii)    if that Party failed to confirm its applicable "passthru payment percentage" then such Party shall be treated for the purposes of the Finance Documents (and payments made thereunder) as if its applicable "passthru payment percentage" is 100%,

    until (in each case) such time as the Party in question provides the requested confirmation, forms, documentation or other information.

(e)    Where the Facility Agent reasonably believes that its obligations under FATCA require it, each Lender shall, within ten Business Days of the date of a request from the Facility Agent,

    supply to the Facility Agent:

    (i)    a withholding certificate on Form W-8 or Form W-9 (or any successor form) (as applicable); or

    (ii)    any withholding statement and other documentation, authorisations and waivers as the Facility Agent may require to certify or establish the status of such Lender under FATCA.

The Facility Agent shall promptly provide any withholding certificate, withholding statement, documentation, authorisations and waivers it receives from a Lender pursuant to this paragraph (e) to the Borrowers and the Facility Agent and the Borrowers shall be entitled to rely on any such withholding certificate, withholding statement, documentation, authorisations and waivers provided without further verification. The Facility Agent shall not be liable for any action taken by it under or in connection with this paragraph (e).

(f)      Each Lender agrees that if any withholding certificate, withholding statement, documentation, authorisations and waivers provided to the Facility Agent pursuant to paragraph (e) above is or becomes materially inaccurate or incomplete, it shall promptly update such withholding certificate, withholding statement, documentation, authorisations and waivers or promptly notify the Facility Agent in writing of its legal inability to do so. The Facility Agent shall provide any such updated withholding certificate, withholding statement, documentation, authorisations and waivers to the Borrowers. The Facility Agent shall not be liable for any action taken by it under or in connection with this paragraph (f).

**12.8    FATCA withholding**

(a)      A FATCA Relevant Party making a payment to any FATCA Non-Exempt Party shall make such FATCA Deduction as it determines is required by law and shall render payment to the IRS within the time allowed and in the amount required by FATCA.

(b)      If a FATCA Deduction is required to be made by any FATCA Relevant Party to a FATCA Non-Exempt Party, the amount of the payment due from such FATCA Relevant Party shall be reduced by the amount of the FATCA Deduction reasonably determined to be required by such FATCA Relevant Party.

(c)      Each FATCA Relevant Party shall promptly upon becoming aware that a FATCA Deduction is required with respect to any payment owed to it (or that there is any change in the rate or basis of a FATCA Deduction) notify each other FATCA Relevant Party accordingly.

(d)      Within thirty days of making either a FATCA Deduction or any payment required in connection with that FATCA Deduction, the party making such FATCA Deduction shall deliver to the Facility Agent for delivery to the party on account of whom the FATCA Deduction was made evidence reasonably satisfactory to that party that the FATCA Deduction has been made or (as applicable) any appropriate payment paid to the IRS.

(e)      A FATCA Relevant Party who becomes aware that it must make a FATCA Deduction in respect of a payment to another FATCA Relevant Party (or that there is any change in the rate or basis of such FATCA Deduction) shall notify that party and the Facility Agent.

(f)      The Facility Agent shall promptly upon becoming aware that it must make a FATCA Deduction in respect of a payment to a Lender which relates to a payment by the Borrowers (or that there is any change in the rate or the basis of such a FATCA Deduction) notify the Borrowers and the relevant Lender.

(g)      If a FATCA Deduction is made as a result of any Finance Party failing to be a FATCA Exempt Party, such party shall indemnify each other Finance Party against any loss, cost or expense to it resulting from such FATCA Deduction.

**12.9    FATCA mitigation**

Notwithstanding any other provision of this Agreement, if a FATCA Deduction is or will be required to be made by any party under Clause 12.8 (*FATCA withholding*) in respect of a payment to any FATCA Non-Exempt Lender, the FATCA Non-Exempt Lender may either:

(a)      transfer its entire interest in the Loan to a U.S. branch or Affiliate, or

(b)     nominate one or more transferee lenders who upon becoming a Lender would be a FATCA Exempt Party, by notice in writing to the Facility Agent and the Borrowers specifying the terms of the proposed transfer, and cause such transferee lender(s) to purchase all of the FATCA Non-Exempt Lender's interest in the Loan. The provisions of Clause 30.2 (*Conditions of assignment or transfer*) shall apply to a transfer of the Loan under this Clause 12.9 (*FATCA mitigation*).

## 13     INCREASED COSTS

### 13.1     Increased costs

(a)     Subject to Clause 13.3 (*Exceptions*), the Borrowers shall, within three Business Days of a demand by the Facility Agent, pay for the account of a Finance Party the amount of any Increased Costs incurred by that Finance Party or any of its Affiliates as a result of:

(i)     the introduction of or any change in (or in the interpretation, administration or application of) any law or regulation; or

(ii)    compliance with any law or regulation made after the date of this Agreement; or

(iii)   the implementation or the application of or compliance with the Basel II Capital Accord, the Basel III Capital Accord or any other Basel II Regulation or Basel III Regulation (whether such implementation is by a government authority, regulator, a Finance Party or any of its Affiliates),

after the date of this Agreement.

(b)     In this Agreement, **"Increased Costs"** means:

(i)     a reduction in the rate of return from the Facility or on a Finance Party's (or its Affiliate's) overall capital;

(ii)    an additional or increased cost; or

(iii)   a reduction of any amount due and payable under any Finance Document,

which is incurred or suffered by a Finance Party or any of its Affiliates to the extent that it is attributable to that Finance Party having entered into its Commitment or funding or performing its obligations under any Finance Document.

Notwithstanding anything above to the contrary, the Dodd Frank Wall Street Reform and Consumer Protection Act, and all requests, rules, guidelines and directives promulgated thereunder, are deemed to have been introduced or adopted after the date of this Agreement, regardless of the date enacted or adopted.

### 13.2     Increased cost claims

(a)     A Finance Party intending to make a claim pursuant to Clause 13.1 (*Increased costs*) shall notify the Facility Agent of the event giving rise to the claim, following which the Facility Agent shall promptly notify the Borrowers.

(b)     Each Finance Party shall, as soon as practicable after a demand by the Facility Agent, provide a certificate confirming the amount of its Increased Costs.

### 13.3     Exceptions

Clause 13.1 (*Increased costs*) does not apply to the extent any Increased Cost is:

54148659v3

(a)     attributable to a Tax Deduction required by law to be made by an Obligor;

(b)     compensated for by Clause 12.3 (*Tax indemnity*) (or would have been compensated for under Clause 12.3 (*Tax indemnity*) but was not so compensated solely because any of the exclusions in paragraph (b) of Clause 12.3 (*Tax indemnity*) applied) or any corresponding provision of any other Finance Document;

(c)     compensated for by any payment made pursuant to Clause 14.3 (*Mandatory Cost*);

(d)     attributable to the wilful breach by the relevant Finance Party or its Affiliates of any law or regulation; or

(e)     incurred by a Hedge Counterparty in its capacity as such.

## 14     OTHER INDEMNITIES

### 14.1     Currency indemnity

(a)     If any sum due from an Obligor under the Finance Documents (a "**Sum**"), or any order, judgment or award given or made in relation to a Sum, has to be converted from the currency (the "**First Currency**") in which that Sum is payable into another currency (the "**Second Currency**") for the purpose of:

    (i)     making or filing a claim or proof against that Obligor; or

    (ii)     obtaining or enforcing an order, judgment or award in relation to any litigation or arbitration proceedings,

that Obligor shall, as an independent obligation, on demand, indemnify each Secured Party to which that Sum is due against any cost, loss or liability arising out of or as a result of the conversion including any discrepancy between (A) the rate of exchange used to convert that Sum from the First Currency into the Second Currency and (B) the rate or rates of exchange available to that person at the time of its receipt of that Sum.

(b)     Each Obligor waives any right it may have in any jurisdiction to pay any amount under the Finance Documents in a currency or currency unit other than that in which it is expressed to be payable.

(c)     This Clause 14.1 (*Currency indemnity*) does not apply to any sum due to a Hedge Counterparty in its capacity as such.

### 14.2     Other indemnities

(a)     Each Obligor shall, on demand, indemnify each Secured Party against any cost, loss or liability incurred by it as a result of:

    (i)     the occurrence of any Event of Default;

    (ii)     a failure by an Obligor to pay any amount due under a Finance Document on its due date, including without limitation, any cost, loss or liability arising as a result of Clause 34 (*Conduct of Business by the Finance Parties*);

    (iii)     funding, or making arrangements to fund, its participation in an Advance requested by the Borrowers in a Utilisation Request but not made by reason of the operation of any one or more of the provisions of this Agreement (other than by reason of default or negligence by that Finance Party alone); or

(iv)    the Loan (or part of the Loan) not being prepaid in accordance with a notice of prepayment given by the Borrowers.

(b)    Each Obligor shall, on demand, indemnify each Finance Party, each Affiliate of a Finance Party and each officer or employee of a Finance Party or its Affiliate (each such person for the purposes of this Clause 14.2 (*Other indemnities*) an **"Indemnified Person"**), against any cost, loss or liability incurred by that Indemnified Person pursuant to or in connection with any litigation, arbitration or administrative proceedings or regulatory enquiry, in connection with or arising out of the entry into and the transactions contemplated by the Finance Documents, having the benefit of any Security constituted by the Finance Documents or which relates to the condition or operation of, or any incident occurring in relation to, any Ship unless such cost, loss or liability is caused by the gross negligence or wilful misconduct of that Indemnified Person.

(c)    Without limiting, but subject to any limitations set out in paragraph (b) above, the indemnity in paragraph (b) above shall cover any cost, loss or liability incurred by each Indemnified Person in any jurisdiction:

(i)    arising or asserted under or in connection with any law relating to safety at sea, the ISM Code, any Environmental Law or any Sanctions; or

(ii)    in connection with any Environmental Claim.

(d)    The Borrowers agree that no Secured Party shall have any liability to any Transaction Obligor whether in tort, contract or otherwise for losses suffered by any Transaction Obligor in connection with, arising out of or in any way related to the transactions contemplated and the relationship established by any of the Finance Documents, or any act, omission or event occurring in connection therewith, unless it is determined in a final non-appealable judgment by a court of a competent jurisdiction that such losses resulted from the gross negligence or wilful misconduct of, the party from which recovery is sought.  No Secured Party shall be liable for any damages arising from the use of others of any information or other materials obtained through 'intralinks' or other similar information transmission systems in connection with any of the Finance Documents and in no event shall any Secured Party be liable for any loss of profits, goodwill, reputation, business opportunity or anticipated saving, or for special, punitive, indirect or consequential damages, whether or not that Secured Party has been advised of the possibility of such loss or damages.

(e)    Any Affiliate or any officer or employee of a Finance Party or of any of its Affiliates may rely on this Clause 14.2 *(Other Indemnities)* and the provisions of the Third Parties Act.

**14.3    Mandatory Cost**

Each Borrower shall, on demand by the Facility Agent, pay to the Facility Agent for the account of the relevant Lender, such amount which any Lender certifies in a notice to the Facility Agent to be its good faith determination of the amount necessary to compensate it for complying with:

(a)    in the case of a Lender lending from a Facility Office in a Participating Member State, the minimum reserve requirements (or other requirements having the same or similar purpose) of the European Central Bank or any other authority or agency which replaces all or any of its functions) in respect of loans made from that Facility Office; and

(b)    in the case of any Lender lending from a Facility Office in the United Kingdom, any reserve asset, special deposit or liquidity requirements (or other requirements having the same or similar purpose) of the Bank of England (or any other governmental authority or agency) and/or paying any fees to the Financial Conduct Authority and/or the Prudential Regulation Authority (or any other governmental authority or agency which replaces all or any of their functions),

54148659v3

which, in each case, is referable to that Lender's participation in the Loan.

**14.4    Indemnity to the Servicing Parties**

Each Obligor shall, on demand, indemnify each Servicing Party against any cost, loss or liability incurred by that Servicing Party (acting reasonably) as a result of:

(a)    investigating any event which it reasonably believes is a Default;

(b)    acting or relying on any notice, request or instruction which it reasonably believes to be genuine, correct and appropriately authorised; and

(c)    instructing lawyers, accountants, tax advisers, surveyors or other professional advisers or experts as permitted under the Finance Documents.

**14.5    Indemnity to the Facility Agent**

Each Obligor shall, on demand, indemnify the Facility Agent against any cost, loss or liability incurred by the Facility Agent (otherwise than by reason of the Facility Agent's gross negligence or wilful misconduct) in acting as Facility Agent under the Finance Documents.

**14.6    Indemnity to the Security Agent**

(a)    Each Obligor shall, on demand, indemnify the Security Agent and every Receiver and Delegate against any cost, loss or liability incurred by any of them:

    (i)    in relation to or as a result of:

        (A)    acting or relying on any notice, request or instruction which it reasonably believes to be genuine, correct and appropriately authorised;

        (B)    the taking, holding, protection or enforcement of the Finance Documents and the Transaction Security;

        (C)    the exercise of any of the rights, powers, discretions, authorities and remedies vested in the Security Agent and each Receiver and Delegate by the Finance Documents or by law;

        (D)    any default by any Transaction Obligor in the performance of any of the obligations expressed to be assumed by it in the Finance Documents;

        (E)    any action by any Obligor which vitiates, reduces the value of, or is otherwise prejudicial to, the Transaction Security; or

        (F)    instructing lawyers, accountants, tax advisers, surveyors or other professional advisers or experts as permitted under the Finance Documents; or

    (ii)    acting as Security Agent, Receiver or Delegate under the Finance Documents or which otherwise relates to any of the Security Property or the performance of the terms of this Agreement or the other Finance Documents (otherwise, in each case, than by reason of the relevant Security Agent's, Receiver's or Delegate's gross negligence or wilful misconduct).

(b)    The Security Agent and every Receiver and Delegate may, in priority to any payment to the Secured Parties, indemnify itself out of the Charged Property in respect of, and pay and retain, all sums necessary to give effect to the indemnity in this Clause 14.6 (*Indemnity to the*

54148659v3

*Security Agent*) and shall have a lien on the Transaction Security and the proceeds of the enforcement of the Transaction Security for all monies payable to it.

**15      MITIGATION BY THE FINANCE PARTIES**

**15.1    Mitigation**

(a)     Each Finance Party shall, in consultation with the Borrowers, take all reasonable steps to mitigate any circumstances which arise and which would result in any amount becoming payable under or pursuant to, or cancelled pursuant to, any of Clause 7.1 (*Illegality*), Clause 12 (*Tax Gross-Up, Indemnities and FATCA*), Clause 13 (*Increased Costs*) or paragraph (a) of Clause 14.3 (*Mandatory Cost*) including (but not limited to) transferring its rights and obligations under the Finance Documents to another Affiliate or Facility Office.

(b)     Paragraph (a) above does not in any way limit the obligations of any Obligor under the Finance Documents.

**15.2    Limitation of liability**

(a)     Each Borrower shall, on demand, indemnify each Finance Party for all costs and expenses reasonably incurred by that Finance Party as a result of steps taken by it under Clause 15.1 (*Mitigation*).

(b)     A Finance Party is not obliged to take any steps under Clause 15.1 (*Mitigation*) if, in the opinion of that Finance Party (acting reasonably), to do so might be prejudicial to it.

**16      COSTS AND EXPENSES**

**16.1    Transaction expenses**

The Borrowers shall, on demand, pay the Facility Agent, (for the account of the Secured Party concerned) the amount of all reasonable costs and expenses (including legal fees, travelling and accommodation costs and expenses of technical advisors) incurred by any Secured Party in connection with the negotiation, preparation, printing, execution, syndication and perfection of:

(a)     this Agreement and any other documents referred to in this Agreement;

(b)     the Transaction Security; and

(c)     any other Finance Documents executed after the date of this Agreement.

**16.2    Amendment costs**

If:

(a)     an Obligor requests an amendment, waiver or consent; or

(b)     an amendment is required pursuant to Clause 35.9 (*Change of currency*); or

(c)     an Obligor requests, and the Security Agent agrees to, the release of all or any part of the Charged Property from the Transaction Security,

the Borrowers shall, on demand, reimburse each of the Facility Agent (for the account of the Secured Party concerned) for the amount of all reasonable costs and expenses (including legal fees) incurred by each Secured Party in responding to, evaluating, negotiating or complying with that request or requirement.

**16.3    Enforcement and preservation costs**

The Borrowers shall, on demand, pay to the Facility Agent (for the account of the Secured Party concerned) the amount of all reasonable costs and expenses (including legal fees) incurred by that Secured Party in connection with the enforcement of, or the preservation of any rights under, any Finance Document and the Transaction Security and any proceedings instituted by or against the Security Agent as a consequence of taking or holding the Transaction Security or enforcing those rights.

**SECTION 7**

**GUARANTEES AND JOINT AND SEVERAL LIABILITY OF BORROWERS**

**17      GUARANTEE AND INDEMNITY – PARENT GUARANTOR**

**17.1    Guarantee and indemnity**

The Parent Guarantor irrevocably and unconditionally:

(a)      guarantees to each Finance Party punctual performance by each Borrower of all that Borrower's obligations under the Finance Documents;

(b)      undertakes with each Finance Party that whenever a Borrower does not pay any amount when due under or in connection with any Finance Document, the Parent Guarantor shall immediately on demand pay that amount as if it were the principal obligor; and

(c)      agrees with each Finance Party that if any obligation guaranteed by it is or becomes unenforceable, invalid or illegal, it will, as an independent and primary obligation, indemnify that Finance Party immediately on demand against any cost, loss or liability it incurs as a result of a Borrower not paying any amount which would, but for such unenforceability, invalidity or illegality, have been payable by it under any Finance Document on the date when it would have been due.  The amount payable by the Parent Guarantor under this indemnity will not exceed the amount it would have had to pay under this Clause 17 (*Guarantee and Indemnity – Parent Guarantor*) if the amount claimed had been recoverable on the basis of a guarantee.

**17.2    Continuing guarantee**

This guarantee is a continuing guarantee and will extend to the ultimate balance of sums payable by any Obligor under the Finance Documents, regardless of any intermediate payment or discharge in whole or in part.

**17.3    Reinstatement**

If any discharge, release or arrangement (whether in respect of the obligations of any Obligor or any security for those obligations or otherwise) is made by a Secured Party in whole or in part on the basis of any payment, security or other disposition which is avoided or must be restored in insolvency, liquidation, administration or otherwise, without limitation, then the liability of the Parent Guarantor under this Clause 17 (*Guarantee and Indemnity – Parent Guarantor*) will continue or be reinstated as if the discharge, release or arrangement had not occurred.

**17.4    Waiver of defences**

The obligations of the Parent Guarantor under this Clause 17 (*Guarantee and Indemnity – Parent Guarantor*) and in respect of any Transaction Security will not be affected or discharged by an act, omission, matter or thing which, but for this Clause 17.4 (*Waiver of defences*), would reduce, release or prejudice any of its obligations under this Clause 17 (*Guarantee and Indemnity – Parent Guarantor*) or in respect of any Transaction Security (without limitation and whether or not known to it or any Secured Party) including:

(a)      any time, waiver or consent granted to, or composition with, any Obligor or other person;

(b)      the release of any other Obligor or any other person under the terms of any composition or arrangement with any creditor of any member of the Group;

54148659v3

(c) the taking, variation, compromise, exchange, renewal or release of, or refusal or neglect to perfect or delay in perfecting, or refusal or neglect to take up or enforce, or delay in taking or enforcing any rights against, or security over assets of, any Obligor or other person or any non-presentation or non-observance of any formality or other requirement in respect of any instrument or any failure to realise the full value of any security;

(d) any incapacity or lack of power, authority or legal personality of or dissolution or change in the members or status of an Obligor or any other person;

(e) any amendment, novation, supplement, extension, restatement (however fundamental and whether or not more onerous) or replacement of any Finance Document or any other document or security including, without limitation, any change in the purpose of, any extension of or any increase in any facility or the addition of any new facility under any Finance Document or other document or security;

(f) any unenforceability, illegality or invalidity of any obligation of any person under any Finance Document or any other document or security; or

(g) any insolvency or similar proceedings.

**17.5    Immediate recourse**

The Parent Guarantor waives any right it may have of first requiring any Secured Party (or any trustee or agent on its behalf) to proceed against or enforce any other rights or security or claim payment from any person (including without limitation to commence any proceedings under any Finance Document or to enforce any Transaction Security) before claiming or commencing proceedings under this Clause 17 (*Guarantee and Indemnity – Parent Guarantor*). This waiver applies irrespective of any law or any provision of a Finance Document to the contrary.

**17.6    Appropriations**

Until all amounts which may be or become payable by the Obligors under or in connection with the Finance Documents have been irrevocably paid in full, each Secured Party (or any trustee or agent on its behalf) may:

(a) refrain from applying or enforcing any other moneys, security or rights held or received by that Secured Party (or any trustee or agent on its behalf) in respect of those amounts, or apply and enforce the same in such manner and order as it sees fit (whether against those amounts or otherwise) and the Parent Guarantor shall not be entitled to the benefit of the same; and

(b) hold in an interest-bearing suspense account any moneys received from the Parent Guarantor or on account of the Parent Guarantor's liability under this Clause 17 (*Guarantee and Indemnity – Parent Guarantor*).

**17.7    Deferral of Parent Guarantor's rights**

All rights which the Parent Guarantor at any time has (whether in respect of this guarantee, a mortgage or any other transaction) against any Borrower, any other Obligor or their respective assets shall be fully subordinated to the rights of the Secured Parties under the Finance Documents and until the end of the Security Period and unless the Facility Agent otherwise directs, the Parent Guarantor will not exercise any rights which it may have (whether in respect of any Finance Document to which it is a Party or any other transaction) by reason of performance by it of its obligations under the Finance Documents or by reason of any amount being payable, or liability arising, under this Clause 17 (*Guarantee and Indemnity – Parent Guarantor*):

(a)     to be indemnified by an Obligor;

(b)     to claim any contribution from any third party providing security for, or any other guarantor of, any Obligor's obligations under the Finance Documents;

(c)     to take the benefit (in whole or in part and whether by way of subrogation or otherwise) of any rights of the Secured Parties under the Finance Documents or of any other guarantee or security taken pursuant to, or in connection with, the Finance Documents by any Secured Party;

(d)     to bring legal or other proceedings for an order requiring any Obligor to make any payment, or perform any obligation, in respect of which the Parent Guarantor has given a guarantee, undertaking or indemnity under Clause 17.1 (*Guarantee and indemnity*);

(e)     to exercise any right of set-off against any Obligor; and/or

(f)     to claim or prove as a creditor of any Obligor in competition with any Secured Party.

If the Parent Guarantor receives any benefit, payment or distribution in relation to such rights it shall hold that benefit, payment or distribution to the extent necessary to enable all amounts which may be or become payable to the Secured Parties by the Obligors under or in connection with the Finance Documents to be repaid in full on trust for the Secured Parties and shall promptly pay or transfer the same to the Facility Agent or as the Facility Agent may direct for application in accordance with Clause 35 (*Payment Mechanics*).

**17.8    Additional security**

This guarantee and any other Security given by the Parent Guarantor is in addition to and is not in any way prejudiced by, and shall not prejudice, any other guarantee or Security or any other right of recourse now or subsequently held by any Secured Party or any right of set-off or netting or right to combine accounts in connection with the Finance Documents.

**17.9    Applicability of provisions of Guarantee to other Security**

Clauses 17.2 (*Continuing guarantee*), 17.3 (*Reinstatement*), 17.4 (*Waiver of defences*), 17.5 (*Immediate recourse*), 17.6 (*Appropriations*), 17.7 (*Deferral of Parent Guarantor's rights*) and 17.8 (*Additional security*) shall apply, with any necessary modifications, to any Security which the Parent Guarantor creates (whether at the time at which it signs this Agreement or at any later time) to secure the Secured Liabilities or any part of them.

**18      GUARANTEE AND INDEMNITY – COLLATERAL GUARANTOR**

**18.1    Guarantee and indemnity**

The Collateral Guarantor irrevocably and unconditionally:

(a)     guarantees to each Finance Party punctual performance by each Borrower of all that Borrower's obligations under the Finance Documents;

(b)     undertakes with each Finance Party that whenever a Borrower does not pay any amount when due under or in connection with any Finance Document, the Collateral Guarantor shall immediately on demand pay that amount as if it were the principal obligor; and

(c)     agrees with each Finance Party that if any obligation guaranteed by it is or becomes unenforceable, invalid or illegal, it will, as an independent and primary obligation, indemnify that Finance Party immediately on demand against any cost, loss or liability it incurs as a result of a Borrower not paying any amount which would, but for such unenforceability, invalidity or illegality, have been payable by it under any Finance Document on the date

when it would have been due. The amount payable by the Collateral Guarantor under this indemnity will not exceed the amount it would have had to pay under this Clause 18 (*Guarantee and indemnity – collateral guarantor*) if the amount claimed had been recoverable on the basis of a guarantee.

### 18.2 Continuing guarantee

This guarantee is a continuing guarantee and will extend to the ultimate balance of sums payable by any Obligor under the Finance Documents, regardless of any intermediate payment or discharge in whole or in part.

### 18.3 Reinstatement

If any discharge, release or arrangement (whether in respect of the obligations of any Obligor or any security for those obligations or otherwise) is made by a Secured Party in whole or in part on the basis of any payment, security or other disposition which is avoided or must be restored in insolvency, liquidation, administration or otherwise, without limitation, then the liability of the Collateral Guarantor under this Clause 18 (*Guarantee and indemnity – collateral guarantor*) will continue or be reinstated as if the discharge, release or arrangement had not occurred.

### 18.4 Waiver of defences

The obligations of the Collateral Guarantor under this Clause 18 (*Guarantee and indemnity – collateral guarantor*) and in respect of any Transaction Security will not be affected or discharged by an act, omission, matter or thing which, but for this Clause 18.4 (*Waiver of defences*), would reduce, release or prejudice any of its obligations under this Clause 18 (*Guarantee and indemnity – collateral guarantor*) or in respect of any Transaction Security (without limitation and whether or not known to it or any Secured Party) including:

(a)     any time, waiver or consent granted to, or composition with, any Obligor or other person;

(b)     the release of any other Obligor or any other person under the terms of any composition or arrangement with any creditor of any member of the Group;

(c)     the taking, variation, compromise, exchange, renewal or release of, or refusal or neglect to perfect or delay in perfecting, or refusal or neglect to take up or enforce, or delay in taking or enforcing any rights against, or security over assets of, any Obligor or other person or any non-presentation or non-observance of any formality or other requirement in respect of any instrument or any failure to realise the full value of any security;

(d)     any incapacity or lack of power, authority or legal personality of or dissolution or change in the members or status of an Obligor or any other person;

(e)     any amendment, novation, supplement, extension, restatement (however fundamental and whether or not more onerous) or replacement of any Finance Document or any other document or security including, without limitation, any change in the purpose of, any extension of or any increase in any facility or the addition of any new facility under any Finance Document or other document or security;

(f)     any unenforceability, illegality or invalidity of any obligation of any person under any Finance Document or any other document or security; or

(g)     any insolvency or similar proceedings.

**18.5    Immediate recourse**

The Collateral Guarantor waives any right it may have of first requiring any Secured Party (or any trustee or agent on its behalf) to proceed against or enforce any other rights or security or claim payment from any person (including without limitation to commence any proceedings under any Finance Document or to enforce any Transaction Security) before claiming or commencing proceedings under this Clause 18 (*Guarantee and indemnity – collateral guarantor*). This waiver applies irrespective of any law or any provision of a Finance Document to the contrary.

**18.6    Appropriations**

Until all amounts which may be or become payable by the Obligors under or in connection with the Finance Documents have been irrevocably paid in full, each Secured Party (or any trustee or agent on its behalf) may:

(a)    refrain from applying or enforcing any other moneys, security or rights held or received by that Secured Party (or any trustee or agent on its behalf) in respect of those amounts, or apply and enforce the same in such manner and order as it sees fit (whether against those amounts or otherwise) and the Collateral Guarantor shall not be entitled to the benefit of the same; and

(b)    hold in an interest-bearing suspense account any moneys received from the Collateral Guarantor or on account of the Collateral Guarantor's liability under this Clause 18 (*Guarantee and indemnity – collateral guarantor*).

**18.7    Deferral of Collateral Guarantor's rights**

All rights which the Collateral Guarantor at any time has (whether in respect of this guarantee, a mortgage or any other transaction) against any Borrower, any other Obligor or their respective assets shall be fully subordinated to the rights of the Secured Parties under the Finance Documents and until the end of the Security Period and unless the Facility Agent otherwise directs, the Collateral Guarantor will not exercise any rights which it may have (whether in respect of any Finance Document to which it is a Party or any other transaction) by reason of performance by it of its obligations under the Finance Documents or by reason of any amount being payable, or liability arising, under this Clause 18 (*Guarantee and indemnity – collateral guarantor*):

(a)    to be indemnified by an Obligor;

(b)    to claim any contribution from any third party providing security for, or any other guarantor of, any Obligor's obligations under the Finance Documents;

(c)    to take the benefit (in whole or in part and whether by way of subrogation or otherwise) of any rights of the Secured Parties under the Finance Documents or of any other guarantee or security taken pursuant to, or in connection with, the Finance Documents by any Secured Party;

(d)    to bring legal or other proceedings for an order requiring any Obligor to make any payment, or perform any obligation, in respect of which the Collateral Guarantor has given a guarantee, undertaking or indemnity under Clause 18.1 (*Guarantee and indemnity*);

(e)    to exercise any right of set-off against any Obligor; and/or

(f)    to claim or prove as a creditor of any Obligor in competition with any Secured Party.

If the Collateral Guarantor receives any benefit, payment or distribution in relation to such rights it shall hold that benefit, payment or distribution to the extent necessary to enable all

amounts which may be or become payable to the Secured Parties by the Obligors under or in connection with the Finance Documents to be repaid in full on trust for the Secured Parties and shall promptly pay or transfer the same to the Facility Agent or as the Facility Agent may direct for application in accordance with Clause 35 (*Payment Mechanics*).

**18.8    Additional security**

This guarantee and any other Security given by the Collateral Guarantor is in addition to and is not in any way prejudiced by, and shall not prejudice, any other guarantee or Security or any other right of recourse now or subsequently held by any Secured Party or any right of set-off or netting or right to combine accounts in connection with the Finance Documents.

**18.9    Applicability of provisions of Guarantee to other Security**

Clauses 18.2 (*Continuing guarantee*), 18.3 (Reinstatement), 18.4 (*Waiver of defences*), 18.5 (*Immediate recourse*), 18.6 (*Appropriations*), 18.7 (*Deferral of Collateral Guarantor's rights*) and 18.8 (*Additional security*) shall apply, with any necessary modifications, to any Security which the Collateral Guarantor creates (whether at the time at which it signs this Agreement or at any later time) to secure the Secured Liabilities or any part of them.

