# EXHIBIT 12

COPY

IN THE HIGH COURT OF SOUTH AFRICA

KWAZULU-NATAL LOCAL DIVISION, DURBAN
(Exercising its Admiralty Jurisdiction)

Case No: A63/2015

Name of Ship: mv "VIGOROUS"

In the matter between:

PACIFIC GULF SHIPPING COMPANY LIMITED                                    Applicant

and

mv "VIGOROUS"                                                             First Respondent
VIGOROUS SHIPPING & TRADING S.A.                                         Second Respondent

## REASONS FOR JUDGMENT

<u>Vahed J</u>:

[1]     On 6 August 2015 and at the instance of the applicant Mbatha J, *ex parte* and in chambers, granted an Order for the arrest of the first respondent, which in its material portion read as follows:-

> "2. The Sheriff for the district of Richards Bay is hereby authorised and directed to arrest the MV VIGOROUS (the "**vessel**") at the port of Richards Bay, alternatively while the vessel is at anchorage outside the port of Richards Bay, in terms of section 5(3) of the Admiralty Jurisdiction Regulation Act 105 of 1983 as amended (the "**Admiralty Act**") for the purpose of providing security for claims that the Applicant has advanced in Arbitration proceedings in London against the

Adamastos Shipping & Trading SA ("Adamastos Shipping") in the amount of US$37,300,000.00 plus interest and legal costs.

3. The Sheriff is hereby authorised and directed to release the vessel from arrest upon provision of security to the satisfaction of the Registrar or the Applicant's attorneys in the amount of USD49,981,697.10 or the value if the property, whichever is the lesser."

[2]     The respondents sought to have the grant of that Order reconsidered and it was set down before me on 11 August 2015 for that purpose. No additional papers were delivered on behalf of the respondents, the matter being argued on the founding papers alone with the respondents' contending that a case had not been made out for the arrest. After hearing argument from Mr Pammenter SC who appeared for the applicant both before me and before Mbatha J and from Mr Mullins SC who appeared before me for the respondents I granted an Order, on 11 August 2015, setting aside the arrest and dismissing the application with costs, such costs to include the costs of Senior Counsel.

[3]     I have been requested to furnish reasons for that order which I now do. I pause to observe that although reasons were requested some time ago they are only being delivered now because of a confusion which arose on my part as a result of subsequent communications that unfolded between Mr Pammenter and myself as to the necessity for these reasons. I accept sole responsibility for that misunderstanding and regret the delay in furnishing these reasons.

[4]     The underlying facts are these.

[5]     The founding affidavit in support of the arrest is, as is usual in matters of this nature, deposed to by the applicant's South African attorney who discloses that the source of the information contained in the affidavit is obtained from solicitors and others based in the United Kingdom. In other words the factual allegations contained in the affidavit, other than those which can be gleaned from either reliable or common cause documents annexed to the affidavit, are entirely of a hearsay nature. Again I make that observation not as an adverse remark but simply to point out that this application fell within the normal and usual "security arrest" type application that is frequently on the Court rolls where the Court exercises its Admiralty Jurisdiction.

[6]     The founding affidavit sets out the underlying basis and I quote from it liberally:-

> "11. In this application the Applicant seeks an order in terms of section 5(3)(a) of the Admiralty Jurisdiction Regulation Act, 105 of 1983 ("the Admiralty Act") for the arrest of the vessel as an vessel associated with the **MV ADAMASTOS** in order to obtain security for a claim which the Applicant has referred to arbitration in London against Adamastos Shipping & Tradind S.A. ("**Adamastos Shipping**"), the registered owner of the MV Adamastos.
>
> 12. The claim to be asserted in the arbitration proceedings against Adamastos Shipping arises out of a breach by Adamastos Shipping of a Charteparty agreement concluded by it with the Applicant on 14 June 2013 pursuant to which the applicant chartered the **MV ADAMASTOS**."