**19    JOINT AND SEVERAL LIABILITY OF THE BORROWERS**

**19.1    Joint and several liability**

All liabilities and obligations of the Borrowers under this Agreement shall, whether expressed to be so or not, be joint and several.

**19.2    Waiver of defences**

The liabilities and obligations of a Borrower shall not be impaired by:

(a)    this Agreement being or later becoming void, unenforceable or illegal as regards the other Borrower;

(b)    any Lender or the Security Agent entering into any rescheduling, refinancing or other arrangement of any kind with the other Borrower;

(c)    any Lender or the Security Agent releasing the other Borrower or any Security created by a Finance Document; or

(d)    any time, waiver or consent granted to, or composition with the other Borrower or other person;

(e)    the release of the other Borrower or any other person under the terms of any composition or arrangement with any creditor of any member of the Group;

(f)    the taking, variation, compromise, exchange, renewal or release of, or refusal or neglect to perfect, take up or enforce, any rights against, or security over assets of, the other Borrower or other person or any non-presentation or non-observance of any formality or other requirement in respect of any instrument or any failure to realise the full value of any security;

(g)    any incapacity or lack of power, authority or legal personality of or dissolution or change in the members or status of the other Borrower or any other person;

(h)    any amendment, novation, supplement, extension, restatement (however fundamental, and whether or not more onerous) or replacement of a Finance Document or any other document or security including, without limitation, any change in the purpose of, any

54148659v3

extension of or any increase in any facility or the addition of any new facility under any Finance Document or other document or security;

(i) any unenforceability, illegality or invalidity of any obligation or any person under any Finance Document or any other document or security; or

(j) any insolvency or similar proceedings.

**19.3    Principal Debtor**

Each Borrower declares that it is and will, throughout the Security Period, remain a principal debtor for all amounts owing under this Agreement and the Finance Documents and no Borrower shall, in any circumstances, be construed to be a surety for the obligations of any other Borrower under this Agreement.

**19.4    Borrower restrictions**

(a) Subject to paragraph (b) below, during the Security Period no Borrower shall:

    (i) claim any amount which may be due to it from the other Borrower whether in respect of a payment made under, or matter arising out of, this Agreement or any Finance Document, or any matter unconnected with this Agreement or any Finance Document; or

    (ii) take or enforce any form of security from the other Borrower for such an amount, or in any the way seek to have recourse in respect of such an amount against any asset of the other Borrower; or

    (iii) set off such an amount against any sum due from it to any other Borrower; or

    (iv) prove or claim for such an amount in any liquidation, administration, arrangement or similar procedure involving the other Borrower; or

    (v) exercise or assert any combination of the foregoing.

(b) If during the Security Period, the Facility Agent, by notice to a Borrower, requires it to take any action referred to in paragraph (a) above in relation to the other Borrower, that Borrower shall take that action as soon as practicable after receiving the Facility Agent's notice.

**19.5    Deferral of Borrowers' rights**

Until all amounts which may be or become payable by the Borrowers under or in connection with the Finance Documents have been irrevocably paid in full and unless the Facility Agent otherwise directs, no Borrower will exercise any rights which it may have by reason of performance by it of its obligations under the Finance Documents:

(a) to be indemnified by the other Borrower; or

(b) to claim any contribution from the other Borrower in relation to any payment made by it under the Finance Documents.

**20    GUARANTEE AND INDEMNITY – HEDGE GUARANTORS**

**20.1    Guarantee and indemnity**

Each Hedge Guarantor irrevocably and unconditionally:

(a)  guarantees to each Finance Party punctual performance by each Borrower of all that Borrower's obligations under the Hedging Agreements;

(b)  undertakes with each Finance Party that whenever a Borrower does not pay any amount when due under or in connection with any Hedging Agreement, that Hedge Guarantor shall immediately on demand pay that amount as if it were the principal obligor; and

(c)  agrees with each Finance Party that if any obligation guaranteed by it is or becomes unenforceable, invalid or illegal, it will, as an independent and primary obligation, indemnify that Finance Party immediately on demand against any cost, loss or liability it incurs as a result of a Borrower not paying any amount which would, but for such unenforceability, invalidity or illegality, have been payable by it under any Hedging Agreement on the date when it would have been due.  The amount payable by a Hedge Guarantor under this indemnity will not exceed the amount it would have had to pay under this Clause 20 (*Guarantee and Indemnity – Hedge Guarantors*) if the amount claimed had been recoverable on the basis of a guarantee.

**20.2    Continuing guarantee**

This guarantee is a continuing guarantee and will extend to the ultimate balance of sums payable by any Borrower under the Hedging Agreements, regardless of any intermediate payment or discharge in whole or in part.

**20.3    Reinstatement**

If any discharge, release or arrangement (whether in respect of the obligations of any Borrower or any security for those obligations or otherwise) is made by a Secured Party in whole or in part on the basis of any payment, security or other disposition which is avoided or must be restored in insolvency, liquidation, administration or otherwise, without limitation, then the liability of each Hedge Guarantor under this Clause 20 (*Guarantee and Indemnity – Hedge Guarantors*) will continue or be reinstated as if the discharge, release or arrangement had not occurred.

**20.4    Waiver of defences**

The obligations of each Hedge Guarantor under this Clause 20 (*Guarantee and Indemnity – Hedge Guarantors*) and in respect of any Transaction Security will not be affected or discharged by an act, omission, matter or thing which, but for this Clause 20.4 (*Waiver of defences*), would reduce, release or prejudice any of its obligations under this Clause 20 (*Guarantee and Indemnity – Hedge Guarantors*) or in respect of any Transaction Security (without limitation and whether or not known to it or any Secured Party) including:

(a)  any time, waiver or consent granted to, or composition with, any Obligor or other person;

(b)  the release of any other Obligor or any other person under the terms of any composition or arrangement with any creditor of any member of the Group;

(c)  the taking, variation, compromise, exchange, renewal or release of, or refusal or neglect to perfect or delay in perfecting, or refusal or neglect to take up or enforce, or delay in taking or enforcing any rights against, or security over assets of, any Obligor or other person or any non-presentation or non-observance of any formality or other requirement in respect of any instrument or any failure to realise the full value of any security;

(d)  any incapacity or lack of power, authority or legal personality of or dissolution or change in the members or status of an Obligor or any other person;

(e)  any amendment, novation, supplement, extension, restatement (however fundamental and whether or not more onerous) or replacement of any Finance Document or any other

document or security including, without limitation, any change in the purpose of, any extension of or any increase in any facility or the addition of any new facility under any Finance Document or other document or security;

(f)     any unenforceability, illegality or invalidity of any obligation of any person under any Finance Document or any other document or security; or

(g)     any insolvency or similar proceedings.

### 20.5    Immediate recourse

Each Hedge Guarantor waives any right it may have of first requiring any Secured Party (or any trustee or agent on its behalf) to proceed against or enforce any other rights or security or claim payment from any person (including without limitation to commence any proceedings under any Finance Document or to enforce any Transaction Security) before claiming or commencing proceedings under this Clause 20 (*Guarantee and Indemnity – Hedge Guarantors*).  This waiver applies irrespective of any law or any provision of a Finance Document to the contrary.

### 20.6    Appropriations

Until all amounts which may be or become payable by the Borrowers under or in connection with the Hedging Agreements have been irrevocably paid in full, each Secured Party (or any trustee or agent on its behalf) may:

(a)     refrain from applying or enforcing any other moneys, security or rights held or received by that Secured Party (or any trustee or agent on its behalf) in respect of those amounts, or apply and enforce the same in such manner and order as it sees fit (whether against those amounts or otherwise) and no Hedge Guarantor shall be entitled to the benefit of the same; and

(b)     hold in an interest-bearing suspense account any moneys received from any Hedge Guarantor or on account of any Hedge Guarantor's liability under this Clause 20 (*Guarantee and Indemnity – Hedge Guarantors*).

### 20.7    Deferral of Hedge Guarantors' rights

All rights which each Hedge Guarantor at any time has (whether in respect of this guarantee, a mortgage or any other transaction) against any Borrower, any other Obligor or their respective assets shall be fully subordinated to the rights of the Secured Parties under the Finance Documents and until the end of the Security Period and unless the Facility Agent otherwise directs, no Hedge Guarantor will exercise any rights which it may have (whether in respect of any Finance Document to which it is a Party or any other transaction) by reason of performance by it of its obligations under the Finance Documents or by reason of any amount being payable, or liability arising, under this Clause 20 (*Guarantee and Indemnity – Hedge Guarantors*):

(a)     to be indemnified by an Obligor;

(b)     to claim any contribution from any third party providing security for, or any other guarantor of, any Obligor's obligations under the Finance Documents;

(c)     to take the benefit (in whole or in part and whether by way of subrogation or otherwise) of any rights of the Secured Parties under the Finance Documents or of any other guarantee or security taken pursuant to, or in connection with, the Finance Documents by any Secured Party;

(d)     to bring legal or other proceedings for an order requiring any Obligor to make any payment, or perform any obligation, in respect of which any Hedge Guarantor has given a guarantee, undertaking or indemnity under Clause 20 (*Guarantee and Indemnity – Hedge Guarantors*);

(e)     to exercise any right of set-off against any Obligor; and/or

(f)     to claim or prove as a creditor of any Obligor in competition with any Secured Party.

If a Hedge Guarantor receives any benefit, payment or distribution in relation to such rights it shall hold that benefit, payment or distribution to the extent necessary to enable all amounts which may be or become payable to the Secured Parties by the Obligors under or in connection with the Finance Documents to be repaid in full on trust for the Secured Parties and shall promptly pay or transfer the same to the Facility Agent or as the Facility Agent may direct for application in accordance with Clause 35 (*Payment Mechanics*).

**20.8    Additional security**

This guarantee and any other Security given by a Hedge Guarantor is in addition to and is not in any way prejudiced by, and shall not prejudice, any other guarantee or Security or any other right of recourse now or subsequently held by any Secured Party or any right of set-off or netting or right to combine accounts in connection with the Finance Documents.

**20.9    Applicability of provisions of Guarantee to other Security**

Clauses 20.2 (*Continuing guarantee*), 20.3 (*Reinstatement*),20.4 (*Waiver of defences*), 20.5 (*Immediate recourse*), 20.6 (*Appropriations*), 20.7 (*Deferral of Hedge Guarantors' rights*) and 20.8 (*Additional security*) shall apply, with any necessary modifications, to any Security which a Hedge Guarantor creates (whether at the time at which it signs this Agreement or at any later time) to secure the Secured Liabilities or any part of them.

54148659v3

**SECTION 8**

**REPRESENTATIONS, UNDERTAKINGS AND EVENTS OF DEFAULT**

**21      REPRESENTATIONS**

**21.1    General**

Each Obligor makes the representations and warranties set out in this Clause 21 (*Representations*) to each Finance Party on the date of this Agreement.

**21.2    Status**

(a)    It is a limited liability corporation, duly incorporated and validly existing in good standing under the law of its jurisdiction of incorporation.

(b)    It has the power to own its assets and carry on its business as it is being conducted.

(c)    Each Obligor's principal place of management is at 47-49 Akti Miaouli, 185 36 Piraeus, Greece and it is not tax resident in any jurisdiction outside of, in the case of each Borrower and the Collateral Guarantor, Liberia and in the case of the Parent Guarantor, the Marshall Islands.

**21.3    Share capital and ownership**

(a)    Each Borrower has an authorised share capital of 500 registered shares of no par value, all of which shares have been issued and fully paid.

(b)    The Collateral Guarantor has an authorised share capital of 500 registered shares of no par value, all of which shares have been issued and fully paid.

(c)    The legal title to and beneficial interest in the shares in each Borrower and in the Collateral Guarantor is held free of any Security or any other claim by the Parent Guarantor.

(d)    None of the shares in any Borrower or in the Collateral Guarantor is subject to any option to purchase, pre-emption rights or similar rights.

**21.4    Binding obligations**

The obligations expressed to be assumed by it in each Transaction Document to which it is a party are (or, when that Transaction Document is entered into by it, will be) legal, valid, binding and enforceable obligations.

**21.5    Validity, effectiveness and ranking of Security**

(a)    Each Finance Document to which it is a party does now or, as the case may be, will upon execution and delivery and, where applicable, registration as provided for in that Finance Document create the Security it purports to create over any assets to which such Security, by its terms, relates, and such Security will, when created or intended to be created, be valid and effective.

(b)    No third party has or will have any Security (except for Permitted Security) over any assets that are the subject of any Transaction Security granted by it.

(c)    The Transaction Security granted by it to the Security Agent or any other Secured Party has or will when created or intended to be created have the first ranking priority it is expressed

to have in the Finance Documents and is not subject to any prior ranking or *pari passu* ranking security.

(d)     No concurrence, consent or authorisation of any person is required for the creation of or otherwise in connection with any Transaction Security.

**21.6    Non-conflict with other obligations**

The entry into and performance by it of, and the transactions contemplated by, each Transaction Document to which it is a party do not and will not conflict with:

(a)     any law or regulation applicable to it;

(b)     the constitutional documents of any Transaction Obligor; or

(c)     any agreement or instrument binding upon it or any Transaction Obligor's assets or constitute a default or termination event (however described) under any such agreement or instrument.

**21.7    Power and authority**

(a)     It has the power to enter into, perform and deliver, and has taken all necessary action to authorise:

    (i)     its entry into, performance and delivery of, each Transaction Document to which it is or will be a party and the transactions contemplated by those Transaction Documents; and

    (ii)    its registration of the Ship owned by it under that Ship's Approved Flag.

(b)     No limit on its powers will be exceeded as a result of the borrowing, granting of security or giving of guarantees or indemnities contemplated by the Transaction Documents to which it is a party.

**21.8    Validity and admissibility in evidence**

All Authorisations required:

(a)     to enable it lawfully to enter into, exercise its rights and comply with its obligations in the Transaction Documents to which it is a party; and

(b)     to make the Transaction Documents to which it is a party admissible in evidence in its Relevant Jurisdictions,

have been obtained or effected and are in full force and effect.

**21.9    Governing law and enforcement**

(a)     The choice of governing law of each Transaction Document to which it is a party will be recognised and enforced in its Relevant Jurisdictions.

(b)     Any judgment obtained in relation to a Transaction Document to which it is a party in the jurisdiction of the governing law of that Transaction Document will be recognised and enforced in its Relevant Jurisdictions.

**21.10   Insolvency**

No:

(a)     corporate action, legal proceeding or other procedure or step described in paragraph (a) of Clause 29.8 (*Insolvency proceedings*); or

(b)     creditors' process described in Clause 29.9 (*Creditors' process*),

has been taken or, to its knowledge, threatened in relation to a member of the Group; and none of the circumstances described in Clause 29.7 (*Insolvency*) applies to a member of the Group.

**21.11   No filing or stamp taxes**

Under the laws of its Relevant Jurisdictions it is not necessary that the Finance Documents to which it is a party be filed, recorded or enrolled with any court or other authority in that jurisdiction or that any stamp, registration, notarial or similar taxes or fees be paid on or in relation to the Finance Documents to which it is a party or the transactions contemplated by those Finance Documents which registration and filings, taxes and fees will be made and paid promptly after the date of the relevant Finance Documents except any filing, recording or enrolling or any tax or fee payable in relation to the Mortgage which is referred to in any legal opinion delivered pursuant to Clause 4 (*Conditions of Utilisation*) and which will be made or paid promptly within the relevant statutory time limits where applicable after the date of the relevant Finance Document.

**21.12   Deduction of Tax**

It is not required to make any deduction for or on account of Tax from any payment it may make under any Finance Document to which it is a party.

**21.13   No default**

(a)     No Event of Default and, on the date of this Agreement and on each Utilisation Date, no Default has occurred and is continuing or might reasonably be expected to result from the making of any Utilisation or the entry into, the performance of, or any transaction contemplated by, any Transaction Document.

(b)     No other event or circumstance is outstanding which constitutes a default or a termination event (however described) under any other agreement or instrument which is binding on it or to which its assets are subject which might have a Material Adverse Effect.

**21.14   No misleading information**

(a)     Any factual information provided by any Transaction Obligor for the purposes of this Agreement was true and accurate in all material respects as at the date it was provided or as at the date (if any) at which it is stated.

(b)     The financial projections contained in any such information have been prepared on the basis of recent historical information and on the basis of reasonable assumptions.

(c)     Nothing has occurred or been omitted from any such information and no information has been given or withheld that results in any such information being untrue or misleading in any material respect.

**21.15   Financial Statements**

(a)     The financial statements delivered pursuant to Clause 22.2 (*Financial statements*):

(i)      have been prepared in accordance with Clause 22.4 (*Requirements as to financial statements*); and

54148659v3

(ii)    give a true and fair view of (if audited) or fairly represent (if unaudited) its financial condition and operations (consolidated in the case of the Parent Guarantor) during the relevant financial year.

(b)    Since the date of the most recent financial statements delivered pursuant to Clause 22.2 (*Financial statements*) there has been no material adverse change in its business, assets or financial condition (or the business or consolidated financial condition of the Group, in the case of the Parent Guarantor).

### 21.16  Pari passu ranking

Its payment obligations under the Finance Documents to which it is a party rank at least *pari passu* with the claims of all its other unsecured and unsubordinated creditors, except for obligations mandatorily preferred by law applying to companies generally.

### 21.17  No proceedings pending or threatened

No litigation, arbitration or administrative proceedings or investigations (including proceedings or investigations relating to any alleged or actual breach of the ISM Code or of the ISPS Code) of or before any court, arbitral body or agency have (to the best of its knowledge and belief (having made due and careful enquiry)) been started or threatened against it.

### 21.18  Validity and completeness of Transaction Documents

(a)    Each Transaction Document (other than a Finance Document) constitutes legal, valid, binding and enforceable obligations of the parties to that Transaction Document.

(b)    The copies of each Transaction Document (other than a Finance Document) delivered to the Facility Agent on or before the date of this Agreement are true and complete copies.

(c)    No amendments or additions to any Transaction Document (other than a Finance Document) have been agreed nor have any rights under any Transaction Document (other than a Finance Document) been waived.

### 21.19  Valuations

(a)    All information supplied by it or on its behalf to an Approved Valuer for the purposes of a valuation delivered to the Facility Agent in accordance with this Agreement was true and accurate as at the date it was supplied or (if appropriate) as at the date (if any) at which it is stated to be given.

(b)    It has not omitted to supply any information to an Approved Valuer which, if disclosed, would adversely affect any valuation prepared by such Approved Valuer.

(c)    There has been no change to the factual information provided pursuant to paragraph (a) above in relation to any valuation between the date such information was provided and the date of that valuation which, in either case, renders that information untrue or misleading in any material respect.

### 21.20  No breach of laws

(a)    No Borrower or any other Transaction Obligor has breached any law or regulation which breach has or is reasonably likely to have a Material Adverse Effect.

(b)    No Transaction Obligor or any Affiliate thereof is in violation of and none shall violate any of the country or list based economic and trade sanctions administered and enforced by OFAC

54148659v3

that are described or referenced at http://ustreas.gov/offices/enforcement/ofac or as otherwise published from time to time.

**21.21   Compliance with Environmental Laws**

All Environmental laws relating to the ownership, operation and management of each Ship and the business of each Borrower and the Collateral Guarantor (as now conducted and as reasonably anticipated to be conducted in the future) and the terms of all Environmental Approvals have been complied with.

**21.22   No Environmental Claim**

No Environmental Claim has been made or threatened against either Owner or either Ship which might reasonably be expected to have a Material Adverse Effect.

**21.23   No Environmental Incident**

No Environmental Incident has occurred and no person has claimed that an Environmental Incident has occurred.

**21.24   ISM and ISPS Code compliance**

All requirements of the ISM Code and the ISPS Code as they relate to each Owner, each Approved Manager and each Ship have been complied with.

**21.25   Taxes paid**

(a)   No Borrower or any other Transaction Obligor is materially overdue in the filing of any Tax returns overdue in the payment of any amount in respect of Tax.

(b)   No claims or investigations are being, or are reasonably likely to be, made or conducted against it with respect to Taxes.

**21.26   Financial Indebtedness**

Neither Borrower nor the Collateral Guarantor has any Financial Indebtedness outstanding other than the Permitted Financial Indebtedness.

**21.27   Overseas companies**

No Obligor has delivered particulars, whether in its name stated in the Finance Documents or any other name, of any UK Establishment to the Registrar of Companies as required under the Overseas Regulations or, if it has so registered, it has provided to the Facility Agent sufficient details to enable an accurate search against it to be undertaken by the Lenders at the Companies Registry.

**21.28   Good title to assets**

Each Transaction Obligor has good, valid and marketable title to, or valid leases or licences of, and all appropriate Authorisations to use, the assets necessary to carry on its business as presently conducted.

**21.29   Ownership**

(a)   Each Owner is the sole legal and beneficial owner of the Ship owned by it, its Earnings and its Insurances.

(b)   With effect on and from the date of its creation or intended creation, each Borrower and the Collateral Guarantor will be the sole legal and beneficial owner of any other asset that is the subject of any Transaction Security created or intended to be created by that Borrower or the Collateral Guarantor (as the case may be).

**21.30   Centre of main interests and establishments**

For the purposes of The Council of the European Union Regulation No. 1346/2000 on Insolvency Proceedings (the "**Regulation**"), its centre of main interest (as that term is used in Article 3(1) of the Regulation) is situated in its jurisdiction of incorporation and it has no "establishment" (as that term is used in Article 2(h) of the Regulation) in any other jurisdiction.

**21.31   Place of business**

Neither Borrower nor the Collateral Guarantor has a place of business in Liberia.

**21.32   No employee or pension arrangements**

No Obligor has any employees or any liabilities under any pension scheme.

**21.33   Sanctions**

(a)   No Transaction Obligor:

(i)      is a Prohibited Person;

(ii)     is owned or controlled by or acting directly or indirectly on behalf of or for the benefit of, a Prohibited Person; or

(iii)    owns or controls a Prohibited Person.

(b)   No proceeds of any Advance or the Loan shall be made available, directly or indirectly, to or for the benefit of a Prohibited Person nor shall they be otherwise directly or indirectly, applied in a manner or for a purpose prohibited by Applicable Sanctions.

**21.34   US Tax Obligor**

No Transaction Obligor is a US Tax Obligor.

**21.35   Margin Regulations; Investment Company Act**

(a)   Neither Borrower nor the Collateral Guarantor is engaged nor will it engage, principally or as one of its important activities, in the business of purchasing or carrying margin stock (within the meaning of Regulation U issued by the Board of Governors of the Federal Reserve System of the United States.

(b)   Neither Borrower nor the Collateral Guarantor is and nor is it required to be registered as an "investment company" under the United States of America Investment Company Act of 1940.

**21.36   Patriot Act**

To the extent applicable, each Borrower and the Collateral Guarantor is in compliance with (i) the Trading with the Enemy Act, and each of the foreign assets control regulations of the United States Treasury Department (31 C.F.R., Subtitle B, Chapter V) and any other enabling legislation or executive order relating thereto and (ii) the PATRIOT Act. No part of the proceeds of the Loan will be used, directly or indirectly, for any payments to any

government official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended.

**21.37   Repetition**

The Repeating Representations are deemed to be made by each Obligor by reference to the facts and circumstances then existing on the date of each Utilisation Request and the first day of each Interest Period.

**21.38   Legal Opinions**

The representations made or to be made by each of the Borrowers and the Collateral Guarantor (as the case may be) under or pursuant to this Clause 21 are and shall be construed as being made subject to (i) the reservations or qualifications as to matters of law set forth in the legal opinions to be delivered to the Facility Agent pursuant to Clause 3, Part A, Schedule 2 and (ii) the principle that equitable remedies may be granted or refused at the discretion of a court and the limitation of enforcement by laws relating to insolvency, reorganisation and other laws generally affecting the rights of creditors.

**22      INFORMATION UNDERTAKINGS**

**22.1    General**

The undertakings in this Clause 22 (*Information Undertakings*) remain in force throughout the Security Period unless the Facility Agent, acting with the authorisation of the Majority Lenders (or, where specified, all the Lenders), may otherwise permit.

**22.2    Financial statements**

Each Borrower, the Collateral Guarantor and the Parent Guarantor shall supply to the Facility Agent in sufficient copies for all the Lenders:

(a)     as soon as they become available, but in any event within 120 days after the end of each of their respective Fiscal Years (commencing with the financial statements in respect of the Fiscal Year ending on 31 December 2014):

    (i)     the annual audited financial statements of the Borrowers and the Collateral Guarantor for that Fiscal Year; and

    (ii)    the audited consolidated financial statements of the Parent Guarantor for that Fiscal Year; and

(b)     as soon as they become available, but in any event within 60 days after the end of each Fiscal Quarter of each Borrower and the Collateral Guarantor and the Parent Guarantor ending on 31 March, 30 June and 30 September their respective unaudited financial statements for that Fiscal Quarter (commencing with the financial statements in respect of the Fiscal Quarter ending on 30 September 2014); and

(c)     as soon as they become available, but in no event later than 90 days after the end of each Fiscal Quarter of each Borrower and the Collateral Guarantor and the Parent Guarantor ending on 31 December their respective unaudited financial statements for that and the preceding three Fiscal Quarters (commencing with the financial statements in respect of the Fiscal Quarter ending 31 December 2014);

(d)    as soon as possible, but in no event later than 30 days after the end of each Fiscal Year of the Owners and the Parent Guarantor, a budget in a format approved by the Facility Agent which shows all anticipated income and expenditure in respect of:

  (i)    each Ship, in the case of each Owner; and

  (ii)    the other ships owned by the Parent Guarantor (directly or indirectly through any of its Subsidiaries), in the case of the Parent Guarantor,

  during the next Fiscal Year of the Owners or, as the case may be, the Parent Guarantor;

(e)    each Owner shall use its best efforts to procure as soon as possible and supply to the Facility Agent audited financial statements in respect of any charterer which is a party to any Charter of either Ship; and

(f)    promptly after each request by the Facility Agent, such further financial or other information in respect of the Borrowers, the Collateral Guarantor, the Ships, the Transaction Obligors and the other members of the Group which may be reasonably requested by the Facility Agent from time to time.

**22.3    Compliance Certificates**

(a)    The Borrowers and the Collateral Guarantor shall supply to the Facility Agent, with each set of financial statements delivered pursuant to sub-paragraph (i) of paragraph (a) or paragraphs (b) or (c) of Clause 22.2 (*Financial statements*) a Borrowers' Compliance Certificate.

(b)    The Parent Guarantor shall supply to the Facility Agent, with each set of financial statements delivered pursuant to sub-paragraph (ii) of paragraph (a) or paragraphs (b) or (c) of Clause 22.2 (*Financial statements*), a Parent Guarantor's Compliance Certificate.

(c)    Each Borrowers' Compliance Certificate shall be signed by a director of each Borrower and of the Collateral Guarantor.

(d)    Each Parent Guarantor's Compliance Certificate shall be signed by a director of the Parent Guarantor.

**22.4    Requirements as to financial statements**

(a)    Each set of financial statements delivered by a Borrower and the Collateral Guarantor pursuant to Clause 22.2 (*Financial statements*) shall be certified by a director of the relevant company as fairly representing (if unaudited) its financial condition and operations as at the date as at which those financial statements were drawn up.

(b)    The Borrowers and the Collateral Guarantor shall procure that each set of financial statements delivered pursuant to Clause 22.2 (*Financial statements*) is prepared using IFRS.

**22.5    Information: miscellaneous**

Each Obligor shall supply to the Facility Agent (in sufficient copies for all the Lenders, if the Facility Agent so requests):

(a)    all documents dispatched by it to its shareholders (or any class of them) or its creditors generally at the same time as they are dispatched;

(b)    promptly upon becoming aware of them, the details of any litigation, arbitration or administrative proceedings (including proceedings relating to any alleged or actual breach of the ISM Code or of the ISPS Code) which are current, threatened or pending against any

Transaction Obligor, and which, if adversely determined might, have a Material Adverse Effect;

(c)  promptly, such further information and/or documents regarding:

   (i)   each Ship, its Earnings and its Insurances;

   (ii)  the Charged Property;

   (iii) compliance of the Transaction Obligors with the terms of the Finance Documents;

   (iv)  the financial condition, business and operations of any Transaction Obligor,

   as any Finance Party (through the Facility Agent) may reasonably request; and

(d)  promptly, such further information and/or documents as any Finance Party (through the Facility Agent) may reasonably request  so as to enable such Finance Party to comply with any laws applicable to it (including, without limitation, compliance with FATCA).

### 22.6  Notification of default

(a)  Each Obligor shall notify the Facility Agent of any Default (and the steps, if any, being taken to remedy it) promptly upon becoming aware of its occurrence.

(b)  Promptly upon a request by the Facility Agent, each Borrower shall supply to the Facility Agent a certificate signed by two of its directors or senior officers on its behalf certifying that no Default is continuing (or if a Default is continuing, specifying the Default and the steps, if any, being taken to remedy it).

### 22.7  Use of websites

(a)  Each Obligor may satisfy its obligation under the Finance Documents to which it is a party to deliver any information in relation to those Lenders (the "**Website Lenders**") which accept this method of communication by posting this information onto an electronic website designated by the Borrowers and the Facility Agent (the "**Designated Website**") if:

   (i)   the Facility Agent expressly agrees (after consultation with each of the Lenders) that it will accept communication of the information by this method;

   (ii)  both the relevant Obligor and the Facility Agent are aware of the address of and any relevant password specifications for the Designated Website; and

   (iii) the information is in a format previously agreed between the relevant Obligor and the Facility Agent.

   If any Lender (a "**Paper Form Lender**") does not agree to the delivery of information electronically then the Facility Agent shall notify the Obligors accordingly and each Obligor shall supply the information to the Facility Agent (in sufficient copies for each Paper Form Lender) in paper form.  In any event each Obligor shall supply the Facility Agent with at least one copy in paper form of any information required to be provided by it.

(b)  The Facility Agent shall supply each Website Lender with the address of and any relevant password specifications for the Designated Website following designation of that website by the Obligors or any of them and the Facility Agent.

(c)  An Obligor shall promptly upon becoming aware of its occurrence notify the Facility Agent if:

   (i)   the Designated Website cannot be accessed due to technical failure;

54148659v3

(ii)    the password specifications for the Designated Website change;

(iii)    any new information which is required to be provided under this Agreement is posted onto the Designated Website;

(iv)    any existing information which has been provided under this Agreement and posted onto the Designated Website is amended; or

(v)    if that Obligor becomes aware that the Designated Website or any information posted onto the Designated Website is or has been infected by any electronic virus or similar software.