[7]     As for the allegations as to association the founding affidavit made the following allegations:-

"41. The Applicant seeks an order for the arrest of the vessel on the grounds that it is an associated ship of the mv "ADAMASTOS", as contemplated by sections 3(6) and 3(7) of the Admiralty Act.

42. As stated above, the mv "Adamastos" is owned by Adamastos Shipping. This is apparent from the Permanent Certificate of Registry issued by the Republic of Liberia on 03 June 2013, a copy of which I annex marked "PJF5".

43. As will furthermore be apparent from what has been stated above, Adamastos Shipping is incorporated in Liberia. The Liberia Corporate Registry, like many other jurisdictions favoured by most ship-owners for the incorporation of ship owning special purpose entities, limits the disclosure of company information. The limitation applies particularly to company shareholding, and it is accordingly not possible for members of the public to obtain details of the shareholding in the Adamastos Shipping via a search at the registry.

44. I refer as well to a Report prepared by Infospectrum dated 27 February 2015 a copy of which I attach marked "PJF6".

45. This Report identifies Adamastos Shipping as the registered owner of the MV Adamastos, describes Phoenix Shipping as its manager and significantly states that it is beneficially owned by the Gourdomichalis brothers, George and Stathis Gourdomichalis, both of whom incidentally are also described as executives of Phoenix Shipping.

46. Finally with regard to PJF6, Blue Wall Shipping Limited, Marshall Islands, and Blue Wall Capital Limited, United Kingdom, are described as "affiliates".

47. I also annex marked "PJF7" an extract from the Blue Wall Shipping Limited website which identifies George and Stathis Gourdomichalis as the Chief Executive Officer and the Chief Operating Officer, respectively.

48. Annexure PJF7 also identifies Blue Wall Shipping Limited as the owner and operator of "Handysize, Handymax and Supra vessels".

49. I also annex marked "PJF8" a further extract from the Blue Wall Shipping Limited website which indicates that "Blue Wall Shipping owns and operates the vessels listed below...". Amongst those listed is the vessel.

50. In the premises, the irresistible inference is that the MV Adamastos and the vessel are beneficially owned by George and Stathis Gourdomichalis who as executives and shareholders of both Blue Wall Shipping Limited, Adamastos Shipping and the Second Respondent have the power to control the destiny of each such company.

51. This is corroborated by the fact that the Gourdomichalis brothers are also executive officers of Phoenix Shipping, which is the approved manager of all the vessels in the group, including the MV Adamastos and the vessel. As we have pointed out at 42 above, Phoenix Shipping held itself out as the beneficial owner of the vessel.

Finally, in this regard, I refer to an extract from Ship2Shore an online magazine of maritime and transport economics dated 26 May 2014 marked "PJF9". I refer in particular to the penultimate paragraph on the first page thereof where, inter alia, in relation to "their fleet" it is stated that the **'latest injection was the Vigorous, the former 52,200 dwt Tropical Queen, built in Japan (Tsuneishi) and also on their fleet is the Adamastos, a panamax that was built in 1999'.**"

[8]     It will be appreciated that the three documents identified as "PJF6", "PJF7" and "PJF8" lie at the heart of the applicant's assertions as to proof of association between the mv Vigorous and the mv Adamastos.

[9]     I deal firstly with the document referred to in paragraph 44 of the founding affidavit, i.e. the report prepared by InfoSpectrum. If regard is had to the InfoSpectrum report it will be seen that it was prepared for a client identified as

Kopak Shipping Co an entity that is not described on the papers nor is its relationship to the applicant disclosed. However I take that observation no further.

[10] The InfoSpectrum report contains the following disclaimer:-
"Please note this document: (i) is only valid as at its date of issue; (ii) represents the current opinions of Infospectrum as at the date of its issue, which Infospectrum has endeavoured to substantiate through appropriate research but the accuracy of any facts stated or of any statements made in this document cannot be guaranteed; and (iii) does not constitute a definitive or conclusive judgement of a particular entity's worth or financial standing. The document should be used as a tool in assessing the subject company and not as the recipient's sole basis for any decision – or in substitution for the recipient's due diligence – in deciding whether or how to trade with the subject company or otherwise. Infospectrum excluded and disclaims any and all liability and responsibility to any entity or person who relies on the document or any part of it or on any information contained within it."