If an Obligor notifies the Facility Agent under sub-paragraph (i) or (v) of paragraph (c) above, all information to be provided by the Obligors under this Agreement after the date of that notice shall be supplied in paper form unless and until the Facility Agent and each Website Lender is satisfied that the circumstances giving rise to the notification are no longer continuing.

(d)    Any Website Lender may request, through the Facility Agent, one paper copy of any information required to be provided under this Agreement which is posted onto the Designated Website. The Obligors shall comply with any such request within 10 Business Days.

**22.8**    **"Know your customer" checks**

(a)    If:

(i)    the introduction of or any change in (or in the interpretation, administration or application of) any law or regulation made after the date of this Agreement;

(ii)    any change in the status of an Obligor after the date of this Agreement; or

(iii)    a proposed assignment or transfer by a Lender of any of its rights and obligations under this Agreement to a party that is not a Lender prior to such assignment or transfer,

obliges a Finance Party (or, in the case of sub-paragraph (iii) above, any prospective new Lender) to comply with "know your customer" or similar identification procedures in circumstances where the necessary information is not already available to it, each Obligor shall promptly upon the request of any Finance Party supply, or procure the supply of, such documentation and other evidence as is reasonably requested by a Servicing Party (for itself or on behalf of any other Finance Party) or any Lender (for itself or, in the case of the event described in sub-paragraph (iii) above, on behalf of any prospective new Lender) in order for such Finance Party or, in the case of the event described in sub-paragraph (iii) above, any prospective new Lender to carry out and be satisfied it has complied with all necessary "know your customer" or other similar checks under all applicable laws and regulations pursuant to the transactions contemplated in the Finance Documents including without limitation obtaining, verifying and recording certain information and documentation that will allow the Facility Agent and each of the Lenders to identify each Transaction Obligor in accordance with the requirements of the PATRIOT Act.

(b)    Each Lender shall promptly upon the request of a Servicing Party supply, or procure the supply of, such documentation and other evidence as is reasonably requested by the Servicing Party (for itself) in order for that Servicing Party to carry out and be satisfied it has complied with all necessary "know your customer" or other similar checks under all applicable laws and regulations pursuant to the transactions contemplated in the Finance Documents.

**22.9**   **Anti-money laundering**

Each Borrower shall promptly upon the request of a Servicing Party supply, or procure the supply of, such documentation and other evidence as is reasonably requested by a Servicing Party (for itself) in order for that Servicing Party to be satisfied it has complied with all necessary anti-money laundering laws.

**23**   **FINANCIAL COVENANTS**

**23.1**   **Application and testing**

Each Borrower and the Collateral Guarantor (as the context may require) shall ensure it complies with the following financial covenants as set out in Clause 23 (*Financial Covenants*) at all times during the Security Period and the financial covenants set out below shall be tested on the date of this Agreement and thereafter as specified below.

**23.2**   **Interest Coverage Ratio**

Each Borrower and the Collateral Guarantor (as the context may require) shall ensure that it complies with the following financial covenant as set out below at all times during the Security Period which shall be tested on the first Utilisation Date and thereafter on a quarterly and annualised pro forma basis.

The Interest Coverage Ratio is not less than:

(a)   2.5:1.0, during the period commencing on the first Utilisation Date and ending on 31 December 2015; and

(b)   3.0:1.0, during the period commencing on 1 January 2016 and throughout the remainder of the Security Period,

**Provided that** during the period commencing on the first Utilisation Date and ending 90 days thereafter any calculations of the Interest Coverage Ratio shall take into account the Unrestricted Cash Reserve Amount,

and if any determination of Interest Coverage Ratio requirement set out in this Clause 23.2 (*Interest Coverage Ratio*) shows that the minimum Interest Coverage Ratio has not been maintained (the "**Shortfall**") the Parent Guarantor shall be entitled to rectify such Shortfall no more than twice during the Security Period by contributing to the Owners on or prior to the Final Date an amount required (the "**Cure Amount**") in order to increase EBITDA in respect of the preceding Fiscal Quarter and the three subsequent Fiscal Quarters (the "**Relevant Fiscal Quarters**") only for the purpose of ensuring compliance with the minimum Interest Coverage Ratio;   **Provided that** the Cure Amount contributed by the Parent Guarantor shall be made in the form of cash common equity (or equivalent) and shall be applied by the Borrowers (and the Collateral Guarantor, as applicable, irrevocably authorises the Borrowers to apply such amounts) towards prepayment of the Loan proportionally between the Tranches pro rata first against the outstanding Repayment Instalments and thereafter against the then outstanding Balloon Instalments.

If, after giving effect to the foregoing re-calculations, the Owners are in compliance with the financial covenant set out in this Clause 23.2 (*Interest Coverage Ratio*), the Owners shall be deemed to have satisfied such financial covenant as at the relevant date of determination and the Shortfall shall be deemed to be rectified.

For the purposes of this Clause 23.2 (*Interest Coverage Ratio*):

"**Final Date**" means a date falling within 10 Business Days after the last date on which the quarterly accounts are required to be delivered pursuant to Clause 22.2 (*Financial statements*).

**23.3    Debt to Total Capitalization Ratio**

The Parent Guarantor shall ensure that at all times the Debt to Total Capitalization Ratio is not more than 0.65:1.00.

**23.4    Liquidity Amounts**

(a)    Borrower A shall, no later than the Utilisation Date of Tranche A, deposit into its Maintenance Reserve Account an amount at least equal to the aggregate of:

    (i)    100 per cent. of the aggregate (as determined by Borrower A and approved by the Facility Agent, acting reasonably) of Ship A's budgeted special survey, intermediate survey and drydocking costs due within the period of 12 months from that Utilisation Date;

    (ii)    50 per cent. of the aggregate (as determined by Borrower A and approved by the Facility Agent, acting reasonably) of Ship A's budgeted special survey, intermediate survey and drydocking costs due within the period commencing 12 months from that Utilisation Date and ending 24 months from that Utilisation Date; and

    (iii)    25 per cent. of the aggregate (as determined by Borrower A and approved by the Facility Agent, acting reasonably) of that Ship's budgeted special survey, intermediate survey and drydocking costs due within the period commencing 24 months from that Utilisation Date and ending 48 months from that Utilisation Date.

(b)    The Collateral Guarantor shall, no later than the Utilisation Date of Tranche B, deposit into its Maintenance Reserve Account an amount equal to $250,000 (an amount representing 50 per cent. of its Maintenance Reserve Amount) and, no later than 15 July 2015, deposit into its Maintenance Reserve Account an additional amount of $250,000 (an amount representing the remaining 50 per cent. of its Maintenance Reserve Amount).

(c)    Each Owner shall ensure that it shall build up in the Maintenance Reserve Account for that Owner in respect of the Ship owned by that Owner the Maintenance Reserve Amount in respect of each special survey, intermediate survey or drydocking (each a "**Subsequent Drydock**") which is due (i) in respect of Ship A, after the date falling 48 months from the Utilisation Date of Tranche A and (ii) in respect of Ship B, after 15 July 2015, in each case by way of six equal quarterly instalments with the last such quarterly instalment being payable at least three months prior to that Subsequent Drydock.

(d)    If on the Utilisation Date of a Ship relevant to a Tranche, that Ship does not have an operational BWTS installed (in the reasonable opinion of the Facility Agent), the BWTS Amount for that Ship shall be built up gradually in the BWTS Account of that Ship by twelve equal quarterly installments with the final such installment being payable on the earlier of (i) the day on which BWTS is installed on that Ship and (ii) 31 August 2018.

(e)    As long as no Event of Default has occurred which is continuing, upon presentation to the Facility Agent of paid invoices in respect of a Ship's special or intermediate survey or, as the case may be, installation of BWTS, the Owner owning such Ship shall be permitted to withdraw the Maintenance Reserve Amount (or any part thereof) for that budgeted cost or, as the case may be, the BWTS Amount (or any part thereof) to apply towards payment of those costs and any surplus for that budgeted cost shall be released to the relevant Owner **Provided that**, without prejudice to the foregoing in the case of the Maintenance Reserve Amount, the relevant Ship has been redelivered by the relevant shipyard in which the Ship was drydocked to the Owner being the owner thereof and, in the case of the BWTS Amount,

the Facility Agent has received a satisfactory confirmation form a technical consultant appointed by the Facility Agent confirming that the BWTS has been properly installed on the relevant Ship.

(f)　On the earlier of:

(i)　the end of the Security Period; and

(ii)　the discharge of the Mortgage over that Ship in connection with its sale in accordance with Clause 24.11 (*Disposals*),

any remaining BWTS Amount shall be released to the Owner owning that Ship, provided no Event of Default has occurred which is then continuing.

In this Clause 23.4 (*Liquidity Amounts*) "**Maintenance Reserve Amount**" means:

(i) in relation to Ship A, an amount representing 100 per cent. of the anticipated cost which is allocated and reserved for costs relating to any drydocking, or (as the case may be) for any special or intermediate survey, of that Ship as outlined in the consolidated financial projections delivered by the Owner which is the owner of that Ship pursuant to Clause 22.2 (*Financial statements*); and

(ii) in relation to Ship B, $500,000.

**23.5　Restricted Cash Reserve Amount**

Each Owner shall ensure that the Restricted Cash Reserve Amount in respect of its Ship is standing to the credit of the Retention Account of that Owner at all times from the Utilisation Date of the Tranche related to that Ship until the earlier of:

(i)　the end of the Security Period; and

(ii)　the discharge of the Mortgage over that Ship in connection with its sale in accordance with Clause 24.11 (*Disposals*),

whereupon that Restricted Cash Reserve Amount may be released to that Owner, provided that no Event of Default has occurred which is continuing.

**23.6　Unrestricted Cash Reserve Amount**

Each Owner shall ensure that the Unrestricted Cash Reserve Amount in respect of its Ship is standing to the credit of its Earnings Account at all times (other than when that Ship is on hire under a Charter) from the Utilisation Date of the Tranche related to that Ship until the earlier of:

(i)　the end of the Security Period; and

(ii)　the discharge of the Mortgage over that Ship in connection with its sale in accordance with Clause 24.11 (*Disposals*),

whereupon that Unrestricted Cash Reserve Amount may be released to that Owner, provided that no Event of Default has occurred which is continuing. Each Unrestricted Cash Reserve Amount may also be released to the Owner owning the Ship to which that Unrestricted Cash Reserve Amount relates if the Facility Agent is provided with evidence satisfactory to the Facility Agent that that Ship has gone on hire under a Charter and provided that no Event of Default has occurred which is continuing.

**23.7　Parent Guarantor's cash reserve amount**

The Parent Guarantor shall ensure that at all times the aggregate of (without double counting):

(a)     the credit balance of each Account (save for any amounts standing to the credit of the Maintenance Reserve Account and the BWTS Account); plus

(b)     the credit balance of any bank account held by any member of the Group with any bank or financial institution (including but not limited the Account Banks) for the purpose of complying with any loan facility entered into by any member of the Group any other bank or financial institution (even if Security exists over any such account and even if withdrawal from any such account is restricted); plus

(c)     any other cash available to the Group (provided that no Security exists over any such cash),

         shall not be less than 5 per cent. of the aggregate Financial Indebtedness of each member of the Group at that time.

## 24     GENERAL UNDERTAKINGS

### 24.1     General

The undertakings in this Clause 24 (*General Undertakings*) remain in force throughout the Security Period except as the Facility Agent, acting with the authorisation of the Majority Lenders (or, where specified, all the Lenders) may otherwise permit.

### 24.2     Authorisations

Each Obligor shall promptly:

(a)     obtain, comply with and do all that is necessary to maintain in full force and effect; and

(b)     supply certified copies to the Facility Agent of any Authorisation required under any law or regulation of a Relevant Jurisdiction or the state of the Approved Flag at any time of each Ship to enable it to:

        (i)      perform its obligations under the Transaction Documents to which it is a party;

        (ii)     ensure the legality, validity, enforceability or admissibility in evidence in any Relevant Jurisdiction or in the state of the Approved Flag at any time of each Ship of any Transaction Document to which it is a party; and

        (iii)    own and operate each Ship (in the case of the Owners).

### 24.3     Compliance with laws

Each Obligor shall comply in all respects with all laws and regulations to which it may be subject including without limitation (i) the Trading with the Enemy Act and each of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V) and any other enabling legislation or executive order thereto) and (ii) the PATRIOT Act.

### 24.4     Environmental compliance

Each Obligor shall:

(a)     comply with all Environmental Laws;

(b)     obtain, maintain and ensure compliance with all requisite Environmental Approvals;

(c)    implement procedures to monitor compliance with and to prevent liability under any Environmental Law.

**24.5    Environmental claims**

Each Obligor shall (through the Parent Guarantor), promptly upon becoming aware of the same, inform the Facility Agent in writing of:

(a)    any Environmental Claim against it which is current, pending or threatened where the claim, if determined against it, has or is reasonably likely to have a Material Adverse Effect; and

(b)    any facts or circumstances which are reasonably likely to result in any Environmental Claim being commenced or threatened against it.

**24.6    Taxation**

(a)    Each Obligor shall pay and discharge all Taxes imposed upon it or its assets within the time period allowed without incurring penalties unless and only to the extent that:

    (i)    such payment is being contested in good faith;

    (ii)    adequate reserves are maintained for those Taxes and the costs required to contest them which have been disclosed in its latest financial statements delivered to the Facility Agent under Clause 22.2 (*Financial statements*); and

    (iii)    such payment can be lawfully withheld.

(b)    No Obligor shall change its residence for Tax purposes.

**24.7    Overseas companies**

Each Obligor shall promptly inform the Facility Agent if it delivers to the Registrar particulars required under the Overseas Regulations of any UK Establishment and it shall comply with any directions given to it by the Facility Agent regarding the recording of any Transaction Security on the register which it is required to maintain under The Overseas Companies (Execution of Documents and Registration of Charges) Regulations 2009.

**24.8    Pari passu ranking**

Each Obligor shall ensure that at all times any unsecured and unsubordinated claims of a Finance Party against it under the Finance Documents rank at least *pari passu* with the claims of all its other unsecured and unsubordinated creditors except those creditors whose claims are mandatorily preferred by laws of general application to companies.

**24.9    Title**

(a)    Each Owner shall hold the legal title to, and own the entire beneficial interest in the Ship owned by it, its Earnings and its Insurances;

(b)    With effect on and from its creation or intended creation, each Borrower and the Collateral Guarantor shall hold the legal title to, and own the entire beneficial interest in any other assets the subject of any Transaction Security created or intended to be created by it.

**24.10    Negative pledge**

(a)    Neither Borrower nor the Collateral Guarantor shall create or permit to subsist any Security over any of its assets.

(b)     Neither Borrower nor the Collateral Guarantor shall:

(i)      sell, transfer or otherwise dispose of any of its assets on terms whereby they are or may be leased to or re-acquired by a Borrower or the Collateral Guarantor;

(ii)     sell, transfer or otherwise dispose of any of its receivables on recourse terms;

(iii)    enter into any arrangement under which money or the benefit of a bank or other account may be applied, set-off or made subject to a combination of accounts; or

(iv)    enter into any other preferential arrangement having a similar effect,

in circumstances where the arrangement or transaction is entered into primarily as a method of raising Financial Indebtedness or of financing the acquisition of an asset.

(c)     Paragraphs (a) and (b) above do not apply to any Permitted Security.

**24.11    Disposals**

(a)     Neither Borrower nor the Collateral Guarantor shall enter into a single transaction or a series of transactions (whether related or not) and whether voluntary or involuntary to sell, lease, transfer or otherwise dispose of any asset (including without limitation (in respect of an Owner) any Ship, its Earnings or its Insurances).

(b)     Paragraph (a) above does not apply to:

(i)      any charter of a Ship to which Clause 26.15 (*Restrictions on chartering, appointment of managers etc.*) applies; and

(ii)     any sale of a Ship to a *bona fide* third party on arm's length terms or, with the Facility Agent's consent, to an Affiliate of the Obligors **Provided always** that Clause 7.3 (*Mandatory prepayment - sale or Total Loss; Change of Control*) is complied with.

**24.12    Merger**

No Obligor shall enter into any amalgamation, demerger, merger, consolidation or corporate reconstruction.

**24.13    Change of business or Fiscal Year**

(a)     The Parent Guarantor shall procure that no substantial change is made to the general nature of the business of the Parent Guarantor or the Group from that carried on at the date of this Agreement.

(b)     No Owner shall engage in any business other than the ownership and operation of its Ship, and Borrower B shall not engage in any other business from that carried on at the date of this Agreement.

(c)     No Obligor shall change its Fiscal Year end.

**24.14    Financial Indebtedness**

Neither Borrower nor the Collateral Guarantor shall incur or permit to be outstanding any Financial Indebtedness except Permitted Financial Indebtedness.

**24.15    Expenditure**

54148659v3

Neither Borrower nor the Collateral Guarantor shall incur any expenditure, except for expenditure reasonably incurred in the ordinary course of owning, operating, maintaining and repairing the Ship owned by that Owner or, in the case of Borrower B, except for expenditure reasonably incurred in the ordinary course of its business.

**24.16    Share capital**

Neither Borrower nor the Collateral Guarantor shall:

(a)    purchase, cancel or redeem any of its share capital;

(b)    increase or reduce its authorised share capital;

(c)    issue any further shares except to the Parent Guarantor and provided such new shares are made subject to the terms of the Shares Security applicable to that Borrower or the Collateral Guarantor (as the case may be) immediately upon the issue thereof in a manner satisfactory to the Facility Agent and the terms of that Shares Security are complied with;

(d)    appoint any further director or officer of that Borrower or the Collateral Guarantor (as the case may be) provided that the Facility Agent is first notified and provided further that (the provisions of the Shares Security applicable to that Borrower or the Collateral Guarantor (as the case may be) are complied with).

**24.17    Dividends**

Neither Borrower nor the Collateral Guarantor shall make nor pay any dividend or other distribution (in cash or in kind) in respect of its share capital save that the Borrowers and the Collateral Guarantor shall, no more than semi-annually, be permitted to pay a dividend (a "**Distribution**") if:

(a)    no Event of Default or Potential Event of Default has occurred and is continuing or would result from the Distribution;

(b)    the balance standing to the credit of the Retention Accounts is sufficient to ensure compliance with the requirement set out in Clause 23.5 (*Restricted Cash Reserve Amount*) both before and after the Distribution;

(c)    the balance standing to the credit of the Earnings Accounts is sufficient to ensure compliance with the requirement set out in Clause 23.6 (*Unrestricted Cash Reserve Amount*) both before and after the Distribution;

(d)    Clause 23.7 (*Parent Guarantor's cash reserve* amount) is complied with both before and after the Distribution;

(e)    the Fixed Charge Coverage Ratio is not less than 1.15:1 both before and after the Distribution; and

prior to the Distribution, the Borrowers, the Collateral Guarantor and the Parent Guarantor have provided to the Facility Agent a written confirmation that the conditions set out in paragraphs (a), (b), (c), (d) and (e) of this Clause 24.17 (*Dividends*) have been complied with for the making of that Distribution.

**24.18    Accounts**

Neither Borrower nor the Collateral Guarantor shall open or maintain any account with any bank or financial institution except the Accounts which are pledge in a form acceptable to the Security Agent for the purposes of the Finance Documents.

**24.19  Investments**

Neither Borrower nor the Collateral Guarantor shall, and the Parent Guarantor shall procure that neither Borrower nor the Collateral Guarantor shall:

(a)  be the creditor in respect of any loan or any form of credit to any person other than another Obligor and where such loan or form of credit is Permitted Financial Indebtedness;

(b)  give or allow to be outstanding any guarantee or indemnity to or for the benefit of any person in respect of any obligation of any other person or enter into any document under which that Borrower or the Collateral Guarantor (as the case may be) assumes any liability of any other person other than any guarantee or indemnity given under the Finance Documents.

(c)  enter into any material agreement other than:

(i)  the Transaction Documents;

(ii)  any other agreement expressly allowed under any other term of this Agreement; and

(d)  enter into any transaction on terms which are, in any respect, less favourable to that Borrower or the Collateral Guarantor (as the case may be) than those which it could obtain in a bargain made at arms' length;

(e)  acquire any shares or other securities other than US or UK Treasury bills and certificates of deposit issued by major North American or European banks or enter into any transaction or any derivative other than any transactions or derivatives under a Hedging Agreement;

(f)  make or agree any amendments in the terms and conditions of the documents entered into with a Subordinated Creditor creating any Subordinated Debt; or

(g)  prepay any Subordinated Debt (or any part thereof) prior to the second Termination Date.

**24.20  Unlawfulness, invalidity and ranking; Security imperilled**

No Obligor shall do (or fail to do) or cause or permit another person to do (or omit to do) anything which is likely to:

(a)  make it unlawful for an Obligor to perform any of its obligations under the Transaction Documents;

(b)  cause any obligation of an Obligor under the Transaction Documents to cease to be legal, valid, binding or enforceable if that cessation individually or together with any other cessations materially or adversely affects the interests of the Secured Parties under the Finance Documents;

(c)  cause any Transaction Document to cease to be in full force and effect;

(d)  cause any Transaction Security to rank after, or lose its priority to, any other Security; and

(e)  imperil or jeopardise the Transaction Security.

**24.21  Further assurance**

(a)  Each Obligor shall promptly, and in any event within the time period specified by the Security Agent do all such acts (including procuring or arranging any registration, notarisation or authentication or the giving of any notice) or execute or procure execution of

all such documents (including assignments, transfers, mortgages, charges, notices, instructions, acknowledgments, proxies and powers of attorney), as the Security Agent may specify (and in such form as the Security Agent may require in favour of the Security Agent or its nominee(s)):

(i)     to create, perfect, vest in favour of the Security Agent or protect the priority of the Security or any right or any kind created or intended to be created under or evidenced by the Finance Documents (which may include the execution of a mortgage, charge, assignment or other Security over all or any of the assets which are, or are intended to be, the subject of the Transaction Security) or for the exercise of any rights, powers and remedies of the Security Agent, any Receiver or the Secured Parties provided by or pursuant to the Finance Documents or by law;

(ii)    to confer on the Security Agent or confer on the Secured Parties Security over any property and assets of that Obligor located in any jurisdiction equivalent or similar to the Security intended to be conferred by or pursuant to the Finance Documents;

(iii)   to facilitate or expedite the realisation and/or sale of, the transfer of title to or the grant of, any interest in or right relating to the assets which are, or are intended to be, the subject of the Transaction Security or to exercise any power specified in any Finance Document in respect of which the Security has become enforceable; and/or

(iv)    to enable or assist the Security Agent to enter into any transaction to commence, defend or conduct any proceedings and/or to take any other action relating to any item of the Security Property.

(b)     Each Obligor shall, take all such action as is available to it (including making all filings and registrations) as may be necessary for the purpose of the creation, perfection, protection or maintenance of any Security conferred or intended to be conferred on the Security Agent or the Secured Parties by or pursuant to the Finance Documents.

(c)     At the same time as an Obligor delivers to the Security Agent any document executed under this Clause 24.21 (*Further assurance*), that Obligor shall deliver to the Security Agent a certificate signed by two of that Obligor's directors or officers which shall:

(i)     set out the text of a resolution of that Transaction Obligor's directors specifically authorising the execution of the document specified by the Security Agent; and

(ii)    state that either the resolution was duly passed at a meeting of the directors validly convened and held, throughout which a quorum of directors entitled to vote on the resolution was present, or that the resolution has been signed by all the directors of officers and is valid under that Obligor's articles of association or other constitutional documents.

## 24.22    No Subsidiaries

Neither Borrower nor the Collateral Guarantor shall form or acquire any Subsidiaries.

## 24.23    Employees and ERISA Compliance

No Obligor shall employ any individuals (other than the master and crew members of the Ship), sponsor, maintain or become obligated to contribute to any Plan. Each Obligor shall provide prompt written notice to the Facility Agent in the event that that Obligor becomes aware that it has incurred or is reasonably likely to incur any liability with respect to any Plan, that, individually or in the aggregate with any other such liability, would be reasonably expected to have a Material Adverse Effect.

**24.24    Charter Assignment**

Upon an Owner entering into a Charter it shall enter into a Charter Assignment and shall procure that all relevant documents pursuant to the Charter Assignment are delivered to the Facility Agent in a form satisfactory to it and its legal advisors and any supporting legal opinions as may be required (including but not limited to a notice of the Charter Assignment on the charterer and use its reasonable endeavours to procure that the charterer acknowledges such notice in such form as the Facility Agent may reasonably approve or require).

**24.25    Books and records**

Each Borrower and the Collateral Guarantor shall keep separate and proper books of record and account in which full and materially correct entries shall be made of all financial transactions and the assets and business in accordance with IFRS and the Facility Agent shall have the right to examine the books and records relevant to each Borrower and the Collateral Guarantor wherever the same may be kept from time to time as it sees fit, in its sole reasonable discretion, or to cause an examination to be made by a firm of accountants selected by it, provided that any examination shall be done without undue interference with the day to day business operations of that Borrower or the Collateral Guarantor (as the case may be).

**24.26    Compliance with contractual obligations**

Each Obligor shall comply with all its material obligations under the agreements to which each is a party.

**25    INSURANCE UNDERTAKINGS**

**25.1    General**

The undertakings in this Clause 25 (*Insurance Undertakings*) remain in force on and from the date of this Agreement and throughout the rest of the Security Period except as the Facility Agent, acting with the authorisation of the Majority Lenders (or, where specified, all the Lenders) may otherwise permit.

**25.2    Maintenance of obligatory insurances**

Each Owner shall keep the Ship owned by it insured at its expense against:

(a)    fire and usual marine risks (including hull and machinery and excess risks);

(b)    protection and indemnity risks;

(c)    war risks (including excess war risks including (but not limited to) crew, cargo liability, pollution liability, removal of wreck and contractual liability); and

(d)    any other risks against which the Facility Agent considers, having regard to practices and other circumstances prevailing at the relevant time, it would be reasonable for that Owner to insure and which are specified by the Facility Agent by notice to that Owner.

**25.3    Terms of obligatory insurances**

Each Owner shall effect such insurances:

(a)    in dollars;

(b) in the case of all marine risks and war risks, in an amount on an agreed value basis at least the greater of:

    (i) 120 per cent. of the aggregate of the Tranche relating to the Ship owned by it and the Hedging Exposure; and

    (ii) the Market Value of the Ship;

(c) in the case of oil pollution liability risks, for an aggregate amount equal to the highest level of cover from time to time available under basic protection and indemnity club entry and in the international marine insurance market;

(d) in the case of protection and indemnity risks, in respect of the full tonnage of its Ship;

(e) on approved terms including but not limited to any limits and deductibles; and

(f) through Approved Brokers and with approved insurance companies and/or underwriters or, in the case of war risks and protection and indemnity risks, in approved war risks and protection and indemnity risks associations.

**25.4    Further protections for the Finance Parties**

In addition to the terms set out in Clause 25.3 (*Terms of obligatory insurances*), each Owner shall procure that the obligatory insurances shall:

(a) subject always to paragraph (b), name that Owner as the sole named assured unless the interest of every other named assured is limited:

    (i) in respect of any obligatory insurances for hull and machinery and war risks;

        (A) to any provable out-of-pocket expenses that it has incurred and which form part of any recoverable claim on underwriters; and

        (B) to any third party liability claims where cover for such claims is provided by the policy (and then only in respect of discharge of any claims made against it); and

    (ii) in respect of any obligatory insurances for protection and indemnity risks, to any recoveries it is entitled to make by way of reimbursement following discharge of any third party liability claims made specifically against it;

and every other named assured has undertaken in writing to the Security Agent (in such form as it requires) that any deductible shall be apportioned between that Owner and every other named assured in proportion to the gross claims made or paid by each of them and that it shall do all things necessary and provide all documents, evidence and information to enable the Security Agent to collect or recover any moneys which at any time become payable in respect of the obligatory insurances;

(b) whenever the Facility Agent requires, endorsement as an additional assured, name (or be amended to name) the Security Agent as additional assured for its rights and interests, warranted no operational interest and with full waiver of rights of subrogation against the Security Agent, but without the Security Agent thereby being liable to pay) premiums, calls or other assessments in respect of such insurance;

(c) name the Security Agent as loss payee with such directions for payment as the Facility Agent may specify;

(d)     provide that all payments by or on behalf of the insurers under the obligatory insurances to the Security Agent shall be made without set off, counterclaim or deductions or condition whatsoever;

(e)     provide that the obligatory insurances shall be primary without right of contribution from other insurances which may be carried by the Security Agent or any other Finance Party; and

(f)     provide that the Security Agent may make proof of loss if that Owner fails to do so.

**25.5     Renewal of obligatory insurances**

Each Owner shall:

(a)     at least 14 days before the expiry of any obligatory insurance:

(i)     notify the Facility Agent of the Approved Brokers (or other insurers) and any protection and indemnity or war risks association through or with which it proposes to renew that obligatory insurance and of the proposed terms of renewal; and

(ii)    obtain the Facility Agents' approval to the matters referred to in paragraph (a)(i) above;

(b)     at least 10 days before the expiry of any obligatory insurance, renew that obligatory insurance in accordance with the Facility Agent's approval pursuant to paragraph (a) above; and

(c)     procure that the approved brokers and/or the approved war risks and protection and indemnity associations with which such a renewal is effected shall promptly after the renewal notify the Facility Agent in writing of the terms and conditions of the renewal.

**25.6     Copies of policies; letters of undertaking**

Each Owner shall ensure that the Approved Brokers provide the Security Agent with:

(a)     pro forma copies of all policies when requested, certificate of insurance and/or cover note relating to the obligatory insurances which they are to effect or renew in a form required by the Facility Agent; and

(b)     a letter or letters or undertaking in a form required by the Facility Agent and including undertakings by the Approved Brokers that:

(i)     they will have endorsed on each policy, immediately upon issue, a loss payable clause and a notice of assignment complying with the provisions of Clause 25.4 (*Further protections for the Finance Parties*);

(ii)    they will hold such policies, and the benefit of such insurances, to the order of the Security Agent in accordance with such loss payable clause;

(iii)   they will advise the Security Agent immediately of any material change to the terms of the obligatory insurances and provide 14 days prior notice of cancellation;

(iv)    they will, if they have not received notice of renewal instructions from the relevant Owner or its agents, notify the Security Agent not less than 14 days before the expiry of the obligatory insurances;

(v)     if they receive instructions to renew the obligatory insurances, they will promptly notify the Facility Agent of the terms of the instructions;

(vi)    they will not set off against any sum recoverable in respect of a claim relating to the Ship owned by that Owner under such obligatory insurances any premiums or other amounts due to them or any other person whether in respect of that Ship or otherwise, they waive any lien on the policies, or any sums received under them, which they might have in respect of such premiums or other amounts and they will not cancel such obligatory insurances by reason of non-payment of such premiums or other amounts;

(vii)    they will arrange for a separate policy to be issued in respect of the Ship owned by that Owner forthwith upon being so requested by the Facility Agent; and

(viii)    they will immediately notify the Security Agent if they receive from an Owner any insurance company or any underwriter notice of cancellation of the obligatory insurances.