[11] In the InfoSpectrum report the shareholders of the company identified as Adamastos Shipping and Trading S.A. (i.e. the registered owners of the mv Adamastos) are described as "... shareholders: not disclosed due to company's Liberian registration. _Understood_ to be beneficially owned by George D. and Stathis D. Gourdomichalis." [my emphasis]. In the section dealing with the directors of Adamastos Shipping and Trading S.A. the report indicated that this information is "...[n]ot disclosed due to company's Liberian Registration". A section dealing with the manager of the company describes it as being managed for Phoenix Shipping and Trading S.A. and describes the two Gourdomichalis brothers as the Chief Executive Officer ("CEO") and the Chief Operations Officer ("COO") respectively.

[12] The report then outlines certain historical information and describes Phoenix Shipping and Trading S.A. ("PST") as a "_perceived affiliate company_" [my

emphasis]. In a section of the InfoSpectrum report under the heading "operations" the following appears:-

> "PST currently provides commerical and technical management services to nine bulk carriers, comprising one Panamax (the aforesaid mv Adamatos), two Supramax, two Handymax, and four Handysize units, of which eight are understood to be operating at this time (see Developments section). As is customary practice in Greek shipping, all of the ships managed by PST are registered under the nominal ownership of separate offshore companies (in this case all domiciled in Liberia), concealing ultimate beneficial control, which for eight of the vessels is understood to lie with the Gourdomichalis brothers and private equity investors through Blue Wall (according to the latter's website), with the subject vessel understood to be controlled by the Gourdomichalis brothers (without the presence of external investment partners)."

[13]    The reference to "Blue Wall" in the paragraph quoted above appears to be a reference to Blue Wall Shipping Limited, Marshall Islands which is described in the InfoSpectrum report as being an affiliate of Adamastos Shipping and Trading S.A..

[14]    Annexure PJF7 to the founding affidavit contains an extract from Blue Wall Shipping's website it discloses that the Gourdomichalis brothers are the CEO and COO of Blue Wall respectively.

[15]    A further extract from Blue Wall Shipping's website appears annexed to the founding affidavit as PJF8 that extract describes the fleet which significantly does not include the mv Adamastos. The link in the founding affidavit to the Adamastos is made by reference to annexure PJF9 to the founding affidavit which is an extract from an online shipping magazine known as "Ship2Shore". In an article dated 26 May 2014 concerning Blue Wall and the Gourdomichalis Brothers reference is made to the mv Adamastos being a recent addition to the Blue Wall Shipping Fleet.

[16]   The picture however will not be complete without returning to the conclusion and assessment made in the InfoSpectrum report under the heading "assessment". That section reads as follows:-

> "Adamastos Shipping & Trading S.A. (AST) is a private company, registered in Liberia in November 2012. Subject to obtaining documentary confirmation from the respective flag registry, is the registered owner for the 1995-built Panamax bulk carrier mv Adamastos, a vessel regarded as ultimately controlled by interests affiliated to the Gourdomichalis brothers, George and Stathis. The mv Adamastos and AST are represented and managed by the perceived affiliate, Piraeus-based ship management affiliate Phoenix Shipping & Trading S.A. (PST).
>
> PST is a private limited company that was incorporated in 2011 in the Marshall Islands, and is understood to be controlled by the brothers George and Stathis Gourdomichalis. The principals come from a shipping family with their father Dracoulis Gurdomichalis being involved in ship owning since the late 1960s. It is worth mentioning that between 2006 and 2011, the Gourdomichalis brothers controlled a further ship management company called G. Bros Maritime S.A (G. Bros), which ran into financial difficulties and was phased out in 2011. PST was set up to front the Gourdomichalis brothers' return to the market, by initially putting two vessels under its management. PST currently manages a fleet of nine bulk carriers, although eight of these are currently operational; the vessels are mainly employed on time charters. With the exception of the mv Adamastos, the remaining eight vessels are understood to be ultimately controlled by Blue Wall Shipping Limited (Blue Wall) (according to the website of the latter). Blue Wall was established in February 2013 by the Gourdomichalis brothers along with undisclosed private equity investors. Between 2013 and 2014, Blue Wall's principals acquired eight bulk carriers, and have four more Handymax units currently on order. The negative market feedback regarding PST's payment performance suggests that the operation's cashflow is strained. The arrest of the mv Porto Maina in September 2014 due to a loan default, along with the troubled record of the mv Adamastos, warrant caution when considering credit dealings."