**25.7    Copies of certificates of entry**

Each Owner shall ensure that any protection and indemnity and/or war risks associations in which the Ship owned by it is entered provide the Security Agent with:

(a)    a certified copy of the certificate of entry for that Ship;

(b)    a letter or letters of undertaking in such form as may be required by the Facility Agent acting on the instructions of Majority Lenders;

(c)    a certified copy of each certificate of financial responsibility for pollution by oil or other Environmentally Sensitive Material issued by the relevant certifying authority in relation to that Ship; and

(d)    the endorsement referred to in paragraph (b) of Clause 25.4 (*Further protections for the Finance Parties*).

**25.8    Deposit of original policies**

Each Owner shall ensure that all policies relating to obligatory insurances effected by it are deposited with the Approved Brokers through which the insurances are effected or renewed.

**25.9    Payment of premiums**

Each Owner shall punctually pay all premiums or other sums payable in respect of the obligatory insurances effected by it and produce all relevant receipts when so required by the Facility Agent or the Security Agent.

**25.10    Guarantees**

Each Owner shall ensure that any guarantees required by a protection and indemnity or war risks association are promptly issued and remain in full force and effect.

**25.11    Compliance with terms of insurances**

(a)    No Owner shall do or omit to do (nor permit to be done or not to be done) any act or thing which would or might render any obligatory insurance invalid, void, voidable or unenforceable or render any sum payable under an obligatory insurance repayable in whole or in part.

(b)    Without limiting paragraph (a) above, each Owner shall:

(i)    take all necessary action and comply with all requirements which may from time to time be applicable to the obligatory insurances, and (without limiting the obligation contained in sub-paragraph (iii) of paragraph (b) of Clause 25.6 (*Copies of policies; letters of undertaking*)) ensure that the obligatory insurances are not made subject to any exclusions or qualifications to which the Facility Agent has not given its prior approval;

(ii)    not make any changes relating to the classification or classification society or manager or operator of the Ship owned by it approved by the underwriters of the obligatory insurances;

(iii)    make (and promptly supply copies to the Facility Agent of) all quarterly or other voyage declarations which may be required by the protection and indemnity risks association in which the Ship owned by it is entered to maintain cover for trading to the United States of America and Exclusive Economic Zone (as defined in the United States Oil Pollution Act 1990 or any other applicable legislation); and

(iv)    not employ the Ship owned by it, nor allow it to be employed, otherwise than in conformity with the terms and conditions of the obligatory insurances, without first obtaining the consent of the insurers and complying with any requirements (as to extra premium or otherwise) which the insurers specify.

**25.12   Alteration to terms of insurances**

No Owner shall make or agree to any alteration to the terms of any obligatory insurance or waive any right relating to any obligatory insurance.

**25.13   Settlement of claims**

Each Owner shall:

(a)    not settle, compromise or abandon any claim under any obligatory insurance for Total Loss or for a Major Casualty; and

(b)    do all things necessary and provide all documents, evidence and information to enable the Security Agent to collect or recover any moneys which at any time become payable in respect of the obligatory insurances.

**25.14   Provision of copies of communications**

Each Owner shall provide the Security Agent, at the time of each such communication, with copies of all written communications between that Owner and:

(a)    the Approved Brokers;

(b)    the approved protection and indemnity and/or war risks associations; and

(c)    the approved insurance companies and/or underwriters,

which relate directly or indirectly to:

(i)    that Owner's obligations relating to the obligatory insurances including, without limitation, all requisite declarations and payments of additional premiums or calls; and

(ii)    any credit arrangements made between that Owner and any of the persons referred to in paragraphs (a) or (b) above relating wholly or partly to the effecting or maintenance of the obligatory insurances.

**25.15    Provision of information**

Each Owner shall promptly provide the Facility Agent (or any persons which it may designate) with any information which the Facility Agent (or any such designated person) requests for the purpose of:

(a)    obtaining or preparing any report from an independent marine insurance broker as to the adequacy of the obligatory insurances effected or proposed to be effected; and/or

(b)    effecting, maintaining or renewing any such insurances as are referred to in Clause 25.16 (*Mortgagee's interest, additional perils and political risk insurances*) or dealing with or considering any matters relating to any such insurances,

and the Borrowers and the Collateral Guarantor shall, forthwith upon demand, indemnify the Security Agent in respect of all fees and other expenses incurred by or for the account of the Security Agent in connection with any such report as is referred to in paragraph (a) above.

**25.16    Mortgagee's interest, additional perils and political risk insurances**

(a)    The Security Agent shall be entitled from time to time to effect, maintain and renew a mortgagee's interest marine insurance, a mortgagee's interest additional perils insurance and any other insurance as the Security Agent may reasonably require (including, without limitation, a mortgagee's political risk insurance and a mortgagee's rights insurance) each in an amount equal to 120 per cent. of the aggregate of the Loan and any Hedging Exposure and on such terms, through such insurers and generally in such manner as the Security Agent acting on the instructions of the Majority Lenders may from time to time consider appropriate.

(b)    The Borrowers and the Collateral Guarantor shall upon demand fully indemnify the Security Agent in respect of all premiums and other expenses which are incurred in connection with or with a view to effecting, maintaining or renewing any insurance referred to in paragraph (a) above or dealing with, or considering, any matter arising out of any such insurance up to an amount not exceeding the estimate provided to the Owners or the Parent Guarantor by a leading independent marine insurance broker for arranging such insurance.

**26      GENERAL SHIP UNDERTAKINGS**

**26.1    General**

The undertakings in this Clause 26 (*General Ship Undertakings*) remain in force on and from the date of this Agreement and throughout the rest of the Security Period except as the Facility Agent, acting with the authorisation of the Majority Lenders (or, where specified, all the Lenders) acting reasonably in the case of Clause 26.2 (*Ships' names and registration*) (a), (b) and (c) and Clause 26.20 (*No variation, release etc. of Purchase Agreements*), may otherwise permit.

**26.2    Ships' names and registration**

Each Owner shall, in respect of the Ship owned by it:

(a)    keep that Ship registered in its name under the Approved Flag from time to time at its port of registration;

(b)    not do or allow to be done anything as a result of which such registration might be suspended, cancelled or imperilled;

(c)   not register the Ship on more than the Approved Flag or with a bareboat charter registry of an Approved Flag; and

(d)   not change the name of that Ship,

provided that any change of flag of a Ship shall be subject to:

(i)   that Ship remaining subject to Security securing the Secured Liabilities created by a first priority or preferred ship mortgage on that Ship and, if appropriate, a first priority deed of covenant collateral to that mortgage (or equivalent first priority Security) on substantially the same terms as the Mortgage on that Ship and related Deed of Covenant and on such other terms and in such other form as the Facility Agent, acting with the authorisation of the Majority Lenders, shall approve or require; and

(ii)   the execution of such other documentation amending and supplementing the Finance Documents as the Facility Agent, acting with the authorisation of the Majority Lenders, shall approve or require.

**26.3   Repair and classification**

Each Owner shall keep the Ship owned by it in a good and safe condition and state of repair:

(a)   consistent with first class ship ownership and management practice; and

(b)   so as to maintain the Approved Classification free of overdue recommendations and conditions affecting that Ship's class.

**26.4   Classification society undertaking**

If required by the Facility Agent in writing each Owner shall, in respect of the Ship owned by it, instruct the relevant Approved Classification Society (and procure that that classification society undertakes with the Security Agent):

(a)   to send to the Security Agent, following receipt of a written request from the Security Agent, certified true copies of all original class records held by the Approved Classification Society in relation to that Ship;

(b)   to allow the Security Agent (or its agents), at any time and from time to time, to inspect the original class and related records of that Owner and that Ship at the offices of the Approved Classification Society and to take copies of them;

(c)   to notify the Security Agent immediately in writing if the Approved Classification Society:

(i)   receives notification from that Owner or any person that that Ship's classification society is to be changed; or

(ii)   becomes aware of any facts or matters which may result in or have resulted in a change, suspension, discontinuance, withdrawal or expiry of that Ship's class under the rules or terms and conditions of that Owner or that Ship's membership of that classification society;

(d)   following receipt of a written request from the Security Agent:

(i)   to confirm that that Owner is not in default of any of its contractual obligations or liabilities to the Approved Classification Society, including confirmation that it has paid in full all fees or other charges due and payable to the Approved Classification Society; or

(ii)    to confirm that that Owner is in default of any of its contractual obligations or liabilities to the Approved Classification Society, to specify to the Security Agent in reasonable detail the facts and circumstances of such default, the consequences of such default, and any remedy period agreed or allowed by that classification society.

**26.5    Modifications**

No Owner shall make any modification or repairs to, or replacement of, any Ship or equipment installed on it which would or might materially alter the structure, type or performance characteristics of that Ship or materially reduce its value other than the installation of an approved BWTS at the time so required by the relevant regulation authorities such approved BWTS to be to a standard approved by the Facility Agent (acting reasonably) and relevant regulatory authority.

**26.6    Removal and installation of parts**

(a)    Subject to paragraph (b) below, no Owner shall remove any material part of any Ship, or any item of equipment installed on any Ship unless:

(i)    the part or item so removed is forthwith replaced by a suitable part or item which is in the same condition as or better condition than the part or item removed;

(ii)    is free from any Security in favour of any person other than the Security Agent; and

(iii)    becomes, on installation on that Ship, the property of that Owner and subject to the security constituted by the Mortgage on that Ship and the related Deed of Covenant.

(b)    An Owner may install equipment owned by a third party if the equipment can be removed without any risk of damage to the Ship owned by that Owner.

**26.7    Surveys**

Each Owner shall submit the Ship owned by it regularly to all periodic or other surveys which may be required for classification purposes and, if so required by the Facility Agent acting on the instructions of the Majority Lenders, provide the Facility Agent, with copies of all survey reports.

**26.8    Inspection**

Once a year and at any time following an Event of Default, which is continuing, at the request of the Facility Agent, each Owner shall (at its own expense) permit the Security Agent (acting through surveyors or other persons appointed by it for that purpose) to board the Ship owned by it at all reasonable times to inspect its condition or to satisfy themselves about proposed or executed repairs and shall afford all proper facilities for such inspections.

**26.9    Prevention of and release from arrest**

(a)    Each Owner shall, in respect of the Ship owned by it, promptly discharge:

(i)    all liabilities which give or may give rise to maritime or possessory liens on or claims enforceable against that Ship, its Earnings or its Insurances;

(ii)    all Taxes, dues and other amounts charged in respect of that Ship, its Earnings or its Insurances; and

(iii)    all other outgoings whatsoever in respect of that Ship, its Earnings or its Insurances.

(b)    Each Owner shall immediately and, forthwith upon receiving notice of the arrest of the Ship owned by it or of its detention in exercise or purported exercise of any lien or claim, procure its release by providing bail or otherwise as the circumstances may require.

**26.10    Compliance with laws etc.**

Each Owner shall:

(a)    comply, or procure compliance with all applicable laws or regulations:

    (i)    relating to its business generally; and

    (ii)    relating to the Ship owned by it, its ownership, employment, operation, management and registration,

including the ISM Code, the ISPS Code, all Environmental Laws, all Applicable Sanctions and the laws of the Approved Flag;

(b)    obtain, comply with and do all that is necessary to maintain in full force and effect any Environment Approvals; and

(c)    without limiting paragraph (a) above, not employ the Ship owned by it nor allow its employment, operation or management in any manner contrary to any law or regulation including but not limited to the ISM Code, the ISPS Code, all Environmental Laws and all Applicable Sanctions.

**26.11    ISPS Code**

Without limiting paragraph (a) of Clause 26.10 (*Compliance with laws etc.*), each Owner shall:

(a)    procure that the Ship owned by it and the company responsible for that Ship's compliance with the ISPS Code comply with the ISPS Code; and

(b)    maintain an ISSC for that Ship; and

(c)    notify the Facility Agent immediately in writing of any actual or threatened withdrawal, suspension, cancellation or modification of the ISSC.

**26.12    Trading in war zones**

In the event of hostilities in any part of the world (whether war is declared or not), no Owner shall cause or permit any Ship to enter or trade to any zone which is declared a war zone by any government or by that Ship's war risks insurers unless:

(a)    the prior written consent of the Security Agent acting on the instructions of the Majority Lenders has been given; and

(b)    that Owner has (at its expense) effected any special, additional or modified insurance cover which the Security Agent acting on the instructions of the Majority Lenders may require.

**26.13    Provision of information**

Without prejudice to Clause 22.5 (*Information: miscellaneous*) each Owner shall, in respect of the Ship owned by it, promptly provide the Facility Agent with any information which it requests regarding:

(a)    that Ship, its employment, position and engagements;

(b)     the Earnings and payments and amounts due to its master and crew;

(c)     any expenditure incurred, or likely to be incurred, in connection with the operation, maintenance or repair of that Ship and any payments made by it in respect of that Ship;

(d)     any towages and salvages; and

(e)     its compliance, the Approved Manager's compliance and the compliance of that Ship with the ISM Code and the ISPS Code,

and, upon the Facility Agent's request, provide copies of any current charter relating to that Ship, of any current guarantee of any such charter, the Ship's Safety Management Certificate and any relevant Document of Compliance.

**26.14    Notification of certain events**

Each Owner shall, in respect of the Ship owned by it, immediately notify the Facility Agent by fax or email, confirmed forthwith by letter of:

(a)     any casualty to that Ship which is or is likely to be or to become a Major Casualty;

(b)     any occurrence as a result of which that Ship has become or is, by the passing of time or otherwise, likely to become a Total Loss;

(c)     any requisition of that Ship for hire;

(d)     any requirement or recommendation made in relation to that Ship by any insurer or classification society or by any competent authority which is not immediately complied with;

(e)     any arrest or detention of that Ship, any exercise or purported exercise of any lien on that Ship or the Earnings or any requisition of that Ship for hire;

(f)     any intended dry docking of that Ship;

(g)     any Environmental Claim made against that Owner or in connection with that Ship, or any Environmental Incident;

(h)     any claim for breach of the ISM Code or the ISPS Code being made against that Owner, an Approved Manager or otherwise in connection with that Ship; or

(i)     any other matter, event or incident, actual or threatened, the effect of which will or could lead to the ISM Code or the ISPS Code not being complied with,

and each Owner shall keep the Facility Agent advised in writing on a regular basis and in such detail as the Facility Agent shall require as to that Owner's, any such Approved Manager's or any other person's response to any of those events or matters.

**26.15    Restrictions on chartering, appointment of managers etc.**

No Owner shall, in relation to the Ship owned by it:

(a)     let that Ship on demise charter for any period;

(b)     enter into any time or consecutive voyage charter in respect of that Ship for a period of, or by virtue of optional extensions may be for a period of, 12 months or more;

(c)     enter into any charter in relation to the Ship under which more than 2 months' hire (or the equivalent) is payable in advance;

(d)     charter the Ship otherwise than on a bona fide arm's length terms at the time when the Ship is fixed;

(e)     appoint a manager of that Ship other than the Approved Commercial Manager (and the only provided that that Approved Commercial Manager has provided a Manager's Undertaking) and the Approved Technical Manager (and the only provided that that Approved Technical Manager has provided a Manager's Undertaking) or agree to any alteration to the terms of an Approved Manager's appointment;

(f)     de activate or lay-up that Ship; or

(g)     put that Ship into the possession of any person for the purpose of work being done upon it in an amount exceeding or likely to exceed US$350,000 (or the equivalent in any other currency) unless that person has first given to the Security Agent and in terms satisfactory to it a written undertaking not to exercise any lien on that Ship or its Earnings for the cost of such work or for any other reason.

**26.16    Notice of Mortgage**

Each Owner shall keep the relevant Mortgage registered against the Ship owned by it as a valid first priority/preferred mortgage, carry on board that Ship a certified copy of the relevant Mortgage and place and maintain in a conspicuous place in the navigation room and the master's cabin of that Ship a framed printed notice stating that that Ship is mortgaged by that Owner to the Security Agent.

"NOTICE OF MORTGAGE

THIS SHIP IS OWNED BY [BRAZEN SHIPPING & TRADING S.A.] [VIGOROUS SHIPPING & TRADING S.A.] AND IS SUBJECT TO A FIRST PRIORITY MORTGAGE IN FAVOUR OF CIT FINANCE LLC IN ITS CAPACITY AS SECURITY AGENT AND MORTGAGEE, UNDER THE TERMS OF SAID MORTGAGE, NEITHER THE OWNER, ANY CHARTERER, THE MASTER OF THE SHIP OR ANY OTHER PERSON HAS ANY RIGHT, POWER OR AUTHORITY TO CREATE, INCUR OR PERMIT TO BE IMPOSED UPON THIS SHIP ANY LIEN WHATSOEVER OTHER THAN FOR CREW'S WAGES AND SALVAGE"

**26.17    Sharing of Earnings**

No Owner shall enter into any agreement or arrangement for the sharing of any Earnings.

**26.18    Notification of compliance**

Each Owner shall promptly provide the Facility Agent from time to time with evidence (in such form as the Facility Agent requires) that it is complying with this Clause 26 (*General Ship Undertakings*).

**26.19    Approved Managers**

Each Owner shall ensure that the Ship owned by it shall be managed at all times by an Approved Commercial Manager, and an Approved Technical Manager, pursuant to the management agreement entered into between that Owner and that Approved Manager; and each Owner shall not agree to any amendment or supplement to, nor waive or fail to enforce any of the provisions of, nor permit termination of, any such management agreement.

**26.20    No variation, release etc. of Purchase Agreements**

(a)    Borrower A shall not, whether by a document, by conduct, by acquiescence or in any other way:

    (i)    materially vary the Purchase Agreement;

    (ii)    release, waive, suspend or subordinate or permit to be lost or impaired any interest or right of any kind which Borrower A has at any time to, in, or in connection with, the Purchase Agreement to which Borrower A is a party or in relation to any matter arising out of or in connection with the Purchase Agreement;

    (iii)    waive any person's breach of the Purchase Agreement; or

    (iv)    rescind or terminate the Purchase Agreement or treat itself as discharged or relieved from further performance of any of its obligations or liabilities under the Purchase Agreement.

(b)    In this Clause 26.20, "material" or "materially" means any change, variation or modification relating to the price, payment terms, date of delivery, vessel type, acceptance criteria and/or performance criteria of Ship A.

## 27    SECURITY COVER

### 27.1    Minimum required security cover

Clause 27.2 (*Prepayment*) applies if the Facility Agent notifies the Borrowers that:

(a)    the Market Value of a Ship then subject to a Mortgage; plus

(b)    the amount of the Restricted Cash Reserve Amount in relation to that Ship then held in the Retention Account of the Owner owning that Ship,

is below 135 per cent. of the aggregate of the Tranche related to that Ship and the Hedging Exposure.

### 27.2    Prepayment

If the Facility Agent serves a notice on the Borrowers under Clause 27.1 (*Minimum required security cover*), the Borrowers shall, on or before the date falling 5 Business Days after the date (the "**Prepayment Date**") on which the Facility Agent's notice is served, prepay such part of the Loan as in order to eliminate the shortfall.

### 27.3    Valuations binding

Any valuation under this Clause 27 (*Security Cover*) shall be binding and conclusive as regards each Borrower and the Collateral Guarantor.

### 27.4    Provision of information

(a)    Each Borrower and the Collateral Guarantor shall promptly provide the Facility Agent and any shipbroker acting under this Clause 27 (*Security Cover*) with any information which the Facility Agent or the shipbroker may request for the purposes of the valuation.

(b)    If a Borrower or the Collateral Guarantor fails to provide the information referred to in paragraph (a) above by the date specified in the request, the valuation may be made on any basis and assumptions which the shipbroker or the Facility Agent considers prudent.

### 27.5    Prepayment mechanism

54148659v3

(a)     Any prepayment pursuant to Clause 27.2 (*Prepayment*) shall reduce in inverse chronological order the amount of each Repayment Instalment of the Tranche relating to the relevant Ship falling after that prepayment by the amount prepaid and otherwise be made in accordance with the relevant provisions of Clause 7 (*Prepayment and Cancellation*).

**27.6    Provision of valuations**

Each Owner shall provide the Facility Agent with a valuation of the Ship owned by it from an Approved Valuer, to enable the Facility Agent to determine the Market Value of that Ship on or not more than 30 days before the Utilisation Date for the Tranche relating to that Ship and semi-annually thereafter **Provided that** the Facility Agent may obtain valuations of the Ships from an Approved Valuer at any other time at the expense of the Borrowers and the Collateral Guarantor after an Event of Default has occurred.

**28      APPLICATION OF EARNINGS; RETENTION ACCOUNTS; MAINTENANCE RESERVE ACCOUNTS; BWTS ACCOUNTS**

**28.1    Payment of Earnings**

Each Borrower and the Collateral Guarantor shall ensure that,

(a)     subject only to the provisions of the General Assignment to which it is a party, all the Earnings in respect of the Ship owned by it are paid in to its Earnings Account; and

(b)     all payments by a Hedge Counterparty to a Borrower under a Hedging Agreement are paid to the Retention Account of that Borrower.

**28.2    Interest accrued on Accounts**

Any credit balance on the Accounts shall bear interest at the rate from time to time offered by the relevant Account Bank to its customers for dollars deposits of similar amounts and for periods similar to those for which such balances appear to that Account Bank likely to remain on that Account.

**28.3    Release of accrued interest**

Interest accruing under Clause 28.2 (*Interest accrued on Accounts*) shall be credited to the relevant Account and shall be for the benefit of the Borrowers or the Collateral Guarantor (as the case may be).

**28.4    Location of accounts**

Each Borrower and the Collateral Guarantor shall promptly:

(a)     comply with any requirement of the Facility Agent as to the location or relocation of its Accounts (or any of them); and

(b)     execute any documents which the Facility Agent specifies to create or maintain in favour of the Security Agent Security over (and/or rights of set-off, consolidation or other rights in relation to) the Accounts.

**28.5    Access to Earnings Accounts**

Each Owner shall have free access to all monies standing to the credit of its Earnings Account at all times until the occurrence of an Event of Default but subject to compliance at all times with Clause 23.6 (*Unrestricted Cash Reserve Amount*).

54148659v3

**28.6    Access to Retention Accounts, Maintenance Reserve Accounts and BWTS Accounts**

Each Retention Account, each Maintenance Reserve Account and each BWTS Account shall be blocked accounts to which the Borrowers or the Collateral Guarantor (as the case may be) will only have access to any credit balances thereon when permitted by the terms of this Agreement.

In no event shall the Facility Agent have any obligation to release any amount from any Retention Account if this would result in Clause 23.5 (*Restricted Cash Reserve Amount*) and/or Clause 23.6 (*Unrestricted Cash Reserve Amount*) not being complied with or if there is an Event of Default which is continuing.

Save as set out above in this Clause, each Retention Account shall be a blocked account and neither Borrower nor the Collateral Guarantor (as the case may be) shall (without the prior written consent of the Facility Agent) withdraw nor transfer any amount from its Retention Account at any time during the Security Period.

**29    EVENTS OF DEFAULT**

**29.1    General**

Each of the events or circumstances set out in this Clause 29 (*Events of Default*) is an Event of Default except for Clause 29.19 (*Acceleration*) and Clause 29.20 (*Enforcement of security*).

**29.2    Non-payment**

An Obligor does not pay on the due date any amount payable pursuant to a Finance Document at the place at and in the currency in which it is expressed to be payable unless:

(a)    its failure to pay is caused by:

    (i)    administrative or technical error; or

    (ii)    a Disruption Event; and

(b)    payment is made within 2 Business Days of its due date.

**29.3    Specific obligations**

A breach occurs of Clause 4.4 (*Waiver of conditions precedent*), Clause 23 (*Financial Covenants*), Clause 24.9 (*Title*), Clause 24.10 (*Negative pledge*), Clause 24.20 (*Unlawfulness, invalidity and ranking; Security imperilled*), Clause 26.19 (*Approved Managers*), Clause 25.11 (*Compliance with terms of insurances*), Clause 25.3 (*Terms of obligatory insurances*), Clause 25.5 (*Renewal of obligatory insurances*), Clause 27 (*Security Cover*) or Clause 24.3 (*Compliance with laws*).

**29.4    Other obligations**

(a)    A Transaction Obligor does not comply with any provision of the Finance Documents (other than those referred to in Clause 29.2 (*Non-payment*) and Clause 29.3 (*Specific obligations*)).

(b)    No Event of Default under paragraph (a) above will occur if the failure to comply is capable of remedy and is remedied within 3 Business Days of the Facility Agent giving notice to the Borrowers or (if earlier) any Transaction Obligor becoming aware of the failure to comply.

**29.5    Misrepresentation**

Any representation or statement made or deemed to be made by a Transaction Obligor in the Finance Documents or any other document delivered by or on behalf of any Transaction Obligor under or in connection with any Finance Document is or proves to have been incorrect or misleading when made or deemed to be made.

**29.6    Cross default**

(a)    Any Financial Indebtedness of any Transaction Obligor or any member of the Group is not paid when due nor within any originally applicable grace period.

(b)    Any Financial Indebtedness of any Transaction Obligor or any member of the Group is declared to be or otherwise becomes due and payable prior to its specified maturity as a result of an event of default (however described).

(c)    Any commitment for any Financial Indebtedness of any Transaction Obligor or any member of the Group is cancelled or suspended by a creditor of that Transaction Obligor or (as the case may be) that member of the Group as a result of an event of default (however described).

(d)    Any creditor of any Transaction Obligor or any member of the Group becomes entitled to declare any Financial Indebtedness of that Transaction Obligor or (as the case may be) that member of the Group due and payable prior to its specified maturity as a result of an event of default (however described).

(e)    No Event of Default will occur under this Clause 29.6 (*Cross default*) if the aggregate amount of Financial Indebtedness or commitment for Financial Indebtedness falling within paragraphs (a) to (d) above is less than (i) US$350,000 (or the equivalent in any other currency) in the case of a Borrower or the Collateral Guarantor, any member of the Group or the Approved Manager and (ii) US$1,000,000 (or the equivalent in any other currency)in the case of the Parent Guarantor.

**29.7    Insolvency**

(a)    A Transaction Obligor or any member of the Group:

(i)    is unable or admits inability to pay its debts as they fall due;

(ii)    is deemed to, or is declared to, be unable to pay its debts under applicable law;

(iii)    suspends or threatens to suspend making payments on any of its debts; or

(iv)    by reason of actual or anticipated financial difficulties, commences negotiations with one or more of its creditors (excluding any Finance Party in its capacity as such) with a view to rescheduling any of its indebtedness.

(b)    The value of the assets of any Transaction Obligor or any member of the Group is less than its liabilities (taking into account contingent and prospective liabilities).

(c)    A moratorium is declared in respect of any indebtedness of any Transaction Obligor or any member of the Group. If a moratorium occurs, the ending of the moratorium will not remedy any Event of Default caused by that moratorium.

For the purposes of this Clause 29.7 (*Insolvency*) a "moratorium" shall not include an agreement between any member of the Group and any Lender to restructure principal repayments under a loan facility involving that member of the Group as borrower, unless such restructuring arises as a direct result of a continuing default by that member of the

Group under the relevant loan facility and/or has an adverse effect on the rights of the Secured Parties under the Facility Agreement and the other Finance Documents.

**29.8    Insolvency proceedings**

(a)    Any corporate action, legal proceedings or other procedure or step is taken in relation to:

    (i)    the suspension of payments, a moratorium of any indebtedness, winding-up, dissolution, administration or reorganisation (by way of voluntary arrangement, scheme of arrangement or otherwise) of any Transaction Obligor or any member of the Group;

    (ii)    a composition, compromise, assignment or arrangement with any creditor of any Transaction Obligor or any member of the Group;

    (iii)    the appointment of a liquidator, receiver, administrator, administrative receiver, compulsory manager or other similar officer in respect of any Transaction Obligor or any member of the Group or any of their respective assets; or

    (iv)    enforcement of any Security over any assets of any Transaction Obligor or any member of the Group,

or any analogous procedure or step is taken in any jurisdiction.

(b)    Paragraph (a) above shall not apply to any winding-up petition which is frivolous or vexatious and is discharged, stayed or dismissed within 14 days of commencement.

**29.9    Creditors' process**

Any expropriation, attachment, sequestration, distress or execution (or any analogous process in any jurisdiction) affects any asset or assets of any Transaction Obligor or any member of the Group.

**29.10    Unlawfulness, invalidity and ranking**

(a)    It is or becomes unlawful for a Transaction Obligor to perform any of its obligations under the Finance Documents.

(b)    Any obligation of a Transaction Obligor under the Finance Documents is not or ceases to be legal, valid, binding or enforceable if that cessation individually or together with any other cessations materially or adversely affects the interests of the Secured Parties under the Finance Documents.

(c)    Any Finance Document ceases to be in full force and effect or to be continuing or is or purports to be determined or any Transaction Security is alleged by a party to it (other than a Finance Party) to be ineffective.

(d)    Any Transaction Security proves to have ranked after, or loses its priority to, any other Security.

**29.11    Security imperilled**

Any Security created or intended to be created by a Finance Document is in any way imperilled or in jeopardy.

54148659v3

**29.12    Cessation of business**

Any Transaction Obligor suspends or ceases to carry on (or threatens to suspend or ceases to carry on) all or a material part of its business.

**29.13    Expropriation**

The authority or ability of any Transaction Obligor to conduct its business is limited or wholly or substantially curtailed by any seizure, expropriation, nationalisation, intervention, restriction or other action by or on behalf of any governmental, regulatory or other authority or other person in relation to any Transaction Obligor or any of its assets.

**29.14    Repudiation and rescission of agreements**

A Transaction Obligor (or any other relevant party other than a Finance Party) rescinds or purports to rescind or repudiates or purports to repudiate a Transaction Document or any of the Transaction Security or evidences an intention to rescind or repudiate a Transaction Document or any Transaction Security.