[17]    On that assessment can it be said that the controlling mind of the mv Adamastos is the same as the controlling mind of the mv Vigorous? In other words has a sufficient link been established between Blue Wall Shipping and the mv Adamastos?

[18]    As Mr Pammenter correctly pointed out the proof of the association is a vital element of the claim and suggested, with reference to *Gericke v Sack* 1978 (1) SA at 827 D – H and to the fact that the respondents have chosen not to put up any papers with regard to the present dispute that proof of the claim is best left to trial and that at present one must err on the side of caution to protect the association alleged.

[19]    It appeared common cause as to the incidence of the onus and here I was referred to paragraphs 39 and 40 in *mv Silver Star: Owners of the mv Silver Star v Hilane Ltd* 2015 (2) SA 331 (SCA):-

> "[39] It is well settled that Hilane bears the onus of demonstrating that the arrest was justified and this includes proving the alleged association on a balance of probabilities (*Cargo Laden and Lately Laden on Board The MV Thalassini Avgi v MV Dimitris* 1989 (3) SA 820 (A) at 834F – G; Bocimar supra at 518B – E). but, as Wallis observes (at 292):
>
>> 'The task of proving the association is complicated by the relative inaccessibility of the key information required to demonstrate the identity if the person or persons who control the two ship-owning companies .... In the circumstances an applicant for arrest is confronted with the heavy burden of proving a disputed matter in a balance of probabilities on the papers when it has no direct access to the relevant information and may well be confronted with the withholding of information, disingenuousness and downright dishonestly.'

In view of that difficulty the fact that the response to an allegation that there is an association between two vessels is untruthful, evasive and economical on detail will be a relevant factor in determining whether the applicant has discharged the onus of proof resting on it.

[40] The purpose of the Act is to make the loss fall where it belongs by reason of ownership, and in the case of a company, ownership or control of the shares (the *Berg* supra at 712A). And, as Marais JA pointed out (albeit in a minority judgment) in *MV Heavy Metal: Belfry Marine Ltd v Palm Base Maritime SDN BHD* 1999 (3) SA 1083 (SCA) (Heavy Metal) para 4:

> 'The way in which this was done was, first, by describing in s 3(7)(a)(i), (ii) and (iii) the circumstances in which ships were to be regarded as associated and, secondly, by enacting certain deeming provisions in s 3(7)(b) (i), (ii) and (iii) which are obviously designed not only to defeat defensive stratagems which ship owners might deliberately deploy to ward off potential arrests of associated ships by disguising their ownership or their control of such ships, but also to allow it to be shown even in a case where no such motive existed where power of control *really* lay'

Those sections require that in relation to both the ship concerned and the associated ship a 'person' must be identified who 'controls' (or controlled) the companies in question. The level of control required is that the person must control the overall destiny of the company (The *Kadirga 5 (No 1) JA Chapman & Co Ltd v Kadigra Denizcilik ve Ticaret AS* SCOSA C12 (N) at C14E). In his consideration of the concept of control as employed in the Act in *Heavy Metal* para 8, Smalberger JA, writing for the majority (Nienaber JA and Melunsky AKA concurring) expressed himself thus:

> 'The subsection [3(7)(b)(ii)] elaborates upon and refined the concept of control by that person. Control is expressed in terms of power. If the person concerned has power, directly or indirectly, to control the company he/she shall be deemed (geag ... word) to control the company. Power is not circumscribed in the Act. It can be the power to

manage the operations of the company or it can be the power to determine its direction and fate. Where these two functions happen to vest in different hands, it is the latter which, in my view, the Legislature had in mind when referring to power and hence to control.'