**29.15    Litigation**

Any litigation, arbitration, administrative, governmental, regulatory or other investigations, proceedings or disputes are commenced or threatened in relation to any of the Transaction Documents or the transactions contemplated in any of the Transaction Documents or against any Transaction Obligor or its assets which has or is reasonably likely to have a Material Adverse Effect.

**29.16    Ownership of Borrowers and the Collateral Guarantor**

Either Borrower or the Collateral Guarantor is not directly or indirectly legally and beneficially wholly owned by the Parent Guarantor.

**29.17    Charters**

(a)    Save for a single period of up to 90 days from the Utilisation Date of Tranche A, Ship A is not employed under a Charter for a continuous period of more than 12 months for the period commencing on the Utilisation Date in respect of Tranche A and ending 12 months thereafter.

(b)    Save for a single period of up to 120 days  from the Utilisation Date of Tranche A, Ship A is off hire (other than for scheduled dry dockings or surveys) for a continuous period of more than 30 days at any time.

**29.18    Material adverse change**

Any event or circumstance occurs which has or is reasonably likely to have a Material Adverse Effect.

**29.19    Acceleration**

On and at any time after the occurrence of an Event of Default which is continuing, the Facility Agent may, and shall if so directed by the Majority Lenders, by notice to the Borrowers:

(a)    cancel the Total Commitments, whereupon they shall immediately be cancelled;

(b)    declare that all or part of the Loan, together with accrued interest, and all other amounts accrued or outstanding under the Finance Documents be immediately due and payable, whereupon it shall become immediately due and payable; and/or

(c)    declare that all or part of the Loan be payable on demand, whereupon it shall immediately become payable on demand by the Facility Agent acting on the instructions of the Majority Lenders,

and the Facility Agent may serve notices under paragraphs (a), (b) and (c) above simultaneously or on different dates and the Security Agent may take any action referred to in Clause 29.20 (*Enforcement of security*) if no such notice is served or simultaneously with or at any time after the service of any of such notice.

**29.20    Enforcement of security**

On and at any time after the occurrence of an Event of Default which is continuing the Security Agent may, and shall if so directed by the Majority Lenders, take any action which, as a result of the Event of Default or any notice served under Clause 29.19 (*Acceleration*), the Security Agent is entitled to take under any Finance Document or any applicable law or regulation.

**SECTION 9**

**CHANGES TO PARTIES**

**30      CHANGES TO THE LENDERS**

**30.1    Assignments and transfers by the Lenders**

Subject to this Clause 30 (*Changes to the Lenders*), a Lender (the "**Existing Lender**") may:

(a)     assign any of its rights; or

(b)     transfer by novation any of its rights and obligations,

under the Finance Documents to another bank or financial institution or to a trust, fund or other entity which is regularly engaged in or established for the purpose of making, purchasing or investing in loans, securities or other financial assets (the "**New Lender**").

**30.2    Conditions of assignment or transfer**

(a)     The consent of the Parent Guarantor is required for an assignment or transfer by an Existing Lender, unless the assignment or transfer is:

    (i)     to another Lender or an Affiliate of a Lender;

    (ii)    if the Existing Lender is a fund, to a fund which is a Related Fund; or

    (iii)   made at a time when an Event of Default is continuing.

(b)     The consent of the Parent Guarantor to an assignment or transfer must not be unreasonably withheld or delayed.  The Parent Guarantor will be deemed to have given its consent 10 Business Days after the Existing Lender has requested it unless consent is expressly refused by the Parent Guarantor within that time.

(c)     The consent of the Parent Guarantor to an assignment or transfer must not be withheld solely because the assignment or transfer may result in an increase to any amount payable under Clause 14.3 (*Mandatory Cost*).

(d)     The consent of the Facility Agent is required for an assignment or transfer by an Existing Lender unless the assignment or transfer is:

    (i)     to another lender or an Affiliate of a Lender; or

    (ii)    if the Existing Lender is a fund, to a fund which is a Related Fund.

(e)     An assignment will only be effective on:

    (i)     receipt by the Facility Agent (whether in the Assignment Agreement or otherwise) of written confirmation from the New Lender (in form and substance satisfactory to the Facility Agent) that the New Lender will assume the same obligations to the other Secured Parties as it would have been under if it were an Original Lender; and

    (ii)    performance by the Facility Agent of all necessary "know your customer" or other similar checks under all applicable laws and regulations in relation to such assignment to a New Lender, the completion of which the Facility Agent shall promptly notify to the Existing Lender and the New Lender.

(f)     A transfer will only be effective if the procedure set out in Clause 30.5 (*Procedure for transfer*) is complied with.

(g)     If:

   (i)     a Lender assigns or transfers any of its rights or obligations under the Finance Documents or changes its Facility Office; and

   (ii)    as a result of circumstances existing at the date the assignment, transfer or change occurs, an Obligor would be obliged to make a payment to the New Lender or Lender acting through its new Facility Office under Clause 12 (*Tax Gross-Up, Indemnities and FATCA*) or Clause 13 (*Increased Costs*),

then the New Lender or Lender acting through its new Facility Office is only entitled to receive payment under those Clauses to the same extent as the Existing Lender or Lender acting through its previous Facility Office would have been if the assignment, transfer or change had not occurred.  This paragraph (g) shall not apply in respect of an assignment or transfer made in the ordinary course of the primary syndication of the Facility.

(h)     Each New Lender, by executing the relevant Transfer Certificate or Assignment Agreement, confirms, for the avoidance of doubt, that the Facility Agent has authority to execute on its behalf any amendment or waiver that has been approved by or on behalf of the requisite Lender or Lenders in accordance with this Agreement on or prior to the date on which the transfer or assignment becomes effective in accordance with this Agreement and that it is bound by that decision to the same extent as the Existing Lender would have been had it remained a Lender.

## 30.3    Assignment or transfer fee

The New Lender shall, on the date upon which an assignment or transfer takes effect, pay to the Facility Agent (for its own account) a fee of US$5,000.

## 30.4    Limitation of responsibility of Existing Lenders

(a)     Unless expressly agreed to the contrary, an Existing Lender makes no representation or warranty and assumes no responsibility to a New Lender for:

   (i)     the legality, validity, effectiveness, adequacy or enforceability of the Finance Documents, the Transaction Security or any other documents;

   (ii)    the financial condition of any Transaction Obligor;

   (iii)   the performance and observance by any Transaction Obligor of its obligations under the Finance Documents or any other documents; or

   (iv)    the accuracy of any statements (whether written or oral) made in or in connection with any Finance Document or any other document,

and any representations or warranties implied by law are excluded.

(b)     Each New Lender confirms to the Existing Lender and the other Finance Parties and the Secured Parties that it:

   (i)     has made (and shall continue to make) its own independent investigation and assessment of the financial condition and affairs of each Transaction Obligor and its related entities in connection with its participation in this Agreement and has not relied exclusively on any information provided to it by the Existing Lender or any

other Finance Party in connection with any Finance Document or the Transaction Security; and

(ii)     will continue to make its own independent appraisal of the creditworthiness of each Transaction Obligor and its related entities throughout the Security Period.

(c)     Nothing in any Finance Document obliges an Existing Lender to:

(i)     accept a re-transfer or re-assignment from a New Lender of any of the rights and obligations assigned or transferred under this Clause 30 (*Changes to the Lenders*); or

(ii)     support any losses directly or indirectly incurred by the New Lender by reason of the non-performance by any Transaction Obligor of its obligations under the Finance Documents or otherwise.

**30.5     Procedure for transfer**

(a)     Subject to the conditions set out in Clause 30.2 (*Conditions of assignment or transfer*), a transfer is effected in accordance with paragraph (c) below when the Facility Agent executes an otherwise duly completed Transfer Certificate delivered to it by the Existing Lender and the New Lender.  The Facility Agent shall, subject to paragraph (b) below as soon as reasonably practicable after receipt by it of a duly completed Transfer Certificate appearing on its face to comply with this Agreement and delivered in accordance with this Agreement, execute that Transfer Certificate.

(b)     The Facility Agent shall only be obliged to execute a Transfer Certificate delivered to it by the Existing Lender and the New Lender once it is satisfied it has complied with all necessary "know your customer" or other similar checks under all applicable laws and regulations in relation to the transfer to such New Lender.

(c)     Subject to Clause 30.9 (*Pro rata interest settlement*), on the Transfer Date:

(i)     to the extent that in the Transfer Certificate the Existing Lender seeks to transfer by novation its rights and obligations under the Finance Documents and in respect of the Transaction Security, each of the Obligors and the Existing Lender shall be released from further obligations towards one another under the Finance Documents and in respect of the Transaction Security and their respective rights against one another under the Finance Documents and in respect of the Transaction Security shall be cancelled (being the "**Discharged Rights and Obligations**");

(ii)     each of the Obligors and the New Lender shall assume obligations towards one another and/or acquire rights against one another which differ from the Discharged Rights and Obligations only insofar as that Obligor and the New Lender have assumed and/or acquired the same in place of that Obligor and the Existing Lender;

(iii)     the Facility Agent, the Security Agent, the New Lender and other Lenders shall acquire the same rights and assume the same obligations between themselves and in respect of the Transaction Security as they would have acquired and assumed had the New Lender been an Original Lender with the rights and/or obligations acquired or assumed by it as a result of the transfer and to that extent the Facility Agent, the Security Agent and the Existing Lenders shall each be released from further obligations to each other under the Finance Documents; and

(iv)     the New Lender shall become a Party as a "Lender".

54148659v3

**30.6    Procedure for assignment**

(a)    Subject to the conditions set out in Clause 30.2 (*Conditions of assignment or transfer*) an assignment may be effected in accordance with paragraph (c) below when the Facility Agent executes an otherwise duly completed Assignment Agreement delivered to it by the Existing Lender and the New Lender.  The Facility Agent shall, subject to paragraph (b) below, as soon as reasonably practicable after receipt by it of a duly completed Assignment Agreement appearing on its face to comply with the terms of this Agreement and delivered in accordance with the terms of this Agreement, execute that Assignment Agreement.

(b)    The Facility Agent shall only be obliged to execute an Assignment Agreement delivered to it by the Existing Lender and the New Lender once it is satisfied it has complied with all necessary "know your customer" or other similar checks under all applicable laws and regulations in relation to the assignment to such New Lender.

(c)    Subject to Clause 30.9 (*Pro rata interest settlement*), on the Transfer Date:

(i)    the Existing Lender will assign absolutely to the New Lender its rights under the Finance Documents and in respect of the Transaction Security expressed to be the subject of the assignment in the Assignment Agreement;

(ii)    the Existing Lender will be released from the obligations (the "**Relevant Obligations**") expressed to be the subject of the release in the Assignment Agreement (and any corresponding obligations by which it is bound in respect of the Transaction Security); and

(iii)    the New Lender shall become a Party as a "Lender" and will be bound by obligations equivalent to the Relevant Obligations.

(d)    Lenders may utilise procedures other than those set out in this Clause 30.6 (*Procedure for assignment*) to assign their rights under the Finance Documents (but not, without the consent of the relevant Obligor or unless in accordance with Clause 30.5 (*Procedure for transfer*), to obtain a release by that Obligor from the obligations owed to that Obligor by the Lenders nor the assumption of equivalent obligations by a New Lender) **provided that** they comply with the conditions set out in Clause 30.2 (*Conditions of assignment or transfer*).

**30.7    Copy of Transfer Certificate or Assignment Agreement to Borrowers**

The Facility Agent shall, as soon as reasonably practicable after it has executed a Transfer Certificate or an Assignment Agreement, send to the Borrowers a copy of that Transfer Certificate or Assignment Agreement.

**30.8    Security over Lenders' rights**

In addition to the other rights provided to Lenders under this Clause 30 (*Changes to the Lenders*), each Lender may without consulting with or obtaining consent from any Obligor, at any time charge, assign or otherwise create Security in or over (whether by way of collateral or otherwise) all or any of its rights under any Finance Document to secure obligations of that Lender including, without limitation:

(a)    any charge, assignment or other Security to secure obligations to a federal reserve or central bank; and

(b)    in the case of any Lender which is a fund, any charge, assignment or other Security granted to any holders (or trustee or representatives of holders) of obligations owed, or securities issued, by that Lender as security for those obligations or securities,

54148659v3

except that no such charge, assignment or Security shall:

(i)    release a Lender from any of its obligations under the Finance Documents or substitute the beneficiary of the relevant charge, assignment or Security for the Lender as a party to any of the Finance Documents; or

(ii)   require any payments to be made by an Obligor other than or in excess of, or grant to any person any more extensive rights than, those required to be made or granted to the relevant Lender under the Finance Documents.

**30.9    Pro rata interest settlement**

If the Facility Agent has notified the Lenders that it is able to distribute interest payments on a "*pro rata* basis" to Existing Lenders and New Lenders then (in respect of any transfer pursuant to Clause 30.5 (*Procedure for transfer*) or any assignment pursuant to Clause 30.6 (*Procedure for assignment*) the Transfer Date of which, in each case, is after the date of such notification and is not on the last day of an Interest Period):

(a)    any interest or fees in respect of the relevant participation which are expressed to accrue by reference to the lapse of time shall continue to accrue in favour of the Existing Lender up to but excluding the Transfer Date ("**Accrued Amounts**") and shall become due and payable to the Existing Lender (without further interest accruing on them) on the last day of the current Interest Period (or, if the Interest Period is longer than six Months, on the next of the dates which falls at six Monthly intervals after the first day of that Interest Period); and

(b)    The rights assigned or transferred by the Existing Lender will not include the right to the Accrued Amounts, so that, for the avoidance of doubt:

(i)    when the Accrued Amounts become payable, those Accrued Amounts will be payable to the Existing Lender; and

(ii)   the amount payable to the New Lender on that date will be the amount which would, but for the application of this Clause 30.9 (*Pro rata interest settlement*), have been payable to it on that date, but after deduction of the Accrued Amounts.]

**31    CHANGES TO THE OBLIGORS**

No Obligor may assign any of its rights or transfer any of its rights or obligations under the Finance Documents.

54148659v3

**SECTION 10**

**THE FINANCE PARTIES**

**32   THE FACILITY AGENT**

**32.1   Appointment of the Facility Agent**

(a)   Each other Finance Party appoints the Facility Agent to act as its agent under and in connection with the Finance Documents.

(b)   Each other Finance Party authorises the Facility Agent to exercise the rights, powers, authorities and discretions specifically given to the Facility Agent under, or in connection with, the Finance Documents together with any other incidental rights, powers, authorities and discretions.

**32.2   Duties of the Facility Agent**

(a)   Subject to paragraph (b) below, the Facility Agent shall promptly forward to a Party the original or a copy of any document which is delivered to the Facility Agent for that Party by any other Party.

(b)   Without prejudice to Clause 30.7 (*Copy of Transfer Certificate or Assignment Agreement to Borrowers*), paragraph (a) above shall not apply to any Transfer Certificate or to any Assignment Agreement.

(c)   Except where a Finance Document specifically provides otherwise, the Facility Agent is not obliged to review or check the adequacy, accuracy or completeness of any document it forwards to another Party.

(d)   If the Facility Agent receives notice from a Party referring to this Agreement, describing a Default and stating that the circumstance described is a Default, it shall promptly notify the Finance Parties.

(e)   If the Facility Agent is aware of the non-payment of any principal, interest, commitment fee or other fee payable to a Finance Party (other than the Facility Agent or the Security Agent) under this Agreement it shall promptly notify the other Finance Parties.

(f)   The Facility Agent's duties under the Finance Documents are solely mechanical and administrative in nature.

**32.3   No fiduciary duties**

(a)   The Facility Agent shall not have any duties or obligations to any person under the Finance Documents except to the extent that they are expressly set out in the Finance Documents.

(b)   The provisions of paragraph (a) above shall apply even if, notwithstanding and contrary to paragraph (a) above, any provision of this Agreement or any other Finance Document by operation of law has the effect of constituting the Facility Agent as a fiduciary.

(c)   Nothing in the Finance Documents constitutes the Facility Agent a trustee of any other person.

(d)   Neither the Facility Agent nor the Security Agent shall be bound to account to any Lender for any sum or the profit element of any sum received by it for its own account.

**32.4    Application of receipts**

Except as expressly stated to the contrary in any Finance Document, any moneys which the Facility Agent receives or recovers in its capacity as Facility Agent shall be applied by the Facility Agent in accordance with Clause 35.5 (*Application of receipts; partial payments*).

**32.5    Business with the Group**

The Facility Agent may accept deposits from, lend money to, and generally engage in any kind of banking or other business with, any member of the Group.

**32.6    Rights and discretions of the Facility Agent**

(a)    The Facility Agent may rely on:

    (i)    any representation, notice or document believed by it to be genuine, correct and appropriately authorised; and

    (ii)    any statement made by a director, authorised signatory or employee of any person regarding any matters which may reasonably be assumed to be within his knowledge or within his power to verify.

(b)    The Facility Agent may assume (unless it has received notice to the contrary in its capacity as agent for the Lenders) that:

    (i)    no Default has occurred (unless it has actual knowledge of a Default arising under Clause 29.2 (*Non-payment*));

    (ii)    any right, power, authority or discretion vested in any Party or the Majority Lenders has not been exercised; and

    (iii)    any notice or request made by any Borrower (other than a Utilisation Request or a Selection Notice) is made on behalf of and with the consent and knowledge of all the Obligors.

(c)    The Facility Agent may engage, pay for and rely on the advice or services of any lawyers, accountants, surveyors or other experts.

(d)    The Facility Agent may act in relation to the Finance Documents through its personnel and agents.

(e)    The Facility Agent may disclose to any other Party any information it reasonably believes it has received as agent under this Agreement.

(f)    Notwithstanding any other provision of any Finance Document to the contrary, the Facility Agent is not obliged to do or omit to do anything if it would or might, in its reasonable opinion, constitute a breach of any law or regulation or a breach of a fiduciary duty or duty of confidentiality.

**32.7    Majority Lenders' instructions**

(a)    Unless a contrary indication appears in a Finance Document, the Facility Agent shall:

    (i)    exercise any right, power, authority or discretion vested in it as Servicing Party in accordance with any instructions given to it by the Majority Lenders (or, if so instructed by the Majority Lenders, refrain from exercising any right, power, authority or discretion vested in it as a Servicing Party); and

(ii)     not be liable for any act (or omission) if it acts (or refrains from taking any action) in accordance with an instruction of the Majority Lenders.

(b)     Unless a contrary indication appears in a Finance Document, any instructions given by the Majority Lenders will be binding on all the Finance Parties.

(c)     The Facility Agent may refrain from acting in accordance with the instructions of the Majority Lenders (or, if appropriate, the Lenders) until it has received such security as it may require for any cost, loss or liability (together with any associated VAT) which it may incur in complying with the instructions.

(d)     In the absence of instructions from the Majority Lenders (or, if appropriate, the Lenders), the Facility Agent shall not be obliged to take any action (or refrain from taking action) (even if it considers acting or not acting to be in the best interests of the Lenders.  The Facility Agent may act (or refrain from taking action) as it considers to be in the best interest of the Lenders.

(e)     The Facility Agent is not authorised to act on behalf of a Lender or Hedge Counterparty (without first obtaining that Lender's or Hedge Counterparty's consent) in any legal or arbitration proceedings relating to any Finance Document.  This paragraph (e) shall not apply to any legal or arbitration proceedings relating to the perfection, preservation or protection of rights under the Transaction Security or Finance Documents creating Transaction Security.

## 32.8     Responsibility for documentation

Neither the Facility Agent:

(a)     is responsible for the adequacy, accuracy and/or completeness of any information (whether oral or written) supplied by the Facility Agent, a Transaction Obligor or any other person given in, or in connection with, any Transaction Document, or

(b)     is responsible for the legality, validity, effectiveness, adequacy or enforceability of any Transaction Document or the Transaction Security or any other agreement, arrangement or document entered into or made or executed in anticipation of, or in connection with, any Transaction Document or the Transaction Security; or

(c)     is responsible for any determination as to whether any information provided or to be provided to any Finance Party is non-public information the use of which may be regulated or prohibited by applicable law or regulation relating to insider dealing or otherwise.

## 32.9     Exclusion of liability

(a)     Without limiting paragraph (b) below (and without prejudice to the provisions of paragraph (e) of Clause 35.11 (*Disruption to Payment Systems etc.*)], the Facility Agent will not be liable (including, without limitation, for negligence, any loss of profits, goodwill, reputation, business opportunity or anticipated saving, or for special, punitive, indirect or consequential damages or any other category of liability whatsoever) for any action taken by it under or in connection with any Finance Document or the Transaction Security, unless directly caused by its gross negligence or wilful misconduct.

(b)     No Party other than the Facility Agent may take any proceedings against any officer, employee or agent of the Facility Agent in respect of any claim it might have against the Facility Agent or in respect of any act or omission of any kind by that officer, employee or agent in relation to any Finance Document and each officer, employee or agent of the Facility Agent may rely on this Clause subject to Clause 1.5 (*Third party rights*) and the provisions of the Third Parties Act.

54148659v3

(c)     The Facility Agent will not be liable for any delay (or any related consequences) in crediting an account with an amount required under the Finance Documents to be paid by it if it has taken all necessary steps as soon as reasonably practicable to comply with the regulations or operating procedures of any recognised clearing or settlement system used by it for that purpose.

(d)     Nothing in this Agreement shall oblige the Facility Agent to carry out any "know your customer" or other checks in relation to any person on behalf of any Lender and each Lender confirms to the Facility Agent that it is solely responsible for any such checks it is required to carry out and that it may not rely on any statement in relation to such checks made by the Facility Agent.

**32.10   Lenders' indemnity to the Facility Agent**

Each Lender shall (in proportion to its share of the Total Commitments or, if the Total Commitments are then zero, to its share of the Total Commitments immediately prior to their reduction to zero) indemnify the Facility Agent, within three Business Days of demand, against any cost, loss or liability (including, without limitation, for negligence or any other category of liability whatsoever) incurred by the Facility Agent (otherwise than by reason of its gross negligence or wilful misconduct) (or, in the case of any cost, loss or liability pursuant to Clause 35.11 (*Disruption to Payment Systems etc.*) notwithstanding the Facility Agent's negligence, gross negligence or any other category of liability whatsoever but not including any claim based on the fraud of the Facility Agent) in acting as Facility Agent under the Finance Documents (unless the Facility Agent has been reimbursed by an Obligor pursuant to a Finance Document).

**32.11   Resignation of the Facility Agent**

(a)     The Facility Agent may resign and appoint one of its Affiliates acting through an office as successor by giving notice to the other Finance Parties and the Borrowers.

(b)     Alternatively, the Facility Agent may resign by giving 30 days' notice to the other Finance Parties and the Borrowers, in which case the Majority Lenders may (in consultation with the Borrowers) appoint a successor Facility Agent.

(c)     If the Majority Lenders have not appointed a successor Facility Agent in accordance with paragraph (b) above within 20 days after notice of resignation was given, the retiring Facility Agent may appoint a successor Facility Agent.

(d)     The retiring Facility Agent shall, at its own cost, make available to the successor Facility Agent such documents and records and provide such assistance as the successor Facility Agent may reasonably request for the purposes of performing its functions Facility Agent under the Finance Documents.

(e)     The Facility Agent's resignation notice shall only take effect upon the appointment of a successor.

(f)     Upon the appointment of a successor, the retiring Facility Agent shall be discharged from any further obligation in respect of the Finance Documents but shall remain entitled to the benefit of this Clause 32 (*The Facility Agent*) and any other provisions of a Finance Document which are expressed to limit or exclude its liability in acting as Facility Agent.  Any successor and each of the other Parties shall have the same rights and obligations amongst themselves as they would have had if such successor had been an original Party.

(g)     The Majority Lenders may, by notice to the Facility Agent, require it to resign in accordance with paragraph (b) above.  In this event, the Facility Agent shall resign in accordance with paragraph (b) above.

54148659v3

(h)     The consent of any Borrower (or any other Obligor) is not required for an assignment or transfer of rights and/or obligations by the Facility Agent.

**32.12    Confidentiality**

(a)     In acting as Facility Agent for the Finance Parties, the Facility Agent shall be regarded as acting through its agency division which shall be treated as a separate entity from any other of its divisions or departments.

(b)     If information is received by a division or department of the Facility Agent other than that division or department responsible for complying with the obligations assumed by it under the Finance Documents, that information may be treated as confidential to that division or department, and the Facility Agent shall not be deemed to have notice of it nor shall it be obliged to disclose such information to any Party.

**32.13    Relationship with the Lenders**

(a)     Subject to Clause 30.9 (*Pro rata interest settlement*), the Facility Agent may treat the person shown in its records as Lender or Hedge Counterparty at the opening of business (in the place of the Facility Agent's principal office as notified to the Finance Parties from time to time) as the Lender acting through its Facility Office or, as the case may be, the Hedge Counterparty:

(i)     entitled to or liable for any payment due under any Finance Document on that day; and

(ii)    entitled to receive and act upon any notice, request, document or communication or make any decision or determination under any Finance Document made or delivered on that day,

unless it has received not less than five Business Days' prior notice from that Lender or Hedge Counterparty to the contrary in accordance with the terms of this Agreement.

(b)     Each Lender and each Hedge Counterparty shall supply the Facility Agent with any information that the Security Agent may reasonably specify (through the Facility Agent) as being necessary or desirable to enable the Security Agent to perform its functions as Security Agent.  Each Lender and Hedge Counterparty shall deal with the Security Agent exclusively through the Facility Agent and shall not deal directly with the Security Agent.

(c)     Any Lender may by notice to the Facility Agent appoint a person to receive on its behalf all notices, communications, information and documents to be made or despatched to that Lender under the Finance Documents.  Such notice shall contain the address, fax number and (where communication by electronic mail or other electronic means is permitted under Clause 37.5 (*Electronic communication*)) electronic mail address and/or any other information required to enable the sending and receipt of information by that means (and, in each case, the department or officer, if any, for whose attention communication is to be made) and be treated as notification of a substitute address, fax number, electronic mail address, department and officer by that Lender for the purposes of Clause 37.2 (*Addresses*) and sub-paragraph (ii) of paragraph (a) of Clause 37.5 (*Electronic communication*) and the Facility Agent shall be entitled to treat such person as the person entitled to receive all such notices, communications, information and documents as though that person were that Lender.

**32.14    Credit appraisal by the Lenders**

Without affecting the responsibility of any Transaction Obligor for information supplied by it or on its behalf in connection with any Finance Document, each Lender and Hedge Counterparty confirms to the Facility Agent that it has been, and will continue to be, solely

responsible for making its own independent appraisal and investigation of all risks arising under, or in connection with, any Finance Document including but not limited to:

(a)     the financial condition, status and nature of each member of the Group;

(b)     the legality, validity, effectiveness, adequacy or enforceability of any Finance Document and the Transaction Security and any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Finance Document or the Transaction Security;

(c)     whether that Lender has recourse, and the nature and extent of that recourse, against any Party or any of its respective assets under, or in connection with, any Finance Document or the Transaction Security, the transactions contemplated by the Finance Documents or any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Finance Document;

(d)     the adequacy, accuracy and/or completeness of any information provided by the Facility Agent, any Party or by any other person under, or in connection with, any Finance Document, the transactions contemplated by the Finance Documents or any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Finance Document; and

(e)     the right or title of any person in or to or the value or sufficiency of any part of the Charged Property, the priority of any of the Transaction Security or the existence of any Security affecting the Charged Property.

**32.15   Reference Banks**

If a Reference Bank (or, if a Reference Bank is not a Lender, the Lender of which it is an Affiliate) ceases to be a Lender, the Facility Agent shall (in consultation with the Borrowers) appoint another Lender or an Affiliate of a Lender to replace that Reference Bank.

**32.16   Deduction from amounts payable by the Facility Agent**

If any Party owes an amount to the Facility Agent under the Finance Documents, the Facility Agent may, after giving notice to that Party, deduct an amount not exceeding that amount from any payment to that Party which the Facility Agent would otherwise be obliged to make under the Finance Documents and apply the amount deducted in or towards satisfaction of the amount owed.  For the purposes of the Finance Documents that Party shall be regarded as having received any amount so deducted.

**32.17   Full freedom to enter into transactions**

Notwithstanding any rule of law or equity to the contrary, the Facility Agent shall be absolutely entitled:

(a)     to enter into and arrange banking, derivative, investment and/or other transactions of every kind with or affecting any Transaction Obligor or any person who is party to, or referred to in, a Finance Document (including, but not limited to, any interest or currency swap or other transaction, whether related to this Agreement or not, and acting as syndicate agent and/or security agent for, and/or participating in, other facilities to such Transaction Obligor or any person who is party to, or referred to in, a Finance Document);

(b)     to deal in and enter into and arrange transactions relating to:

(i)     any securities issued or to be issued by any Transaction Obligor or any other person; or

(ii)     any options or other derivatives in connection with such securities; and

(c)     to provide advice or other services to any Borrower or any person who is a party to, or referred to in, a Finance Document,

and, in particular, the Facility Agent shall be absolutely entitled, in proposing, evaluating, negotiating, entering into and arranging all such transactions and in connection with all other matters covered by paragraphs (a), (b) and (c) above, to use (subject only to insider dealing legislation) any information or opportunity, howsoever acquired by it, to pursue its own interests exclusively, to refrain from disclosing such dealings, transactions or other matters or any information acquired in connection with them and to retain for its sole benefit all profits and benefits derived from the dealings transactions or other matters.

## 33      THE SECURITY AGENT

### 33.1    Trust

(a)     The Security Agent declares that it shall hold the Security Property on trust for the Secured Parties on the terms contained in this Agreement and shall deal with the Security Property in accordance with this Clause 33 (*The Security Agent*) and the other provisions of the Finance Documents.

(b)     Each of the parties to this Agreement agrees that the Security Agent shall have only those duties, obligations and responsibilities expressly specified in this Agreement or in the Finance Documents (and no others shall be implied).

(c)     The Security Agent shall not have any liability to any person in respect of its duties, obligations and responsibilities under this Agreement or the other Finance Documents except as expressly set out in paragraph (a) of Clause 33.1 (*Trust*) and as excluded or limited by this Clause 33 (*The Security Agent*) including in particular Clause 33.8 (*Instructions to Security Agent and exercise of discretion*), Clause 33.13 (*Responsibility for documentation*), Clause 33.14 (*Exclusion of liability*). Clause 33.16 (*Lenders' indemnity to the Security Agent*), Clause 33.23 *(Business with Obligors)* and Clause 33.29 (*Full freedom to enter into transactions*).

### 33.2    Parallel Debt (Covenant to pay the Security Agent)

(a)     Each Obligor irrevocably and unconditionally undertakes to pay to the Security Agent its Parallel Debt which shall be amounts equal to, and in the currency or currencies of, its Corresponding Debt.