According to Wallis (at 187) the process of comparison that follows upon this identification is intended to be a simple one. He adds:

'The maritime claimant identifies the party who controls the company that owned the ship concerned and identifies the party who controls the company that owns the associated ship that it seeks to arrest, the result of those exercises is then compared. If they correspond, in the sense that the same person or persons control both companies, then the requisite association is established. If they are not the same then the association is not established.'"

[20]    I however agree with the submission made by Mr Mullins that there must be at least some evidence based on actual fact and not mere suggestion and conjecture. The essence of proof of association is to establish that the same person or persons have the power to determine the direction and fate of the two ships in question. In this regard I was referred to *mv Heavy Metal: Belfry Marine v Palm Base Maritime SDN BDH* 1999 (3) SA 1083 (SCA) at paragraph 8 (quoted in part above):

"The subsection elaborates upon and refines the concept of control by that person. Control is expressed in terms of power. Of the person concerned has power, directly or indirectly, to control the company he/she shall be deemed (geag ... word) to control the company. 'Power' is not circumscribed in the Act. It can be the power to manage the operations of the company or it can be the power to determine its direction and fate. Where these two functions happen to vest in different hands, it is the latter which, in my view, the Legislature had in mind when referring to 'power' and hence to 'control'. In South African legal terminology that means (essentially for the

reasons given by the Court a quo at 1998 (4) SA 479 (C) at 492C – F ('the reported judgment); see also s 195 (1) of the Companies Act 61 of 1973) the person who controls the shareholding in the company. Foreign law is a question of fact. If the appellant wished to make out a case that the law of the Republic of Cyprus differed significantly from the law of South Africa, it should have adduced evidence to that effect. It did not do so. Consequently there is no reason to surmise that the applicable law in Cyprus differs materially from that of South Africa (cf *Caterham Car Sales & Coachworks Ltd v Birkin Cars (Pty) Ltd and Another* 1998 (3) SA 938 (SCA) at 954B – E)'

[21]   On the papers before me it seems that the attempts to establish a link between the mv Adamastos and the mv Vigorous via Blue Wall Shipping boils down to being mere suggestion and conjecture. In my view it is crucial that the InfoSpectrum report understands that the mv Adamastos is controlled by the Gourdomichalis brothers alone without the presence of external investment partners while the remainder of the so called fleet within Blue Wall is controlled by entities which are not described, the high water mark being that the Gourdomichalis brothers are involved in Blue Wall Shipping but with additional external investors who might or might not have an influence with regard to the direction and fate of the vessels in their fleet.

[22]   That situation brings to mind what was said by Magid J in *East Cross Sea Transport Inc v Elgin Brown and Hamer (Pty) Ltd* 1992 (1) SA 102 (D) at 107 E – F:-

"If they had common directors, those directors, acting together would have controlled the management of the companys' affairs. That is not, however, to say that they controlled the shares in the companies for there is a vast conceptual and factual

difference between control of the management of a company's affairs and control of the shares in that company; and, as appears clearly from s3(7)(a)(ii) of the Act, the ownership [and control] of shares is the sole criterion of association contained therein".

[23]  In the result I was not convinced that there was sufficient in the founding papers that required the respondent to put up an affidavit in order to deal with the question of association. The founding affidavit, did not, in my view, go far enough to overcoming the hurdle imposed by the onus and consequently I found that upon reconsideration the arrest had to be set aside which is why I made the order that I did.

_____
Vahed J