(b)     The Parallel Debt of an Obligor:

(i)      shall become due and payable at the same time as its Corresponding Debt;

(ii)     is independent and separate from, and without prejudice to, its Corresponding Debt.

(c)     For purposes of this Clause 33.2 (*Parallel Debt (Covenant to pay the Security Agent)*), the Security Agent:

(i)      is the independent and separate creditor of each Parallel Debt;

(ii)     acts in its own name and not as agent, representative or trustee of the Finance Parties and its claims in respect of each Parallel Debt shall not be held on trust; and

(iii)    shall have the independent and separate right to demand payment of each Parallel Debt in its own name (including, without limitation, through any suit, execution,

enforcement of security, recovery of guarantees and applications for and voting in any kind of insolvency proceeding).

(d)    The Parallel Debt of an Obligor shall be:

(i)    decreased to the extent that its Corresponding Debt has been irrevocably and unconditionally paid or discharged; and

(ii)    increased to the extent that its Corresponding Debt has increased,

and the Corresponding Debt of an Obligor shall be:

(A)    decreased to the extent that its Parallel Debt has been irrevocably and unconditionally paid or discharged; and

(B)    increased to the extent that its Parallel Debt has increased,

in each case provided that the Parallel Debt of an Obligor shall never exceed its Corresponding Debt.

(e)    All amounts received or recovered by the Security Agent in connection with this Clause 33.2 (*Parallel Debt (Covenant to pay the Security Agent)*) to the extent permitted by applicable law, shall be applied in accordance with Clause 35.5 (*Application of receipts; partial payments*).

(f)    This Clause 33.2 (*Parallel Debt (Covenant to pay the Security Agent)*) shall apply, with any necessary modifications, to each Finance Document.

### 33.3    No independent power

The Secured Parties shall not have any independent power to enforce, or have recourse to, any of the Transaction Security or to exercise any rights or powers arising under the Finance Documents creating the Transaction Security except through the Security Agent.

### 33.4    Application of receipts

(a)    Except as expressly stated to the contrary in any Finance Document, any moneys which the Security Agent receives or recovers and which are, or are attributable to, Security Property (for the purposes of this Clause 33 (*The Security Agent*), the "**Recoveries**") shall be transferred to the Facility Agent for application in accordance with Clause 35.5 (*Application of receipts; partial payments*) .

(b)    Paragraph (a) above is without prejudice to the rights of the Security Agent, each Receiver and each Delegate:

(i)    under Clause 14.6 (*Indemnity to the Security Agent*) to be indemnified out of the Charged Property; and

(ii)    under any Finance Document to credit any moneys received or recovered by it to any suspense account.

(c)    Any transfer by the Security Agent to the Facility Agent in accordance with paragraph (a) above shall be a good discharge, to the extent of that payment, by the Security Agent.

(d)    The Security Agent is under no obligation to make the payments to the Facility Agent under paragraph (a) of this Clause 33.4 (*Application of receipts*) in the same currency as that in which the obligations and liabilities owing to the relevant Finance Party are denominated.

**33.5    Deductions from receipts**

(a)    Before transferring any moneys to the Facility Agent under Clause 33.4 (*Application of receipts*), the Security Agent may, in its discretion:

    (i)    deduct any sum then due and payable under this Agreement or any other Finance Documents to the Security Agent or any Receiver or Delegate and retain that sum for itself or, as the case may require, pay it to another person to whom it is then due and payable;

    (ii)    set aside by way of reserve amounts required to meet, and to make and pay, any deductions and withholdings (on account of Taxes or otherwise) which it is or may be required by any applicable law to make from any distribution or payment made by it under this Agreement; and

    (iii)    pay all Taxes which may be assessed against it in respect of any of the Security Property, or as a consequence of performing its duties, or by virtue of its capacity as Security Agent under any of the Finance Documents or otherwise (other than in connection with its remuneration for performing its duties under this Agreement).

(b)    For the purposes of sub-paragraph (i) of paragraph (a) above, if the Security Agent has become entitled to require a sum to be paid to it on demand, that sum shall be treated as due and payable, even if no demand has yet been served.

**33.6    Prospective liabilities**

Following acceleration of any of the Transaction Security, the Security Agent may, in its discretion, or at the request of the Facility Agent, hold any Recoveries in an interest bearing suspense or impersonal account(s) in the name of the Security Agent with such financial institution (including itself) and for so long as the Security Agent shall think fit (the interest being credited to the relevant account) for later payment to the Facility Agent for application in accordance with Clause 35.5 (*Application of receipts; partial payments*) in respect of:

(a)    any sum to the Security Agent, any Receiver or any Delegate; and

(b)    any part of the Secured Liabilities,

that the Security Agent or, in the case of paragraph (b) only, the Facility Agent, reasonably considers, in each case, might become due or owing at any time in the future.

**33.7    Investment of proceeds**

Prior to the payment of the proceeds of the Recoveries to the Facility Agent for application in accordance with Clause 35.5 (*Application of receipts; partial payments*) the Security Agent may, in its discretion, hold all or part of those proceeds in an interest bearing suspense or impersonal account(s) in the name of the Security Agent with such financial institution (including itself) and for so long as the Security Agent shall think fit (the interest being credited to the relevant account) pending the payment from time to time of those moneys in the Security Agent's discretion in accordance with the provisions of this Clause 33.7 (*Investment of proceeds*).

**33.8    Instructions to Security Agent and exercise of discretion**

(a)    Subject to paragraph (d) below, the Security Agent shall act in accordance with any instructions given to it by the Facility Agent (acting on the instructions of the Majority Lenders or all the Lenders (as appropriate)) or, if so instructed by the Facility Agent (acting on the instructions of the Majority Lenders or all the Lenders (as appropriate)), refrain from

exercising any right, power, authority or discretion vested in it as Security Agent and shall be entitled to assume that:

(i)    any instructions received by it from the Facility Agent (acting on the instructions of the Majority Lenders or all the Lenders (as appropriate)) are duly given in accordance with the terms of the Finance Documents; and

(ii)    unless it has received actual notice of revocation, that those instructions or directions have not been revoked.

(b)    The Security Agent shall be entitled to request instructions, or clarification of any direction, from the Facility Agent (acting on the instructions of the Majority Lenders or all the Lenders (as appropriate)) as to whether, and in what manner, it should exercise or refrain from exercising any rights, powers, authorities and discretions and the Security Agent may refrain from acting unless and until those instructions or clarification are received by it.

(c)    Any instructions given to the Security Agent by the Facility Agent (acting on the instructions of the Majority Lenders or all the Lenders (as appropriate)) shall override any conflicting instructions given by any other Party.

(d)    Paragraph (a) above shall not apply:

(i)    where a contrary indication appears in this Agreement;

(ii)    where this Agreement requires the Security Agent to act in a specified manner or to take a specified action;

(iii)    in respect of any provision which protects the Security Agent's own position in its personal capacity as opposed to its role of Security Agent for the Secured Parties including, without limitation, the provisions set out in Clauses 33.10 (*Security Agent's discretions*) to Clause 33.29 (*Full freedom to enter into transactions*); and

(iv)    in respect of the exercise of the Security Agent's discretion to exercise a right, power or authority under any of Clause 33.5 (*Deductions from receipts*) and Clause 33.6 (*Prospective liabilities*).

### 33.9   Security Agent's Actions

Without prejudice to the provisions of Clause 33.4 (*Application of receipts*), the Security Agent may (but shall not be obliged to), in the absence of any instructions to the contrary, take such action in the exercise of any of its powers and duties under the Finance Documents as it considers in its discretion to be appropriate.

### 33.10   Security Agent's discretions

(a)    The Security Agent may:

(i)    assume (unless it has received actual notice to the contrary from the Facility Agent) that (i) no Default has occurred and no Obligor is in breach of or default under its obligations under any of the Finance Documents and (ii) any right, power, authority or discretion vested by any Finance Document in any person has not been exercised;

(ii)    any notice or request made by any Borrower (other than the Utilisation Request or a Selection Notice) is made on behalf of and with the consent and knowledge of all the Obligors;

(iii)   if it receives any instructions or directions to take any action in relation to the Transaction Security, assume that all applicable conditions under the Finance Documents for taking that action have been satisfied;

(iv)   engage, pay for and rely on the advice or services of any legal advisers, accountants, tax advisers, surveyors or other experts (whether obtained by the Security Agent or by any other Secured Party) whose advice or services may at any time seem necessary, expedient or desirable;

(v)    act in relation to the Finance Documents through its personnel and agents;

(vi)   disclose to any other Party any information it reasonably believes it has received as security agent under this Agreement;

(vii)  rely upon any communication or document believed by it to be genuine and, as to any matters of fact which might reasonably be expected to be within the knowledge of a Secured Party or an Obligor, upon a certificate signed by or on behalf of that person; and

(viii) refrain from acting in accordance with the instructions of any Party (including bringing any legal action or proceeding arising out of or in connection with the Finance Documents) until it has received any indemnification and/or security that it may in its discretion require (whether by way of payment in advance or otherwise) for all costs, losses and liabilities which it may incur in so acting.

(b)    Notwithstanding any other provision of any Finance Document to the contrary, the Security Agent is not obliged to do or omit to do anything if it would or might, in its reasonable opinion, constitute a breach of any law or regulation or a breach of a fiduciary duty or duty of confidentiality.

### 33.11   Security Agent's obligations

The Security Agent shall promptly:

(a)    copy to the Facility Agent the contents of any notice or document received by it from any Obligor under any Finance Document;

(b)    forward to a Party the original or a copy of any document which is delivered to the Security Agent for that Party by any other Party provided that, except where a Finance Document expressly provides otherwise, the Security Agent is not obliged to review or check the adequacy, accuracy or completeness of any document it forwards to another Party; and

(c)    inform the Facility Agent of the occurrence of any Default or any default by a Debtor in the due performance of or compliance with its obligations under any Finance Document of which the Security Agent has received notice from any other party to this Agreement.

### 33.12   Excluded obligations

Notwithstanding anything to the contrary expressed or implied in the Finance Documents, the Security Agent shall not:

(a)    be bound to enquire as to (i) whether or not any Default has occurred or (ii) the performance, default or any breach by a Transaction Obligor of its obligations under any of the Finance Documents;

(b)    be bound to account to any other Party for any sum or the profit element of any sum received by it for its own account;

(c)    be bound to disclose to any other person (including but not limited to any Secured Party) (i) any confidential information or (ii) any other information if disclosure would, or might in its reasonable opinion, constitute a breach of any law or be a breach of fiduciary duty;

(d)    have or be deemed to have any relationship of trust or agency with, any Obligor.

**33.13    Responsibility for documentation**

None of the Security Agent, any Receiver nor any Delegate shall accept responsibility or be liable for:

(a)    the adequacy, accuracy or completeness of any information (whether oral or written) supplied by the Security Agent or any other person in or in connection with any Finance Document or the transactions contemplated in the Finance Documents, or any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Finance Document;

(b)    the legality, validity, effectiveness, adequacy or enforceability of any Finance Document, the Security Property or any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Finance Document or the Security Property;

(c)    any losses to any person or any liability arising as a result of taking or refraining from taking any action in relation to any of the Finance Documents, the Security Property or otherwise, whether in accordance with an instruction from the Facility Agent or otherwise unless directly caused by its gross negligence or wilful misconduct;

(d)    the exercise of, or the failure to exercise, any judgment, discretion or power given to it by or in connection with any of the Finance Documents, the Security Property or any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with, the Finance Documents or the Security Property; or

(e)    any shortfall which arises on the enforcement or realisation of the Security Property.

**33.14    Exclusion of liability**

(a)    Without limiting Clause 33.15 (*No proceedings*), none of the Security Agent, any Receiver or any Delegate will be liable for any action taken by it or not taken by it under or in connection with any Finance Document or the Transaction Security, unless directly caused by its gross negligence or wilful misconduct.

(b)    The Security Agent will not be liable for any delay (or any related consequences) in crediting an account with an amount required under the Finance Documents to be paid by it if it has taken all necessary steps as soon as reasonably practicable to comply with the regulations or operating procedures of any recognised clearing or settlement system used by it for that purpose.

(c)    Nothing in this Agreement shall oblige the Security Agent to carry out any "know your customer" or other checks in relation to any person on behalf of any Lender and each Lender confirms to the Security Agent that it is solely responsible for any such checks it is required to carry out and that it may not rely on any statement in relation to such checks made by the Security Agent.

**33.15    No proceedings**

No Party (other than the Security Agent, that Receiver or that Delegate) may take any proceedings against any officer, employee or agent of the Security Agent, a Receiver or a Delegate in respect of any claim it might have against the Security Agent, a Receiver or a

Delegate or in respect of any act or omission of any kind by that officer, employee or agent in relation to any Finance Document or any Security Property and any officer, employee or agent of the Security Agent, a Receiver or a Delegate may rely on this Clause subject to Clause 1.5 (*Third party rights*) and the provisions of the Third Parties Rights Act.

## 33.16 Lenders' indemnity to the Security Agent

Each Lender shall (in proportion to its share of the Total Commitments or, if the Total Commitments are then zero, to its share of the Total Commitments immediately prior to their reduction to zero) indemnify the Security Agent and every Receiver and every Delegate, within three Business Days of demand, against any cost, loss or liability incurred by any of them (otherwise than by reason of the relevant Security Agent's, Receiver's or Delegate's gross negligence or wilful misconduct) in acting as Security Agent, Receiver or Delegate under the Finance Documents (unless the relevant Security Agent, Receiver or Delegate has been reimbursed by a Transaction Obligor pursuant to a Finance Document).

## 33.17 Own responsibility

Without affecting the responsibility of any Transaction Obligor for information supplied by it or on its behalf in connection with any Finance Document, each Secured Party confirms to the Security Agent that it has been, and will continue to be, solely responsible for making its own independent appraisal and investigation of all risks arising under or in connection with any Finance Document including but not limited to:

(a)     the financial condition, status and nature of each Transaction Obligor;

(b)     the legality, validity, effectiveness, adequacy and enforceability of any Finance Document, the Security Property and any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Finance Document or the Security Property;

(c)     whether that Secured Party has recourse, and the nature and extent of that recourse, against any Party or any of its respective assets under or in connection with any Finance Document, the Security Property, the transactions contemplated by the Finance Documents or any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Finance Document or the Security Property;

(d)     the adequacy, accuracy and/or completeness of any information provided by the Security Agent or by any other person under or in connection with any Finance Document, the transactions contemplated by any Finance Document or any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Finance Document; and

(e)     the right or title of any person in or to, or the value or sufficiency of any part of the Charged Property, the priority of any of the Transaction Security or the existence of any Security affecting the Charged Property,

and each Secured Party warrants to the Security Agent that it has not relied on and will not at any time rely on the Security Agent in respect of any of these matters.

## 33.18 No responsibility to perfect Transaction Security

The Security Agent shall not be liable for any failure to:

(a)     require the deposit with it of any deed or document certifying, representing or constituting the title of any Transaction Obligor to any of the Charged Property;

(b)     obtain any licence, consent or other authority for the execution, delivery, legality, validity, enforceability or admissibility in evidence of any of the Finance Documents or the Transaction Security;

(c)     register, file or record or otherwise protect any of the Transaction Security (or the priority of any of the Transaction Security) under any applicable laws in any jurisdiction or to give notice to any person of the execution of any of the Finance Documents or of the Transaction Security;

(d)     take, or to require any of the Transaction Obligors to take, any steps to perfect its title to any of the Charged Property or to render the Transaction Security effective or to secure the creation of any ancillary Security under the laws of any jurisdiction; or

(e)     require any further assurances in relation to any of the Finance Documents creating the Transaction Security.

**33.19    Insurance by Security Agent**

(a)     The Security Agent shall not be under any obligation to insure any of the Charged Property, to require any other person to maintain any insurance or to verify any obligation to arrange or maintain insurance contained in the Finance Documents.  The Security Agent shall not be responsible for any loss which may be suffered by any person as a result of the lack of or inadequacy of any such insurance.

(b)     Where the Security Agent is named on any insurance policy as an insured party, it shall not be responsible for any loss which may be suffered by reason of, directly or indirectly, its failure to notify the insurers of any material fact relating to the risk assumed by such insurers or any other information of any kind, unless the Facility Agent shall have requested it to do so in writing and the Security Agent shall have failed to do so within 14 days after receipt of that request.

**33.20    Custodians and nominees**

The Security Agent may appoint and pay any person to act as a custodian or nominee on any terms in relation to any assets of the trust as the Security Agent may determine, including for the purpose of depositing with a custodian this Agreement or any document relating to the trust created under this Agreement and the Security Agent shall not be responsible for any loss, liability, expense, demand, cost, claim or proceedings incurred by reason of the misconduct, omission or default on the part of any person appointed by it under this Agreement or be bound to supervise the proceedings or acts of any person.

**33.21    Acceptance of title**

The Security Agent shall be entitled to accept without enquiry, and shall not be obliged to investigate, any right and title that any of the Transaction Obligors may have to any of the Charged Property and shall not be liable for or bound to require any Transaction Obligor to remedy any defect in its right or title.

**33.22    Refrain from illegality**

Notwithstanding anything to the contrary expressed or implied in the Finance Documents, the Security Agent may refrain from doing anything which in its opinion will or may be contrary to any relevant law, directive or regulation of any jurisdiction and the Security Agent may do anything which is, in its opinion, necessary to comply with any such law, directive or regulation.

**33.23   Business with Transaction Obligor**

The Security Agent may accept deposits from, lend money to, and generally engage in any kind of banking or other business with, any Transaction Obligor.

**33.24   Winding up of trust**

If the Security Agent, with the approval of the Facility Agent determines that (a) all of the Secured Liabilities and all other obligations secured by the Finance Documents creating the Transaction Security have been fully and finally discharged and (b) none of the Secured Parties is under any commitment, obligation or liability (actual or contingent) to make advances or provide other financial accommodation to any Obligor pursuant to the Finance Documents:

(a)   the trusts set out in this Agreement shall be wound up and the Security Agent shall release, without recourse or warranty, all of the Transaction Security and the rights of the Security Agent under each of the Finance Documents creating the Transaction Security; and

(b)   any Retiring Security Agent shall release, without recourse or warranty, all of its rights under each of the Finance Documents creating the Transaction Security.

**33.25   Perpetuity period**

The trusts constituted by this Agreement are governed by English law and the perpetuity period under the rule against perpetuities, if applicable to this Agreement, shall be the period of 125 years from the date of this Agreement.

**33.26   Powers supplemental**

The rights, powers and discretions conferred upon the Security Agent by this Agreement shall be supplemental to the Trustee Act 1925 and the Trustee Act 2000 and in addition to any which may be vested in the Security Agent by general law or otherwise.

**33.27   Trustee division separate**

(a)   In acting as trustee for the Secured Parties, the Security Agent shall be regarded as acting through its trustee division which shall be treated as a separate entity from any of its other divisions or departments.

(b)   If information is received by another division or department of the Security Agent, it may be treated as confidential to that division or department and the Security Agent shall not be deemed to have notice of it nor shall it be obliged to disclose such information to any Party.

**33.28   Disapplication**

In addition to its rights under or by virtue of this Agreement and the other Finance Documents, the Security Agent shall have all the rights conferred on a trustee by the Trustee Act 1925, the Trustee Delegation Act 1999, the Trustee Act 2000 and by general law or otherwise, provided that:

(a)   section 1 of the Trustee Act 2000 shall not apply to the duties of the Security Agent in relation to the trusts constituted by this Agreement and the other Finance Documents; and

(b)   where there are any inconsistencies between (i) the Trustee Acts 1925 and 2000 and (ii) the provisions of this Agreement and any other Finance Document, the provisions of this Agreement and any other Finance Document shall, to the extent allowed by law, prevail and, in the case of any inconsistency with the Trustee Act 2000, such provisions shall constitute a restriction or exclusion for the purposes of the Trustee Act 2000.

**33.29    Full freedom to enter into transactions**

Notwithstanding any rule of law or equity to the contrary, the Security Agent shall be absolutely entitled:

(a)    to enter into and arrange banking, derivative, investment and/or other transactions of every kind with or affecting any Transaction Obligor or any person who is party to, or referred to in, a Finance Document (including, but not limited to, any interest or currency swap or other transaction, whether related to this Agreement or not, and acting as syndicate agent and/or security agent for, and/or participating in, other facilities to such Transaction Obligor or any person who is party to, or referred to in, a Finance Document);

(b)    to deal in and enter into and arrange transactions relating to:

(i)    any securities issued or to be issued by any Transaction Obligor or any other person; or

(ii)    any options or other derivatives in connection with such securities; and

(c)    to provide advice or other services to any Borrower or any person who is a party to, or referred to in, a Finance Document,

and, in particular, each Servicing Party shall be absolutely entitled, in proposing, evaluating, negotiating, entering into and arranging all such transactions and in connection with all other matters covered by paragraphs (a), (b) and (c) above, to use (subject only to insider dealing legislation) any information or opportunity, howsoever acquired by it, to pursue its own interests exclusively, to refrain from disclosing such dealings, transactions or other matters or any information acquired in connection with them and to retain for its sole benefit all profits and benefits derived from the dealings transactions or other matters.

**33.30    Resignation of the Security Agent**

(a)    The Security Agent may resign and appoint one of its affiliates as successor by giving notice to the Borrowers and each Finance Party.

(b)    Alternatively the Security Agent may resign by giving notice to the other Parties in which case the Majority Lenders may (in consultation with the Borrowers) appoint a successor Security Agent.

(c)    If the Majority Lenders have not appointed a successor Security Agent in accordance with paragraph (b) above within 30 days after the notice of resignation was given, the Security Agent (after consultation with the Facility Agent) may appoint a successor Security Agent.

(d)    The retiring Security Agent (the "**Retiring Security Agent**") shall, at its own cost, make available to the successor Security Agent such documents and records and provide such assistance as the successor Security Agent may reasonably request for the purposes of performing its functions as Security Agent under the Finance Documents.

(e)    The Security Agent's resignation notice shall only take effect upon (i) the appointment of a successor and (ii) the transfer, by way of a document expressed as a deed, of all of the Security Property to that successor.

(f)    Upon the appointment of a successor, the Retiring Security Agent shall be discharged, by way of a document executed as a deed, from any further obligation in respect of the Finance Documents (other than its obligations under paragraph (b) of Clause 33.24 (*Winding up of trust*) and under paragraph (d) above) but shall, in respect of any act or omission by it whilst it was the Security Agent, remain entitled to the benefit of Clause 33 (*The Security Agent*),

Clause 14.6 (*Indemnity to the Security Agent*), Clause 33.16 (*Lenders' indemnity to the Security Agent*) and any other provisions of a Finance Document which are expressed to limit or exclude its liability in acting as Security Agent. Its successor and each of the other Parties shall have the same rights and obligations amongst themselves as they would have had if that successor had been an original Party.

(g)     The Majority Lenders may, by notice to the Security Agent, require it to resign in accordance with paragraph (b) above. In this event, the Security Agent shall resign in accordance with paragraph (b) above but the cost referred to in paragraph (d) above shall be for the account of the Borrowers.

(h)     The consent of any Borrower (or any other Obligor) is not required for an assignment or transfer of rights and/or obligations by the Security Agent.

**33.31    Delegation**

(a)     Each of the Security Agent, any Receiver and any Delegate may, at any time, delegate by power of attorney or otherwise to any person for any period, all or any of the rights, powers and discretions vested in it by any of the Finance Documents.

(b)     That delegation may be made upon any terms and conditions (including the power to sub delegate) and subject to any restrictions that the Security Agent, that Receiver or that Delegate (as the case may be) may, in its discretion, think fit in the interests of the Secured Parties and it shall not be bound to supervise, or be in any way responsible for any loss incurred by reason of any misconduct or default on the part of any such delegate or sub delegate.

**33.32    Additional Security Agents**

(a)     The Security Agent may at any time appoint (and subsequently remove) any person to act as a separate trustee or as a co-trustee jointly with it:

(i)      if it considers that appointment to be in the interests of the Secured Parties; or

(ii)     for the purposes of conforming to any legal requirements, restrictions or conditions which the Security Agent deems to be relevant; or

(iii)    for obtaining or enforcing any judgment in any jurisdiction,

and the Security Agent shall give prior notice to the Borrowers and the Facility Agent of that appointment.

(b)     Any person so appointed shall have the rights, powers and discretions (not exceeding those conferred on the Security Agent by this Agreement) and the duties and obligations that are conferred or imposed by the instrument of appointment.

(c)     The remuneration that the Security Agent may pay to that person, and any costs and expenses (together with any applicable VAT) incurred by that person in performing its functions pursuant to that appointment shall, for the purposes of this Agreement, be treated as costs and expenses incurred by the Security Agent.

**34      CONDUCT OF BUSINESS BY THE FINANCE PARTIES**

**34.1    General**

No provision of this Agreement will:

(a)     interfere with the right of any Finance Party to arrange its affairs (tax or otherwise) in whatever manner it thinks fit;

(b)     oblige any Finance Party to investigate or claim any credit, relief, remission or repayment available to it or the extent, order and manner of any claim; or

(c)     oblige any Finance Party to disclose any information relating to its affairs (tax or otherwise) or any computations in respect of Tax.

**34.2    Payments to Finance Parties**

If a Finance Party (a "**Recovering Finance Party**") receives or recovers any amount from an Obligor other than in accordance with Clause 35 (*Payment Mechanics*) (a "**Recovered Amount**") and applies that amount to a payment due to it under the Finance Documents then:

(a)     the Recovering Finance Party shall, within three Business Days, notify details of the receipt or recovery, to the Facility Agent;

(b)     the Facility Agent shall determine whether the receipt or recovery is in excess of the amount the Recovering Finance Party would have been paid had the receipt or recovery been received or made by the Facility Agent and distributed in accordance with Clause 35 (*Payment Mechanics*), without taking account of any Tax which would be imposed on the Facility Agent in relation to the receipt, recovery or distribution; and

(c)     the Recovering Finance Party shall, within three Business Days of demand by the Facility Agent, pay to the Facility Agent an amount (the "**Sharing Payment**") equal to such receipt or recovery less any amount which the Facility Agent determines may be retained by the Recovering Finance Party as its share of any payment to be made, in accordance with Clause 35.5 (*Application of receipts; partial payments*).

**34.3    Redistribution of payments**

The Facility Agent shall treat the Sharing Payment as if it had been paid by the relevant Obligor and distribute it among the Finance Parties (other than the Recovering Finance Party) (the "**Sharing Finance Parties**") in accordance with Clause 35.5 (*Application of receipts; partial payments*) towards the obligations of that Obligor to the Sharing Finance Parties.

**34.4    Recovering Finance Party 's rights**

On a distribution by the Facility Agent under Clause 34.3 (*Redistribution of payments*) of a payment received by a Recovering Finance Party from an Obligor, as between the relevant Obligor and the Recovering Finance Party, an amount of the Recovered Amount equal to the Sharing Payment will be treated as not having been paid by that Obligor.

**34.5    Reversal of redistribution**

If any part of the Sharing Payment received or recovered by a Recovering Finance Party becomes repayable and is repaid by that Recovering Finance Party, then:

(a)     each Sharing Finance Party shall, upon request of the Facility Agent, pay to the Facility Agent for the account of that Recovering Finance Party an amount equal to the appropriate part of its share of the Sharing Payment (together with an amount as is necessary to reimburse that Recovering Finance Party for its proportion of any interest on the Sharing Payment which that Recovering Finance Party is required to pay) (the "**Redistributed Amount**"); and

(b)    as between the relevant Obligor and each relevant Sharing Finance Party, an amount equal to the relevant Redistributed Amount will be treated as not having been paid by that Obligor.

**34.6    Exceptions**

(a)    This Clause 34.6 (*Exceptions*) shall not apply to the extent that the Recovering Finance Party would not, after making any payment pursuant to this Clause, have a valid and enforceable claim against the relevant Obligor.

(b)    A Recovering Finance Party is not obliged to share with any other Finance Party any amount which the Recovering Finance Party has received or recovered as a result of taking legal or arbitration proceedings, if:

(i)    it notified that other Finance Party of the legal or arbitration proceedings; and

(ii)    that other Finance Party had an opportunity to participate in those legal or arbitration proceedings but did not do so as soon as reasonably practicable having received notice and did not take separate legal or arbitration proceedings.

**SECTION 11**

**ADMINISTRATION**

**35      PAYMENT MECHANICS**

**35.1    Payments to the Facility Agent**

(a)    On each date on which an Obligor or a Lender is required to make a payment under a Finance Document, that Obligor or Lender shall make an amount equal to such payment available to the Facility Agent (unless a contrary indication appears in a Finance Document) for value on the due date at the time and in such funds specified by the Facility Agent as being customary at the time for settlement of transactions in the relevant currency in the place of payment.

(b)    Payment shall be made to such account in the principal financial centre of the country of that currency with such bank as the Facility Agent specifies.

**35.2    Distributions by the Facility Agent**

Each payment received by the Facility Agent under the Finance Documents for another Party shall, subject to Clause 35.3 (*Distributions to an Obligor*) and Clause 35.4 (*Clawback* ) be made available by the Facility Agent as soon as practicable after receipt to the Party entitled to receive payment in accordance with this Agreement (in the case of a Lender, for the account of its Facility Office), to such account as that Party may notify to the Facility Agent by not less than five Business Days' notice with a bank specified by that Party in the principal financial centre of the country of that currency or, in the case of the Loan, to such account of such person as may be specified by the Borrowers in the Utilisation Request.

**35.3    Distributions to an Obligor**

The Facility Agent may (with the consent of the Obligor or in accordance with Clause 36 (*Set-Off*)) apply any amount received by it for that Obligor in or towards payment (on the date and in the currency and funds of receipt) of any amount due from that Obligor under the Finance Documents or in or towards purchase of any amount of any currency to be so applied.

**35.4    Clawback**

(a)    Where a sum is to be paid to the Facility Agent under the Finance Documents for another Party, the Facility Agent is not obliged to pay that sum to that other Party (or to enter into or perform any related exchange contract) until it has been able to establish to its satisfaction that it has actually received that sum.

(b)    if the Facility Agent pays an amount to another Party and it proves to be the case that the Facility Agent had not actually received that amount, then the Party to whom that amount (or the proceeds of any related exchange contract) was paid by the Facility Agent shall on demand refund the same to the Facility Agent together with interest on that amount from the date of payment to the date of receipt by the Facility Agent, calculated by the Facility Agent to reflect its cost of funds.

(c)    If the Facility Agent is willing to make available amounts for the account of the Borrowers before receiving funds from the Lenders then if and to the extent that the Facility Agent does so but it proves to be the case that it does not then receive funds from a Lender in respect of a sum which it paid to the Borrowers:

(i)     the Facility Agent shall notify the Borrowers of that Lender's identity and the Borrowers shall on demand refund it to the Facility Agent; and

(ii)    the Lender by whom those funds should have been made available or, if the Lender fails to do so, the Borrowers to whom that sum was made available, shall on demand pay to the Facility Agent the amount (as certified by the Facility Agent) which will indemnify the Facility Agent against any funding cost incurred by it as a result of paying out that sum before receiving those funds from that Lender.

**35.5    Application of receipts; partial payments**

(a)    Subject to paragraph (b) below and except as any Finance Document may otherwise provide, any payment that is received or recovered by any Finance Party under, in connection with, or pursuant to any Finance Document shall be paid to the Facility Agent which shall apply the same in the following order:

(i)     **first**, in or towards payment of any amounts then due and payable under any of the Finance Documents;

(ii)    **secondly**, in retention by the Security Agent of an amount equal to any amount not then payable under any Finance Document but which the Facility Agent, by notice to the Borrowers and the other Finance Parties, states in its opinion will or may become payable in the future and, upon those amounts becoming due and payable, in or towards satisfaction of them; and

(iii)   **thirdly**, any surplus shall be paid to the Borrowers or to any other person who appears to be entitled to it.

(b)    If the Facility Agent receives a payment that is insufficient to discharge all the amounts then due and payable by an Obligor under the Finance Documents, the Facility Agent shall apply that payment towards the obligations of that Obligor under the Finance Documents in the following order:

(i)     **first**, in or towards payment *pro rata* of any unpaid fees, costs and expenses of, and any other amounts owing to, the Facility Agent, the Security Agent, any Receiver and any Delegate under the Finance Documents;

(ii)    **secondly**, in or towards payment *pro rata* of:

(A)    any accrued interest and fees due but unpaid to the Lenders under this Agreement; and

(B)    any periodical payments (not being payments as a result of termination or closing out) due but unpaid to the Hedge Counterparties under the Hedging Agreements;

(iii)   **thirdly**, in or towards payment *pro rata* of:

(A)    any principal due but unpaid to the Lenders under this Agreement; and

(B)    any payments as a result of termination or closing out due but unpaid to the Hedge Counterparties under the Hedging Agreements; and

(iv)    **fourthly**, in or towards payment *pro rata* of any other sum due to any Finance Party but unpaid under the Finance Documents.

(c)    The Facility Agent shall, if so directed by the Majority Lenders and the Hedge Counterparties, vary the order set out in sub-paragraphs (ii) to (iv) of paragraph (b) above.

54148659v3

(d)     Paragraphs (a), (b) and (c) above will override any appropriation made by an Obligor.

**35.6    No set-off by Obligors**

(a)     All payments to be made by an Obligor under the Finance Documents shall be calculated and be made without (and free and clear of any deduction for) set-off or counterclaim.

(b)     Paragraph (a) above shall not affect the operation of any payment or close-out netting in respect of any amounts owing under any Hedging Agreement.

**35.7    Business Days**

(a)     Any payment which is due to be made on a day that is not a Business Day shall be made on the next Business Day in the same calendar month (if there is one) or the preceding Business Day (if there is not).

(b)     During any extension of the due date for payment of any principal or an Unpaid Sum under this Agreement interest is payable on the principal or Unpaid Sum at the rate payable on the original due date.

**35.8    Currency of account**

(a)     Subject to paragraphs (b) and (c) below, dollars is the currency of account and payment for any sum due from an Obligor under any Finance Document.

(b)     Each payment in respect of costs, expenses or Taxes shall be made in the currency in which the costs, expenses or Taxes are incurred.

(c)     Any amount expressed to be payable in a currency other than dollars shall be paid in that other currency.

**35.9    Change of currency**

(a)     Unless otherwise prohibited by law, if more than one currency or currency unit are at the same time recognised by the central bank of any country as the lawful currency of that country, then:

  (i)     any reference in the Finance Documents to, and any obligations arising under the Finance Documents in, the currency of that country shall be translated into, or paid in, the currency or currency unit of that country designated by the Facility Agent (after consultation with the Borrowers); and

  (ii)    any translation from one currency or currency unit to another shall be at the official rate of exchange recognised by the central bank for the conversion of that currency or currency unit into the other, rounded up or down by the Facility Agent (acting reasonably).

(b)     If a change in any currency of a country occurs, this Agreement will, to the extent the Facility Agent (acting reasonably and after consultation with the Borrowers) specifies to be necessary, be amended to comply with any generally accepted conventions and market practice in the London interbank market and otherwise to reflect the change in currency.

**35.10    Currency Conversion**

(a)     For the purpose of, or pending any payment to be made by any Servicing Party under any Finance Document, such Servicing Party may convert any moneys received or recovered by it from one currency to another, at a market rate of exchange.

(b)     The obligations of any Obligor to pay in the due currency shall only be satisfied to the extent of the amount of the due currency purchased after deducting the costs of conversion.

**35.11    Disruption to Payment Systems etc.**

If either the Facility Agent determines (in its discretion) that a Disruption Event has occurred or the Facility Agent is notified by a Borrower that a Disruption Event has occurred:

(a)     the Facility Agent may, and shall if requested to do so by a Borrower, consult with the Borrowers with a view to agreeing with the Borrowers such changes to the operation or administration of the Facility as the Facility Agent may deem necessary in the circumstances;

(b)     the Facility Agent shall not be obliged to consult with the Borrowers in relation to any changes mentioned in paragraph (a) above if, in its opinion, it is not practicable to do so in the circumstances and, in any event, shall have no obligation to agree to such changes;

(c)     the Facility Agent may consult with the Finance Parties in relation to any changes mentioned in paragraph (a) above but shall not be obliged to do so if, in its opinion, it is not practicable to do so in the circumstances;

(d)     any such changes agreed upon by the Facility Agent and the Borrowers shall (whether or not it is finally determined that a Disruption Event has occurred) be binding upon the Parties as an amendment to (or, as the case may be, waiver of) the terms of the Finance Documents notwithstanding the provisions of Clause 43 (*Amendments and Waivers*);

(e)     the Facility Agent shall not be liable for any damages, costs or losses to any person, any diminution in value or any liability whatsoever (including, without limitation for negligence, gross negligence or any other category of liability whatsoever but not including any claim based on the fraud of the Facility Agent) arising as a result of its taking, or failing to take, any actions pursuant to or in connection with this Clause 35.11 (*Disruption to Payment Systems etc.*); and

(f)     the Facility Agent shall notify the Finance Parties of all changes agreed pursuant to paragraph (d) above.

**36      SET-OFF**

After the occurrence of an Event of Default which is continuing, a Finance Party may set off any matured obligation due from an Obligor under the Finance Documents (to the extent beneficially owned by that Finance Party) against any matured obligation owed by that Finance Party to that Obligor, regardless of the place of payment, booking branch or currency of either obligation. If the obligations are in different currencies, the Finance Party may convert either obligation at a market rate of exchange in its usual course of business for the purpose of the set-off.

**37      NOTICES**

**37.1    Communications in writing**

Any communication to be made under or in connection with the Finance Documents shall be made in writing and, unless otherwise stated, may be made by email, fax or letter.

**37.2    Addresses**

The address and fax number (and the department or officer, if any, for whose attention the communication is to be made) of each Party for any communication or document to be made or delivered under or in connection with the Finance Documents are:

(a)     in the case of the Borrowers, that specified in Schedule 1 (*The Parties*);

(b)     in the case of each Lender, each Hedge Counterparty or any other Obligor, that specified in Schedule 1 (*The Parties*) or, if it becomes a Party after the date of this Agreement, that notified in writing to the Facility Agent on or before the date on which it becomes a Party;

(c)     in the case of the Facility Agent, that specified in Schedule 1 (*The Parties*); and

(d)     in the case of the Security Agent, that specified in Schedule 1 (*The Parties*),

or any substitute address, fax number or department or officer as the Party may notify to the Facility Agent (or the Facility Agent may notify to the other Parties, if a change is made by the Facility Agent) by not less than five Business Days' notice.

**37.3    Delivery**

(a)     Any communication or document made or delivered by one person to another under or in connection with the Finance Documents will only be effective:

(i)      if by way of fax, when received in legible form; or

(ii)     if by way of letter, when it has been left at the relevant address or five Business Days after being deposited in the post postage prepaid in an envelope addressed to it at that address,

and, if a particular department or officer is specified as part of its address details provided under Clause 37.2 (*Addresses*), if addressed to that department or officer.

(b)     Any communication or document to be made or delivered to a Servicing Party will be effective only when actually received by that Servicing Party and then only if it is expressly marked for the attention of the department or officer of that Servicing Party specified in Schedule 1 (*The Parties*) (or any substitute department or officer as that Servicing Party shall specify for this purpose).

(c)     All notices from or to an Obligor shall be sent through the Facility Agent unless otherwise specified in any Finance Document.

(d)     Any communication or document made or delivered to the Borrowers in accordance with this Clause will be deemed to have been made or delivered to each of the Obligors.

(e)     Any communication or document which becomes effective, in accordance with paragraphs (a) to (d) above, after 5.00 p.m. in the place of receipt shall be deemed only to become effective on the following day.

**37.4    Notification of address and fax number**

Promptly upon receipt of notification of an address and fax number or change of address or fax number pursuant to Clause 37.2 (*Addresses*) or changing its own address or fax number, the Facility Agent shall notify the other Parties.

**37.5    Electronic communication**

(a)     Any communication to be made between any two Parties under or in connection with the Finance Documents may be made by electronic mail or other electronic means, to the extent that those two Parties agree that, unless and until notified to the contrary, this is to be an accepted form of communication and if those two Parties:

(i)     notify each other in writing of their electronic mail address and/or any other information required to enable the sending and receipt of information by that means; and

(ii)    notify each other of any change to their address or any other such information supplied by them by not less than five Business Days' notice.

(b)     Any electronic communication made between those two Parties will be effective only when actually received in readable form and in the case of any electronic communication made by a Party to the Facility Agent only if it is addressed in such a manner as the Facility Agent shall specify for this purpose.

(c)     Any electronic communication which becomes effective, in accordance with paragraph (b) above, after 5.00 p.m. in the place of receipt shall be deemed only to become effective on the following day.

**37.6    English language**

(a)     Any notice given under or in connection with any Finance Document must be in English.

(b)     All other documents provided under or in connection with any Finance Document must be:

(i)     in English; or

(ii)    if not in English, and if so required by the Facility Agent, accompanied by a certified English translation prepared by a translator approved by the Facility Agent and, in this case, the English translation will prevail unless the document is a constitutional, statutory or other official document.

**37.7    Hedging Agreement**

Notwithstanding anything in Clause 1.1 (*Definitions*), references to the Finance Documents or a Finance Document in this clause do not include any Hedging Agreement entered into by a Borrower with the Hedge Counterparty in connection with the Facility.

**38      CALCULATIONS AND CERTIFICATES**

**38.1    Accounts**

In any litigation or arbitration proceedings arising out of or in connection with a Finance Document, the entries made in the accounts maintained by a Finance Party are *prima facie* evidence of the matters to which they relate.

**38.2    Certificates and determinations**

Any certification or determination by a Finance Party of a rate or amount under any Finance Document is, in the absence of manifest error, conclusive evidence of the matters to which it relates.

**38.3    Day count convention**

Any interest, commission or fee accruing under a Finance Document will accrue from day to day and is calculated on the basis of the actual number of days elapsed and a year of 360 days or, in any case where the practice in the Relevant Interbank Market differs, in accordance with that market practice.

**39    PARTIAL INVALIDITY**

If, at any time, any provision of the Finance Documents is or becomes illegal, invalid or unenforceable in any respect under any law of any jurisdiction, neither the legality, validity or enforceability of the remaining provisions under the law of that jurisdiction nor the legality, validity or enforceability of such provision under the law of any other jurisdiction will in any way be affected or impaired.

**40    REMEDIES AND WAIVERS**

No failure to exercise, nor any delay in exercising, on the part of any Secured Party, any right or remedy under the Finance Documents shall operate as a waiver of any such right or remedy or constitute an election to affirm any of the Finance Documents.  No election to affirm any of the Finance Documents on the part of a Secured Party shall be effective unless it is in writing.  No single or partial exercise of any right or remedy shall prevent any further or other exercise or the exercise of any other right or remedy.  The rights and remedies provided in this Agreement are cumulative and not exclusive of any rights or remedies provided by law.

**41    SETTLEMENT OR DISCHARGE CONDITIONAL**

Any settlement or discharge under any Finance Document between any Finance Party and any Obligor shall be conditional upon no security or payment to any Finance Party by any Obligor or any other person being set aside, adjusted or ordered to be repaid, whether under any insolvency law or otherwise.

**42    IRREVOCABLE PAYMENT**

If the Facility Agent considers that an amount paid or discharged by, or on behalf of, an Obligor or by any other person in purported payment or discharge of an obligation of that Obligor to a Finance Party under the Finance Documents is capable of being avoided or otherwise set aside on the liquidation or administration of that Obligor or otherwise, then that amount shall not be considered to have been unconditionally and irrevocably paid or discharged for the purposes of the Finance Documents.

**43    AMENDMENTS AND WAIVERS**

**43.1    Required consents**

(a)    Subject to Clause 43.2 (*All Lender matters*) and Clause 43.3 (*Other exceptions*) any term of the Finance Documents may be amended or waived only with the consent of the Majority Lenders and, in the case of an amendment, the Obligors and any such amendment or waiver will be binding on all Parties.

(b)    The Facility Agent may effect, on behalf of any Finance Party, any amendment or waiver permitted by this Clause 43 (*Amendments and Waivers*).

(c)    Without prejudice to the generality of Clause 32.6 (*Rights and discretions of the Facility Agent*) and Clause 33.10 (*Security Agent's discretions*), the Facility Agent may engage, pay for and rely on the services of lawyers in determining the consent level required for and effecting any amendment, waiver or consent under this Agreement.

**43.2    All Lender matters**

(a)    An amendment of or waiver or consent in relation to any term of any Finance Document that has the effect of changing or which relates to:

    (i)    the definition of "Majority Lenders" in Clause 1.1 (*Definitions*);

(ii)    a postponement to or extension of the date of payment of any amount under the Finance Documents;

(iii)    a reduction in the Margin or the amount of any payment of principal, interest, fees or commission payable;

(iv)    an increase in an extension of any Commitment or any requirement that a cancellation of Commitments reduces the Commitments of the Lenders rateably under the Facility;

(v)    a change to any Obligor;

(vi)    any provision which expressly requires the consent of all the Lenders;

(vii)    this Clause 43 (*Amendments and Waivers*);

(viii)    any change to the preamble (Background), Clause 2 (*The Facility*), Clause 3 (*Purpose*), Clause 5 (*Utilisation*), Clause 8 (*Interest*), Clause 28 (*Application of Earnings; Retention Accounts; Maintenance Reserve Accounts; BWTS Accounts*), Clause 30 (*Changes to the Lenders*), Clause 46 (*Governing Law*) or Clause 47 (*Enforcement*);

(ix)    any release of, or material variation to, any Transaction Security, guarantee, indemnity or subordination arrangement set out in a Finance Document (except in the case of a release of Transaction Security as it relates to the disposal of an asset which is the subject of the Transaction Security and where such disposal is expressly permitted by the Majority Lenders or otherwise under a Finance Document);

(x)    (other than as expressly permitted by the provisions of any Finance Document), the nature or scope of:

    (A)    the guarantees and indemnities granted under Clause 17 (*Guarantee and Indemnity – Parent Guarantor*), Clause 18 (*Guarantee and indemnity – collateral guarantor*), the joint and several liability of the Borrowers under Clause 19 (*Joint and Several Liability of the Borrowers*) and Clause 20 (*Guarantee and Indemnity – Hedge Guarantors*);

    (B)    the Charged Property; or

    (C)    the manner in which the proceeds of enforcement of the Transaction Security are distributed,

    (except in the case of sub-paragraphs (A) and (C) above, insofar as it relates to a sale or disposal of an asset which is the subject of the Transaction Security where such sale or disposal is expressly permitted under this Agreement or any other Finance Document); or

    (D)    permitted under any Finance Document; or

(xi)    the release of the guarantees and indemnities granted under Clause 17 (*Guarantee and Indemnity – Parent Guarantor*), 18 (*Guarantee and indemnity – collateral guarantor*) and Clause 20 (*Guarantee and Indemnity – Hedge Guarantors*) or of any Transaction Security unless permitted under this Agreement or any other Finance Document or relating to a sale or disposal of an asset which is the subject of the Transaction Security where such sale or disposal is expressly permitted under this Agreement or any other Finance Document; or

    54148659v3

(xii)    the manner in which the proceeds of enforcement of the Transaction Security are distributed,

shall not be made, or given, without the prior consent of all the Lenders.

**43.3    Other exceptions**

(a)    An amendment or waiver which relates to the rights or obligations of a Servicing Party (each in their capacity as such) may not be effected without the consent of that Servicing Party or, as the case may be.

(b)    An amendment or waiver which relates to the rights or obligations of a Hedge Counterparty (in its capacity as such) may not be effected without the consent of that Hedge Counterparty.

(c)    The Borrowers and the Facility Agent or the Security Agent, as applicable, may amend or waive a term of a Fee Letter to which they are party.

**44    CONFIDENTIALITY**

**44.1    Confidential Information**

Each Finance Party agrees to keep all Confidential Information confidential and not to disclose it to anyone, save to the extent permitted by Clause 44.2 (*Disclosure of Confidential Information*) and Clause 44.3 (*Disclosure to numbering service providers*)] and to ensure that all Confidential Information is protected with security measures and a degree of care that would apply to its own confidential information.

**44.2    Disclosure of Confidential Information**

Any Finance Party may disclose:

(a)    to any of its Affiliates and Related Funds and any of its or their officers, directors, employees, professional advisers, auditors, partners and Representatives such Confidential Information as that Finance Party shall consider appropriate if any person to whom the Confidential Information is to be given pursuant to this paragraph (a) is informed in writing of its confidential nature and that some or all of such Confidential Information may be price-sensitive information except that there shall be no such requirement to so inform if the recipient is subject to professional obligations to maintain the confidentiality of the information or is otherwise bound by requirements of confidentiality in relation to the Confidential Information;

(b)    to any person:

(i)    to (or through) whom it assigns or transfers (or may potentially assign or transfer) all or any of its rights and/or obligations under one or more Finance Documents or which succeeds (or which may potentially succeed) it as Facility Agent or Security Agent and, in each case, to any of that person's Affiliates, Related Funds, Representatives and professional advisers;

(ii)    with (or through) whom it enters into (or may potentially enter into), whether directly or indirectly, any sub-participation in relation to, or any other transaction under which payments are to be made or may be made by reference to, one or more Finance Documents and/or one or more Obligors and to any of that person's Affiliates, Related Funds, Representatives and professional advisers;

(iii)    appointed by any Finance Party or by a person to whom sub-paragraphs (i) or (ii) of paragraph (b) above applies to receive communications, notices, information or

54148659v3

documents delivered pursuant to the Finance Documents on its behalf (including, without limitation, any person appointed under paragraph (b) of Clause 32.13 (*Relationship with the Lenders*));

(iv)    who invests in or otherwise finances (or may potentially invest in or otherwise finance), directly or indirectly, any transaction referred to in sub-paragraph (i) or (ii) of paragraph (b) above;

(v)    to whom information is required or requested to be disclosed by any court of competent jurisdiction or any governmental, banking, taxation or other regulatory authority or similar body, the rules of any relevant stock exchange or pursuant to any applicable law or regulation;

(vi)    to whom information is required to be disclosed in connection with, and for the purposes of, any litigation, arbitrations, administrative or other investigations, proceedings or disputes;

(vii)    to whom or for whose benefit that Finance Party charges, assigns or otherwise creates Security (or may do so) pursuant to Clause 30.8 (*Security over Lenders' rights*)];

(viii)    who is a Party, a member of the Group or any related entity of an Obligor;

(ix)    as a result of the registration of any Finance Document as contemplated by any Finance Document or any legal opinion obtained in connection with any Finance Document; or

(x)    with the consent of the Parent Guarantor;

in each case, such Confidential Information as that Finance Party shall consider appropriate if:

(A)    in relation to sub-paragraphs (i), (ii) and (iii) of paragraph (b) above, the person to whom the Confidential Information is to be given has entered into a Confidentiality Undertaking except that there shall be no requirement for a Confidentiality Undertaking if the recipient is a professional adviser and is subject to professional obligations to maintain the confidentiality of the Confidential Information;

(B)    in relation to sub-paragraph (iv) of paragraph (b) above, the person to whom the Confidential Information is to be given has entered into a Confidentiality Undertaking or is otherwise bound by requirements of confidentiality in relation to the Confidential Information they receive and is informed that some or all of such Confidential Information may be price-sensitive information;

(C)    in relation to sub-paragraphs (v), (vi) and (vii) of paragraph (b) above, the person to whom the Confidential Information is to be given is informed of its confidential nature and that some or all of such Confidential Information may be price-sensitive information except that there shall be no requirement to so inform if, in the opinion of that Finance Party, it is not practicable so to do in the circumstances;

(c)    to any person appointed by that Finance Party or by a person to whom sub-paragraph (i) or (ii) of paragraph (b) above applies to provide administration or settlement services in respect of one or more of the Finance Documents including without limitation, in relation to the trading of participations in respect of the Finance Documents, such Confidential Information as may be required to be disclosed to enable such service provider to provide any of the

services referred to in this paragraph (c) if the service provider to whom the Confidential Information is to be given has entered in to a confidentiality agreement substantially in the form of the LMA Master Confidentiality Undertaking for Use With Administration/Settlement Service Providers or such other form of confidentiality undertaking agreed between the Borrowers and the relevant Finance Party;

(d)     to any rating agency (including its professional advisers) such Confidential Information as may be required to be disclosed to enable such rating agency to carry out its normal rating activities in relation to the Finance Documents and/or the Obligors if the rating agency to whom the Confidential Information is to be given is informed of its confidential nature and that some or all of such Confidential Information may be price-sensitive information.

**44.3    Disclosure to numbering service providers**

(a)     Any Finance Party may disclose to any national or international numbering service provider appointed by that Finance Party to provide identification numbering services in respect of this Agreement, the Facility and/or one or more Obligors the following information:

(i)      names of Obligors;

(ii)     country of domicile of Obligors;

(iii)    place of incorporation of Obligors;

(iv)    date of this Agreement;

(v)     the names of the Facility Agent;

(vi)    date of each amendment and restatement of this Agreement;

(vii)   amount of Total Commitments;

(viii)  currency of the Facility;

(ix)    type of Facility;

(x)     ranking of Facility;

(xi)    Termination Dates for the Facility;

(xii)   changes to any of the information previously supplied pursuant to sub-paragraphs (i) to (xi) above; and

(xiii)  such other information agreed between such Finance Party and the Borrowers,

to enable such numbering service provider to provide its usual syndicated loan numbering identification services.

(b)     The Parties acknowledge and agree that each identification number assigned to this Agreement, the Facility and/or one or more Obligors by a numbering service provider and the information associated with each such number may be disclosed to users of its services in accordance with the standard terms and conditions of that numbering service provider.

(c)     Each Obligor represents that none of the information set out in sub-paragraphs (i) to (xiii) of paragraph (a) above is, nor will at any time be, unpublished price-sensitive information.

(d)     The Facility Agent shall notify the Parent Guarantor and the other Finance Parties of:

54148659v3

(i)    the name of any numbering service provider appointed by the Facility Agent in respect of this Agreement, the Facility and/or one or more Obligors; and

(ii)    the number or, as the case may be, numbers assigned to this Agreement, the Facility and/or one or more Obligors by such numbering service provider.

**44.4    Entire agreement**

This Clause 44 (*Confidentiality*) constitutes the entire agreement between the Parties in relation to the obligations of the Finance Parties under the Finance Documents regarding Confidential Information and supersedes any previous agreement, whether express or implied, regarding Confidential Information.

**44.5    Inside information**

Each of the Finance Parties acknowledges that some or all of the Confidential Information is or may be price-sensitive information and that the use of such information may be regulated or prohibited by applicable legislation including securities law relating to insider dealing and market abuse and each of the Finance Parties undertakes not to use any Confidential Information for any unlawful purpose.

**44.6    Notification of disclosure**

Each of the Finance Parties agrees (to the extent permitted by law and regulation) to inform the Borrowers:

(a)    of the circumstances of any disclosure of Confidential Information made pursuant to sub-paragraph (v) of paragraph (b) of Clause 44.2 (*Disclosure of Confidential Information*) except where such disclosure is made to any of the persons referred to in that paragraph during the ordinary course of its supervisory or regulatory function; and

(b)    upon becoming aware that Confidential Information has been disclosed in breach of this Clause 44 (*Confidentiality*).

**44.7    Continuing obligations**

The obligations in this 44 (*Confidentiality*) are continuing and, in particular, shall survive and remain binding on each Finance Party for a period of 12 months from the earlier of:

(a)    the date on which all amounts payable by the Obligors under or in connection with this Agreement have been paid in full and all Commitments have been cancelled or otherwise cease to be available; and

(b)    the date on which such Finance Party otherwise ceases to be a Finance Party.

**45    COUNTERPARTS**

Each Finance Document may be executed in any number of counterparts, and this has the same effect as if the signatures on the counterparts were on a single copy of the Finance Document.

54148659v3

**SECTION 12**

**GOVERNING LAW AND ENFORCEMENT**

**46    GOVERNING LAW**

This Agreement and any non-contractual obligations arising out of or in connection with it are governed by English law.

**47    ENFORCEMENT**

**47.1    Jurisdiction**

(a)    The courts of England have exclusive jurisdiction to settle any dispute arising out of or in connection with this Agreement (including a dispute regarding the existence, validity or termination of this Agreement or any non-contractual obligation arising out of or in connection with this Agreement) (a "**Dispute**").

(b)    The Obligors accept that the courts of England are the most appropriate and convenient courts to settle Disputes and accordingly no Obligor will argue to the contrary.

(c)    This Clause 47.1 (*Jurisdiction*) is for the benefit of the Secured Parties only.  As a result, no Secured Party shall be prevented from taking proceedings relating to a Dispute in any other courts with jurisdiction.  To the extent allowed by law, the Secured Parties may take concurrent proceedings in any number of jurisdictions.

**47.2    Service of process**

(a)    Without prejudice to any other mode of service allowed under any relevant law, each Obligor:

(i)    irrevocably appoints TLT LLP at its registered office for the time being at 20 Gresham Street, London EC2V 7JE, England as its agent for service of process in relation to any proceedings before the English courts in connection with any Finance Document; and

(ii)    agrees that failure by a process agent to notify the relevant Obligor of the process will not invalidate the proceedings concerned.

(b)    If any person appointed as an agent for service of process is unable for any reason to act as agent for service of process, the Borrowers (on behalf of all the Obligors) must immediately (and in any event within 5 days of such event taking place) appoint another agent on terms acceptable to the Facility Agent.  Failing this, the Facility Agent may appoint another agent for this purpose.

**48    PATRIOT ACT NOTICE**

**48.1    PATRIOT Act Notice**

Each of the Facility Agent and the Lenders hereby notifies the Borrowers that pursuant to the requirements of the PATRIOT Act and the policies and practices of the Facility Agent and each Lender, the Facility Agent and each of the Lenders is required to obtain, verify and record certain information and documentation that identifies each Transaction Obligor, which information includes the name and address of each Transaction Obligor and such other information that will allow the Facility Agent and each of the Lenders to identify each Transaction Obligor in accordance with the PATRIOT Act.

This Agreement has been entered into on the date stated at the beginning of this Agreement.

SCHEDULE 1

THE PARTIES

PART A

THE OBLIGORS

| Name of Borrower | Place of Incorporation | Address for Communication |
| --- | --- | --- |
| BRAZEN SHIPPING & TRADING S.A. | Liberia | c/o Phoenix Shipping and Trading S.A. 47-49 Akti Miaouli 185 36 Piraeus, Greece Fax: +30 213 3333429 |
| DASHING SHIPPING & TRADING S.A. | Liberia | c/o Phoenix Shipping and Trading S.A. 47-49 Akti Miaouli 185 36 Piraeus, Greece Fax: +30 213 3333429 |
| Name of Collateral Guarantor VIGOROUS SHIPPING & TRADING S.A. | Liberia | c/o Phoenix Shipping and Trading S.A. 47-49 Akti Miaouli 185 36 Piraeus, Greece Fax: +30 213 3333429 |

| Name of Parent Guarantor | Place of Incorporation | Address for Communication |
| --- | --- | --- |
| Blue Wall Shipping Limited | Republic of the Marshall Islands | c/o Phoenix Shipping and Trading S.A. 47-49 Akti Miaouli 185 36 Piraeus, Greece Fax: +30 213 3333429 |

| Name of Hedge Guarantor | Place of Incorporation | Address for Communication |
| --- | --- | --- |
| BRAZEN SHIPPING & TRADING S.A. | Liberia | c/o Phoenix Shipping and Trading S.A. 47-49 Akti Miaouli 185 36 Piraeus, Greece Fax: +30 213 3333429 |

54148659v3

| DASHING SHIPPING & TRADING S.A. | Liberia | c/o Phoenix Shipping and Trading S.A. 47-49 Akti Miaouli 185 36 Piraeus, Greece Fax: +30 213 3333429 |

## PART B

### THE ORIGINAL LENDERS

| Name of Original Lender | Commitment | Address for Communication |
|---|---|---|
| CIT Finance LLC | US$24,150,000 | 11 West 42nd Street New York New York 10036 USA |
| | | Facsimile: +1 (212) 461 5402 Email: maritime_compliance@CIT.com |
| | | Attention: Chief Legal Counsel, Transportation Finance |

### THE HEDGE COUNTERPARTIES

| Name of Hedge Counterparty | Address for Communication |
|---|---|
| CIT Finance LLC | 11 West 42nd Street New York New York 10036 USA |
| | Facsimile: +1 (212) 461 5402 |
| | Attention: Chief Legal Counsel, Transportation Finance |

54148659v3

**PART C**

**THE SERVICING PARTIES**

| Name of Facility Agent | Address for Communication |
|---|---|
| CIT Finance LLC | 11 West 42nd Street<br>New York<br>New York 10036<br>USA<br><br>Facsimile: +1 (212) 461 5402<br><br>Attention: Chief Legal Counsel, Transportation Finance<br><br>Email: maritime_compliance@CIT.com |

| Name of Security Agent | Address for Communication |
|---|---|
| CIT Finance LLC | 11 West 42nd Street<br>New York<br>New York 10036<br>USA<br><br>Facsimile: +1 (212) 461 5402<br><br>Attention: Chief Legal Counsel, Transportation Finance<br>Email: maritime_compliance@CIT.com |

**SCHEDULE 2**

**CONDITIONS PRECEDENT**

**PART A**

**CONDITIONS PRECEDENT TO INITIAL UTILISATION REQUEST**

1    **Obligors**

1.1    A copy of the constitutional documents of each Obligor.

1.2    A copy of a resolution of the board of directors of each Obligor:

(a)    approving the terms of, and the transactions contemplated by, the Finance Documents to which it is a party and resolving that it execute the Finance Documents to which it is a party;

(b)    authorising a specified person or persons to execute the Finance Documents to which it is a party on its behalf; and

(c)    authorising a specified person or persons, on its behalf, to sign and/or despatch all documents and notices (including, if relevant, a Utilisation Request and each Selection Notice) to be signed and/or despatched by it under, or in connection with, the Finance Documents to which it is a party.

1.3    An original of the power of attorney of any Obligor authorising a specified person or persons to execute the Finance Documents to which it is a party.

1.4    A specimen of the signature of each person authorised by the resolution referred to in paragraph 1.2 above.

1.5    A copy of a resolution signed by the Parent Guarantor as the holder of the issued shares in each Borrower and the Collateral Guarantor, approving the terms of, and the transactions contemplated by, the Finance Documents to which that Borrower and the Collateral Guarantor is a party.

1.6    A certificate of each Obligor (signed by a director) confirming that borrowing or guaranteeing, as appropriate, the Total Commitments would not cause any borrowing, guaranteeing or similar limit binding on that Obligor to be exceeded.

1.7    A certificate of each Obligor that is incorporated outside the UK (signed by a director) certifying either that (i) it has not delivered particulars of any UK Establishment to the Registrar of Companies as required under the Overseas Regulations or (ii) it has a UK Establishment and specifying the name and registered number under which it is registered with the Registrar of Companies.

1.8    A certificate of an authorised signatory of the relevant Obligor certifying that each copy document relating to it specified in this Part A of Schedule 2 (*Conditions Precedent*) is correct, complete and in full force and effect as at a date no earlier than the date of this Agreement.

2    **Fee Letter, Hedging and Security**

2.1    A duly executed original of this Agreement, the Fee Letter, each Shares Security, the Hedging Agreement Assignment, any Subordination Agreement, any Subordinated Debt Security (and of each document to be delivered under each of them).

2.2     If applicable, copies of each Hedging Agreement executed by a Hedge Counterparty and the relevant Borrower.

**3       Legal opinions**

3.1     Legal opinions of the legal advisers to the Facility Agent and the Security Agent in the jurisdiction of England and Wales, Marshall Islands, Liberia and such other relevant jurisdictions as the Facility Agent may require.

**4       Other documents and evidence**

4.1     Copies of each Hedging Agreement executed by a Hedge Counterparty and the relevant Borrower.

4.2     Evidence that any process agent referred to in Clause 47.2 (*Service of process*), if not an Obligor, has accepted its appointment.

4.3     A copy of any other Authorisation or other document, opinion or assurance which the Facility Agent considers to be necessary in connection with the entry into and performance of the transactions contemplated by any Transaction Document, or for the validity and enforceability of any Transaction Document.

4.4     Confirmation from the Facility Agent that the capitalisation, corporate structure and ownership structure of the Borrowers, the Collateral Guarantor and the Parent Guarantor is acceptable to the Lenders.

4.5     Evidence that the requirements of Clause 23.7 (*Parent Guarantor's cash reserve* amount) have been complied with.

4.6     Such evidence as the Facility Agent may require for the Finance Parties to be able to satisfy each of their "know your customer", anti-money laundering or similar identification procedures (and of their PATRIOT ACT and OFAC compliance requirements) in relation to the transactions contemplated by the Finance Documents.

**PART B**

**CONDITIONS PRECEDENT TO UTILISATION**

1    **Borrowers**

A certificate of an authorised signatory of each Borrower certifying that each copy document which it is required to provide under this Part B of Schedule 2 (*Conditions Precedent*) is correct, complete and in full force and effect as at the Utilisation Date.

2    **Ship and other security**

2.1    A duly executed original of the Mortgage, the Deed of Covenant (if applicable) and the General Assignment, each Account Security and of any Charter Assignment in respect of the Ship which is related to that Tranche to which the Utilisation Request relates (the "**Relevant Ship**") and of each document to be delivered under or pursuant to each of them together with documentary evidence that the Mortgage in respect of that Relevant Ship has been duly registered as a valid first priority ship mortgage in accordance with the laws of the jurisdiction of its Approved Flag.

2.2    Documentary evidence that the Relevant Ship:

(a)    in respect of Ship A, has been unconditionally delivered by the Seller to, and accepted by, Borrower A under the Purchase Agreement and that the full purchase price payable and all other sums due to the Seller under that Purchase Agreement, other than the sums to be financed pursuant to the Utilisation of Tranche A, have been paid to the Seller;

(b)    is definitively and permanently registered in the name of the relevant Owner under the Approved Flag;

(c)    is in the absolute and unencumbered ownership of the relevant Owner save as contemplated by the Finance Documents;

(d)    maintains the Approved Classification with the Approved Classification Society free of all overdue recommendations and conditions of the Approved Classification Society; and

(e)    is insured in accordance with the provisions of this Agreement and all requirements in this Agreement in respect of insurances have been complied with.

2.3    Documents establishing that the Relevant Ship will be managed commercially by the Approved Commercial Manager and technically by the Approved Technical Manager on terms acceptable to the Facility Agent acting with the authorisation of all of the Lenders, together with:

(a)    a Manager's Undertaking for each of the Approved Technical Manager and the Approved Commercial Manager of the Relevant Ship; and

(b)    copies of the relevant Approved Technical Manager's Document of Compliance and of each Ship Safety Management Certificate (together with any other details of the applicable safety management system which the Facility Agent requires) and of any other documents required under the ISM Code and the ISPS Code in relation to the Relevant Ship including without limitation an ISSC.

2.4    An opinion from an independent insurance consultant acceptable to the Facility Agent on such matters relating to the Insurances as the Facility Agent may require.

2.5    Valuation of the Relevant Ship, addressed to the Facility Agent on behalf of the Finance Parties, stated to be for the purposes of this Agreement and dated not later than 45 days

before Utilisation from an Approved Valuer which shows a market value confirming that the Tranche to be drawdown is not more than 50 per cent. of the lesser of (i) the Initial Market Value and (ii) the Purchase Price (in respect of Ship A) and not more than 50 per cent. of the Initial Market Value (in respect of Ship B).

2.6     A survey report from an independent marine surveyor in respect of the physical condition of the Relevant Ship, in a form and substance satisfactory to the Facility Agent in its sole discretion.

2.7     If a Charter of the Relevant Ship exists on the Utilisation Date, a copy of that Charter.

2.8     An opinion from an independent technical consultant appointed by the Facility Agent at the Borrowers' or the Collateral Guarantor's (as the case may be) expense relating to the condition of the Relevant Ship.

**3        Legal opinions**

Legal opinions of the legal advisers to the Facility Agent and the Security Agent in the jurisdiction of the Approved Flag of the Relevant Ship and such other relevant jurisdictions as the Facility Agent may require.

**4        Other documents and evidence**

4.1     A copy of the Purchase Agreement (in the case of Ship A) and of all documents signed or issued by any party under or in connection with it.

4.2     In the case of Ship A, such documentary evidence as the Facility Agent and its legal advisers may require in relation to the due authorisation and execution of the Purchase Agreement by each of the parties thereto.

4.3     Receipt of the Borrowers' and the Collateral Guarantor's consolidated financial projections for the next five years in a form satisfactory to the Facility Agent presented on a quarterly basis for the first 12 months and on an annual basis thereafter.

4.4     In respect of Ship A, evidence of the breakdown of how the Tranche for the Relevant Ship will be applied to include the part financing of that Ship, and any fees, costs and expenses in each case to be approved by the Lenders.

4.5     Evidence that the Restricted Cash Reserve Amount for the Relevant Ship has been or will be credited to the Retention Account of the Owner which will own the Relevant Ship upon Utilisation and that (if the Relevant Ship is not on hire under a Charter) the Unrestricted Cash Reserve Amount for the Relevant Ship has been or will be credited to the Earnings Account of the Owner which will own the Relevant Ship upon Utilisation.

4.6     Evidence that the Accounts of the Owner which will own the Relevant Ship are fully opened and operational and that the Facility Agent has been added in the distribution list of the monthly statements of those Accounts.

4.7     The Original Financial Statements of the Parent Guarantor.

4.8     Evidence that the requirements of paragraph (a) of Clause 23.4 (*Liquidity Amounts*) in relation to the Relevant Ship have been complied with.

4.9     The Facility Agent is satisfied that there has been no event, development or circumstance that has had or could reasonably be expected to have a material adverse effect on the business, either Ship or other assets, liabilities (actual or contingent), operations, condition (financial or otherwise) or prospects of the Borrowers, the Collateral Guarantor, the Parent Guarantor and their respective members and subsidiaries (or any of them).

54148659v3

4.10    Evidence that the fees, costs and expenses then due from the Borrowers pursuant to Clause 11 (*Fees*) and Clause 16 (*Costs and Expenses*) have been paid or will be paid by the Utilisation Date.

4.11    In respect of Ship A, evidence acceptable to the Facility Agent and its legal advisers that the Seller has consented to the assignment of the warranties pursuant to clause 31 (*Warranty of the Vessel's quality*) of the MOA.

**SCHEDULE 3**

**REQUESTS**

**PART A**

**UTILISATION REQUEST**

From:   **BRAZEN SHIPPING & TRADING S.A. and
DASHING SHIPPING & TRADING S.A.**

To:      **CIT FINANCE LLC**

Dated:  [●] 2014

Dear Sirs

**BRAZEN SHIPPING & TRADING S.A. and DASHING SHIPPING & TRADING S.A. – US$24,150,000
Facility Agreement dated [●]  2014 (the "Agreement")**

1      We refer to the Agreement.  This is a Utilisation Request.  Terms defined in the Agreement
have the same meaning in this Utilisation Request unless given a different meaning in this
Utilisation Request.

2      We wish to borrow the Advance under Tranche [A][B] on the following terms:

Proposed Utilisation Date:          [●] (or, if that is not a Business Day, the next
Business Day)

Amount:                                     [●] or, if less, the Total Commitments

Interest Period for the first Tranche:     3 months

3      We confirm that each condition specified in Clause 4.1 (*Initial conditions precedent*) and
Clause 4.2 (*Further conditions precedent*) as they relate to the Advance to which this
utilisation request refers of the Agreement is satisfied on the date of this Utilisation Request.

4      The proceeds of this Advance should be credited to.

(a)     in respect of US$[●] being the commitment fee and the upfront fee to [account] of the
Facility Agent; and

(b)     [in respect of US$[●] to cover other expenses and reserves to [account]; and

(c)     In respect of US$[●] to [account].

54148659v3

5    This Utilisation Request is irrevocable.

Yours faithfully


[●]
authorised signatory for
**BRAZEN SHIPPING & TRADING S.A.**


[●]
authorised signatory for
**DASHING SHIPPING & TRADING S.A.**

54148659v3

**PART B**

**SELECTION NOTICE**

From:  **BRAZEN SHIPPING & TRADING S.A.  and**
       **DASHING SHIPPING & TRADING S.A.**

To:    **CIT FINANCE LLC**

Dated:  [●]2014

Dear Sirs

**BRAZEN SHIPPING & TRADING S.A. and DASHING SHIPPING & TRADING S.A. - US$24,150,000**
**Facility Agreement dated [●] (the "Agreement")**

1      We refer to the Agreement.  This is a Selection Notice.  Terms defined in the Agreement
       have the same meaning in this Selection Notice unless given a different meaning in this
       Selection Notice.

2      We request that, subject to paragraph (f) of Clause 9.1 (*Selection of Interest Periods*) of the
       Agreement, the next Interest Period for the Loan be [3 months].

3      This Selection Notice is irrevocable.

Yours faithfully

[●]
authorised signatory for
**BRAZEN SHIPPING & TRADING S.A.**

[●]
authorised signatory for
**DASHING SHIPPING & TRADING S.A.**

54148659v3

**SCHEDULE 4**

**FORM OF TRANSFER CERTIFICATE**

To:     CIT FINANCE LLC as Facility Agent

From:   [The Existing Lender] (the "**Existing Lender**") and [The New Lender] (the "**New Lender**")

Dated: [●]

Dear Sirs

**BRAZEN SHIPPING & TRADING S.A. and DASHING SHIPPING & TRADING S.A. – US$24,150,000**
**Facility Agreement dated [●] (the "Agreement")**

1       We refer to the Agreement.  This is a Transfer Certificate.  Terms defined in the Agreement have the same meaning in this Transfer Certificate unless given a different meaning in this Transfer Certificate.

2       We refer to Clause 30.5 (*Procedure for transfer*) of the Agreement:

(a)     The Existing Lender and the New Lender agree to the Existing Lender transferring to the New Lender by novation all of the Existing Lender's rights and obligations under the Agreement and the other Finance Documents which relate to that portion of the Existing Lender's Commitment and participation in the Loan under the Agreement as specified in the Schedule in accordance with Clause 30.5 (*Procedure for transfer*) of the Agreement.

(b)     The proposed Transfer Date is [●].

(c)     The Facility Office and address, fax number and attention details for notices of the New Lender for the purposes of Clause 37.2 (*Addresses*) of the Agreement are set out in the Schedule.

3       The New Lender expressly acknowledges the limitations on the Existing Lender's obligations set out in paragraph (c) of Clause 30.4 (*Limitation of responsibility of Existing Lenders*) of the Agreement.

4       This Transfer Certificate may be executed in any number of counterparts and this has the same effect as if the signatures on the counterparts were on a single copy of this Transfer Certificate.

5       This Transfer Certificate and any non-contractual obligations arising out of or in connection with it is governed by English law.

6       This Transfer Certificate has been entered into on the date stated at the beginning of this Transfer Certificate.

**Note: The execution of this Transfer Certificate may not transfer a proportionate share of the Existing Lender's interest in the Transaction Security in all jurisdictions.  It is the responsibility of the New Lender to ascertain whether any other documents or other formalities are required to perfect a transfer of such a share in the Existing Lender's Transaction Security in any jurisdiction and, if so, to arrange for execution of those documents and completion of those formalities.**

54148659v3

**THE SCHEDULE**

**Commitment/rights and obligations to be transferred**

**[insert relevant details]**

[Facility Office address, fax number and attention details

for notices and account details for payments.]

[Existing Lender]                                    [New Lender]

By: [●]                                              By: [●]

This Transfer Certificate is accepted by the Facility Agent and the Transfer Date is confirmed as [●].

[Facility Agent]

By: [●]

54148659v3

**SCHEDULE 5**

**FORM OF ASSIGNMENT AGREEMENT**

To:    CIT FINANCE LLC as Facility Agent and BRAZEN SHIPPING & TRADING S.A. and DASHING SHIPPING & TRADING S.A. as Borrowers, for and on behalf of each Obligor

From:   CIT FINANCE LLC (the "**Existing Lender**") and [the New Lender] (the "**New Lender**")

Dated: [●]

Dear Sirs

**BRAZEN SHIPPING & TRADING S.A. and DASHING SHIPPING & TRADING S.A. - US$24,150,000
Facility Agreement dated [●] (the "Agreement")**

1        We refer to the Agreement.  This is an Assignment Agreement.  Terms defined in the Agreement have the same meaning in this Assignment Agreement unless given a different meaning in this Assignment Agreement.

2        We refer to Clause 30.6 (*Procedure for assignment*):

(a)      The Existing Lender assigns absolutely to the New Lender all the rights of the Existing Lender under the Agreement, the other Finance Documents and in respect of the Transaction Security which correspond to that portion of the Existing Lender's Commitment and participations in the Loan under the Agreement as specified in the Schedule.

(b)      The Existing Lender is released from all the obligations of the Existing Lender which correspond to that portion of the Existing Lender's Commitments and participations in the Loan under the Agreement specified in the Schedule.

(c)      The New Lender becomes a Party as a Lender and is bound by obligations equivalent to those from which the Existing Lender is released under paragraph (b) above.

3        The proposed Transfer Date is [●].

4        On the Transfer Date the New Lender becomes Party to the Finance Documents as a Lender.

5        The Facility Office and address, fax, number and attention details for notices of the New Lender for the purposes of Clause 37.2 (*Addresses*) are set out in the Schedule.

6        The New Lender expressly acknowledges the limitations on the Existing Lender's obligations set out in paragraph (c) of Clause 30.4 (*Limitation of responsibility of Existing Lenders*).

7        This Assignment Agreement acts as notice to the Facility Agent (on behalf of each Finance Party) and, upon delivery in accordance with Clause 30.7 (*Copy of Transfer Certificate or Assignment Agreement to Borrowers*), to the Borrowers (on behalf of each Obligor) of the assignment referred to in this Assignment Agreement.

8        This Assignment Agreement may be executed in any number of counterparts and this has the same effect as if the signatures on the counterparts were on a single copy of this Assignment Agreement.

54148659v3

9        This Assignment Agreement and any non-contractual obligations arising out of or in connection with it are governed by English law.

10       This Assignment Agreement has been entered into on the date stated at the beginning of this Assignment Agreement.

**Note: The execution of this Assignment Agreement may not transfer a proportionate share of the Existing Lender's interest in the Transaction Security in all jurisdictions.  It is the responsibility of the New Lender to ascertain whether any other documents or other formalities are required to perfect a transfer of such a share in the Existing Lender's Transaction Security in any jurisdiction and, if so, to arrange for execution of those documents and completion of those formalities.**

54148659v3

**THE SCHEDULE**

**Commitment rights and obligations to be transferred by assignment, release and accession**

[insert relevant details]

[Facility office address, fax number and attention details for notices
and account details for payments]

[Existing Lender]                    [New Lender]

By: [●]                              By: [●]

This Assignment Agreement is accepted by the Facility Agent and the Transfer Date is confirmed as
[●].

Signature of this Assignment Agreement by the Facility Agent constitutes confirmation by the Facility
Agent of receipt of notice of the assignment referred to herein, which notice the Facility Agent
receives on behalf of each Finance Party.

[Facility Agent]

By:

54148659v3

**SCHEDULE 6**

**FORM OF BORROWERS' COMPLIANCE CERTIFICATE**

To:      CIT FINANCE LLC as Facility Agent

From:   BRAZEN SHIPPING & TRADING S.A. and DASHING SHIPPING & TRADING S.A. as Borrowers

Dated:  [●]

Dear Sirs

**BRAZEN SHIPPING & TRADING S.A. and DASHING SHIPPING & TRADING S.A. – US$24,150,000 Facility Agreement dated [●] 2014 (as amended from time to time, the "Agreement")**

The undersigned hereby certifies as follows:

1       We are directors of BRAZEN SHIPPING & TRADING S.A., DASHING SHIPPING & TRADING S.A. and VIGOROUS SHIPPING L& TRADING S.A.

2       We have reviewed the terms of the Agreement by and among BRAZEN SHIPPING & TRADING S.A. and DASHING SHIPPING & TRADING S.A. as joint and several borrowers, VIGOROUS SHIPPING & TRADING S.A. as collateral guarantor, Blue Wall Shipping Limited as Parent Guarantor, CIT Finance LLC, as Facility Agent and Security Agent and the banks and financial institutions listed therein as Lenders and Hedge Counterparties, and we have made, or have caused to be made under our supervision, a review in reasonable detail of the transactions and condition of the Obligors during the accounting period covered by the attached financial statements. Terms used but not otherwise defined herein shall have the meanings ascribed to them in the Agreement.

3       We hereby certify that the financial statements delivered with this Certificate (i) were prepared in accordance with IFRS consistently applied throughout the period covered thereby, and (ii) fairly present in all material respects the financial condition, results of operations and cash flows of the Borrowers and the Collateral Guarantor as of the date thereof and for the period covered thereby.

4       The examination described in paragraph 2 above did not disclose, and we have no knowledge of, the existence of any condition or event which constitutes an Event of Default or Default during or at the end of the accounting period covered by the attached financial statements or as of the date of this Certificate [,except as set forth in a separate attachment, if any, to this Certificate, describing in reasonable detail, the nature of the condition or event, the period during which it has existed and the action which the applicable Obligor has taken, is taking, or proposes to take with respect to each such condition or event].

5       [We hereby certify that the Borrowers and the Collateral Guarantor (as the case may be) are in compliance with Clause 23.2 (*Interest Coverage Ratio*), Clause 23.5 (*Restricted Cash Reserve Amount*), Clause 23.6 (*Unrestricted Cash Reserve Amount*) and Clause 27 (*Security Cover*) of the Agreement.

The foregoing certifications, together with the computations set forth in the Annex A-1 hereto and the financial statements delivered with this Certificate in support hereof, are made and delivered on [●] pursuant to Clause 22.3 (*Compliance Certificates*) of the Agreement.

for and on behalf of:

---------------------------------------------------

**BRAZEN SHIPPING & TRADING S.A.**
**DASHING SHIPPING & TRADING S.A.**
**VIGOROUS SHIPPING & TRADING S.A.**

54148659v3

By:
Name:
Title:

**ANNEX A-1**
**TO COMPLIANCE CERTIFICATE**
**INTEREST COVERAGE RATIO**
**FOR THE LATEST TWELVE MONTHS ENDING [mm/dd/yyyy]**

Date: _____ __, 20__

For the 12-month test period ended _____

(A)    Net Income =

(B)    Adjustments applicable under (b)(i) through (b)(v) under the definition of EBITDA =

(C)    Adjustments applicable under (c)(i) through (c)(vi) under the definition of EBITDA =

(D)    EBITDA: (A) minus (B) plus (C) =

(E)    Interest Expense =

(F)    Interest Coverage Ratio: (D) divided by (E) =

Compliance?
[Yes/No]

54148659v3

**SCHEDULE 7**

**FORM OF PARENT GUARANTOR'S COMPLIANCE CERTIFICATE**

To:     CIT FINANCE LLC as Facility Agent

From:   BLUE WALL SHIPPING LIMITED as Parent Guarantor

Dated: [●]

Dear Sirs

**BRAZEN SHIPPING & TRADING S.A. and DASHING SHIPPING & TRADING S.A. – US$24,150,000 Facility Agreement dated [●] 2014 (as amended from time to time, the "Agreement")**

The undersigned hereby certifies as follows:

1       I am a director of Blue Wall Shipping Limited.

2       I have reviewed the terms of the Agreement by and among BRAZEN SHIPPING & TRADING S.A. and DASHING SHIPPING & TRADING S.A. as joint and several borrowers, VIGOROUS SHIPPING & TRADING S.A. as collateral guarantor, Blue Wall Shipping Limited as Parent Guarantor, CIT Finance LLC, as Facility Agent and Security Agent and the banks and financial institutions listed therein as Lenders and Hedge Counterparties, and I have made, or have caused to be made under my supervision, a review in reasonable detail of the transactions and condition of the Obligors during the accounting period covered by the attached financial statements. Terms used but not otherwise defined herein shall have the meanings ascribed to them in the Agreement.

3       I hereby certify that the financial statements delivered with this Certificate (i) were prepared in accordance with IFRS consistently applied throughout the period covered thereby, and (ii) fairly present in all material respects the financial condition, results of operations and cash flows of the Parent Guarantor as of the date thereof and for the period covered thereby.

4       The examination described in paragraph 2 above did not disclose, and I have no knowledge of, the existence of any condition or event which constitutes an Event of Default or Default during or at the end of the accounting period covered by the attached financial statements or as of the date of this Certificate [,except as set forth in a separate attachment, if any, to this Certificate, describing in reasonable detail, the nature of the condition or event, the period during which it has existed and the action which the applicable Obligor has taken, is taking, or proposes to take with respect to each such condition or event].

5       I hereby certify that the Guarantor is in compliance with Clauses 23.3 (*Debt to Total Capitalization Ratio*) and 23.7 (*Parent Guarantor's cash reserve* amount) of the Agreement.

54148659v3

The foregoing certifications, together with the computations set forth in the Annex A-1 hereto and the financial statements delivered with this Certificate in support hereof, are made and delivered on [●] pursuant to Clause 22.3 (*Compliance Certificates*) of the Agreement.

for and on behalf of:

------------------------------------------------

**BLUE WALL SHIPPING LIMITED**

By:
Name:
Title:

54148659v3

**ANNEX A-1**
**TO COMPLIANCE CERTIFICATE**

By:
Name:
Title:

**DEBT TO TOTAL CAPITALISATION RATIO**
**FOR THE FISCAL QUARTER ENDING [mm/dd/yyyy]**

Date: _____ __, 20__

(A)     Financial Indebtedness =

(B)     Shareholder' Equity =

(C)     Total Capitalisation: (A) plus (B) =

(D)     Debt to Total Capitalisation Ratio: (A) divided by (C) =

**Compliance:**
**YES/NO**

54148659v3

## SCHEDULE 8

### TIMETABLES

| | |
|---|---|
| Delivery of a duly completed Utilisation Request (Clause 5.1 (*Delivery of a Utilisation Request*)) or a Selection Notice (Clause 9.1 (*Selection of Interest Periods*)) | Three Business Days before the intended Utilisation Date (Clause 5.1 (*Delivery of a Utilisation Request*)) or the expiry of the preceding Interest Period (Clause 9.1 (*Selection of Interest Periods*)) |
| Facility Agent notifies the Lenders of the Advance in accordance with Clause 5.4 (*Lenders' participation*) | Three Business Days before the intended Utilisation Date. |
| LIBOR is fixed | Quotation Day as of 11:00 am London time |

54148659v3

**EXECUTION PAGES**

**BORROWERS**

| | |
|---|---|
| **SIGNED** by | ) |
| duly authorised | ) |
| for and on behalf of | ) |
| **BRAZEN SHIPPING & TRADING S.A.** | ) |
| in the presence of: | ) |
| | |
| Witness' signature: | ) |
| Witness' name: | ) |
| Witness' address: | ) |

| | |
|---|---|
| **SIGNED** by | ) |
| duly authorised | ) |
| for and on behalf of | ) |
| **DASHING SHIPPING & TRADING S.A.** | ) |
| in the presence of: | ) |
| | |
| Witness' signature: | ) |
| Witness' name: | ) |
| Witness' address: | ) |

**HEDGING GUARANTORS**

| | |
|---|---|
| **SIGNED** by | ) |
| duly authorised | ) |
| for and on behalf of | ) |
| **BRAZEN SHIPPING & TRADING S.A.** | ) |
| in the presence of: | ) |
| | |
| Witness' signature: | ) |
| Witness' name: | ) |
| Witness' address: | ) |

| | |
|---|---|
| **SIGNED** by | ) |
| duly authorised | ) |
| for and on behalf of | ) |
| **DASHING SHIPPING & TRADING S.A.** | ) |
| in the presence of: | ) |
| | |
| Witness' signature: | ) |
| Witness' name: | ) |
| Witness' address: | ) |

54148659v3

**COLLATERAL GUARANTOR**

| | |
|---|---|
| **SIGNED** by | ) |
| duly authorised | ) |
| for and on behalf of | ) |
| **VIGOROUS SHIPPING & TRADING S.A.** | ) |
| in the presence of: | ) |
| | |
| Witness' signature: | ) |
| Witness' name: | ) |
| Witness' address: | ) |

**PARENT GUARANTOR**

| | |
|---|---|
| **SIGNED** by | ) |
| duly authorised | ) |
| for and on behalf of | ) |
| **BLUE WALL SHIPPING LIMITED** | ) |
| in the presence of: | ) |
| | |
| Witness' signature: | ) |
| Witness' name: | ) |
| Witness' address: | ) |

**ORIGINAL LENDERS**

| | |
|---|---|
| **SIGNED** by | ) |
| duly authorised | ) |
| for and on behalf of | ) |
| **CIT FINANCE LLC** | ) |
| in the presence of: | ) |
| | |
| Witness' signature: | ) |
| Witness' name: | ) |
| Witness' address: | ) |

**ORIGINAL HEDGE COUNTERPARTIES**

| | |
|---|---|
| **SIGNED** by | ) |
| duly authorised | ) |
| for and on behalf of | ) |
| **CIT FINANCE LLC** | ) |
| in the presence of: | ) |
| | |
| Witness' signature: | ) |
| Witness' name: | ) |
| Witness' address: | ) |

54148659v3

**FACILITY AGENT**

| | |
|---|---|
| **SIGNED** by | ) |
| duly authorised | ) |
| for and on behalf of | ) |
| **CIT FINANCE LLC** | ) |
| in the presence of: | ) |
| | |
| Witness' signature: | ) |
| Witness' name: | ) |
| Witness' address: | ) |


**SECURITY AGENT**

| | |
|---|---|
| **SIGNED** by | ) |
| duly authorised | ) |
| for and on behalf of | ) |
| **CIT FINANCE LLC** | ) |
| in the presence of: | ) |
| | |
| Witness' signature: | ) |
| Witness' name: | ) |
| Witness' address: | ) |

54148659v3

**PORT OF NEW YORK**
OFFICE OF THE DEPUTY COMMISSIONER
OF MARITIME AFFAIRS OF THE
REPUBLIC OF LIBERIA

*Dec 30*, 20 *14*

Received for record at *5* h *11* m *A*. M. *E.S.T.*

Recorded in BOOK *PM66* at PAGE *1019*.

(SEAL)

Deputy Commissioner of Maritime Affairs
of the Republic of Liberia



# THE REPUBLIC OF LIBERIA
## LIBERIA MARITIME AUTHORITY

99 Park Avenue, Suite 1830
New York, NY, 10016, USA
Tel: +1 212 697 3434
Fax: +1 212 697 5655
E-mail: registrations@liscr.com
Website: www.liscr.com

### OFFICE OF THE DEPUTY COMMISSIONER
### OF MARITIME AFFAIRS OF THE
### REPUBLIC OF LIBERIA

**I HEREBY CERTIFY THAT** the within is a true copy of the instrument received for record and recorded in this office in

**BOOK** PM 66 at **PAGE** 1019 on: 30th Day, December Month, 2014 Year

At 5 h, 11 m, A. M, E ST.

**Name of Vessel :** VIGOROUS

**Official Number :** 16411

**GIVEN** under my hand and seal this
5th day of August 20 15.

Yvonne Clinton
Deputy Commissioner
Maritime Affairs